Nos. 12-1369, 12-1417 & 12-1494

_____

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

UNITED STATES EX REL.
KURT BUNK & RAY AMMONS

Plaintiffs-Appellants/Cross-Appellees,

v.

BIRKART GLOBISTICS, GmbH & Co., et al.,

Defendants-Appellees/Cross-Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

_____

BRIEF FOR THE UNITED STATES AS APPELLANT

_____

STUART F. DELERY
  Acting Assistant Attorney General
NEIL H. MacBRIDE
  United States Attorney
MICHAEL S. RAAB
  (202) 514-4053
JEFFREY CLAIR
  (202) 514-4028
  Attorneys, Civil Division
  Room 7243, Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530

_____

_____

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . 2

STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.    Statement of the Case and Course of Proceedings. . . . . . . . . . . . . . . 2

    2.    Statute Involved. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    3.    Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        a.    International Through Government Bill of
                Lading Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        b.    The "Landed Rate" Conspiracy. . . . . . . . . . . . . . . . . . . . . . . 7

        c.    Fraud In Direct Procurement Method
                Contracting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    4.    Related Criminal Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    5.    District Court Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        a.    Covan Bid-Rigging Claims. . . . . . . . . . . . . . . . . . . . . . . . . . 15

        b.    Cartwright Bid-Rigging Claims. . . . . . . . . . . . . . . . . . . . . . . 16

        c.    Landed Rate Price Fixing Claim. . . . . . . . . . . . . . . . . . . . . . 18

        d.    Direct Procurement Method Claim. . . . . . . . . . . . . . . . . . . . 19

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.    The Excessive Fines Clause Does Not Bar The
      Imposition Of A Substantial Monetary Penalty On
      Defendants Who Have Submitted Thousands Of
      False Claims To The Government. . . . . . . . . . . . . . . . . . . . . . . . . 25

      A.    The Court, Upon Determining That A
            Statutorily Mandated Penalty Is Excessive,
            Must Remit The Penalty To An Amount
            That Comports With The Eighth Amendment. . . . . . . . . . . . 28

      B.    The United States Has Prosecutorial
            Discretion To Seek Statutorily Authorized
            Penalties For A Limited Subset Of The
            Number of False Claims Proven At Trial. . . . . . . . . . . . . . . 32

      C.    The Requested Penalties Are Not Grossly
            Disproportional To Defendants'
            Misconduct And Therefore Comport With
            The Excessive Fines Clause. . . . . . . . . . . . . . . . . . . . . . . . . . 38

II.   Defendants' Price Fixing Agreement On "Landed
      Rates" Is Not Made Lawful By The Shipping Act. . . . . . . . . . . . . . 46

      A.    The "Landed Rate" Agreement Is Unlawful
            Under This Court's Existing Precedent. . . . . . . . . . . . . . . . 47

      B.    The Shipping Act's Antitrust Exception For
            Agreements Concerning The "Foreign Inland
            Segment" of Through Transportation Is
            Limited To Ocean Common Carriers And
            Marine Terminal Operators And Therefore
            Cannot Apply To Defendants. . . . . . . . . . . . . . . . . . . . . . . . 50

-ii-

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

REQUEST FOR ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

RULE 32 CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . 62

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

## TABLE OF AUTHORITIES

### Cases:

*Ayotte v. Planned Parenthood of Northern New Eng.*,
    546 U.S. 320 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27, 29, 32

*BMW of North America, Inc.* v. *Gore*, 517 U.S. 559
    (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 43-44

*Carnation Co. v. Pacific Westbound Conference*,
    383 U.S. 213 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 56

*Cook County, Illinois v. United States ex rel. Chandler*,
    538 U.S. 119 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*FMC v. Seatrain Lines, Inc.*, 411 U.S. 726 (1973). . . . . . . . . . . . . . 14, 25, 52, 56

*Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hudson v. United States*, 522 U.S. 93 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Ignacio v. United States*, 774 F.3d 252 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . 25

*Kawasaki Kisen Kaisha, Ltd v. Regal-Beloit Corp.*,
    130 S. Ct. 2433 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Kemezy v. Peters*, 79 F.3d 33 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Nat. Fed. of Indep. Business v. Sebelius*, No. 11-393
(U.S. June 28, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Peterson v. Weinberger*, 508 F.2d 45 (5th Cir. 1975).. . . . . . . . . . . . . . . . . . . . . 31

*Philbrook v. Glodgett*, 421 U.S. 707 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Plaquemines Port, Harbor, and Terminal Dist. v. FMC*,
838 F.2d 536 (D.C. Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Puerto Rico Ports Auth. v. FMC*, 919 F.2d 799 (1st Cir. 1990). . . . . . . . . . . . . . 51

*Toepleman v. United States*, 263 F.2d 697 (4th Cir. 1959). . . . . . . . . . . . . . . . . 41

*Transpacific Westbound Rate Agreement v. FMC*,
951 F.2d 950 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States ex rel. Bahrani v. Conagra, Inc.*,
465 F.3d 1189 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States ex rel. Koch v. Koch Indus., Inc.*,
57 F. Supp. 2d 1122 (N.D. Okl. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1942). . . . . . . . . . . . . . . . 18

*United States ex rel. Smith v. Gilbert Realty Co., Inc.*,
840 F. Supp. 71 (E.D. Mich. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Advance Tool Co.*, 902 F. Supp. 1011
(W.D. Mo, 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Ahmad*, 213 F.3d 805 (4th Cir.), *cert. denied*,

-iv-

531 U.S. 1014 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Bajakajian*, 524 U.S. 321 (1998). . . . . . . . . . . . . . . . . . . . 27, 38

*United States v. Bajakajian*, 524 U.S. 328 (1998). . . . . . . . . . . . . . 23, 25, 40, 43

*United States v. Bickel*, No. 02-3144, 2006 WL 1120439
    (C.D. Ill. Feb. 22, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States. v. Bieri*, 21 F.3d 819 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . . 31

*United States v. Bollin*, 264 F.3d 391 (4th Cir. 2001). . . . . . . . . . . . . . . . 39, 42

*United States v. Brown*, 274 F.2d 107 (4th Cir. 1960). . . . . . . . . . . . . . . . . . . 34

*United States v. Cato Bros., Inc.*, 273 F.2d 153 (4th Cir. 1959).. . . . . . . . . . . . 34

*United States v. Gosselin World Wide Moving N.V.*,
    333 F. Supp. 2d 497 (E.D. Va. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 14, 54

*United States v. Gosselin World Wide Moving N.V.*,
    411 F.3d 502 (4th Cir. 2005). . . . . . . . . . . . . . 14, 19, 24, 47, 48, 50, 56, 60

*United States v. Halper*, 490 U.S. 435 (1989). . . . . . . . . . . . . . . . . . . . . . 30, 31

*United States* v. *Jalaram, Inc.*, 599 F3d. 347 (4th Cir. 2010). . . . . . . . . . . . . . 42

*United States v. Jiminez*, 507 F.3d 13 (1st Cir. 2007). . . . . . . . . . . . . . . . . . . 44

*United States v. Mackby*, 339 F.3d 1013 (9th Cir. 2003),
    *cert. denied*, 541 U.S. 936 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 39

*United States v. McNinch*, 356 U.S. 595 (1958). . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Neifert-White Co.*, 390 U.S. 228 (1968). . . . . . . . . . . . . . . . . 26

*United States v. Newport News Shipbuilding & Dry Dock Co.*,

571 F.2d 1283 (4th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Real Property in Eldorado County,*
59 F.3d 974 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Sarbello*, 985 F.2d 716 (3d Cir. 1993). . . . . . . . . . . . . . . . . . 31

*United States v. Tucor International, Inc.,*
189 F.3d 834 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . 19, 55, 56, 57, 58, 60

*Vermont Agency of Natural Resources v. United States ex rel.*
*Stevens*, 529 U.S. 765 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## United States Constitution:

Double Jeopardy Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Due Process Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Excessive Fines Clause, 8th Amend.. . . . . . . . . .  2, 3, 21, 23, 25, 26, 27, 38, 46

## Statutes:

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

False Claims Act:

31 U.S.C. § 3729 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5
31 U.S.C. § 3729(a)(2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 34
31 U.S.C. § 3729(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
31 U.S.C. § 3729(a)(1)(2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
31 U.S.C. § 3729(a)(1)(B)(Supp. IV 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 4
31 U.S.C. § 3729(a)(1)(C)(Supp. IV 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 4
31 U.S.C. § 3730. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
31 U.S.C. § 3730(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 33
31 U.S.C. § 3730(a) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
31 U.S.C. § 3730(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2
31 U.S.C. § 3730(b)(1) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

31 U.S.C. § 3730(b)(2) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 33
31 U.S.C. § 3730(c)(3) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 33
31 U.S.C. § 3730(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
31 U.S.C. § 3130(c)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
31 U.S.C. § 3730(d) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
31 U.S.C. § 3131(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
31 U.S.C. § 3732. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Shipping Act of 1984, Pub. L. No. 98-237,
    98 Stat. 67 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

46 U.S.C. app. § 1701 note. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
46 U.S.C. app. § 1702(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
46 U.S.C. app. § 1702(a)(24) (2000). . . . . . . . . . . . . . . . . . . . . 14
46 U.S.C. app § 1702(14). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
46 U.S.C. app § 1702(16). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
46 U.S.C. app. § 1703(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
46 U.S.C. app. § 1703(b)(1). Section 5. . . . . . . . . . . . . . . . . . . . 53
46 U.S.C. app. § 1704. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
46 U.S.C. app. § 1704(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
46 U.S.C. app. § 1704(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
46 U.S.C. app. § 1705. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
46 U.S.C. app. § 1706(a)(1)),. . . . . . . . . . . . . . . . . . . . . . . . . . . 54
46 U.S.C. app. § 1706(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
46 U.S.C. app. § 1706(a)(4) (2000). . . . . . . . . . . 2, 13, 14, 47, 48, 54
46 U.S.C. app. § 1707(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
46 U.S.C. app. § 1709. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
46 U.S.C. app. § 1709(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
46 U.S.C. app. § 1709(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
46 U.S.C. app. § 1709(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
46 U.S.C. app. § 1710(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
46 U.S.C. § 55302. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
46 U.S.C. § 40307(a)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Pub. L. No. 101-410, § 2, 104 Stat. 890 (1990). . . . . . . . . . . . . . . . . . . . . . 26
Pub. L. No. 109-304, § 2, 120 Stat. 1485 (2006). . . . . . . . . . . . . . . . . . . . 47
Pub. L. No. 111-21, § 4, 123 Stat. 1621 (2009). . . . . . . . . . . . . . . . . . . . . 4

Pub. L. No. 111-21, § 4(f)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 516. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Regulations:**

48 C.F.R. 52.203-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
48 C.F.R. 247.570(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Rules:**

Fed. R. Civ. P. 54(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 15
Fed. R. Evid. 201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**Legislative Materials:**

H.R. Rep. No. 98-53, Pt. I, 98th Cong., 1st Sess. 5-6 (1983),
     *reprinted in* 1984 U.S.C.C.A.N. 167, 170-71. . . . . . . . . . . . . . 51, 52, 53, 56

S. Rep. No. 99-345, 99th Cong., 2d Sess. 2, *reprinted in*
     1986 U.S.C.C.A.N. 5266. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 41, 42

**Miscellaneous:**

Richard A. Posner, *Economic Analysis of Law* 262,
     277 (8th ed. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

52 Official Journal of the European Union 16
     (European Commission August 11, 2009),
     *<available at* http://eur-lex.europa.eu/LexUriServ/
     LexUriServ.do?uri=OJ:C:2009:188:0016:0018:EN:PDF>,
     *as modified by* General Court of the European Union
     (Eighth Chamber), Case T-208/08 (June 16, 2011)
      *<available at <*http://eur-lex.europa.eu/LexUriServ/
     LexUriServ.do?uri=CELEX:62008TJ0208:EN:HTML>. . . . . . . . . . . . . . 45

*Restatement (3d) of Foreign Relations* § 483 08   . . . . . . . . . . . . . . . . . . . . . . . 46

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

Nos. 12-1369, 12-1417 & 12-1494

_____

UNITED STATES EX REL.
KURT BUNK & RAY AMMONS

Plaintiffs-Appellants/Cross-Appellees,

v.

BIRKART GLOBISTICS, GmbH & Co., et al.,

Defendants-Appellees/Cross-Appellants.

_____

BRIEF FOR THE UNITED STATES AS APPELLANT

_____

**STATEMENT OF JURISDICTION**

1.  This is a False Claims Act case initially filed by private relators as a *qui
tam* action brought on behalf of the United States.  *See* 31 U.S.C. § 3730(b).  The
district court had subject matter jurisdiction under 31 U.S.C. §§ 3730 and 3732.

2.  On February 14, 2012, the district court entered a Fed. R. Civ. P. 54(b)
final judgment disposing of all the claims asserted against defendants Gosselin
World Wide Moving, N.V., Gosselin Group, N.V., and Marc Smet.  Clerk's
Notation of Record ("CR.") 1132.  The United States filed a timely notice of
appeal on April 13, 2012.  CR. 1146.  This Court has appellate jurisdiction under

28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.  Whether, as applied to these defendants, the civil money penalty provisions of the False Claims Act, 31 U.S.C. § 3729(a), violate the Excessive Fines Clause of the Eighth Amendment.

2.  Whether an agreement to fix prices charged to the Department of Defense for the movement of military and civilian household goods within Germany is exempted from antitrust law liability by section 7(a)(4) of the Shipping Act, 46 U.S.C. app. § 1706(a)(4) (2000), and is therefore lawful for purposes of the False Claims Act.

## STATEMENT

1.  <u>Statement of the Case and Course of Proceedings</u>.

This is a False Claims Act case brought to recover treble damages and civil money penalties for defendants' bid rigging, collusive price fixing, and other fraudulent conduct in obtaining contracts for transporting the household goods of U.S. military and civilian personnel stationed overseas.  The case originated as a *qui tam* action filed in the Eastern District of Virginia by relators Kurt Bunk and Daniel Heuser.  *See* 31 U.S.C. 3730(b).  A third relator, Ray Ammons, later filed a separate *qui tam* action in the Eastern District of Missouri arising out of some of

-2-

the same conduct.  That action was transferred to the Eastern District of Virginia

and consolidated with the case on appeal here.  The United States intervened as to

some of the claims asserted by relators and filed a separate complaint in

intervention.  *See* 31 U.S.C. § 3730(c).  The United States thereafter assumed

primary responsibility for litigating the claims as to which it intervened.  *Ibid.*  The

relators retained primary responsibility for litigating the "non-intervened" claim

and remained parties to the proceeding.  *See ibid*.

The district court concluded that defendants were not liable for damages

with respect to any of the claims asserted by the United States and the relators.   It

further concluded that, as to one claim, the False Claims Act's civil money

penalties provision violated the Excessive Fines Clause of the Eighth Amendment

and could not constitutionally be applied to the defendants.  Though additional

claims against other defendants remain unresolved, the district court concluded

that there is no just reason for delay and, *sua sponte*, entered a final judgment as to

several of the defendants under Fed. R. Civ. P. 54(b).[1]  Joint Appendix ("JA.")

1618-21.  The United States, the private relators, and the judgment defendants

---

[1] After entry of judgment, the United States filed a motion asking the court
to clarify the bases for a Rule 54(b) certification.  CR. 1142.  Defendants opposed
the motion, stating that "[n]o parties are challenging the Rule 54(b) certification"
and asserting that the certification was adequately supported.  CR. 1145 at 4, 6.
The district court denied the motion for clarification on April 26, 2012.  JA. 1622.

have each appealed.

    2. <u>Statute Involved</u>.

    The False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*., prohibits the submission of false or fraudulent claims for payment to the United States.[2]  A violation of the FCA occurs when a person "knowingly presents, or causes to be presented" to the government "a false or fraudulent claim for payment or approval," 31 U.S.C.  § 3729(a)(1)(2006), "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B)(Supp. IV 2010), or "conspires to commit" such a violation or other misconduct specified in the statute, 31 U.S.C. 3729(a)(1)(C) (Supp. IV 2010).   Violators are liable to the United States for civil penalties and treble damages.  31 U.S.C. § 3729(a)(2006).

    Suits to collect statutory damages and penalties may be brought either by

---

    [2] The FCA was amended in 2009.  Pub. L. No. 111-21,§ 4, 123 Stat. 1621 (2009).  The amendments were enacted on May 20, 2009, generally apply to conduct on or after that date, and were principally intended to clarify rather than change the prior law.  *Id.,* § 4(f).  Defendants' conduct occurred between 2000 and 2002 and is thus in most instances governed by the prior law.  The amendments now codified at 31 U.S.C. § 3729(a)(1)(B), however, were intended to apply to claims pending on or after June 7, 2008, and thus would apply to the claims here, which were filed in 2002 and not resolved until 2012.  *See* Pub. L. No. 111-21, § 4(f)(1).  We cite to the appropriate version of the statute in each instance but note that the amendments do not affect the issues presented here.

-4-

the Attorney General of the United States or by a private person (known as a relator) in the name of the United States, in an action referred to as a *qui tam* suit. 31 U.S.C. §§ 3730(a) & (b)(1) (2006). *See Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U.S. 765, 769-78 (2000). When a *qui tam* action is filed, the government may intervene and take over the case. 31 U.S.C. §§ 3730(b)(2), & (c)(3) (2006). If the government declines to intervene, the relator may conduct the litigation. In either event, if the judgment awards damages and/or civil penalties, the proceeds are divided between the government and the relator. 31 U.S.C. § 3730(d) (2006).

     3. <u>Statement of Facts</u>.

     a. <u>International Through Government Bill of Lading Program</u>.

Under its International Through Government Bill of Lading program, the Department of Defense establishes the prices for moving household goods between the United States and foreign countries through a competitive bidding process. Bidders must submit a rate for providing door-to-door transportation services between a foreign country and the United States. The rates filed for such "door-to-door" service are known as "through rates." Separate "through rates" are established for specific traffic routes or "channels" between a foreign country and each state. There are thus, for example, separate rates for traffic between Germany

and Virginia or Germany and Maryland. JA. 1120-21.

At the times pertinent here, "through rates" were set through a two-step bidding process for each shipping season. In the first step, carriers or freight forwarders submit bids offering rates for a specific traffic channel. DoD then determines the five lowest rates for each traffic channel. The lowest rate bid for a channel establishes the "prime through rate," and the successful low bidder is guaranteed a certain percentage of the total shipping volume in that channel for the pertinent bidding cycle. In the next step, other carriers or freight forwarders are offered a chance to match one of the lowest five bids submitted in the first round. Second round bidders who match the "prime through rate" are also ensured a certain percentage of shipping volume during the rate cycle. Carriers may submit bids at a higher rate as well, but they will not be awarded any shipments until the capacity of all lower-rate bidders has been exhausted. JA. 1121-22.

DoD issues the carrier or freight forwarder an "International Through Government Bill of Lading" for each shipment awarded a successful bidder.[3] A carrier or freight forwarder that accepts the shipment is then solely responsible for

---

[3] A "bill of lading" records that a carrier has received goods from the shipper, states the terms of carriage, and serves as evidence of the contract for carriage. A "through" bill of lading covers both the ocean and inland portions of the transport in a single document. *See Kawasaki Kisen Kaisha, Ltd* v. *Regal-Beloit Corp.*, 130 S. Ct. 2433, 2439 (2010).

ensuring door-to-door transportation of the household goods.  JA. 275-76; 1122.

That may in turn involve a series of discrete steps and services.  For a shipment

originating in a foreign country, these may include household packing and

transportation to a foreign port, loading the goods onto a vessel and handling

customs and other clearance matters, ocean transport to a U.S. port, unloading the

goods and clearing U.S. customs, transporting the goods to their final destination,

and unpacking.  JA. 1122.

      b.  <u>The "Landed Rate" Conspiracy</u>.

      Several of the claims asserted by the United States and relators arise out of

defendants' conduct with respect to the 2001 and 2002 bidding cycles in the

International Through Government Bill of Lading program.  During that time,

some of the defendants subcontracted with successful carrier/freight forwarder

bidders to provide what has been referred to in this litigation as a "landed rate" for

services within Germany and ocean transport to the United States during the

pertinent period.   A "landed rate" provider offered carriers or freight forwarders a

bundle of local packing and transportation services, foreign port services, and

ocean transport services for a single rate.  JA. 1123.

      The central allegations here are that defendants conspired to fix the price

charged carriers for the local packing and transportation component of the "landed

-7-

rate," and that the defendants further conspired to protect the fixed price by, in certain instances, rigging the bidding process to increase the Department of Defense rates paid to carriers, thereby ensuring that carriers would be compensated at levels high enough to pay the inflated rates for local services. JA. 276-81.

Specifically, in November 2000, defendants entered into an agreement, referred to in the litigation as the Sonthofen Agreement, to raise the rates paid for local packing and transportation services in Germany. The "landed rate provider" defendants agreed to raise the rates they would pay for local packing and transportation services. The local packing and transportation provider defendants in turn agreed that they would not work for a lower rate, thereby preventing carriers or freight forwarders from negotiating directly with local providers for a better price. JA. 1123-24. Approximately 70-80 percent of local service providers agreed to adhere to these fixed rates. Carriers and freight forwarders in turn relied on the fixed rate for these services in determining what to bid for the entire door-to-door service, thereby increasing the ultimate cost to DoD. *Ibid.*

The success of the price fixing agreement depended in part on whether carriers and freight forwarders would have the economic wherewithal to pay these inflated rates. In the years preceding the Sonthofen Agreement, several freight

-8-

forwarders that had established low "prime rates" in the bidding process had filed for bankruptcy, with the result that many of the German local agents, including a number of the defendants here, had been unable to collect payments due for their services. JA. 1125 n.6. Defendants, though not themselves bidding on shipping contracts, thus had an interest in ensuring that the DoD bidding process did not result in carrier rates that would be too low to cover their collusively inflated charges for local services.

There were two instances in which defendants conspired to inflate "prime through rates" believed to be too low for their needs. First, during a 2001 bidding cycle, an American freight forwarder, Covan International, was the low bidder and thus established the "prime through rate" for fourteen traffic channels between Germany and the United States. Defendants undertook a series of steps to pressure Covan into cancelling its low bid and to ensure a higher rate for these channels. JA. 1125-26. In particular, defendant Gosselin allegedly threatened to withdraw from an offer to finance Covan's purchase of equipment needed to transport household goods during the pertinent shipping season unless Covan cancelled its bid. JA. 279-80. The local service provider defendants collectively agreed to boycott Covan or any other carrier or freight forwarder that bid for shipments at the low, prime through rate first bid by Covan, or at any other rate

-9-

below the second lowest bid previously submitted.  JA. 279-81; 1125.  And

defendants collectively pressured other carriers to match the second lowest bid

rather than Covan's "prime through rate" during the next round of bidding.  As a

result, Covan cancelled its low bid and no other carrier finally matched Covan's

bid during the second round of bidding.  *Ibid*.

Second, defendants conspired to effect a similar increase in certain prime

through rates established in a 2002 bidding cycle.  An American freight forwarder,

Cartwright International Van Lines, Inc., was the low bidder in 26 traffic channels

during that cycle, including 12 channels between the United States and Germany.

Defendants concluded that the rates for the German channels were too low and

targeted them for cancellation.  As with Covan, defendants agreed that local

service providers would not do business in any of the 12 channels with freight

forwarders or carriers who matched Cartwright's prime through rate, or who

submitted bids below the second lowest bid previously submitted.  JA. 1125-26.

As a result, Cartwright cancelled its bid, carriers that had matched Cartwright's

prime through rate cancelled their bids, and other carriers were pressured into

submitting second-round bids that matched the second lowest bid rather than the

prime through rate established by Cartwright.  *Ibid*.

Defendants' "landed rate" price fixing agreement thus operated to inflate the

-10-

rates DoD paid for moving services in all traffic channels between the United States and Germany during 2001 and 2002. With respect to channels served by Covan and Cartwright, defendants conspired to rig carrier bids for DoD contracts and further inflate the price. And with respect to all the pertinent channels, defendants conspired to fix the price carriers would be obligated to pay – and to pass on to DoD – for an essential component of door-to-door transportation services.

    c. <u>Fraud In Direct Procurement Method Contracting</u>.

Relators also asserted claims arising out of defendants efforts to obtain contracts for the shipment of U.S. military and civilian household goods between European countries. In late 2000, DoD announced that it would be soliciting bids for transportation of household goods between Germany, Italy, Belgium, the Netherlands, and Luxemburg in 2001. JA. 1586. Unlike transportation to and from the United States, DoD is not required by statute or regulation to employ U.S.-flagged carriers for such transportation. *Cf.* 46 U.S.C. § 55302; 48 C.F.R. 247.570(b) (requiring use of U.S.-flagged vessels for transporting certain cargo between United States and foreign country). DoD thus did not employ the same procurement procedures for transportation within Europe that it used in the International Through Government Bill of Lading program.

-11-

DoD instead opted to deal directly with local agents within Europe and to obtain services through a procedure referred to as the Direct Procurement Method. It announced that only one company would be awarded a contract for these services, that bidders would therefore be required to demonstrate the capability to service all countries contemplated by the contract, and that if a bidder intended to rely on subcontractors or joint venturers to meet this requirement, it must identify all such arrangements in its bid.  JA. 1586.

Defendant Gosselin was awarded the 2001 contract.  JA. 1588.  Relators allege that Gosselin and other defendants violated the FCA because they failed to disclose that they had previously agreed among themselves as to the prices each would charge and the territories they would service as subcontractors to the winning bidder.  JA. 326-27; 329-30.  Relators further allege that Gosselin violated the FCA by falsely certifying to DoD that its bid was not the product of prior agreement restricting competition.  *Ibid*.; *see* 48 C.F.R. 52.203-2 (Federal Acquisition Regulation requiring bidders for government contract to certify that offered prices are arrived at independently, without prior agreement intended to restrict competition).[4]

---

[4] The United States, though intervening with respect to claims arising out of the International Through Government Bill of Lading program, did not intervene with respect to this "direct procurement method" claim.  That claim was therefore

4.  <u>Related Criminal Proceedings</u>.

During the pendency of the FCA case, Gosselin World Wide Moving and the Pasha Group defendants were criminally prosecuted for conduct related to coercing Cartwright International Van Lines into cancelling its bids establishing the "prime through rates" for certain traffic channels.

The indictment charged Gosselin with a conspiracy to restrain trade, in violation of 15 U.S.C. § 1, and conspiracy to defraud the United States, in violation of 18 U.S.C. § 371.  JA. 539.  Gosselin filed a conditional guilty plea that reserved the right to argue that the alleged conspiracy was immunized by provisions of the Shipping Act that exempt certain conduct from antitrust liability. JA. 539-40.  Specifically, Gosselin argued the collusive bidding agreement pertaining to Cartwright was immunized by provisions formerly codified at 46 U.S.C. app. § 1706(a)(4).  This statute provides that the antitrust laws do not apply to:

> any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade.[5]

---

prosecuted by the relators rather than the government.

    [5] "Through transportation" is defined as "continuous transportation between origin and destination for which a through rate is assessed and which is offered or

The district court held that the Shipping Act afforded defendants immunity from antitrust liability but did not bar criminal fraud charges. *United States* v. *Gosselin World Wide Moving N.V.* 333 F. Supp. 2d 497 (E.D. Va. 2004). This Court reversed in part, holding that the Shipping Act does not immunize defendants' conduct with respect to any of the criminal violations arising out of the Cartwright bid cancellation scheme. *United States* v. *Gosselin World Wide Moving N.V.*, 411 F.3d 502 (4th Cir. 2005). It reasoned that the scheme was not immunized by 46 U.S.C. app. § 1706(a)(4) (2000) because "defendants' collusive effort was aimed at the entire through transportation market, rather than just the foreign inland segment * * *." *Id.* at 510. The Court reasoned that defendants had not confined themselves to manipulating rates for local transportation services within Germany but had taken several steps to manipulate carrier bids for the entire "through transportation." *Id.* at 511. It further noted that exceptions to the antitrust law must be narrowly construed [*ibid.*, citing *FMC* v. *Seatrain Lines, Inc.*, 411 U.S. 726, 732-33 (1973)], and that "the upshot of defendants' interpretation * * * would therefore be a through transportation market beset with collusive and artificially inflated bids, detrimental to consumers and non-cooperating

---

performed by one or more carriers, at least one of which is a common carrier, between a United States port or point and a foreign port or point." 46 U.S.C. app. § 1702(a)(24) (2000).

-14-

competitors alike." *Ibid*.    The Court accordingly reversed.

On remand, the district court imposed criminal fines of $6 million and ordered defendants to pay the United States $865,000 in restitution for the damages cased by its unlawful conduct in connection with the Cartwright bid rigging scheme.  JA. 539-40.

5.  <u>District Court Decision</u>.

On February 14, 2012, the district court issued a Rule 54(b) final judgment as to most of the defendants with respect to the civil claims pertaining to the Covan bid cancellation scheme, the Cartwright bid cancellation scheme, the remaining claims arising out of the Sonthofen price-fixing agreement on "landed rates," and the Direct Procurement Method contract for transportation between European countries.[6]  JA. 1618.  A brief summary of the disposition of each claim follows below.

a.  <u>Covan Bid-Rigging Claims</u>.

The judgment denied the government any relief on the Covan claims.  The court, before the case was submitted to the jury, concluded that the government

---

[6] The Rule 54(b) judgment does not dispose of claims against Government Logistics N.V. – a defendant alleged to be liable as a corporate successor to one of the participants in the alleged conspiracy – as well as claims pertaining to the relators' attorney fees.  JA. 1617 n.22.

had not adduced sufficient evidence of damages from the Covan bid rigging scheme. *See* Hearing of July 28, 2011, Tr. 1055. Thus, the only issues submitted to the jury were whether defendants had violated the FCA and if so, the number of false claims subject to a civil money penalty.

The jury concluded that although defendants had presented false claims with respect to the shipments in channels for which Covan had established the prime through rate, they did not do so knowingly and thus did not violate the FCA. JA. 1113-15. The government consequently obtained no recovery on these claims. JA. 1621.

b. Cartwright Bid-Rigging Claims.

The court found the defendants liable for FCA violations with respect to the Cartwright Channel claims but held that: (1) the government is not entitled to any damages, and (2) the government is entitled to a single civil penalty for only one false claim – for a total award of $5,500.

As an initial matter, the court found that the guilty plea and stipulated statement of facts entered by defendants Gosselin World Wide Moving and Marc Smet in their criminal prosecution established all the elements of a FCA violation arising out of the Cartwright bid rigging scheme. It therefore entered partial summary judgment holding these defendants liable for an FCA violation. JA. 341.

-16-

The court later held, however, that the government is not entitled to damages because the full amount of its injury had already been recovered through other payments made by defendants in connection with the criminal case and through settlement payments made by defendants' co-conspirators. JA. 545-50. It concluded in this regard that the government had alleged "a single overarching conspiracy" with respect to all defendants and that "[t]he amounts the government obtained from the settling defendants through settlement and the judgment the government obtained at trial with respect to those same settled claims were 'common damages.'" JA. 1228-29. It therefore held that the amounts the government had already collected through criminal restitution and settlement payments must be credited in full against the litigating defendants' liability, and that these credits reduce the amount of defendant's damages liability to zero. JA. 1230-31.

The court also held that the government had failed to adduce evidence sufficient to determine the number of false claims submitted under the contracts tainted by the Cartwright bid rigging conspiracy. JA. 1113-20.. It concluded that the government had established, at most, that defendants had caused the submission of a single false claim warranting the imposition of a single civil money penalty. JA. 1221. The government's recovery on the Cartwright claims,

-17-

for both damages and civil money penalties, was thus limited to $5,500.
JA. 1621.

     c. Landed Rate Price Fixing Claim.

The government's complaint with regard to this claim is that, by colluding on the prices that would be charged for the local packing and transportation, defendants unlawfully fixed a component of the bid carriers submitted for DoD contracts, thereby tainting the carrier bids with fraud and rendering claims paid under contracts awarded these carriers "false" for purposes of the FCA. *Cf. United States ex rel. Marcus* v. *Hess*, 317 U.S. 537 (1942)(unlawful collusion among subcontractors in setting price relied upon by prime contractor in its contract with government renders subcontractors liable under the FCA for causing the presentment of false claims). This claim, as argued in this case, thus depends on showing that the prior price-fixing agreement is unlawful, and that the submission of claims based on the unlawful agreement is therefore fraudulent.

Here, the district court concluded that the defendants' agreement with respect to "landed rates" was not an unlawful agreement in restraint of trade but was instead immunized from all antitrust liability by provisions of the Shipping Act. The court thus held that, because the landed rate price fixing agreement was not unlawful, the agreement could not render false or fraudulent claims submitted

-18-

by carriers who relied on the prices fixed in the "landed rate" agreement.  JA. 1137.

The court reasoned that the landed rate agreement concerned only the foreign inland segment of "through transportation" and that, unlike the Cartwright agreement at issue in the criminal case, it was not aimed at the entire U.S.-foreign transportation.  The court also rejected the contention that the Shipping Act antitrust exemptions generally apply only to agreements between common carriers and marine terminal operators.[7]  Following the Ninth Circuit's decision in *United States* v. *Tucor International, Inc*., 189 F.3d 834 (9th Cir. 1999), the court concluded that the plain language of the Shipping Act does not support these limitations on the statutory exemption from antitrust laws.  JA. 1131-33.  It therefore held that, because the "landed rate" price fixing agreement did not violate antitrust laws, claims based on the agreement could not be deemed false or fraudulent for purposes of the FCA.

      d.  <u>Direct Procurement Method Claim</u>.

The jury found that, in seeking this contract, defendant Gosselin had falsely certified that its bid was not based on a prior price-fixing agreement.  The court

---

[7] This Court did not reach these issues in the criminal case.  *See Gosselin*, 411 F.3d at 510, 514 n.3.

found sufficient evidence to support this jury determination, that the parties had stipulated that defendants had filed 9,136 invoices on the contract, and that each of those payment claims was false and an actionable violation of the FCA. JA. 1223-27; *see Harrison* v. *Westinghouse Savannah River Co.*, 176 F.3d 776, 786 (4th Cir. 1999) (every claim submitted under a fraudulently obtained contract is "false" and actionable under the FCA).

The relators did not seek damages but instead confined their demand to civil money penalties. *See* JA. 1588. At the minimum penalty authorized by statute, and assuming a penalty would be imposed for each of the thousands of false claims submitted, defendants would have been liable for penalties exceeding $50 million. JA. 1585. The relators, however, in consultation with the government, sought reduced penalties of $24 million instead of the higher amounts authorized by statute. *See* JA. 1368. The court nonetheless concluded that the only statutorily-authorized application of the penalty provision would result in an unconstitutionally excessive fine and therefore held that the penalty provision could not be applied to defendants. It therefore held that no penalty, of any amount, could be imposed.

First, the court rejected our argument that the government, or relators acting in consultation with the government, have prosecutorial discretion to seek

-20-

penalties for a smaller subset of the false claims litigated at trial, reasoning that the statute mandates a penalty of at least the statutory minimum for every false claim proven. JA. 1593, 1615 n.19. Thus, in the court's view, the statute mandated a penalty of at least $50 million.

Second, it held that an award of $50 million would be grossly disproportionate to defendants' offense and would therefore violate the Excessive Fines Clause of the Eighth Amendment. The court reasoned that relators had failed to show that the price fixing resulted in substantially different costs to the government than those that would have otherwise been incurred (JA. 1593-98), that the price fixing did not substantially harm the integrity of the bidding process (JA. 1599-1603), that the pertinent conduct was distinct from the other unlawful conduct alleged in the case (JA. 1603), and that the penalty exceeded any proven economic harm, defendants' profit, or analogous criminal penalties (JA. 1604-07).

Finally, the court held that it had no authority to remit the penalty to avoid an unconstitutional result, reasoning that the statute mandated imposition of at least $50 million in fines and that it had no authority to rewrite the law. JA. 1607-11. It concluded that the penalty mandated by the statute is unconstitutional as applied to these defendants, that it had no authority to award a different penalty that might otherwise comport with the Eighth Amendment, and that it would

-21-

therefore award no penalty whatsoever with respect to defendant's liability on the Direct Procurement Method claim.  Thus, as relators had not claimed any economic damages, the government obtained no monetary recovery on this claim.

## SUMMARY OF THE ARGUMENT

1.    The district court's Excessive Fines holding violates a court's fundamental obligation to enforce a statute to the fullest extent permitted by the Constitution.  It is firmly settled that a reviewing court, upon finding an Act of Congress to be unconstitutional as applied, must depart no further from the statute's directive than is necessary to prevent a constitutional violation.  *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 328–329 (2006).  That in turn means that the court, upon concluding that a statutorily-mandated FCA penalty is unconstitutionally excessive, must impose a reduced penalty that will conform to constitutional requirements while still vindicating Congress's intent in the FCA to impose substantial penalties on those who defraud the government.

The district court, however, instead barred *any* application of the penalty provision to these defendants, relying on reasoning that would preserve penalties for small-time offenders but relieve the worst, repeat offenders of all penalty liability.  No principle of constitutional review supports creating such anomalous distinctions in the application of the FCA.

-22-

The court compounded this error by applying substantive standards of review that are inconsistent with the substantial deference owed Congress's determination of the appropriate penalty for defrauding the United States.  In *United States* v. *Bajakajian*, 524 U.S. 328 (1998), the Supreme Court stressed that legislative penalty determinations must be sustained against Eighth Amendment challenge unless grossly disproportionate to the offense.  The district court's decision disregards this fundamental principle of Eighth Amendment law and frustrates Congress's intent to ensure that *every* false claim identified by the government carries with it the risk of a significant sanction.

Vindicating that objective is particularly important here, because defendants have engaged in a widespread, systematic, and costly practice of fraud perpetuated over several years of Department of Defense operations.  The government, in consultation with relators, accordingly sought penalties for enough of the false claims proven at trial to further the deterrent purposes of the statute without running afoul of the Excessive Fines Clause.  The district court nonetheless substituted its judgment for that of Congress and gutted statutory provisions intended to deter offenders from both initiating and perpetuating a fraud on the public fisc.  That is error which compels reversal of the judgment.

2.  The district court also erred in holding that the Shipping Act renders

-23-

lawful a secret agreement to fix the price for local packing and shipping services within Germany. The court relies on Shipping Act provisions that exempt from the antitrust laws agreements concerning the foreign inland segment of a door-to-door "through" transportation to the United States. Defendants' price-fixing agreement, however, depended upon securing carrier rates for the *entire* through transportation at levels that would be sufficient to defray their collusively-established prices for the local, foreign leg of the shipment. They took concrete steps, through the Covan and Cartwright bid-rigging schemes, to achieve that objective, and the district court itself concluded that these bid rigging schemes were part and parcel of a single, overarching conspiracy. This Court has already held that conduct aimed at establishing rates for through transportation to the United States falls outside the scope of the Shipping Act's narrowly limited exemption from antitrust liability. *United States* v. *Gosselin World Wide Moving N.V.,* 411 F.3d 502 (4th Cir. 2005). The district court erred in failing to apply *Gosselin* here.

Moreover, even if *Gosselin* were not controlling, the Shipping Act antitrust exemptions on which the district court relied apply only to vessel-operating common carriers or marine terminal operators – categories that exclude defendants. The Shipping Act does not give all parties to a shipping transaction

-24-

unfettered license to engage in collusive price-fixing. It rather exempts from the antitrust laws only a carefully defined set of agreements that are subject to regulatory oversight by the Federal Maritime Commission. *FMC* v. *Seatrain Lines, Inc.*, 411 U.S. 726, 728, 732-33 (1973). Defendants' "landed rate" agreement was not subjected to FMC review or otherwise subsumed by tariffs within the FMC's regulatory purview. Under *Seatrain*, it thus remained subject to antitrust laws making such price-fixing collusion unlawful. Contrary to the district court's holding, claims based upon the illegal Sonthofen agreement on "landed rates" are therefore "false" and actionable under the FCA.

The judgment should therefore be reversed.

## STANDARD OF REVIEW

The constitutional and statutory construction issues raised here are subject to *de novo* review. *United States* v. *Bajakajian*, 524 U.S. 328, 336 & n.10 (1998); *Ignacio* v. *United States*, 774 F.3d 252, 254 (4th Cir. 2012).

## ARGUMENT

I.    The Excessive Fines Clause Does Not Bar The Imposition Of A Substantial Monetary Penalty On Defendants Who Have Submitted Thousands Of False Claims To The Government.

The district court's conclusion that the Excessive Fines Clause precludes

application of any civil money penalty to a defendant who has submitted thousands of false claims to the government is at odds with controlling precedent and eviscerates a statute that is "the Government's primary litigative tool for combating fraud." S. Rep. No. 99-345, 99th Cong., 2d Sess. 2, *reprinted in* 1986 U.S.C.C.A.N. 5266. In enacting the False Claims Act, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Cook County, Illinois* v. *United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *United States* v. *Neifert-White Co.*, 390 U.S. 228, 232 (1968)). Congress accordingly authorized stiff financial penalties to ensure that those who would defraud the government of public funds face appropriate punishment for past misconduct and a strong deterrent to future wrongdoing. *See* Pub. L. No. 101-410, § 2, 104 Stat. 890 (1990) (authorizing inflation-adjusted increases to civil money penalties in order to "maintain the deterrent effect of civil money penalties and promote compliance with the law").

While these penalties must comport with the Excessive Fines Clause of the Eighth Amendment, Supreme Court precedent makes clear that a court considering an Excessive Fines challenge to a statutorily prescribed penalty must accord substantial deference to Congress's judgment as to an appropriate sanction and

-26-

enforce the statute to the fullest extent consistent with the Constitution. The Supreme Court has thus held that a court may not bar the imposition of a statutorily authorized civil penalty under the Excessive Fines Clause unless the sanction is "*grossly* disproportional to the gravity of the defendant's offense." *United States* v. *Bajakajian*, 524 U.S. 321, 334 (1998) (emphasis added). And its precedents on a court's power to remedy an unconstitutional application of statute make clear that, if a statutorily-mandated penalty does violate the Excessive Fines Clause, the reviewing court remains obligated to enforce the statute to the fullest extent consistent with the Constitution. *See, e.g., Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 328–329 (2006).

The district court's holding is inconsistent with these bedrock principles of constitutional law. The court has substituted its judgment for that of Congress in determining an appropriate penalty, trammeled on the prosecutorial discretion vested by the False Claims Act in the Attorney General, and adopted anomalous rules of decision that preserve the penalty provisions for small-scale offenders while rendering the provisions wholly unenforceable against individuals who repeatedly submit false claims to the United States. Each of these determinations is incorrect and compels reversal of the judgment.

-27-

A.    The Court, Upon Determining That A Statutorily
      Mandated Penalty Is Excessive, Must Remit The Penalty
      To An Amount That Comports With The Eighth
      Amendment.

The district court reasoned that it is statutorily obligated to award at least

the minimum, $5,500 penalty for every proven false claim, that this in turn

mandates penalties exceeding $50 million, that a $50 million fine would be

unconstitutionally excessive, and, crucially, that it had no authority to remit the

penalty to a lower, constitutionally permissible amount.  JA. 1592-93, 1607-10.  It

therefore reached the surprising conclusion that, although defendants had

submitted more than nine *thousand* false claims to the government, they must

nonetheless be excused from *any* penalty liability under the statute.  JA. 1611.

This line of reasoning is flawed at every turn.   As we will show below, the

statute vests the government with broad prosecutorial discretion to confine a

penalty demand to a subset of proven false claims if it concludes that a reduced

demand is sufficient to vindicate the deterrent purposes of the statute, or if it itself

concludes that a reduced demand is needed to avoid a constitutionally excessive

penalty.  Here, the government requested the minimum statutory penalty for less

than half the number of proven false claims.  And while the penalty request still

sought a very substantial fine – $24 million – the requested amount is

proportionate to the gravity of defendant's misconduct and must therefore be sustained under the highly deferential standards of review applicable to an Excessive Fines challenge.

While each of these errors undermines the district court judgment, its perceived limitations on the scope of a court's power to remedy an unconstitutional application of a statute present issues of particularly far-reaching and untoward precedential significance. The general, well-settled rule is that a court is obligated to fashion a remedy for constitutional violations that will preserve as much of the statute as is practicable:

> Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact. We prefer, for example, to enjoin only the unconstitutional applications of the statute while leaving other applications in force * * *.

*Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 328–329 (2006) (internal citation omitted). Thus, "when a court confronts an unconstitutional statute, its endeavor must be to conserve, not destroy, the legislature's dominant objective." *Nat. Fed. of Indep. Business* v. *Sebelius*, No. 11-393 (U.S. June 28, 2012) (Ginsburg, J., concurring in part and dissenting in part).

The case law accordingly makes clear that, if a statutory penalty is

-29-

unconstitutionally severe, the appropriate remedy is to reduce the penalty to levels that comport with the Constitution, even if the resulting penalty is below the minimum otherwise mandated by the statute.

In *United States* v. *Halper*, 490 U.S. 435 (1989), for example, the district court reduced FCA penalties below the statutory minimum to ensure that the penalties would not result in the imposition of multiple punishments and a violation of the Double Jeopardy Clause. *Id.* at 439. The Supreme Court, though remanding for an accounting of the government's actual losses in the case, noted that "[w]e must leave to the trial court the discretion to determine on the basis of such an accounting the size of the civil sanction the Government may receive without crossing the line between remedy and punishment." *Id.* at 450. That discretion implicitly assumes that the trial court has remedial authority to impose less than the statutory minimum if necessary to avoid an unconstitutional sanction.[8]

Similarly, the settled rule in forfeiture cases is that, if the statutorily-mandated forfeiture is unconstitutionally excessive, the court may reduce the

---

[8] In *Hudson v. United States,* 522 U.S. 93 (1997), the Court abrogated *Halper's* holding that civil punishments implicate the Double Jeopardy Clause. The Court, however, did not overrule *Halper* in its entirety, and other aspects of *Halper* thus remain good law.

-30-

forfeiture *below* the level otherwise mandated by the statute to remedy the constitutional violation. *United States v. Sarbello*, 985 F.2d 716, 728 (3d Cir. 1993); *United States*. v, *Bieri*, 21 F.3d 819, 824-25 (8th Cir. 1994); *United States* v. *Real Property in Eldorado County*, 59 F.3d 974, 986 (9th Cir. 1995).

Consistent with *Halper* and these precedents*,* all other courts to address the matter have indicated that a district court can remit an FCA penalty below the minimum mandated by the statute where necessary to prevent a constitutional violation. *Peterson* v. *Weinberger*, 508 F.2d 45, 55 (5th Cir. 1975); *United States ex rel. Smith* v. *Gilbert Realty Co., Inc.*, 840 F. Supp. 71, 73-75 (E.D. Mich. 1993); *United States* v. *Advance Tool Co.*, 902 F. Supp. 1011, 1018-19 (W.D. Mo, 1995); *United States ex rel. Koch* v. *Koch Indus., Inc.*, 57 F. Supp. 2d 1122, 1145 (N.D. Okl. 1999)(dicta).

The district court nonetheless reasoned that to impose a civil penalty of less than $50 million (*i.e.*, a minimum penalty for every proven false claim) would be inconsistent with "the presumed intent of Congress, in effect an unauthorized exercise of statutory revision." JA. 1610. But in a statute whose principal purpose is to erect substantial deterrents to defrauding the government, an award of zero dollars in penalties for submitting 9,136 false claims is a far greater deviation from what Congress intended.

-31-

At bottom, the district court's "all or nothing" approach to the statute frustrates congressional intent to impose effective penalties on repeat offenders and is inconsistent with the reviewing court's obligation "not to nullify more of a legislature's work than is necessary." *Ayotte*, 546 U.S. at 329.   Moreover, it creates anomalous distinctions in which relatively small-scale offenders face stiff financial penalties while repeat offenders who submit thousands of false claims may evade all statutory liability.   That cannot be right.

> B.   The United States Has Prosecutorial Discretion To Seek Statutorily Authorized Penalties For A Limited Subset Of The Number of False Claims Proven At Trial.

In the proceedings below, relators, acting in close consultation with the government, sought the minimum per claim penalty for less than half the number of false claims established at trial.   As noted above, in light of the thousands of claims submitted under the Direct Procurement Method contract, the statute, at the minimum penalty per claim authorized by Congress, would have authorized a penalty of more than $50 million.   Recognizing that a penalty in that amount might raise Eighth Amendment concerns, however, the relators, acting in close consultation with the Department of Justice, reduced the penalty request to $24 million – less than half the minimum authorized by statute.   We explained to the district court that we were seeking penalties for less than half the number of false

-32-

claims established at the liability stage of the case, that our demand sought the $5,500 statutory minimum for each of these claims, and that the total penalty demand amounted to 22 percent of the maximum penalty authorized by statute. JA. 1476.

Rather than evaluate the constitutionality of the penalty actually requested, however, the district court focused on the statutory minimum. It reasoned that the United States had no discretion to seek less than the statutory minimum for each and every claim proven at trial, and that the Eighth Amendment inquiry must therefore proceed on the premise that the FCA mandates at least the minimum statutorily authorized penalty for each false claim established at the liability stage of the case.

The court's holding in this regard fails to take into account the substantial prosecutorial discretion vested in the Attorney General. The statute provides that if the Attorney General finds a violation he "may" bring an FCA action 31 U.S.C. § 3730(a). If a *qui tam* action is instead filed by the relator, the statute affords the Attorney General broad discretion to intervene (§ 3730(b)(2)), to dismiss the action or settle it on such terms as the Attorney General deems appropriate (*ibid.*), to add to or modify the claims asserted by the relator (§ 3131(c)), and to seek alternative remedies (§ 3130(c)(5)). To that is added the

-33-

Attorney General's general statutory authority to direct the conduct of litigation in which the United States is a party or is interested. 28 U.S.C. § 516; *see generally United States* v. *Newport News Shipbuilding & Dry Dock Co.*, 571 F.2d 1283, 1287 (4th Cir. 1978). The Attorney General thus has sweeping authority to decide whether an FCA action should go forward, to determine the scope of violations to be prosecuted, and to decide what remedies to seek from the court once a violation is proven.

That discretion is confirmed by the text of the civil money penalty provision itself. Rather than state that the court "shall impose" a within-range penalty for every proven false claim, the statute states only that the defendant "is liable to the United States Government for a civil penalty of not less than $5,000 [as adjusted for inflation]" for each false or fraudulent claim. 31 U.S.C. § 3729(a). These provisions fix the minimum liability per claim. Consequently, if the government demands penalties for a set of proven false claims, the reviewing court is indeed obligated to award at least the statutory minimum for every claim asserted and has no statutory discretion to reduce the penalty below the prescribed amount. *See United States* v. *Brown*, 274 F.2d 107, 110 (4th Cir. 1960); *United States* v. *Cato Bros., Inc.*, 273 F.2d 153 (4th Cir. 1959). But the United States, like other litigants, is master of its own complaint. It is not obligated to pursue every

-34-

potential claim against a defendant.

Apart from the district court decision here, we are aware of no decision contesting the United States' discretion to confine its penalty demand to a smaller subset of the false claims proven at trial. In *United States* v. *Mackby*, 339 F.3d 1015 (9th Cir. 2003), for example, the district court found that the defendant had submitted 8,499 false claims. *Id*. at 1015. The government, however, only sought penalties for 111 of those claims – far below the minimum authorized by statute. *Ibid*. Unlike the district court here, the Ninth Circuit, in response to an Excessive Fines challenge, reviewed the reduced penalties requested by the government rather than the minimum authorized by the statute, without any suggestion that the government lacked prosecutorial discretion to seek penalties below the statutory minimum. *Accord United States* v. *Bickel*, No. 02-3144, 2006 WL 1120439 (C.D. Ill. Feb. 22, 2006) (implicitly recognizing U.S. authority to seek reduced penalty to avoid unconstitutionally excessive fine).

Contrary to the district court's reasoning, nothing in the statute limits the government's prosecutorial discretion in this regard. It is free to seek penalties for a smaller number claims than those proven at trial where the government determines that the statutory objectives will be adequately served by a lower total penalty, that litigating additional claims would overburden the government's

-35-

limited enforcement resources, that the defendant lacks the ability to pay a higher sanction, or that imposing a penalty for each proven false claim would raise Eighth Amendment concerns.

The district court's contrary, "all or nothing" approach would impede the government's exercise of this statutory authority. Moreover, it would create nonsensical distinctions in the application of the law. It is, for example, undisputed that the government could limit its liability prosecution to a small subset of false claims submitted under a fraudulently obtained contract, thereby obviate any occasion to address whether penalties should be imposed on other false claims submitted under the contract, and thus achieve the same reduction in the scope of potential penalties as that sought here. Nothing in the statute precludes the government from making similar choices in determining the amount of a civil penalty to seek from the court once the universe of false claims is proven. The statute instead commits these choices to the Attorney General's informed discretion.

Finally, though the penalties at issue here were sought by the private relators rather than Department of Justice attorneys, the penalty requested below remains a product of the Attorney General's prosecutorial discretion. As a general matter, the United States's powers to take over a *qui tam* case or to compel its

-36-

dismissal or settlement give it substantial practical authority over a relator's remedial demand. Here, moreover, the relators' penalty request was developed in close consultation with attorneys for the United States, and the United States filed a joint brief with relators specifically defending the requested sanction. *See* JA. 1457-80. The penalties requested below thus reflect the government's choices as to an appropriate remedy and are an exercise of its own prosecutorial discretion.

Recognizing such prosecutorial discretion conserves judicial resources and furthers the public interest. It enables the government to make litigative choices that, in the judgment of the Attorney General and those exercising his delegated authority, best serve the law enforcement interests underlying the FCA. It also enables the government to shape remedial requests that will mitigate the risk of constitutional violation in the application of the statute – consistent with the general principle that a court should avoid unnecessary constitutional adjudication. *Cf. Lyng* v. *Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them"). Nothing in the FCA purports to constrain these salutary exercises of prosecutorial discretion. Consequently, the Excessive Fines analysis should focus on the amount of penalties requested on behalf of the United

-37-

States – $24 million.

C.    The Requested Penalties Are Not Grossly
Disproportional To Defendants' Misconduct And
Therefore Comport With The Excessive Fines Clause.

A fine is "excessive" under the Eighth Amendment only if it is "grossly

disproportional to the gravity of the defendant's offense." *United States* v.

*Bajakajian*, 524 U.S. 321, 334 (1998).  This standard reflects both the obligation

to defer to legislative judgments regarding punishment and the impossibility of

determining with precision the gravity of a particular offense.  *Id.* at 336.

*Bajakajian* thus holds that "judgments about the appropriate punishment for an

offense belong in the first instance to the legislature," and that courts "should

grant substantial deference to the broad authority that legislatures necessarily

possess in determining the types and limits of punishments * * *."  *Ibid*. (internal

citations and quotation omitted).  It further cautions that "any judicial

determination regarding the gravity of a particular criminal offense will be

inherently imprecise."  *Ibid*.  The Court therefore rejected any requirement of strict

proportionality between the amount of the fine and the gravity of the offense,

holding instead that a fine is excessive if and only if it is *grossly* disproportionate

to the gravity of the offense.  *Ibid*.

In applying the "grossly disproportional" standard, the reviewing court may

-38-

consider whether the fined conduct is related to other illegal activity, the fine's relation to the maximum penalty that could be imposed for the same conduct under the applicable criminal law, the extent of the harm caused the government, and the seriousness of the offense. *United States* v. *Mackby*, 339 F.3d 1013 (9th Cir. 2003), *cert. denied*, 541 U.S. 936 (2004); *accord  United States* v. *Bollin*, 264 F.3d 391, 417 (4th Cir. 2001).

Despite these standards, the district court, in an alternative holding, concluded that if it were authorized to award less than the amount mandated by the statute, it would find that a penalty of $1.5 million is the constitutional maximum, and that a penalty of $500,000 is all that is appropriate in the circumstances of this case.  JA. 1614-17.  It reasoned that the government had not suffered any demonstrable damages as a result of defendant's fraudulent conduct, and that $500,000 was reasonably proportional to defendants' profit from the scheme. *Ibid*.

Both points are incorrect.  As an initial matter, the court erred in concluding that the government suffered no harm from defendants' conduct.  There was reasonable evidence in the record that defendants false claims under the Direct Procurement Method contract cost the government $3 million to $5 million in

-39-

additional shipment charges and associated interest costs.[9]  *See* JA. 1695 n.10;

1297-1303; 1244-47.  Even if that were the only harm to the government – and it

is not – a civil penalty of less than nine times actual damages would not be

"grossly" disproportional to the offense under *Bajakajian.  Cf. BMW of North*

*America, Inc*. v. *Gore*, 517 U.S. 559, 581-83 (1996) (punitive damage awards that

are a single-digit multiple of actual damages will not in most instances violate the

Due Process Clause).

      In any event, the submission of false claims causes harm to the government

well beyond economic damages.  Congress, stating that "[t]he cost of fraud cannot

always be measured in dollars and cents," agreed that "fraud erodes public

confidence in the government's ability to efficiently and effectively manage its

programs" and found that even in cases where there is no dollar loss, fraud

---

[9] The district court concluded that "Plaintiffs have failed to establish, based on reliable information, that Defendants' conduct, in fact caused the government any economic harm."  JA. 1596.  But it is the *defendants*' burden to demonstrate that a requested penalty is grossly disproportional to the relevant harm.  *United States* v. *Ahmad*, 213 F.3d 805, 816 (4th Cir.), *cert. denied*, 531 U.S. 1014 (2000); *see also Bajakajian*, 524 U.S. at 348 (Kennedy, J., dissenting).   A defendant who asserts that a penalty is excessive because his fraud caused the government no injury thus has the burden of both producing relevant economic evidence and of proving the lack of economic harm.  *Cf. Kemezy* v. *Peters*, 79 F.3d 33 (7th Cir. 1996) (defendant has burden of producing evidence that punitive damage award is excessive in relation to defendant's worth).  The district court erred in shifting this burden to the government and in thereby rejecting reasonable evidence of a $3 million to $5 million injury to the government.

undermines the integrity of procurement programs.  S. Rep. No. 99-345 at 3,

*reprinted in* 1986 U.S.C.C.A.N. at 5268.   Courts have accordingly recognized that

the government may recover penalties solely upon proof that false claims were

made, without *any* proof of economic damages.  *Id*. at 5273 (collecting cases); *see*

*also United States ex rel. Bahrani* v. *Conagra*, *Inc.,* 465 F.3d 1189, 1203 (10th

Cir. 2006).  Thus, as this Court has held:

> [S]urely, no proof is required to convince one that to the
> Government a false claim, successful or not, is always
> costly.  Just as surely, against this loss the Government
> may protect itself, though the damage be not explicitly or
> nicely ascertainable.
>
> The Act seeks to reimburse the Government for just such
> losses.  For a single false claim $2,000 [the penalty
> amount in effect in 1959] would not seem exorbitant.
> Furthermore, *even when multiplied by a plurality of*
> *impostures, it still would not appear unreasonable when*
> *balanced against the expense of the constant Treasury*
> *vigil they necessitate*.

*Toepleman* v. *United States*, 263 F.2d 697, 699 (4th Cir. 1959) (emphasis added).

The district court's focus on the defendants' profits is also misplaced.   Civil

penalties are indeed intended to ensure that a person does not reap ill-gotten gains

from his misconduct.   But we are aware of no case holding that, as a matter of

constitutional law, a fine must be proportional to such ill-gotten profits.  The

constitutional standard instead requires consideration of the nature and extent of

-41-

the criminal activity and the harm it caused the victim of the fraud, not defendant's profits. *United States* v. *Jalaram, Inc.*, 599 F3d. 347, 356 (4th Cir. 2010).

The $24 million penalty requested by the government and relators here is not excessive under these constitutional standards, and it is far more appropriate to the circumstances of the case than the lesser penalties contemplated by the district court. First, the penalty furthers Congress's specific intent to impose penalties that will deter offenders from continuing to submit false claims under a contract initially procured by fraud. The legislative history of the FCA expressly states that "each and every claim submitted under a contract * * * which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim" and is therefore subject to a civil penalty. S. Rep. No. 99-345 at 9, 1986 U.S.C.C.A.N. at 5274.

By thus providing that penalties increase with every false claim submitted, Congress authorized potentially substantial assessments against parties who continue to seek payments under a fraudulently obtained contract. That, however, plainly serves the deterrent purposes of the statute. Each false claims compounds the potential economic injury to the government. Moreover, if penalty liability were confined to conduct involved in obtaining the contract in the first instance,

-42-

offenders would face no further disincentive to submitting a stream of false claims if their initial fraud escapes detection. The statutory scheme consequently erects a strong deterrent to perpetuating a fraud in this manner. It contemplates that *every* false claim will carry with it the risk of an additional penalty and thus makes clear to offenders that penalties will continue to mount if their fraudulent conduct continues. Congress has deemed these measures necessary to protect the public fisc. Contrary to the district court's holding, such "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*, 524 U.S. at 336.

Second, the requested penalty is not grossly disproportional to the offense in light of the special difficulties of detecting and deterring fraud in defense procurement. Fraud in defense procurement is a longstanding and pernicious problem. The FCA was originally enacted in response to widespread fraud in military acquisitions and intended to "stop this plundering of the public treasury." *United States* v. *McNinch*, 356 U.S. 595, 599 (1958). At the same time, fraud like that committed by defendants – based on collusion with third parties – is difficult to detect. That, in turn, underscores the need for penalties high enough to make a potential wrongdoer wary of risking sanction in circumstances where his secretive conduct makes the risk of detection low. *Cf. BMW of North America, Inc.*, 517

-43-

U.S. at 582 (high punitive damage awards may comport with due process where "injury is hard to detect or the monetary value of noneconomic harm [is] difficult to determine"); *United States* v. *Jiminez*, 507 F.3d 13, 20 (1st Cir. 2007) ("From a deterrence perspective, a stiffer penalty is logically called for when the risk of detection decreases"); *see generally* Richard A. Posner, *Economic Analysis of Law* 262, 277 (8th ed. 2011) (same).

Third, the requested penalty is not grossly disproportional to defendants' misconduct. Defendants conspired to fix the price for a sole source contract for services rendered in Germany, Italy, Belgium, the Netherlands, and Luxemburg. JA. 1586-89. They certified to the Department of Defense that their contract offer had been arrived at independently, without prior agreement – an outright lie. JA. 1588. Once they fraudulently obtained the contract, they submitted, over a three-year period – *see* JA. 2228-29 – more than nine *thousand* false claims for payment – at rates inflated by undisclosed and unlawful collusion with others. JA. 1592. In the criminal case, defendants were fined $6 million for conduct that was of more limited scope and duration. Here, defendants perpetrated a sustained and widespread fraud on the United States affecting shipments throughout five European countries over the course of the three years the contract was in effect. Given the scale and duration of the misconduct, the requested penalty is not

-44-

grossly disproportional to the offense.

Finally, defendants' fraud with respect to the Direct Procurement Method contract was part of a larger pattern of fraudulent activity. Defendants were convicted of criminal violations with respect to the Cartwright bid rigging scheme and found by the jury to have submitted false claims with respect to the Covan bid-rigging scheme, although to have done so without the scienter necessary to establish FCA liability.[10]  They also colluded in an agreement to fix the price of the local services component of "landed rates" for "through shipments" to the United States.  And defendants were fined € 2.32 million by the European Union for their seven-and-a half year participation in a bid-rigging and price fixing scheme in Belgium.[11]  Defendants, in short, are repeat offenders.  For this reason

_____

[10] As we show below, the jury's finding that defendants did not "knowingly" submit false claims with respect to the Covan channel bid is tainted by prejudicially erroneous trial rulings on the scope of the Shipping Act antitrust immunities and should be reversed.  The Covan scheme should thus be considered as part of the defendants' pattern of fraudulent conduct.

[11] *See* 52 Official Journal of the European Union 16 (European Commission August 11, 2009), <*available at* http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2009:188:0016:0018:EN:PDF>, *as modified by* General Court of the European Union (Eighth Chamber), Case T-208/08 (June 16, 2011) <*available at* <http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=CELEX:62008TJ0208:EN:HTML>.  The district court excluded these European Union decisions from the jury's consideration of liability and they are not part of the evidentiary record below.  JA. 910.  The EU decisions, however, are judicially noticeable by this

as well, the requested penalties are not grossly disproportional to the offense and thus do not violate the Excessive Fines Clause.

\* \* \*

Because the requested penalty is not unconstitutional, the Court should direct entry of judgment on the Direct Procurement Method claim for $24 million in civil penalties.  If, however, the Court finds that the requested penalties are excessive, or, alternatively, that the government has no prosecutorial discretion to request penalties below the statutory minimum and that *those* penalties are excessive, it should hold that there is judicial authority to remit the penalty to an amount that comports with the Excessive Fines Clause and enter judgment accordingly.

II.    Defendants' Price Fixing Agreement On "Landed Rates"
       Is Not Made Lawful By The Shipping Act.

The government's "landed rate" claim is based on the premise that by colluding on the prices that would be charged for the local packing and transportation, defendants unlawfully fixed a component of the bid carriers submitted for DoD contracts, thereby tainting the carrier bids with fraud and

---

Court under Fed. R. Evid. 201 and may properly be considered in determining whether the civil money penalties requested here are excessive in light of defendants' pattern of similar unlawful conduct.  *Cf. Restatement (3d) of Foreign Relations* § 483, Reporters' Note 3 (1987) (U.S. courts recognize foreign penal judgments for purposes of habitual offender sentencing laws).

rendering claims paid under contracts awarded these carriers "false" for purposes of the FCA.  The district court dismissed this claim after concluding that the "landed rate" price fixing agreement is rendered lawful by provisions of the Shipping Act that exempt from antitrust liability an agreement "concerning the foreign inland segment of through transportation" to the United States.  46 U.S.C. app. § 1706(a)(4) (2000). [12]  That holding is inconsistent with this Court's decision in the prior criminal case, *United States* v. *Gosselin World Wide Moving N.V.*, 411 F.3d 502 (4th Cir. 2005), and misconstrues the scope of the Shipping Act's exemptions from antitrust liability.

>    A.    The "Landed Rate" Agreement Is Unlawful Under This
>          Court's Existing Precedent.

In *Gosselin World Wide Moving N.V.*, this Court reviewed whether the § 1706(a)(4) antitrust exemption applied to the defendants' bid-rigging scheme. The Court reasoned that if defendants' conduct had gone no further than colluding

---

[12] The Shipping Act was revised and recodified in 2006 and this provision is now codified at 46 U.S.C. § 40307(a)(5).  The statute, as so revised, now refers to agreements "relating to" the foreign inland segment of through transportation, rather than agreements "concerning" such transportation.  *Ibid*.  The 2006 revision was not intended to change the substantive law.  See Pub. L.  No. 109-304, §2, 120 Stat. 1485 (2006).  It nonetheless changes a word that is critical here.  We will, like the district court (*see* JA. 1129 & n.7), accordingly focus on the wording of the prior statute, which was in effect at the time of the conduct challenged here, and which is reprinted in our statutory addendum.

on the price for local packing and shipping services in Germany, it might have had the kind of relationship to a "foreign inland segment" of through transportation that the Shipping Act exempts from the antitrust laws. *Id*., 411 F.3d at 510. The Court concluded, however, that "[b]ecause the defendants' collusive effort was aimed at the entire through transportation market, rather than just the foreign inland segment, we do not think that they can claim exemption from antitrust liability under § 1706(a)(4)." *Ibid*.

The district court here distinguished the Sonthofen agreement on the ground that, unlike defendants various bid-rigging schemes, the landed rate agreement "concern[ed] exclusively the German inland segment." JA. 1134. The court, however, erred in treating defendants' participation in the Sonthofen agreement and their participation in the Covan and Cartwright bid-rigging schemes as separate and discrete conspiracies. The record instead shows that there was a single, overarching conspiracy aimed at both inflating the rates for local services and at ensuring that bidders for DoD shipments to or from the United States would be paid enough to meet these collusively inflated prices.

As the district court found, in the years preceding the Sonthofen agreement, several freight forwarders that had established low "prime rates" in the bidding process had filed for bankruptcy, with the result that many of the German local

agents, including a number of the defendants here, had been unable to collect

millions of dollars due for their services.  JA. 1125 n.6.  Thus, the parties to the

Sonthofen agreement "identified prime rates [that] were too low to cover all their

charges for the local destination and line haul services that they had set for

themselves," JA. 1125, and then took steps – through the Covan and Cartwright

bid-rigging schemes – to ensure that low through rates were replaced with higher

rates sufficient to pay their collusively inflated charges.   As defendant Smet

explained in an e-mail, sent within days of executing the Sonthofen agreement, to

the CEO of Covan – one of the freight forwarders bidding on contracts for DoD

"through" transportation:

> The situation, however, is that the agents are no longer
> going to handle any business at lower rates. In order to
> enforce this, the larger agents have already agreed to
> only handle business for carriers going under landed
> rates as they can see that this is the only system under
> which they will be protected and can get the rates they
> need to get. The convention in Sonthofen has been very
> hectic, but finally all parties there, general agents,
> port[]agents and agents are in agreement this is the way
> to go. Hopefully this will bring the stability we'll need
> and also allow the carriers to put enough in the rates to
> cover their charges and be able to handle business.

JA. 2692.

Simply put, the Sonthofen agreement could not work unless it was linked to

-49-

concerted action to inflate bids for the entirety of through transportation to or from the United States. That was one of its key objectives, and defendants took concrete steps, through the Cartwright and Covan bid rigging schemes, to achieve it. As such, the Sonthofen agreement was merely one element of a single, overarching conspiracy directed at the entire through transportation market, not just the inland foreign portion of it.

Under *Gosselin*, such conduct falls well outside the Shipping Act's antitrust immunity. It is unlawful collusion that taints the pertinent DoD contracts with fraud. And that in turn renders claims submitted under those contracts "false" and actionable under the FCA.

> B.     The Shipping Act's Antitrust Exception For Agreements
>        Concerning The "Foreign Inland Segment" of Through
>        Transportation Is Limited To Ocean Common Carriers
>        And Marine Terminal Operators And Therefore Cannot
>        Apply To Defendants.

Even assuming the Court's decision in *Gosselin* is not controlling, the district court erred in concluding that the Shipping Act's antitrust immunities apply to entities that are not ocean common carriers or marine terminal operators, and whose agreements consequently are not subject to review by the Federal Maritime Commission.

The Shipping Act's antitrust immunities are not intended to give

-50-

participants in trade affecting U.S. commerce *carte blanche* to collude on prices or to otherwise enable and condone anti-competitive behavior. The immunities are instead intended to exempt from the antitrust laws only a carefully delimited class of agreements that – in lieu of the constraints imposed by the antitrust laws – will instead be subject to direct or indirect regulatory oversight by the Federal Maritime Commission.

That is clear from the statute's legislative history. At the beginning of the 20th century, the great majority of United States' water-carried exports was carried in foreign vessels whose rates were established by price-fixing cartels known as liner conferences. *See generally Puerto Rico Ports Auth.* v. *FMC*, 919 F.2d 799, 806-07 (1st Cir. 1990). In the Shipping Act of 1916, Congress sought to foster the growth of the United States shipping industry. To that end, it established the U.S. Shipping Board (a predecessor to the Federal Maritime Commission) and gave it authority to regulate and promote privately-owned shipyards and vessels. H.R. Rep. No. 98-53, Pt. I, 98th Cong., 1st Sess. 5-6 (1983), *reprinted in* 1984 U.S.C.C.A.N. 167, 170-71. Congress, however, concluded that U.S. carriers could not opt out of the international cartel system and survive at the level required by national needs and security. *Plaquemines Port, Harbor, and Terminal Dist*. v. *FMC*, 838 F.2d 536, 542, (D.C. Cir. 1988). Section 15 of the statute, 39 Stat. 728,

-51-

733 (1916), accordingly exempted from the Sherman and Clayton Act antitrust laws price-fixing agreements that were otherwise lawful under the statute and approved by the Shipping Board, thereby permitting carriers serving the U.S. trade to participate in price-fixing "conferences." *See Carnation Co.* v. *Pacific Westbound Conference*, 383 U.S. 213, 216-17 & n.1 (1966); *FMC* v. *Seatrain Lines, Inc.*, 411 U.S. 726, 727-28 (1973).

The 1916 Act, however, though permitting price-fixing agreements, subjected such agreements to significant restrictions intended to limit their potential for monopolistic abuse. *Id*., 1984 U.S.C.C.A.N. at 171. One restriction required open eligibility for membership in conferences serving U.S. trade. H.R. Rep. No. 98-53, *supra,* 1984 U.S.C.C.A.N. at 171. A second key restriction provided that every rate agreement reached by a conference must be approved by the Shipping Board (or, later, the FMC) before it could be put into effect. *Ibid*.

The Shipping Act of 1984, Pub. L. No. 98-237, 98 Stat. 67 (1984), revised the regulatory scheme to minimize government involvement in shipping operations and to focus the FMC on protecting carriers, shippers, and ports from unfair or discriminatory practices. H.R. Rep. No. 98-53, *supra,* 1984 U.S.C.C.A.N. at 169. It nonetheless continued to link exemption from the antitrust laws to regulation by the FMC. Congress thus explained that a key

purpose of the statute "is to exempt from the antitrust laws those agreements subject to regulation by the Federal Maritime Commission." *Id.* at 168.

Congress's purpose is reflected in the structure of the statutory scheme. Section 4 describes what agreements are within the scope of the Act, providing in relevant part that "this Chapter[13] applies to":

> agreements by or among ocean common carriers to * * * discuss, fix, or regulate transportation rates, including through rates, cargo space accommodations, and other conditions of service * * * .

46 U.S.C. app. § 1703(a)(1),

as well as to:

> agreements among marine terminal operators, or by or among one or more marine terminal operators and one or more ocean common carriers to * * * to discuss, fix, or regulate rates or other conditions of service * * *.

46 U.S.C. app. § 1703(b)(1).

Section 5, subject to certain exceptions, requires these and other agreements within the scope of the Act to be filed with the FMC. 46 U.S.C. app. § 1704.

Section 6 authorizes the FMC to disapprove or modify agreements that do not meet statutory requirements (*see*, *e.g.* 46 U.S.C. app. § 1704(b)) or that would

---

[13] The statutory reference to "this Chapter" is to chapter 36 of the U.S. Code, which codifies the Shipping Act of 1984, including the antitrust exemptions at issue here. *See* 46 U.S.C. app. §1701 note.

authorize conduct violating a specific prohibition in the Act (*see* 46 U.S.C. app. § 1709, setting forth prohibited acts). 46 U.S.C. app. § 1705. It also empowers the FMC to seek injunctions barring operation of an agreement that is likely to reduce competition. *Ibid.*

Finally, section 7 enumerates the agreements or activities that are exempt from the antitrust laws. It thus provides, in relevant part, that "[t]he antitrust laws do not apply to" agreements that are filed with the FMC and have taken effect under the Act (46 U.S.C. app. § 1706(a)(1)), and, of central relevance here, to:

> any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade.

46 U.S.C. app. § 1706(a)(4).

Section 7 antitrust exemptions are thus applicable only to agreements that are made subject to the Shipping Act by section 4. And section 4 is, as relevant here, limited to agreements by or among ocean common carriers or marine terminal operators – categories that exclude defendants.[14]

---

[14] The statute defines an ocean common carrier as a "vessel operating common carrier," and a "marine terminal operator" as a person engaged in the business of furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier. 46 U.S.C. app § 1702(14) & (16). Defendants acted as an agent for an association of freight forwarders and a general/booking agent for packing, trucking, and port services within Germany. *See Gosselin World Wide Moving N.V.*, 333 F. Supp. at 500-01. They did not operate an ocean

-54-

The district court rejected this construction, reasoning that the plain language of the section 7 "foreign inland segment" exemption is not, standing alone, limited to agreements otherwise within the scope of the Shipping Act, and that the reach of the exemption is not qualified by section 4 provisions defining the agreements to which the Shipping Act applies.  JA. 1131-32; *accord Tucor*, 189 F.3d at 837.

This holding is erroneous for several reasons.  First, in determining the meaning of a statute, the reviewing court should not consider a word or phrase in isolation, but must rather evaluate its meaning in context, looking to the structure and language of the statute as a whole, as well as the statute's object and policy. *Philbrook* v. *Glodgett*, 421 U.S. 707, 713 (1975).  The district court's holding violates this well-settled rule of statutory construction.  Section 4, on its face, defines the agreements to which Shipping Act provisions apply.  It is thus intended to be read in tandem with section 7 and thereby to define the agreements to which the section 7 antitrust exemptions apply.  The legislative history is unequivocal on this point, noting that the "scope" provisions now set forth in section 4 "state[] the coverage of" the statute and "list[] the type of agreements" to

---

vessel or marine terminal, and their business agreements therefore fall outside section 4.

which the statute applies. H.R. Rep. No. 98-53, Pt. I, *supra*, 1984 U.S.C.C.A.N. at 194. The district court nonetheless reads this critical provision out of the statute entirely.

Second, exemptions from the antitrust laws must be strictly and narrowly construed. "This narrow construction of antitrust immunity is appropriate because the robust marketplace competition that antitrust laws protect is a 'fundamental national economic policy.'" *Gosselin World Wide Moving, N.V.*, 411 F.3d at 508, quoting *Carnation Co.*, 383 U.S. at 218. The Supreme Court has made clear that this principle of strict construction applies with full force to the antitrust exemptions set forth in the Shipping Act, and that the statute confers a "limited antitrust exemption" that extends only to agreements that are subject to FMC oversight. *Seatrain Lines, Inc.*, 411 U.S. at 732-35; *accord Carnation Co.*, 383 U.S. at 219.

Third, the district court's reliance on the Ninth Circuit's decision in *Tucor* is misplaced. *Tucor* reasons that section 7 antitrust exemptions cannot be limited to agreements among ocean common carriers because one of those exemptions, that set forth in section 7(a)(3), covers participation in wholly foreign transportation. *See* 46 U.S.C. app. § 1706(a)(3). In the Ninth Circuit's view, an ocean common carrier is, by definition, limited to carriers providing transportation between the

-56-

United States and a foreign port. *Tucor*, 189 F.3d at 837; *see* 46 U.S.C. app. §

1702(a)(6) (defining common carrier). Thus, the section 7 antitrust exemptions

cannot be limited to common carrier agreements because section 7 assertedly

includes within the scope of exempted activities wholly foreign agreements –

agreements that, in the Ninth Circuit's view, could not be deemed agreements by a

"common carrier" in the first instance. *Tucor*, 189 F.3d at 837.

 *Tucor*, however, misreads the statutory definition of "common carrier" and

confuses the distinction between the entities generally within the scope of the

Shipping Act provisions and the specific activities of those entities that are subject

to the FMC's jurisdiction. Contrary to the Ninth Circuit's reasoning, the statute

does not confine the definition of "common carrier" to entities that operate solely

and exclusively in United States foreign commerce. It rather defines a "common

carrier" as an entity that "hold[s] itself out to the general public" to provide

transportation by water between the United States and a foreign country. 46

U.S.C. app. § 1702(a)(6). Nothing in this definition suggests that an entity which

"holds itself out" to provide transportation in the United States foreign commerce

cannot also participate in wholly foreign commerce. Rather, the statute instead

provides that when "common carriers" do participate in such wholly foreign

trades, those strictly-foreign activities are exempt from FMC jurisdiction.

-57-

Consistent with that construction, section 5 of the statute – a provision *Tucor* does not address – makes clear that while agreements covered by section 4 – "common carrier" agreements with respect to rates and conditions – must generally be filed with the FMC, this filing requirement does not apply to agreements "related to transportation to be performed within or between foreign countries." 46 U.S.C. app. § 1704(a). This statutory exception to the FMC filing requirements for common carriers would make no sense if *Tucor* were correct in concluding that agreements with respect to wholly foreign transportation can never be "common carrier" agreements otherwise subject to the FMC's jurisdiction. *Tucor*, in sum, cannot be reconciled with the text and structure of the Shipping Act and therefore should not be followed here.

Finally, the district court's construction cannot be reconciled with any plausible conception of congressional policy. Congress deemed certain antitrust exemptions necessary to promote the U.S. shipping industry. But at the same time, it put in place a regulatory regime designed to ensure that cooperative practices would not result in anti-competitive abuse. Thus, where a common carrier provides intermodal "through transportation" that includes a foreign inland segment, the statute requires the carrier to make available for public inspection "tariffs showing all its rates, charges, classifications, rules, and practices between

-58-

all points or ports on its own route and on any through transportation route that has been established." 46 U.S.C. app. § 1707(a)(1). The FMC is empowered to enforce statutory provisions barring the carrier from discriminating in the application of the rates and services set forth in such published tariffs. 46 U.S.C. app. § 1709(b)(1) & (2). And it is further empowered to take enforcement action against unjust or unreasonable practices with respect to the carriers' handling and delivery of property under these tariffs. *See* 46 U.S.C. app. §§ 1709(d)(1), 1710(c).

Taken together, these Shipping Act provisions provide for the transparency and regulatory oversight necessary to prevent injurious, anti-competitive behavior. Defendants' "landed rate" agreement, however, falls outside this regulatory scheme. Exempting such agreements from the antitrust laws as well would consequently mean that there is no legal constraint on blatantly collusive price-fixing – a loophole in the law that serves no discernable congressional purpose. "It does not seem logical that Congress intended to confer antitrust immunity on parties largely outside the regulatory power of the Commission." *Transpacific Westbound Rate Agreement* v. *FMC*, 951 F.2d 950, 954 (9th Cir. 1991). Rather, as this Court observed in a related context, "[s]uch a state of affairs would be the antitheses of the antitrust protections that the maxim requiring narrow construction

of exemptions therefrom contemplates." *Gosselin*, 411 F.3d at 514.

\* \* \*

The district court thus erred in concluding that the "landed rate" agreement was lawful under the Shipping Act.  The  judgment for defendants on the FCA claim arising out of that agreement must therefore be reversed and the matter remanded for further proceedings.

The court's error in construing the Shipping Act, moreover, also compels reversal of the judgment on the Covan bid-rigging scheme.  Though the court held this conduct was not immunized by the Shipping Act, it instructed the jury that in determining whether defendants acted with the requisite knowledge under the FCA, it may consider whether defendants had a good faith belief that their conduct was permitted by U.S. law.  JA. 1052, 1095-96.  Defendants, over timely objection, were permitted to place the Ninth Circuit's *Tucor* decision in evidence for that purpose.  JA. 2231-32.  *Tucor,* however, did not involve an effort to manipulate the rates paid for the entire through transportation and thus has no bearing on whether defendants' could have a good faith basis for believing that rigging bids for the rates charged on the entire through transportation in the Covan channels was also lawful.  *See Gosselin*, 411 F.3d at 510.   The admission of *Tucor* into evidence was thus a prejudicial error that compels reversal of the judgment

-60-

for defendants on the Covan channel claims and requires a remand for new trial of these claims as well.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

STUART F. DELERY
  Acting Assistant Attorney General

NEIL H. MacBRIDE
  United States Attorney

MICHAEL S. RAAB
  (202) 514-4053
/s/ JEFFREY CLAIR
  (202) 514-4028
jeffrey.clair@usdoj.gov
  Attorneys, Civil Division
  Room 7243, Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530

-61-

## REQUEST FOR ORAL ARGUMENT

The United States respectfully requests oral argument.  Oral argument will illuminate the position of the parties and aid the Court in reaching a decision.

## RULE 32 CERTIFICATE OF COMPLIANCE

I certify that this brief complies with FRAP 32(a)(7)(B) because it is printed in a 14-point, proportionally spaced font and because, based on word processing software, the brief contains 13,565 words.


/s/ Jeffrey Clair, Attorney


## CERTIFICATE OF SERVICE

I certify that on July 20, 2012, I electronically filed the foregoing Brief for the United States as Appellee by using the Court's Case Management/Electronic Case Filing system, that counsel for the other parties are  registered CM/ECF users, and that service will therefore be accomplished through the Court's CM/ECF system.


/s/ Jeffrey Clair, Attorney


-62-

# STATUTORY ADDENDUM

(2) Actions of the Maritime Subsidy Board pending on review before the Secretary of Commerce on the day preceding August 6, 1981, shall remain with the Secretary of Commerce, unless otherwise agreed between the Secretary of Commerce and the Secretary of Transportation, for final administrative disposition as though this Act had not been enacted.

(3) The Secretary of Transportation may promulgate regulations providing for the orderly transfer of proceedings continued under paragraph (1).

**(c) Actions and proceedings commenced prior to transfer of functions**

Except as provided in subsection (e) of this section—

(1) the provisions of this Act shall not affect actions commenced prior to August 6, 1981, and

(2) in all such actions, proceedings shall be had, appeals taken, and judgments rendered in the same manner and effect as if this Act had not been enacted.

**(d) Abatement of actions, proceedings, etc.**

No action or other proceeding commenced by or against any officer of the Maritime Administration in his official capacity shall abate by reason of the enactment of this Act. No cause of action by or against the Maritime Administration or by or against any officer of the Maritime Administration in his official capacity shall abate by reason of the enactment of this Act.

**(e) Substitution of parties**

If, before August 6, 1981, the Secretary of Commerce is a party to an action, and under this Act any function of the Secretary of Commerce which is the subject of the action is transferred to the Secretary of Transportation, then such action shall be continued with the Secretary of Transportation substituted as a party.

**(f) Administrative and judicial review procedures applicable**

Orders and actions of the Secretary of Transportation in the exercise of functions transferred under this Act shall be subject to judicial review as if such orders and actions had been by the Secretary of Commerce exercising such functions immediately preceding their transfer. Any statutory requirements relating to notice, hearings, action upon the record, or administrative review that apply to any function transferred by this Act shall apply to the exercise of such function by the Secretary of Transportation.

(Pub. L. 97–31, §9, Aug. 6, 1981, 95 Stat. 152.)

REFERENCES IN TEXT

This Act, referred to in text, is Pub. L. 97–31, Aug. 6, 1981, 95 Stat. 151, known as the Maritime Act of 1981. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this Appendix and Tables.

**§ 1609. References in other Federal laws to functions or offices transferred**

With respect to any function or office transferred by this Act and exercised on or after August 6, 1981, reference in any other Federal law

to the Maritime Administration or any of its predecessor agencies or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary of Transportation, other official, or component of the Department of Transportation to which this Act transfers such functions.

(Pub. L. 97–31, §10, Aug. 6, 1981, 95 Stat. 153.)

REFERENCES IN TEXT

This Act, referred to in text, is Pub. L. 97–31, Aug. 6, 1981, 95 Stat. 151, known as the Maritime Act of 1981. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this Appendix and Tables.

**§ 1610. Severability**

If any provisions of this Act or the application thereof to any person or circumstance is held invalid, neither the remainder of this Act nor the application of such provision to other persons or circumstances shall be affected thereby.

(Pub. L. 97–31, §11, Aug. 6, 1981, 95 Stat. 153.)

REFERENCES IN TEXT

This Act, referred to in text, is Pub. L. 97–31, Aug. 6, 1981, 95 Stat. 151, known as the Maritime Act of 1981. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this Appendix and Tables.

## CHAPTER 36—INTERNATIONAL OCEAN COMMERCE TRANSPORTATION

| Sec. | |
|------|---|
| 1701. | Declaration of policy. |
| 1702. | Definitions. |
| 1703. | Agreements within scope of chapter. |
| | (a) Ocean common carriers. |
| | (b) Marine terminal operators. |
| | (c) Acquisitions. |
| 1704. | Agreements. |
| | (a) Filing requirements. |
| | (b) Conference agreements. |
| | (c) Ocean common carrier agreements. |
| | (d) Interconference agreements. |
| | (e) Assessment agreements. |
| | (f) Maritime labor agreements. |
| | (g) Vessel sharing agreements. |
| 1705. | Action on agreements. |
| | (a) Notice. |
| | (b) Review standard. |
| | (c) Review and effective date. |
| | (d) Additional information. |
| | (e) Request for expedited approval. |
| | (f) Term of agreements. |
| | (g) Substantially anticompetitive agreements. |
| | (h) Injunctive relief. |
| | (i) Compliance with informational needs. |
| | (j) Nondisclosure of submitted material. |
| | (k) Representation. |
| 1706. | Exemption from antitrust laws. |
| | (a) In general. |
| | (b) Exceptions. |
| | (c) Limitations. |
| 1707. | Tariffs. |
| | (a) In general. |
| | (b) Time-volume rates. |
| | (c) Service contracts. |
| | (d) Tariff rates. |
| | (e) Refunds. |
| | (f) Marine terminal operator schedules. |
| | (g) Regulations. |
| 1708. | Controlled carriers. |
| | (a) Controlled carrier rates. |

Sec.
     (b) Rate standards.
     (c) Effective date of rates.
     (d) Prohibition of rates.
     (e) Presidential review.
     (f) Exceptions.
1709. Prohibited acts.
     (a) In general.
     (b) Common carriers.
     (c) Concerted action.
     (d) Common carriers, ocean transportation intermediaries, and marine terminal operators.
     (e) Joint ventures.
1710. Complaints, investigations, reports, and reparations.
     (a) Filing of complaints.
     (b) Satisfaction or investigation of complaints.
     (c) Commission investigations.
     (d) Conduct of investigation.
     (e) Undue delays.
     (f) Reports.
     (g) Reparations.
     (h) Injunction.
1710a. Foreign laws and practices.
     (a) Definitions.
     (b) Authority to conduct investigations.
     (c) Investigations.
     (d) Information requests.
     (e) Action against foreign carriers.
     (f) Actions upon request of Commission.
     (g) Report.
     (h) Administration and enforcement of other laws.
     (i) Review of rules, regulations, and final orders of Commission; exclusive procedure.
1711. Subpenas and discovery.
     (a) In general.
     (b) Witness fees.
1712. Penalties.
     (a) Assessment of penalty.
     (b) Additional penalties.
     (c) Assessment procedures.
     (d) Review of civil penalty.
     (e) Failure to pay assessment.
     (f) Limitations.
1713. Commission orders.
     (a) In general.
     (b) Reversal or suspension of orders.
     (c) Enforcement of nonreparation orders.
     (d) Enforcement of reparation orders.
     (e) Statute of limitations.
1714. Reports.
1715. Exemptions.
1716. Regulations.
1718. Ocean transportation intermediaries.
     (a) License.
     (b) Financial responsibility.
     (c) Suspension or revocation.
     (d) Exception.
     (e) Compensation of intermediaries by carriers.
1719. Contracts, agreements, and licenses under prior legislation.
     (a) to (c) Omitted.
     (d) Effects on certain agreements and contracts.
     (e) Savings provisions.

CHAPTER REFERRED TO IN OTHER SECTIONS

This chapter is referred to in sections 817d, 817e, 1241f, 1273a of this Appendix.

## § 1701. Declaration of policy

The purposes of this chapter are—

(1) to establish a nondiscriminatory regulatory process for the common carriage of goods by water in the foreign commerce of the United States with a minimum of government intervention and regulatory costs;

(2) to provide an efficient and economic transportation system in the ocean commerce of the United States that is, insofar as possible, in harmony with, and responsive to, international shipping practices;

(3) to encourage the development of an economically sound and efficient United States-flag liner fleet capable of meeting national security needs; and

(4) to promote the growth and development of United States exports through competitive and efficient ocean transportation and by placing a greater reliance on the marketplace.

(Pub. L. 98–237, § 2, Mar. 20, 1984, 98 Stat. 67; Pub. L. 105–258, title I, § 101, Oct. 14, 1998, 112 Stat. 1902.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act" meaning Pub. L. 98–237, Mar. 20, 1984, 98 Stat. 67, as amended, known as the Shipping Act of 1984. For complete classification of this Act to the Code, see Short Title note below and Tables.

AMENDMENTS

1998—Par. (4). Pub. L. 105–258 added par. (4).

EFFECTIVE DATE OF 1998 AMENDMENT

Pub. L. 105–258, § 2, Oct. 14, 1998, 112 Stat. 1902, provided that: "Except as otherwise expressly provided in this Act [see Tables for classification], this Act and the amendments made by this Act take effect May 1, 1999."

EFFECTIVE DATE

Section 21 of Pub. L. 98–237, which provided that Pub. L. 98–237 (see Short Title note below) shall become effective 90 days after Mar. 20, 1984, except that sections 1716 and 1717 of this Appendix shall become effective Mar. 20, 1984, was repealed by Pub. L. 101–225, title III, § 307(11), Dec. 12, 1989, 103 Stat. 1925.

SHORT TITLE OF 1998 AMENDMENT

Pub. L. 105–258, § 1, Oct. 14, 1998, 112 Stat. 1902, provided that: "This Act [see Tables for classification] may be cited as the 'Ocean Shipping Reform Act of 1998'."

SHORT TITLE OF 1992 AMENDMENT

Pub. L. 102–251, title II, § 201(a), Mar. 9, 1992, 106 Stat. 60, provided that: "This section [amending sections 1709 and 1721 of this Appendix and enacting provisions set out as notes under sections 1709 and 1721 of this Appendix] may be cited as the 'Non-Vessel-Operating Common Carrier Act of 1991'."

SHORT TITLE OF 1990 AMENDMENT

Pub. L. 101–595, title VII, § 710(a), Nov. 16, 1990, 104 Stat. 2996, provided that: "This section [enacting section 1721 of this Appendix, amending section 1709 of this Appendix, and enacting provisions set out as notes under sections 1709 and 1721 of this Appendix] may be cited as the 'Non-Vessel-Operating Common Carrier Amendments of 1990'."

SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–418, title X, § 10001, Aug. 23, 1988, 102 Stat. 1570, provided that: "This subtitle [subtitle A (§§ 10001–10003) of title X of Pub. L. 100–418, enacting section 1710a of this Appendix, amending section 1120b of this Appendix, and enacting provisions set out as a note under section 3302 of Title 46, Shipping] may be cited as the 'Foreign Shipping Practices Act of 1988'."

SHORT TITLE

Section 1 of Pub. L. 98–237 provided: "That this Act [enacting this chapter, amending sections 801, 812, 814, 815, 816, 817, 819, 820, 821, 824, 828, 829, 830, 831, 841c, 1122, and 1124 of this Appendix, repealing sections 813, 813a, 825, and 841b of this Appendix, enacting provisions set out as notes under this section, and repealing provisions set out as a note under section 801 of this Appendix] may be cited as the 'Shipping Act of 1984'."

## §1702. Definitions

As used in this chapter—

(1) "agreement" means an understanding, arrangement, or association (written or oral) and any modification or cancellation thereof; but the term does not include a maritime labor agreement.

(2) "antitrust laws" means the Act of July 2, 1890 (ch. 647, 26 Stat. 209), as amended [15 U.S.C. 1 et seq.]; the Act of October 15, 1914 (ch. 323, 38 Stat. 730), as amended [15 U.S.C. 12 et seq.]; the Federal Trade Commission Act (38 Stat. 717), as amended [15 U.S.C. 41 et seq.]; sections 73 and 74 of the Act of August 27, 1894 (28 Stat. 570), as amended [15 U.S.C. 8 and 9]; the Act of June 19, 1936 (ch. 592, 49 Stat. 1526), as amended [15 U.S.C. 13, 13a, 13b, 21a]; the Antitrust Civil Process Act (76 Stat. 548), as amended [15 U.S.C. 1311 et seq.]; and amendments and Acts supplementary thereto.

(3) "assessment agreement" means an agreement, whether part of a collective-bargaining agreement or negotiated separately, to the extent that it provides for the funding of collectively bargained fringe benefit obligations on other than a uniform man-hour basis, regardless of the cargo handled or type of vessel or equipment utilized.

(4) "bulk cargo" means cargo that is loaded and carried in bulk without mark or count.

(5) "Commission" means the Federal Maritime Commission.

(6) "common carrier" means a person holding itself out to the general public to provide transportation by water of passengers or cargo between the United States and a foreign country for compensation that—

(A) assumes responsibility for the transportation from the port or point of receipt to the port or point of destination, and

(B) utilizes, for all or part of that transportation, a vessel operating on the high seas or the Great Lakes between a port in the United States and a port in a foreign country, except that the term does not include a common carrier engaged in ocean transportation by ferry boat, ocean tramp, or chemical parcel-tanker or by vessel when primarily engaged in the carriage of perishable agricultural commodities (i) if the common carrier and the owner of those commodities are wholly-owned, directly or indirectly, by a person primarily engaged in the marketing and distribution of those commodities and (ii) only with respect to the carriage of those commodities. As used in this paragraph, "chemical parcel-tanker" means a vessel whose cargo-carrying capability consists of individual cargo tanks for bulk chemicals that are a permanent part of the vessel, that have segregation capability with piping systems to permit simultaneous carriage of several bulk chemical cargoes with minimum risk of cross-contamination, and that has a valid certificate of fitness under the International Maritime Organization Code for the Construction and Equipment of Ships Carrying Dangerous Chemicals in Bulk.

(7) "conference" means an association of ocean common carriers permitted, pursuant to an approved or effective agreement, to engage in concerted activity and to utilize a common tariff; but the term does not include a joint service, consortium, pooling, sailing, or transshipment arrangement.

(8) "controlled carrier" means an ocean common carrier that is, or whose operating assets are, directly or indirectly, owned or controlled by a government; ownership or control by a government shall be deemed to exist with respect to any carrier if—

(A) a majority portion of the interest in the carrier is owned or controlled in any manner by that government, by any agency thereof, or by any public or private person controlled by that government; or

(B) that government has the right to appoint or disapprove the appointment of a majority of the directors, the chief operating officer, or the chief executive officer of the carrier.

(9) "deferred rebate" means a return by a common carrier of any portion of freight money to a shipper as a consideration for that shipper giving all, or any portion, of its shipments to that or any other common carrier over a fixed period of time, the payment of which is deferred beyond the completion of service for which it is paid, and is made only if the shipper has agreed to make a further shipment or shipments with that or any other common carrier.

(10) "forest products" means forest products including, but not limited to lumber in bundles, rough timber, ties, poles, piling, laminated beams, bundled siding, bundled plywood, bundled core stock or veneers, bundled particle or fiber boards, bundled hardwood, wood pulp in rolls, wood pulp in unitized bales, paper and paper board in rolls or in pallet or skid-sized sheets.

(11) "inland division" means the amount paid by a common carrier to an inland carrier for the inland portion of through transportation offered to the public by the common carrier.

(12) "inland portion" means the charge to the public by a common carrier for the nonocean portion of through transportation.

(13) "loyalty contract" means a contract with an ocean common carrier or agreement by which a shipper obtains lower rates by committing all or a fixed portion of its cargo to that carrier or agreement and the contract provides for a deferred rebate arrangement.

(14) "marine terminal operator" means a person engaged in the United States in the business of furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier, or in connection

with a common carrier and a water carrier subject to subchapter II of chapter 135 of title 49.

(15) "maritime labor agreement" means a collective-bargaining agreement between an employer subject to this chapter, or group of such employers, and a labor organization representing employees in the maritime or stevedoring industry, or an agreement preparatory to such a collective-bargaining agreement among members of a multiemployer bargaining group, or an agreement specifically implementing provisions of such a collective-bargaining agreement or providing for the formation, financing, or administration of a multiemployer bargaining group; but the term does not include an assessment agreement.

(16) "ocean common carrier" means a vessel-operating common carrier.

(17) "ocean transportation intermediary" means an ocean freight forwarder or a nonvessel-operating common carrier. For purposes of this paragraph, the term—

(A) "ocean freight forwarder" means a person that—

(i) in the United States, dispatches shipments from the United States via a common carrier and books or otherwise arranges space for those shipments on behalf of shippers; and

(ii) processes the documentation or performs related activities incident to those shipments; and

(B) "non-vessel-operating common carrier" means a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper in its relationship with an ocean common carrier.

(18) "person" includes individuals, corporations, partnerships, and associations existing under or authorized by the laws of the United States or of a foreign country.

(19) "service contract" means a written contract, other than a bill of lading or a receipt, between one or more shippers and an individual ocean common carrier or an agreement between or among ocean common carriers in which the shipper or shippers makes a commitment to provide a certain volume or portion of cargo over a fixed time period, and the ocean common carrier or the agreement commits to a certain rate or rate schedule and a defined service level, such as assured space, transit time, port rotation, or similar service features. The contract may also specify provisions in the event of nonperformance on the part of any party.

(20) "shipment" means all of the cargo carried under the terms of a single bill of lading.

(21) "shipper" means—

(A) a cargo owner;

(B) the person for whose account the ocean transportation is provided;

(C) the person to whom delivery is to be made;

(D) a shippers' association; or

(E) an ocean transportation intermediary, as defined in paragraph (17)(B) of this section, that accepts responsibility for payment of all charges applicable under the tariff or service contract.

(22) "shippers' association" means a group of shippers that consolidates or distributes freight on a nonprofit basis for the members of the group in order to secure carload, truckload, or other volume rates or service contracts.

(23) "through rate" means the single amount charged by a common carrier in connection with through transportation.

(24) "through transportation" means continuous transportation between origin and destination for which a through rate is assessed and which is offered or performed by one or more carriers, at least one of which is a common carrier, between a United States point or port and a foreign point or port.

(25) "United States" includes the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Marianas, and all other United States territories and possessions.

(Pub. L. 98–237, §3, Mar. 20, 1984, 98 Stat. 67; Pub. L. 99–307, §11, May 19, 1986, 100 Stat. 447; Pub. L. 105–258, title I, §102, Oct. 14, 1998, 112 Stat. 1902; Pub. L. 105–383, title IV, §424(d), Nov. 13, 1998, 112 Stat. 3441.)

REFERENCES IN TEXT

Act of July 2, 1890 (ch. 647, 26 Stat. 209), as amended, referred to in par. (2), is known as the Sherman Act, which is classified to sections 1 to 7 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1 of Title 15 and Tables.

Act of October 15, 1914 (ch. 323, 38 Stat. 730), as amended, referred to in par. (2), is known as the Clayton Act, which is classified generally to sections 12, 13, 14 to 19, 20, 21, and 22 to 27 of Title 15 and sections 52 and 53 of Title 29, Labor. For further details and complete classification of this Act to the Code, see References in Text note set out under section 12 of Title 15 and Tables.

The Federal Trade Commission Act, referred to in par. (2), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, as amended, which is classified generally to subchapter I (§41 et seq.) of chapter 2 of Title 15. For complete classification of this Act to the Code, see section 58 of Title 15 and Tables.

Sections 73 and 74 of the Act of August 27, 1894, referred to in par. (2), are sections 73 and 74 of act Aug. 27, 1894, ch. 349, 28 Stat. 570. Sections 73 to 77 of such Act are known as the Wilson Tariff Act. Sections 73 to 76 enacted sections 8 to 11 of Title 15. Section 77 was not classified to the Code. For complete classification of this Act to the Code, see Short Title note set out under section 8 of Title 15 and Tables.

Act of June 19, 1936 (ch. 592, 49 Stat. 1526), as amended, referred to in par. (2), is popularly known as the Robinson-Patman Antidiscrimination Act and also as the Robinson-Patman Price Discrimination Act, which enacted sections 13a, 13b, and 21a of Title 15 and amended section 13 of Title 15. For complete classification of this Act to the Code, see Short Title note set out under section 13 of Title 15 and Tables.

The Antitrust Civil Process Act, referred to in par. (2), is Pub. L. 87–664, Sept. 19, 1962, 76 Stat. 548, as amended, which is classified generally to chapter 34 (§1311 et seq.) of Title 15. For complete classification of this Act to the Code, see Short Title note set out under section 1311 of Title 15 and Tables.

AMENDMENTS

1998—Par. (6)(B). Pub. L. 105–383, in first sentence, substituted "parcel-tanker or by vessel when primarily

engaged in the carriage of perishable agricultural commodities (i) if the common carrier and the owner of those commodities are wholly-owned, directly or indirectly, by a person primarily engaged in the marketing and distribution of those commodities and (ii) only with respect to the carriage of those commodities.'' for ''parcel-tanker.''

Par. (8). Pub. L. 105–258, §102(1), substituted ''a government;'' for ''the government under whose registry the vessels of the carrier operate;'' in introductory provisions.

Par. (9). Pub. L. 105–258, §102(2), added par. (9) and struck out former par. (9) which read as follows: '''deferred rebate' means a return by a common carrier of any portion of the freight money to a shipper as a consideration for that shipper giving all, or any portion, of its shipments to that or any other common carrier, or for any other purpose, the payment of which is deferred beyond the completion of the service for which it is paid, and is made only if, during both the period for which computed and the period of deferment, the shipper has complied with the terms of the rebate agreement or arrangement.''

Par. (10). Pub. L. 105–258, §102(5), substituted ''paper and paper board in rolls or in pallet or skid-sized sheets.'' for ''paper board in rolls, and paper in rolls.'' Pub. L. 105–258, §102(4), struck out ''in an unfinished or semifinished state that require special handling moving in lot sizes too large for a container,'' after ''means forest products''.

Pub. L. 105–258, §102(3), redesignated par. (11) as (10) and struck out former par. (10) which read as follows: '''fighting ship' means a vessel used in a particular trade by an ocean common carrier or group of such carriers for the purpose of excluding, preventing, or reducing competition by driving another ocean common carrier out of that trade.''

Pars. (11), (12). Pub. L. 105–258, §102(3), redesignated pars. (12) and (13) as (11) and (12), respectively. Former par. (11) redesignated (10).

Par. (13). Pub. L. 105–258, §102(7), substituted ''agreement and the contract provides for a deferred rebate arrangement.'' for ''conference.''

Pub. L. 105–258, §102(6), substituted ''agreement'' for ''conference, other than a service contract or contract based upon time-volume rates,''.

Pub. L. 105–258, §102(3), redesignated par. (14) as (13). Former par. (13) redesignated (12).

Par. (14). Pub. L. 105–258, §102(3), (8), redesignated par. (15) as (14) and substituted ''carrier, or in connection with a common carrier and a water carrier subject to subchapter II of chapter 135 of title 49.'' for ''carrier.'' Former par. (14) redesignated (13).

Par. (15). Pub. L. 105–258, §102(3), redesignated former par. (16) as (15). Former par. (15) redesignated (14).

Par. (16). Pub. L. 105–258, §102(9), redesignated par. (17) as (16) and struck out former par. (16) which read as follows: '''non-vessel-operating common carrier' means a common carrier that does not operate the vessels by which the ocean transportation is provided, and is a shipper in its relationship with an ocean common carrier.''

Pub. L. 105–258, §102(3), redesignated par. (17) as (16). Former par. (16) redesignated (15).

Par. (17). Pub. L. 105–258, §102(10), added par. (17) and struck out former par. (17) which read as follows: '''ocean freight forwarder' means a person in the United States that—

''(A) dispatches shipments from the United States via common carriers and books or otherwise arranges space for those shipments on behalf of shippers; and

''(B) processes the documentation or performs related activities incident to those shipments.''

Pub. L. 105–258, §102(9), redesignated par. (18) as (17). Former par. (17) redesignated (16).

Pub. L. 105–258, §102(3), redesignated par. (18) as (17). Former par. (17) redesignated (16).

Par. (18). Pub. L. 105–258, §102(9), redesignated par. (19) as (18). Former par. (18) redesignated (17).

Pub. L. 105–258, §102(3), redesignated par. (19) as (18). Former par. (18) redesignated (17).

Par. (19). Pub. L. 105–258, §102(11), added par. (19) and struck out former par. (19) which read as follows: '''service contract' means a contract between a shipper and an ocean common carrier or conference in which the shipper makes a commitment to provide a certain minimum quantity of cargo over a fixed time period, and the ocean common carrier or conference commits to a certain rate or rate schedule as well as a defined service level—such as, assured space, transit time, port rotation, or similar service features; the contract may also specify provisions in the event of nonperformance on the part of either party.''

Pub. L. 105–258, §102(9), redesignated par. (20) as (19). Former par. (19) redesignated (18).

Pub. L. 105–258, §102(3), redesignated par. (20) as (19). Former par. (19) redesignated (18).

Par. (20). Pub. L. 105–258, §102(9), redesignated par. (21) as (20). Former par. (20) redesignated (19).

Pub. L. 105–258, §102(3), redesignated par. (21) as (20). Former par. (20) redesignated (19).

Par. (21). Pub. L. 105–258, §102(12), added par. (21) and struck out former par. (21) which read as follows: '''shipper' means an owner or person for whose account the ocean transportation of cargo is provided or the person to whom delivery is to be made.''

Pub. L. 105–258, §102(3), redesignated par. (22) as (21). Former par. (21) redesignated (20).

Pub. L. 105–258, §102(3), redesignated par. (22) as (21). Former par. (21) redesignated (20).

Pars. (22) to (27). Pub. L. 105–258, §102(3), (9), redesignated pars. (24) to (27) as (22) to (25), respectively. Former pars. (22) and (23) redesignated (20) and (21), respectively.

1986—Par. (6)(B). Pub. L. 99–307, §11(1), inserted provision that ''common carrier'' not include common carrier engaged in ocean transportation by ferry boat, ocean tramp, or chemical parcel-tanker, and defined ''chemical parcel-tanker''.

Par. (18). Pub. L. 99–307, §11(2), struck out ''; but the term does not include one engaged in ocean transportation by ferry boat or ocean tramp'' after ''common carrier''.

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1241s, 1707, 1709, 1710a, 1718, 1807 of this Appendix; title 19 section 1641; title 41 section 431; title 49 section 5901.

## § 1703. Agreements within scope of chapter

### (a) Ocean common carriers

This chapter applies to agreements by or among ocean common carriers to—

(1) discuss, fix, or regulate transportation rates, including through rates, cargo space accommodations, and other conditions of service;

(2) pool or apportion traffic, revenues, earnings, or losses;

(3) allot ports or restrict or otherwise regulate the number and character of sailings between ports;

(4) limit or regulate the volume or character of cargo or passenger traffic to be carried;

(5) engage in exclusive, preferential, or cooperative working arrangements among themselves or with one or more marine terminal operators;

(6) control, regulate, or prevent competition in international ocean transportation; or

(7) discuss and agree on any matter related to service contracts.

**(b) Marine terminal operators**

This chapter applies to agreements among marine terminal operators and among one or more marine terminal operators and one or more ocean common carriers to—

(1) discuss, fix, or regulate rates or other conditions of service; or

(2) engage in exclusive, preferential, or cooperative working arrangements, to the extent that such agreements involve ocean transportation in the foreign commerce of the United States.

**(c) Acquisitions**

This chapter does not apply to an acquisition by any person, directly or indirectly, of any voting security or assets of any other person.

(Pub. L. 98–237, §4, Mar. 20, 1984, 98 Stat. 70; Pub. L. 105–258, title I, §103, Oct. 14, 1998, 112 Stat. 1904.)

AMENDMENTS

1998—Subsec. (a)(5). Pub. L. 105–258, §103(a)(1), substituted "operators;" for "operators or non-vessel-operating common carriers;".

Subsec. (a)(6). Pub. L. 105–258, §103(a)(2), substituted "or" for "and" at end.

Subsec. (a)(7). Pub. L. 105–258, §103(a)(3), added par. (7) and struck out former par. (7) which read as follows: "regulate or prohibit their use of service contracts."

Subsec. (b). Pub. L. 105–258, §103(b)(1), struck out "(to the extent the agreements involve ocean transportation in the foreign commerce of the United States)" after "agreements" in introductory provisions.

Subsec. (b)(1). Pub. L. 105–258, §103(b)(2), substituted "or" for "and" at end.

Subsec. (b)(2). Pub. L. 105–258, §103(b)(3), substituted "arrangements, to the extent that such agreements involve ocean transportation in the foreign commerce of the United States." for "arrangements."

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1704 of this Appendix.

**§ 1704. Agreements**

**(a) Filing requirements**

A true copy of every agreement entered into with respect to an activity described in section 1703(a) or (b) of this Appendix shall be filed with the Commission, except agreements related to transportation to be performed within or between foreign countries and agreements among common carriers to establish, operate, or maintain a marine terminal in the United States. In the case of an oral agreement, a complete memorandum specifying in detail the substance of the agreement shall be filed. The Commission may by regulation prescribe the form and manner in which an agreement shall be filed and the additional information and documents necessary to evaluate the agreement.

**(b) Conference agreements**

Each conference agreement must—

(1) state its purpose;

(2) provide reasonable and equal terms and conditions for admission and readmission to conference membership for any ocean common carrier willing to serve the particular trade or route;

(3) permit any member to withdraw from conference membership upon reasonable notice without penalty;

(4) at the request of any member, require an independent neutral body to police fully the obligations of the conference and its members;

(5) prohibit the conference from engaging in conduct prohibited by section 1709(c)(1) or (3) of this Appendix;

(6) provide for a consultation process designed to promote—

(A) commercial resolution of disputes, and

(B) cooperation with shippers in preventing and eliminating malpractices;

(7) establish procedures for promptly and fairly considering shippers' requests and complaints; and

(8) provide that any member of the conference may take independent action on any rate or service item upon not more than 5 calendar days' notice to the conference and that, except for exempt commodities not published in the conference tariff, the conference will include the new rate or service item in its tariff for use by that member, effective no later than 5 calendar days after receipt of the notice, and by any other member that notifies the conference that it elects to adopt the independent rate or service item on or after its effective date, in lieu of the existing conference tariff provision for that rate or service item;

**(c) Ocean common carrier agreements**

An ocean common carrier agreement may not—

(1) prohibit or restrict a member or members of the agreement from engaging in negotiations for service contracts with 1 or more shippers;

(2) require a member or members of the agreement to disclose a negotiation on a service contract, or the terms and conditions of a service contract, other than those terms or conditions required to be published under section 1707(c)(3) of this Appendix; or

(3) adopt mandatory rules or requirements affecting the right of an agreement member or agreement members to negotiate and enter into service contracts.

An agreement may provide authority to adopt voluntary guidelines relating to the terms and procedures of an agreement member's or agreement members' service contracts if the guidelines explicitly state the right of members of the agreement not to follow the guidelines. These guidelines shall be confidentially submitted to the Commission.

**(d) Interconference agreements**

Each agreement between carriers not members of the same conference must provide the right of independent action for each carrier. Each agreement between conferences must provide the right of independent action for each conference.

**(e) Assessment agreements**

Assessment agreements shall be filed with the Commission and become effective on filing. The

§1705    TITLE 46, APPENDIX—SHIPPING    Page 1352

Commission shall thereafter, upon complaint filed within 2 years of the date of the agreement, disapprove, cancel, or modify any such agreement, or charge or assessment pursuant thereto, that it finds, after notice and hearing, to be unjustly discriminatory or unfair as between carriers, shippers, or ports. The Commission shall issue its final decision in any such proceeding within 1 year of the date of filing of the complaint. To the extent that an assessment or charge is found in the proceeding to be unjustly discriminatory or unfair as between carriers, shippers, or ports, the Commission shall remedy the unjust discrimination or unfairness for the period of time between the filing of the complaint and the final decision by means of assessment adjustments. These adjustments shall be implemented by prospective credits or debits to future assessments or charges, except in the case of a complainant who has ceased activities subject to the assessment or charge, in which case reparation may be awarded. Except for this subsection and section 1706(a) of this Appendix, this chapter does not apply to assessment agreements.

**(f) Maritime labor agreements**

This chapter does not apply to maritime labor agreements. This subsection does not exempt from this chapter any rates, charges, regulations, or practices of a common carrier that are required to be set forth in a tariff or are essential terms of a service contract, whether or not those rates, charges, regulations, or practices arise out of, or are otherwise related to, a maritime labor agreement.

**(g) Vessel sharing agreements**

An ocean common carrier that is the owner, operator, or bareboat, time, or slot charterer of a United States-flag liner vessel documented pursuant to sections[1] 12102(a) or (d) of title 46 is authorized to agree with an ocean common carrier that is not the owner, operator or bareboat charterer for at least 1 year of United States-flag liner vessels which are eligible to be included in the Maritime Security Fleet Program and are enrolled in an Emergency Preparedness Program pursuant to subtitle B of title VI of the Merchant Marine Act, 1936 (46 U.S.C. App. 1187 et seq.), to which it charters or subcharters the United States-flag vessel or space on the United States-flag vessel that such charterer or subcharterer may not use or make available space on the vessel for the carriage of cargo reserved by law for United States-flag vessels.

(Pub. L. 98–237, §5, Mar. 20, 1984, 98 Stat. 76; Pub. L. 98–595, §3(b)(1), Oct. 30, 1984, 98 Stat. 3132; Pub. L. 104–88, title III, §335(c)(2), Dec. 29, 1995, 109 Stat. 954; Pub. L. 105–258, title I, §104, Oct. 14, 1998, 112 Stat. 1904; Pub. L. 105–383, title IV, §424(a), Nov. 13, 1998, 112 Stat. 3440.)

REFERENCES IN TEXT

The Merchant Marine Act, 1936, referred to in subsec. (g), is act June 29, 1936, ch. 858, 49 Stat. 1985, as amended. Subtitle B of title VI of the Act is classified generally to part B (§1187 et seq.) of subchapter VI of chapter 27 of this Appendix. For complete classification of this Act to the Code, see section 1245 of this Appendix and Tables.

_____
[1] So in original. Probably should be "section".

AMENDMENTS

1998—Subsec. (b)(8). Pub. L. 105–258, §104(a)(1), added par. (8) and struck out former par. (8) which read as follows: "provide that any member of the conference may take independent action on any rate or service item required to be filed in a tariff under section 1707(a) of this Appendix upon not more than 10 calendar days' notice to the conference and that the conference will include the new rate or service item in its tariff for use by that member, effective no later than 10 calendar days after receipt of the notice, and by any other member that notifies the conference that it elects to adopt the independent rate or service item on or after its effective date, in lieu of the existing conference tariff provision for that rate or service item."

Subsec. (c). Pub. L. 105–258, §104(a)(2), (3), added subsec. (c) and redesignated former subsec. (c) as (d).

Subsec. (d). Pub. L. 105–258, §104(a)(2), redesignated former subsec. (c) as (d). Former subsec. (d) redesignated (e).

Subsec. (e). Pub. L. 105–258, §104(a)(2), (b)(1), redesignated former subsec. (d) as (e) and substituted "this chapter does" for "this chapter, the Shipping Act, 1916, and the Intercoastal Shipping Act, 1933, do". Former subsec. (e) redesignated (f).

Subsec. (f). Pub. L. 105–258, §104(b)(2)(C), inserted "or are essential terms of a service contract" after "tariff".

Pub. L. 105–258, §104(b)(2)(B), which directed amendment of subsec. (f) by striking out "or the Shipping Act, 1916," was executed by striking out "or the Shipping Act, 1916" before "any rates, charges", to reflect the probable intent of Congress.

Pub. L. 105–258, §104(b)(2)(A), which directed amendment of subsec. (f) by substituting "does" for "and the Shipping Act, 1916, do", was executed by making the substitution for "and the Shipping Act, 1916 do" after "This chapter", to reflect the probable intent of Congress.

Pub. L. 105–258, §104(a)(2), redesignated subsec. (e) as (f).

Subsec. (g). Pub. L. 105–383 added subsec. (g).

1995—Subsec. (e). Pub. L. 104–88 substituted "This chapter and the Shipping Act 1916" for "This chapter, the Shipping Act, 1916 (46 App. U.S.C. 801 et seq.], and the Intercoastal Shipping Act, 1933," and "this chapter or the Shipping Act, 1916" for "this chapter, the Shipping Act, 1916, or the Intercoastal Shipping Act, 1933,".

1984—Subsec. (a). Pub. L. 98–595 substituted "section 1703(a) or (b) of this Appendix" for "section 1703 of this Appendix".

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–88 effective Jan. 1, 1996, see section 2 of Pub. L. 104–88, set out as an Effective Date note under section 701 of Title 49, Transportation.

AUTHORITY OR EFFECTIVENESS OF ORDERS

Pub. L. 105–383, title IV, §424(c), Nov. 13, 1998, 112 Stat. 3441, provided that: "Nothing in this section [amending this section and sections 1702 and 1709 of this Appendix] shall affect or in any way diminish the authority or effectiveness of orders issued by the Maritime Administration pursuant to sections 9 and 41 of the Shipping Act, 1916 (46 U.S.C. App. 808 and 839)."

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1705, 1706, 1709, 1710 of this Appendix.

**§1705. Action on agreements**

**(a) Notice**

Within 7 days after an agreement is filed, the Commission shall transmit a notice of its filing to the Federal Register for publication.

## (b) Review standard

The Commission shall reject any agreement filed under section 1704(a) of this Appendix that, after preliminary review, it finds does not meet the requirements of section 1704 of this Appendix. The Commission shall notify in writing the person filing the agreement of the reason for rejection of the agreement.

## (c) Review and effective date

Unless rejected by the Commission under subsection (b) of this section, agreements, other than assessment agreements, shall become effective—

(1) on the 45th day after filing, or on the 30th day after notice of the filing is published in the Federal Register, whichever day is later; or

(2) if additional information or documentary material is requested under subsection (d) of this section, on the 45th day after the Commission receives—

(A) all the additional information and documentary material requested; or

(B) if the request is not fully complied with, the information and documentary material submitted and a statement of the reasons for noncompliance with the request. The period specified in paragraph (2) may be extended only by the United States District Court for the District of Columbia upon an application of the Commission under subsection (i) of this section.

## (d) Additional information

Before the expiration of the period specified in subsection (c)(1) of this section, the Commission may request from the person filing the agreement any additional information and documentary material it deems necessary to make the determinations required by this section.

## (e) Request for expedited approval

The Commission may, upon request of the filing party, shorten the review period specified in subsection (c) of this section, but in no event to a date less than 14 days after notice of the filing of the agreement is published in the Federal Register.

## (f) Term of agreements

The Commission may not limit the effectiveness of an agreement to a fixed term.

## (g) Substantially anticompetitive agreements

If, at any time after the filing or effective date of an agreement, the Commission determines that the agreement is likely, by a reduction in competition, to produce an unreasonable reduction in transportation service or an unreasonable increase in transportation cost, it may, after notice to the person filing the agreement, seek appropriate injunctive relief under subsection (h) of this section.

## (h) Injunctive relief

The Commission may, upon making the determination specified in subsection (g) of this section, bring suit in the United States District Court for the District of Columbia to enjoin operation of the agreement. The court may issue a temporary restraining order or preliminary injunction and, upon a showing that the agree-

ment is likely, by a reduction in competition, to produce an unreasonable reduction in transportation service or an unreasonable increase in transportation cost, may enter a permanent injunction. In a suit under this subsection, the burden of proof is on the Commission. The court may not allow a third party to intervene with respect to a claim under this subsection.

## (i) Compliance with informational needs

If a person filing an agreement, or an officer, director, partner, agent, or employee thereof, fails substantially to comply with a request for the submission of additional information or documentary material within the period specified in subsection (c) of this section, the United States District Court for the District of Columbia, at the request of the Commission—

(1) may order compliance;

(2) shall extend the period specified in subsection (c)(2) of this section until there has been substantial compliance; and

(3) may grant such other equitable relief as the court in its discretion determines necessary or appropriate.

## (j) Nondisclosure of submitted material

Except for an agreement filed under section 1704 of this Appendix, information and documentary material filed with the Commission under section 1704 of this Appendix or this section is exempt from disclosure under section 552 of title 5 and may not be made public except as may be relevant to an administrative or judicial action or proceeding. This section does not prevent disclosure to either body of Congress or to a duly authorized committee or subcommittee of Congress.

## (k) Representation

Upon notice to the Attorney General, the Commission may represent itself in district court proceedings under subsections (h) and (i) of this section and section 1710(h) of this Appendix. With the approval of the Attorney General, the Commission may represent itself in proceedings in the United States Courts of Appeal under subsections (h) and (i) of this section and section 1710(h) of this Appendix.

(Pub. L. 98–237, § 6, Mar. 20, 1984, 98 Stat. 72.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1706, 1709, 1710 of this Appendix.

## § 1706. Exemption from antitrust laws

## (a) In general

The antitrust laws do not apply to—

(1) any agreement that has been filed under section 1704 of this Appendix and is effective under section 1704(d)[1] or section 1705 of this Appendix or is exempt under section 1715 of this Appendix from any requirement of this chapter;

(2) any activity or agreement within the scope of this chapter, whether permitted under or prohibited by this chapter, undertaken or entered into with a reasonable basis to conclude that (A) it is pursuant to an agreement

---

[1] See References in Text note below.

on file with the Commission and in effect when the activity took place, or (B) it is exempt under section 1715 of this Appendix from any filing or publication requirement of this chapter;

(3) any agreement or activity that relates to transportation services within or between foreign countries, whether or not via the United States, unless that agreement or activity has a direct, substantial, and reasonably foreseeable effect on the commerce of the United States;

(4) any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade;

(5) any agreement or activity to provide or furnish wharfage, dock, warehouse, or other terminal facilities outside the United States; or

(6) subject to section 1719(e)(2) of this Appendix, any agreement, modification, or cancellation approved by the Commission before the effective date of this chapter under section 15[2] of the Shipping Act, 1916, or permitted under section 14b[2] thereof, and any properly published tariff, rate, fare, or charge, classification, rule, or regulation explanatory thereof implementing that argement,[3] modification, or cancellation.

**(b) Exceptions**

This chapter does not extend antitrust immunity—

(1) to any agreement with or among air carriers, rail carriers, motor carriers, or common carriers by water not subject to this chapter with respect to transportation within the United States;

(2) to any discussion or agreement among common carriers that are subject to this chapter regarding the inland divisions (as opposed to the inland portions) of through rates within the United States;

(3) to any agreement among common carriers subject to this chapter to establish, operate, or maintain a marine terminal in the United States; or

(4) to any loyalty contract.

**(c) Limitations**

(1) Any determination by an agency or court that results in the denial or removal of the immunity to the antitrust laws set forth in subsection (a) of this section shall not remove or alter the antitrust immunity for the period before the determination.

(2) No person may recover damages under section 4 of the Clayton Act (15 U.S.C. 15), or obtain injunctive relief under section 16 of that Act (15 U.S.C. 26), for conduct prohibited by this chapter.

(Pub. L. 98–237, § 7, Mar. 20, 1984, 98 Stat. 73; Pub. L. 105–258, title I, § 105, Oct. 14, 1998, 112 Stat. 1905.)

REFERENCES IN TEXT

Section 1704(d) of this Appendix, referred to in subsec. (a)(1), was redesignated section 1704(e) of this Appendix

[2]See References in Text note below.
[3]So in original. Probably should be "agreement,".

by Pub. L. 105–258, title I, § 104(a)(2), Oct. 14, 1998, 112 Stat. 1904.

For the effective date of this chapter, referred to in subsec. (a)(6), as 90 days after Mar. 20, 1984, see section 21 of Pub. L. 98–237, formerly set out as an Effective Date note under section 1701 of this Appendix.

Section 15 of the Shipping Act, 1916, referred to in subsec. (a)(6), which was classified to section 814 of this Appendix, was repealed by Pub. L. 104–88, title III, § 335(b)(3), Dec. 29, 1996, 109 Stat. 954.

Section 14b of the Shipping Act, 1916, referred to in subsec. (a)(6), which was classified to section 813a of former Title 46, Shipping, was repealed by Pub. L. 98–237, § 20(a), Mar. 20, 1984, 98 Stat. 88.

AMENDMENTS

1998—Subsec. (a)(2). Pub. L. 105–258, § 105(1), inserted "or publication" after "filing".

Subsec. (b)(4). Pub. L. 105–258, § 105(2)–(4), added par. (4).

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1704 of this Appendix.

**§ 1707. Tariffs**

**(a) In general**

(1) Except with regard to bulk cargo, forest products, recycled metal scrap, new assembled motor vehicles, waste paper, and paper waste, each common carrier and conference shall keep open to public inspection in an automated tariff system, tariffs showing all its rates, charges, classifications, rules, and practices between all points or ports on its own route and on any through transportation route that has been established. However, common carriers shall not be required to state separately or otherwise reveal in tariffs the inland divisions of a through rate. Tariffs shall—

(A) state the places between which cargo will be carried;

(B) list each classification of cargo in use;

(C) state the level of ocean transportation intermediary, as defined in section 1702(17)(A) of this Appendix, compensation, if any, by a carrier or conference;

(D) state separately each terminal or other charge, privilege, or facility under the control of the carrier or conference and any rules or regulations that in any way change, affect, or determine any part or the aggregate of the rates or charges;

(E) include sample copies of any bill of lading, contract of affreightment, or other document evidencing the transportation agreement; and

(F) include copies of any loyalty contract, omitting the shipper's name.

(2) Tariffs may be made available electronically to any person, without time, quantity, or other limitation, through appropriate access from remote locations, and a reasonable charge may be assessed for such access. No charge may be assessed a Federal agency for such access.

**(b) Time-volume rates**

Rates shown in tariffs filed under subsection (a) of this section may vary with the volume of cargo offered over a specified period of time.

### (c) Service contracts

#### (1) In general

An individual ocean common carrier or an agreement between or among ocean common carriers may enter into a service contract with one or more shippers subject to the requirements of this chapter. The exclusive remedy for a breach of a contract entered into under this subsection shall be an action in an appropriate court, unless the parties otherwise agree. In no case may the contract dispute resolution forum be controlled by or in any way affiliated with a controlled carrier as defined in section 1702(8) of this Appendix, or by the government which owns or controls the carrier.

#### (2) Filing requirements

Except for service contracts dealing with bulk cargo, forest products, recycled metal scrap, new assembled motor vehicles, waste paper, or paper waste, each contract entered into under this subsection by an individual ocean common carrier or an agreement shall be filed confidentially with the Commission. Each service contract shall include the following essential terms—

    (A) the origin and destination port ranges;
    (B) the origin and destination geographic areas in the case of through intermodal movements;
    (C) the commodity or commodities involved;
    (D) the minimum volume or portion;
    (E) the line-haul rate;
    (F) the duration;
    (G) service commitments; and
    (H) the liquidated damages for non-performance, if any.

#### (3) Publication of certain terms

When a service contract is filed confidentially with the Commission, a concise statement of the essential terms described in paragraphs 2(A),[1] (C), (D), and (F) shall be published and made available to the general public in tariff format.

#### (4) Disclosure of certain terms

(A) An ocean common carrier, which is a party to or is subject to the provisions of a collective bargaining agreement with a labor organization, shall, in response to a written request by such labor organization, state whether it is responsible for the following work at dock areas and within port areas in the United States with respect to cargo transportation under a service contract described in paragraph (1) of this subsection—

    (i) the movement of the shipper's cargo on a dock area or within the port area or to or from railroad cars on a dock area or within the port area;
    (ii) the assignment of intraport carriage of the shipper's cargo between areas on a dock or within the port area;
    (iii) the assignment of the carriage of the shipper's cargo between a container yard on a dock area or within the port area and a rail yard adjacent to such container yard; and
    (iv) the assignment of container freight station work and container maintenance and repair work performed at a dock area or within the port area.

(B) The common carrier shall provide the information described in subparagraph (A) of this paragraph to the requesting labor organization within a reasonable period of time.

(C) This paragraph requires the disclosure of information by an ocean common carrier only if there exists an applicable and otherwise lawful collective bargaining agreement which pertains to that carrier. No disclosure made by an ocean common carrier shall be deemed to be an admission or agreement that any work is covered by a collective bargaining agreement. Any dispute regarding whether any work is covered by a collective bargaining agreement and the responsibility of the ocean common carrier under such agreement shall be resolved solely in accordance with the dispute resolution procedures contained in the collective bargaining agreement and the National Labor Relations Act [29 U.S.C. 151 et seq.], and without reference to this paragraph.

(D) Nothing in this paragraph shall have any effect on the lawfulness or unlawfulness under this chapter, the National Labor Relations Act [29 U.S.C. 151 et seq.], the Taft-Hartley Act [29 U.S.C. 141 et seq.], the Federal Trade Commission Act [15 U.S.C. 41 et seq.], the antitrust laws, or any other Federal or State law, or any revisions or amendments thereto, of any collective bargaining agreement or element thereof, including any element that constitutes an essential term of a service contract under this subsection.

(E) For purposes of this paragraph the terms "dock area" and "within the port area" shall have the same meaning and scope as in the applicable collective bargaining agreement between the requesting labor organization and the carrier.

### (d) Tariff rates

No new or initial rate or change in an existing rate that results in an increased cost to the shipper may become effective earlier than 30 calendar days after publication. The Commission, for good cause, may allow such a new or initial rate or change to become effective in less than 30 calendar days. A change in an existing rate that results in a decreased cost to the shipper may become effective upon publication.

### (e) Refunds

The Commission may, upon application of a carrier or shipper, permit a common carrier or conference to refund a portion of freight charges collected from a shipper or to waive the collection of a portion of the charges from a shipper if—

    (1) there is an error in a,[2] in failing to publish a new tariff, or an error in quoting a tariff, and the refund will not result in discrimination among shippers, ports, or carriers;
    (2) the common carrier or conference has, prior to filing an application for authority to

---

[1] So in original. Probably should be "(2)(A),".

[2] So in original.

make a refund for an error in a tariff or a fail-
ure to publish a tariff, published a new tariff
that sets forth the rate on which the refund or
waiver would be based; and

(3) the application for refund or waiver is
filed with the Commission within 180 days
from the date of shipment.

**(f) Marine terminal operator schedules**

A marine terminal operator may make avail-
able to the public, subject to section 1709(d) of
this Appendix, a schedule of rates, regulations,
and practices, including limitations of liability
for cargo loss or damage, pertaining to receiv-
ing, delivering, handling, or storing property at
its marine terminal. Any such schedule made
available to the public shall be enforceable by
an appropriate court as an implied contract
without proof of actual knowledge of its provi-
sions.

**(g) Regulations**

The Commission shall by regulation prescribe
the requirements for the accessibility and accu-
racy of automated tariff systems established
under this section. The Commission may, after
periodic review, prohibit the use of any auto-
mated tariff system that fails to meet the re-
quirements established under this section. The
Commission may not require a common carrier
to provide a remote terminal for access under
subsection (a)(2) of this section. The Commis-
sion shall by regulation prescribe the form and
manner in which marine terminal operator
schedules authorized by this section shall be
published.

(Pub. L. 98–237, § 8, Mar. 20, 1984, 98 Stat. 74; Pub.
L. 105–258, title I, § 106, Oct. 14, 1998, 112 Stat.
1905.)

REFERENCES IN TEXT

The National Labor Relations Act, referred to in sub-
sec. (c)(4)(C), (D), is act July 5, 1935, ch. 372, 49 Stat. 449,
as amended, which is classified generally to subchapter
II (§ 151 et seq.) of chapter 7 of Title 29, Labor. For com-
plete classification of this Act to the Code, see section
167 of Title 29 and Tables.

The Taft-Hartley Act, also known as the Labor Man-
agement Relations Act, 1947, referred to in subsec.
(c)(4)(D), is act June 23, 1947, ch. 120, 61 Stat. 136, as
amended, which is classified principally to chapter 7
(§ 141 et seq.) of Title 29, Labor. For complete classifica-
tion of this Act to the Code, see section 141 of Title 29
and Tables.

The Federal Trade Commission Act, referred to in
subsec. (c)(4)(D), is act Sept. 26, 1914, ch. 311, 38 Stat.
717, as amended, which is classified generally to sub-
chapter I (§ 41 et seq.) of chapter 2 of Title 15, Com-
merce and Trade. For complete classification of this
Act to the Code, see section 58 of Title 15 and Tables.

AMENDMENTS

1998—Subsec. (a)(1). Pub. L. 105–258, § 106(a)(1)–(4), in
introductory provisions, in first sentence, inserted
"new assembled motor vehicles," after "scrap,", struck
out "file with the Commission, and" after "conference
shall", and substituted "inspection in an automated
tariff system," for "inspection,", and in second sen-
tence, substituted "tariffs" for "tariff filings".

Subsec. (a)(1)(C). Pub. L. 105–258, § 106(a)(5), sub-
stituted "transportation intermediary, as defined in
section 1702(17)(A) of this Appendix," for "freight for-
warder".

Subsec. (a)(1)(E). Pub. L. 105–258, § 106(a)(7), struck
out "loyalty contract," before "bill of lading".

Subsec. (a)(1)(F). Pub. L. 105–258, § 106(a)(6), (8), (9),
added subpar. (F).

Subsec. (a)(2). Pub. L. 105–258, § 106(a)(10), added par.
(2) and struck out former par. (2) which read as follows:
"Copies of tariffs shall be made available to any per-
son, and a reasonable charge may be assessed for
them."

Subsec. (c). Pub. L. 105–258, § 106(b), amended heading
and text of subsec. (c) generally. Prior to amendment,
text read as follows: "An ocean common carrier or con-
ference may enter into a service contract with a ship-
per or shippers' association subject to the requirements
of this chapter. Except for service contracts dealing
with bulk cargo, forest products, recycled metal scrap,
waste paper, or paper waste, each contract entered into
under this subsection shall be filed confidentially with
the Commission, and at the same time, a concise state-
ment of its essential terms shall be filed with the Com-
mission and made available to the general public in
tariff format, and those essential terms shall be avail-
able to all shippers similarly situated. The essential
terms shall include—

"(1) the origin and destination port ranges in the
case of port-to-port movements, and the origin and
destination geographic areas in the case of through
intermodal movements;

"(2) the commodity or commodities involved;

"(3) the minimum volume;

"(4) the line-haul rate;

"(5) the duration;

"(6) service commitments; and

"(7) the liquidated damages for nonperformance, if
any.

The exclusive remedy for a breach of a contract entered
into under this subsection shall be an action in an ap-
propriate court, unless the parties otherwise agree."

Subsec. (d). Pub. L. 105–258, § 106(c), substituted "Tar-
iff rates" for "Rates" in heading and substituted "30
calendar days after publication." for "30 days after fil-
ing with the Commission." in first sentence, inserted
"calendar" after "30" in second sentence, and sub-
stituted "publication." for "publication and filing with
the Commission." in last sentence.

Subsec. (e)(1). Pub. L. 105–258, § 106(d)(2), which di-
rected amendment of par. (1) by substituting "publish
a new tariff, or an error in quoting a tariff," for "file
a new tariff," was executed by making the substitution
for "file a new tariff" after "in failing to", to reflect
the probable intent of Congress.

Pub. L. 105–258, § 106(d)(1), substituted "error in a,"
for "error in a tariff of a clerical or administrative na-
ture or an error due to inadvertence".

Subsec. (e)(2). Pub. L. 105–258, § 106(d)(3), (4), sub-
stituted "refund for an error in a tariff or a failure to
publish a tariff, published a new tariff" for "refund,
filed a new tariff with the Commission" and inserted
"and" at end.

Subsec. (e)(3), (4). Pub. L. 105–258, § 106(d)(5), redesig-
nated par. (4) as (3) and struck out former par. (3) which
read as follows: "the common carrier or conference
agrees that if permission is granted by the Commission,
an appropriate notice will be published in the tariff, or
such other steps taken as the Commission may require
that give notice of the rate on which the refund or
waiver would be based, and additional refunds or waiv-
ers as appropriate shall be made with respect to other
shipments in the manner prescribed by the Commission
in its order approving the application; and".

Subsec. (f). Pub. L. 105–258, § 106(e), amended heading
and text of subsec. (f) generally. Prior to amendment,
text read as follows: "The Commission may by regula-
tion prescribe the form and manner in which the tariffs
required by this section shall be published and filed.
The Commission may reject a tariff that is not filed in
conformity with this section and its regulations. Upon
rejection by the Commission, the tariff is void and its
use is unlawful."

Subsec. (g). Pub. L. 105–258, § 106(f), added subsec. (g).

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1704, 1708, 1709, 1719 of this Appendix.

## § 1708. Controlled carriers

### (a) Controlled carrier rates

No controlled carrier subject to this section may maintain rates or charges in its tariffs or service contracts, or charge or assess rates, that are below a level that is just and reasonable, nor may any such carrier establish[1] maintain, or enforce unjust or unreasonable classifications, rules, or regulations in those tariffs or service contracts. An unjust or unreasonable classification, rule, or regulation means one that results or is likely to result in the carriage or handling of cargo at rates or charges that are below a just and reasonable level. The Commission may, at any time after notice and hearing, prohibit the publication or use of any rates, charges, classifications, rules, or regulations that the controlled carrier has failed to demonstrate to be just and reasonable. In a proceeding under this subsection, the burden of proof is on the controlled carrier to demonstrate that its rates, charges, classifications, rules, or regulations are just and reasonable. Rates, charges, classifications, rules, or regulations that have been suspended or prohibited by the Commission are void and their use is unlawful.

### (b) Rate standards

For the purpose of this section, in determining whether rates, charges, classifications, rules, or regulations by a controlled carrier are just and reasonable, the Commission shall take into account whether the rates or charges which have been published or assessed or which would result from the pertinent classifications, rules, or regulations are below a level which is fully compensatory to the controlled carrier based upon that carrier's actual costs or upon its constructive costs. For purposes of the preceding sentence, the term "constructive costs" means the costs of another carrier, other than a controlled carrier, operating similar vessels and equipment in the same or a similar trade. The Commission may also take into account other appropriate factors, including but not limited to, whether—

(1) the rates, charges, classifications, rules, or regulations are the same as or similar to those published or assessed or assessed[2] by other carriers in the same trade;

(2) the rates, charges, classifications, rules, or regulations are required to assure movement of particular cargo in the trade; or

(3) the rates, charges, classifications, rules, or regulations are required to maintain acceptable continuity, level, or quality of common carrier service to or from affected ports.

### (c) Effective date of rates

Notwithstanding section 1707(d) of this Appendix and except for service contracts, the rates, charges, classifications, rules, or regulations of controlled carriers may not, without special permission of the Commission, become effective sooner than the 30th day after the date of publication. Each controlled carrier shall, upon the request of the Commission, file, within 20 days of request (with respect to its existing or proposed rates, charges, classifications, rules, or regulations), a statement of justification that sufficiently details the controlled carrier's need and purpose for such rates, charges, classifications, rules, or regulations upon which the Commission may reasonably base its determination of the lawfulness thereof.

### (d) Prohibition of rates

Within 120 days after the receipt of information requested by the Commission under this section, the Commission shall determine whether the rates, charges, classifications, rules, or regulations of a controlled carrier may be unjust and unreasonable. Whenever the Commission is of the opinion that the rates, charges, classifications, rules, or regulations published or assessed by a controlled carrier may be unjust and unreasonable, the Commission shall issue an order to the controlled carrier to show cause why those rates, charges, classifications, rules, or regulations should not be prohibited. Pending a determination as to their lawfulness in such a proceeding, the Commission may suspend the rates, charges, classifications, rules, or regulations at any time before their effective date. In the case of rates, charges, classifications, rules, or regulations that have already become effective, the Commission may, upon the issuance of an order to show cause, suspend those rates, charges, classifications, rules, or regulations on not less than 30 days' notice to the controlled carrier. No period of suspension under this subsection may be greater than 180 days. Whenever the Commission has suspended any rates, charges, classifications, rules, or regulations under this subsection, the affected controlled carrier may publish new rates, charges, classifications, rules, or regulations to take effect immediately during the suspension period in lieu of the suspended rates, charges, classifications, rules, or regulations—except that the Commission may reject the new rates, charges, classifications, rules, or regulations if it is of the opinion that they are unjust and unreasonable.

### (e) Presidential review

Concurrently with the publication thereof, the Commission shall transmit to the President each order of suspension or final order of prohibition of rates, charges, classifications, rules, or regulations of a controlled carrier subject to this section. Within 10 days after the receipt or the effective date of the Commission order, the President may request the Commission in writing to stay the effect of the Commission's order if the President finds that the stay is required for reasons of national defense or foreign policy, which reasons shall be specified in the report. Notwithstanding any other law, the Commission shall immediately grant the request by the issuance of an order in which the President's request shall be described. During any such stay, the President shall, whenever practicable, attempt to resolve the matter in controversy by negotia-

---

[1] So in original. Probably should be followed by a comma.

[2] So in original.

tion with representatives of the applicable foreign governments.

**(f) Exceptions**

This section does not apply to—

(1) a controlled carrier of a state whose vessels are entitled by a treaty of the United States to receive national or most-favored-nation treatment; or

(2) a trade served exclusively by controlled carriers.

(Pub. L. 98–237, §9, Mar. 20, 1984, 98 Stat. 76; Pub. L. 102–100, §5, Aug. 17, 1991, 105 Stat. 492; Pub. L. 105–258, title I, §108, Oct. 14, 1998, 112 Stat. 1908.)

AMENDMENTS

1998—Subsec. (a). Pub. L. 105–258, §108(1)–(4), substituted "service contracts, or charge or assess rates," for "service contracts filed with the Commission" and "maintain, or enforce" for "or maintain" in first sentence, "prohibit the publication or use of" for "disapprove" in third sentence, and "that have been suspended or prohibited by the Commission" for "filed by a controlled carrier that have been rejected, suspended, or disapproved by the Commission" in last sentence.

Subsec. (b). Pub. L. 105–258, §108(5), substituted "shall take into account whether the rates or charges which have been published or assessed or which would result from the pertinent classifications, rules, or regulations are below a level which is fully compensatory to the controlled carrier based upon that carrier's actual costs or upon its constructive costs. For purposes of the preceding sentence, the term 'constructive costs' means the costs of another carrier, other than a controlled carrier, operating similar vessels and equipment in the same or a similar trade. The Commission may also take into account other appropriate factors, including but not limited to, whether—" for "may take into account appropriate factors including, but not limited to, whether—" in introductory provisions.

Subsec. (b)(1). Pub. L. 105–258, §108(6), (7), redesignated par. (2) as (1), substituted "published or assessed" for "filed", and struck out former par. (1) which read as follows: "the rates or charges which have been filed or which would result from the pertinent classifications, rules, or regulations are below a level which is fully compensatory to the controlled carrier based upon that carrier's actual costs or upon its constructive costs, which are hereby defined as the costs of another carrier, other than a controlled carrier, operating similar vessels and equipment in the same or a similar trade;".

Subsec. (b)(2) to (4). Pub. L. 105–258, §108(6), redesignated pars. (2) to (4) as (1) to (3), respectively.

Subsec. (c). Pub. L. 105–258, §108(8), substituted "publication." for "filing with the Commission." in first sentence.

Subsec. (d). Pub. L. 105–258, §108(9)–(15), substituted "Prohibition" for "Disapproval" in heading, inserted first sentence and read as follows: "Within 120 days after the receipt of information requested by the Commission under this section, the Commission shall determine whether the rates, charges, classifications, rules, or regulations of a controlled carrier may be unjust and unreasonable.", substituted "published or assessed" for "filed", "shall issue" for "may issue", and "prohibited." for "disapproved." in second sentence, substituted "30" for "60" in fourth sentence, and in last sentence inserted "controlled" after "affected" and substituted "publish" for "file".

Subsec. (e). Pub. L. 105–258, §108(16), substituted "prohibition" for "disapproval" in first sentence.

Subsec. (f)(1). Pub. L. 105–258, §108(17), inserted "or" at end.

Subsec. (f)(2) to (5). Pub. L. 105–258, §108(18), (19), redesignated par. (5) as (2) and struck out former pars. (2) to (4) which read as follows:

"(2) a controlled carrier of a state which, on the effective date of this section, has subscribed to the state-

ment of shipping policy contained in note 1 to annex A of the Code of Liberalization of Current Invisible Operations, adopted by the Council of the Organization for Economic Cooperation and Development;

"(3) rates, charges, classifications, rules, or regulations of a controlled carrier in any particular trade that are covered by an agreement effective under section 1705 of this Appendix, other than an agreement in which all of the members are controlled carriers not otherwise excluded from the provisions of this subsection;

"(4) rates, charges, classifications, rules, or regulations governing the transportation of cargo by a controlled carrier between the country by whose government it is owned or controlled, as defined herein and the United States; or".

1991—Subsec. (a). Pub. L. 102–100, §5(a), inserted "or service contracts" after "tariffs" in two places.

Subsec. (c). Pub. L. 102–100, §5(b), inserted "and except for service contracts" after "Notwithstanding section 1707(d) of this Appendix".

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1709 of this Appendix.

## §1709. Prohibited acts

**(a) In general**

No person may—

(1) knowingly and willfully, directly or indirectly, by means of false billing, false classification, false weighing, false report of weight, false measurement, or by any other unjust or unfair device or means obtain or attempt to obtain ocean transportation for property at less than the rates or charges that would otherwise be applicable;

(2) operate under an agreement required to be filed under section 1704 of this Appendix that has not become effective under section 1705 of this Appendix, or that has been rejected, disapproved, or canceled; or

(3) operate under an agreement required to be filed under section 1704 of this Appendix except in accordance with the terms of the agreement or any modifications made by the Commission to the agreement.

**(b) Common carriers**

No common carrier, either alone or in conjunction with any other person, directly or indirectly, may—

(1) allow any person to obtain transportation for property at less than the rates or charges established by the carrier in its tariff or service contract by means of false billing, false classification, false weighing, false measurement, or by any other unjust or unfair device or means;

(2) provide service in the liner trade that—

(A) is not in accordance with the rates, charges, classifications, rules, and practices contained in a tariff published or a service contract entered into under section 1707 of this Appendix unless excepted or exempted under section 1707(a)(1) or 1715 of this Appendix; or

(B) is under a tariff or service contract which has been suspended or prohibited by

the Commission under section 1708 of this Appendix or the Foreign Shipping Practices Act of 1988 (46 U.S.C. App. 1710a);

(3) retaliate against any shipper by refusing, or threatening to refuse, cargo space accommodations when available, or resort to other unfair or unjustly discriminatory methods because the shipper has patronized another carrier, or has filed a complaint, or for any other reason;

(4) for service pursuant to a tariff, engage in any unfair or unjustly discriminatory practice in the matter of—

(A) rates or charges;

(B) cargo classifications;

(C) cargo space accommodations or other facilities, due regard being had for the proper loading of the vessel and the available tonnage;

(D) the loading and landing of freight; or

(E) the adjustment and settlement of claims;

(5) for service pursuant to a service contract, engage in any unfair or unjustly discriminatory practice in the matter of rates or charges with respect to any port;

(6) use a vessel or vessels in a particular trade for the purpose of excluding, preventing, or reducing competition by driving another ocean common carrier out of that trade;

(7) offer or pay any deferred rebates;

(8) for service pursuant to a tariff, give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage;

(9) for service pursuant to a service contract, give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any port;

(10) unreasonably refuse to deal or negotiate;

(11) knowingly and willfully accept cargo from or transport cargo for the account of an ocean transportation intermediary that does not have a tariff and a bond, insurance, or other surety as required by sections 1707 and 1718 of this Appendix;

(12) knowingly and willfully enter into a service contract with an ocean transportation intermediary that does not have a tariff and a bond, insurance, or other surety as required by sections 1707 and 1718 of this Appendix, or with an affiliate of such ocean transportation intermediary; or

(13) knowingly disclose, offer, solicit, or receive any information concerning the nature, kind, quantity, destination, consignee, or routing of any property tendered or delivered to a common carrier without the consent of the shipper or consignee if that information—

(A) may be used to the detriment or prejudice of the shipper or consignee;

(B) may improperly disclose its business transaction to a competitor; or

(C) may be used to the detriment or prejudice of any common carrier.

Nothing in paragraph (13) shall be construed to prevent providing such information, in response to legal process, to the United States, the Commission, or to an independent neutral body oper-

ating within the scope of its authority to fulfill the policing obligations of the parties to an agreement effective under this chapter. Nor shall it be prohibited for any ocean common carrier that is a party to a conference agreement approved under this chapter, or any receiver, trustee, lessee, agent, or employee of that carrier, or any other person authorized by that carrier to receive information, to give information to the conference or any person, firm, corporation, or agency designated by the conference, or to prevent the conference or its designee from soliciting or receiving information for the purpose of determining whether a shipper or consignee has breached an agreement with the conference or its member lines or for the purpose of determining whether a member of the conference has breached the conference agreement, or for the purpose of compiling statistics of cargo movement, but the use of such information for any other purpose prohibited by this chapter or any other Act is prohibited.

**(c) Concerted action**

No conference or group of two or more common carriers may—

(1) boycott or take any other concerted action resulting in an unreasonable refusal to deal;

(2) engage in conduct that unreasonably restricts the use of intermodal services or technological innovations;

(3) engage in any predatory practice designed to eliminate the participation, or deny the entry, in a particular trade of a common carrier not a member of the conference, a group of common carriers, an ocean tramp, or a bulk carrier;

(4) negotiate with a nonocean carrier or group of nonocean carriers (for example, truck, rail, or air operators) on any matter relating to rates or services provided to ocean common carriers within the United States by those non-ocean carriers, unless such negotiations and any resulting agreements are not in violation of the antitrust laws and are consistent with the purposes of this chapter: *Provided,* That this paragraph does not prohibit the setting and publishing of a joint through rate by a conference, joint venture, or an association of ocean common carriers;

(5) deny in the export foreign commerce of the United States compensation to an ocean transportation intermediary, as defined by section 1702(17)(A) of this Appendix, or limit that compensation to less than a reasonable amount;

(6) allocate shippers among specific carriers that are parties to the agreement or prohibit a carrier that is a party to the agreement from soliciting cargo from a particular shipper, except as authorized by section 1704(g) of this Appendix, or as otherwise required by the law of the United States or the importing or exporting country, or as agreed to by a shipper in a service contract;

(7) for service pursuant to a service contract, engage in any unjustly discriminatory practice in the matter of rates or charges with respect to any locality, port, or persons due to those persons' status as shippers' associations or ocean transportation intermediaries; or

§ 1709            TITLE 46, APPENDIX—SHIPPING            Page 1360

(8) for service pursuant to a service contract, give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any locality, port, or persons due to those persons' status as shippers' associations or ocean transportation intermediaries;

**(d) Common carriers, ocean transportation intermediaries, and marine terminal operators**

(1) No common carrier, ocean transportation intermediary, or marine terminal operator may fail to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property.

(2) No marine terminal operator may agree with another marine terminal operator or with a common carrier to boycott, or unreasonably discriminate in the provision of terminal services to, any common carrier or ocean tramp.

(3) The prohibitions in subsections (b)(10) and (13) of this section apply to marine terminal operators.

(4) No marine terminal operator may give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any person.

(5) The prohibition in subsection (b)(13) of this section applies to ocean transportation intermediaries, as defined by section 1702(17)(A) of this Appendix.

**(e) Joint ventures**

For purposes of this section, a joint venture or consortium of two or more common carriers but operated as a single entity shall be treated as a single common carrier.

(Pub. L. 98–237, § 10, Mar. 20, 1984, 98 Stat. 77; Pub. L. 101–595, title VII, § 710(c), Nov. 16, 1990, 104 Stat. 2997; Pub. L. 102–251, title II, § 201(b), Mar. 9, 1992, 106 Stat. 60; Pub. L. 105–258, title I, § 109, Oct. 14, 1998, 112 Stat. 1909; Pub. L. 105–383, title IV, § 424(b), Nov. 13, 1998, 112 Stat. 3441.)

REFERENCES IN TEXT

The Foreign Shipping Practices Act of 1988, referred to in subsec. (b)(2), is Pub. L. 100–418, title X, subtitle A (§§ 10001–10003), Aug. 23, 1988, 102 Stat. 1570, which enacted section 1710a of this Appendix, amended section 1122b of this Appendix, and enacted provisions set out as a note under section 3302 of Title 46, Shipping. For complete classification of this Act to the Code, see Short Title of 1988 Amendment note set out under section 1701 of this Appendix and Tables.

AMENDMENTS

1998—Subsec. (b). Pub. L. 105–258, § 109(a)(16), (17), substituted "paragraph (13)" for "paragraph (16)" and inserted "the Commission," after "United States," in concluding provisions.

Subsec. (b)(1). Pub. L. 105–258, § 109(a)(1), (2), redesignated par. (4) as (1) and struck out former par. (1) which read as follows: "charge, demand, collect, or receive greater, less, or different compensation for the transportation of property or for any service in connection ther=with than the rates and charges that are shown in its tariffs or service contracts;".

Subsec. (b)(2). Pub. L. 105–258, § 109(a)(1), (3), added par. (2) and struck out former par. (2) which read as follows: "rebate, refund, or remit in any manner, or by any device, any portion of its rates except in accordance with its tariffs or service contracts;".

Subsec. (b)(3). Pub. L. 105–258, § 109(a)(1), (4), redesignated par. (5) as (3) and struck out former par. (3) which

read as follows: "extend or deny to any person any privilege, concession, equipment, or facility except in accordance with its tariffs or service contracts;".

Subsec. (b)(4). Pub. L. 105–258, § 109(a)(5), substituted "for service pursuant to a tariff," for "except for service contracts," in introductory provisions.

Pub. L. 105–258, § 109(a)(4), redesignated par. (6) as (4). Former par. (4) redesignated (1).

Subsec. (b)(4)(A). Pub. L. 105–258, § 109(a)(6), substituted "rates or charges;" for "rates;".

Subsec. (b)(5). Pub. L. 105–258, § 109(a)(7), added par. (5). Former par. (5) redesignated (3).

Subsec. (b)(6). Pub. L. 105–258, § 109(a)(9), added par. (6) and struck out former par. (6) which read as follows: "employ any fighting ship;".

Pub. L. 105–258, § 109(a)(8), redesignated par. (5) as (6). Former par. (6) redesignated (4).

Subsec. (b)(7). Pub. L. 105–258, § 109(a)(8), redesignated par. (8) as (7). Former par. (7) redesignated (6).

Subsec. (b)(8). Pub. L. 105–258, § 109(a)(10), added par. (8). Former par. (8) redesignated (7).

Subsec. (b)(9), (10). Pub. L. 105–258, § 109(a)(10), added pars. (9) and (10) and struck out former pars. (9) and (10) which read as follows:

"(9) use a loyalty contract, except in conformity with the antitrust laws;

"(10) demand, charge, or collect any rate or charge that is unjustly discriminatory between shippers or ports;".

Subsec. (b)(11). Pub. L. 105–258, § 109(a)(10)–(13), redesignated par. (14) as (11), substituted "an ocean transportation intermediary" for "a non-vessel-operating common carrier" and "sections 1707 and 1718" for "sections 1707 and 1721", and struck out former par. (11) which read as follows: "except for service contracts, make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever;".

Subsec. (b)(12). Pub. L. 105–258, § 109(a)(10)–(15), redesignated par. (15) as (12), substituted "an ocean transportation intermediary" for "a non-vessel-operating common carrier" in two places, substituted "sections 1707 and 1718" for "sections 1707 and 1721", struck out "or in which an ocean transportation intermediary is listed as an affiliate" before "that does not", substituted "Appendix, or with an affiliate of such ocean transportation intermediary;" for "Appendix;", and struck out former par. (12) which read as follows: "subject any particular person, locality, or description of traffic to an unreasonable refusal to deal or any undue or unreasonable prejudice or disadvantage in any respect whatsoever;".

Subsec. (b)(13). Pub. L. 105–258, § 109(a)(10), (11), redesignated par. (16) as (13) and struck out former par. (13) which read as follows: "refuse to negotiate with a shippers' association;".

Subsec. (b)(14) to (16). Pub. L. 105–258, § 109(a)(11), redesignated pars. (14) to (16) as (11) to (13), respectively.

Subsec. (c)(4). Pub. L. 105–258, § 109(b)(1), which directed amendment of subsec. (c)(4) by substituting "non-ocean carriers, unless such negotiations and any resulting agreements are not in violation of the antitrust laws and are consistent with the purposes of this chapter" for "non-ocean carriers", was executed by making the substitution for "nonocean carriers" the second place it appeared, to reflect the probable intent of Congress.

Subsec. (c)(5). Pub. L. 105–258, § 109(b)(2), substituted "transportation intermediary, as defined by section 1702(17)(A) of this Appendix," for "freight forwarder".

Subsec. (c)(6). Pub. L. 105–383 inserted "authorized by section 1704(g) of this Appendix, or as" before "otherwise".

Subsec. (c)(7), (8). Pub. L. 105–258, § 109(b)(3)–(5), added pars. (7) and (8).

Subsec. (d). Pub. L. 105–258, § 109(c)(1), substituted "transportation intermediaries," for "freight forwarders," in heading.

Subsec. (d)(1). Pub. L. 105–258, § 109(c)(2), substituted "transportation intermediary," for "freight forwarder,".

Subsec. (d)(3). Pub. L. 105–258, §109(c)(3), which directed amendment of subsec. (d) by substituting "subsections (b)(10) and (13)" for "subsection (b)(11), (12), and (16)", was executed by making the substitution for "subsection (b)(11), (12), and (14)" in par. (3), to reflect the probable intent of Congress.

Subsec. (d)(4), (5). Pub. L. 105–258, §109(c)(4), added pars. (4) and (5).

1992—Subsec. (b)(14), (15). Pub. L. 102–251 inserted ", insurance, or other surety" after "bond".

1990—Subsec. (b). Pub. L. 101–595 added pars. (14) and (15), redesignated former par. (14) as (16), and substituted "paragraph (16)" for "paragraph (14)" in penultimate sentence.

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

EFFECTIVE DATE OF 1992 AMENDMENT

Section 201(f) of Pub. L. 102–251 provided that: "This section [amending this section and section 1721 of this Appendix and enacting provisions set out as notes under sections 1701 and 1721 of this Appendix] shall become effective 90 days after the date of its enactment [Mar. 9, 1992]."

EFFECTIVE DATE OF 1990 AMENDMENT

Section 710(e) of Pub. L. 101–595 provided that: "This section [enacting section 1721 of this Appendix, amending this section, and enacting provisions set out as notes under sections 1701 and 1721 of this Appendix] shall become effective 90 days after the date of its enactment [Nov. 16, 1990]."

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1704, 1707, 1710, 1712 of this Appendix.

## § 1710. Complaints, investigations, reports, and reparations

### (a) Filing of complaints

Any person may file with the Commission a sworn complaint alleging a violation of this chapter, other than section 1705(g) of this Appendix, and may seek reparation for any injury caused to the complainant by that violation.

### (b) Satisfaction or investigation of complaints

The Commission shall furnish a copy of a complaint filed pursuant to subsection (a) of this section to the person named therein who shall, within a reasonable time specified by the Commission, satisfy the complaint or answer it in writing. If the complaint is not satisfied, the Commission shall investigate it in an appropriate manner and make an appropriate order.

### (c) Commission investigations

The Commission, upon complaint or upon its own motion, may investigate any conduct or agreement that it believes may be in violation of this chapter. Except in the case of an injunction granted under subsection (h) of this section, each agreement under investigation under this section remains in effect until the Commission issues an order under this subsection. The Commission may by order disapprove, cancel, or modify any agreement filed under section 1704(a) of this Appendix that operates in violation of this chapter. With respect to agreements inconsistent with section 1705(g) of this Appendix, the Commission's sole remedy is under section 1705(h) of this Appendix.

### (d) Conduct of investigation

Within 10 days after the initiation of a proceeding under this section, the Commission shall set a date on or before which its final decision will be issued. This date may be extended for good cause by order of the Commission.

### (e) Undue delays

If, within the time period specified in subsection (d) of this section, the Commission determines that it is unable to issue a final decision because of undue delays caused by a party to the proceedings, the Commission may impose sanctions, including entering a decision adverse to the delaying party.

### (f) Reports

The Commission shall make a written report of every investigation made under this chapter in which a hearing was held stating its conclusions, decisions, findings of fact, and order. A copy of this report shall be furnished to all parties. The Commission shall publish each report for public information, and the published report shall be competent evidence in all courts of the United States.

### (g) Reparations

For any complaint filed within 3 years after the cause of action accrued, the Commission shall, upon petition of the complainant and after notice and hearing, direct payment of reparations to the complainant for actual injury (which, for purposes of this subsection, also includes the loss of interest at commercial rates compounded from the date of injury) caused by a violation of this chapter plus reasonable attorney's fees. Upon a showing that the injury was caused by activity that is prohibited by section 1709(b)(3) or (6) of this Appendix or section 1709(c)(1) or (3) of this Appendix, or that violates section 1709(a)(2) or (3) of this Appendix, the Commission may direct the payment of additional amounts; but the total recovery of a complainant may not exceed twice the amount of the actual injury. In the case of injury caused by an activity that is prohibited by section 1709(b)(4)(A) or (B) of this Appendix, the amount of the injury shall be the difference between the rate paid by the injured shipper and the most favorable rate paid by another shipper.

### (h) Injunction

(1) In connection with any investigation conducted under this section, the Commission may bring suit in a district court of the United States to enjoin conduct in violation of this chapter. Upon a showing that standards for granting injunctive relief by courts of equity are met and after notice to the defendant, the court may grant a temporary restraining order or preliminary injunction for a period not to exceed 10 days after the Commission has issued an order disposing of the issues under investigation. Any such suit shall be brought in a district in which the defendant resides or transacts business.

(2) After filing a complaint with the Commission under subsection (a) of this section, the complainant may file suit in a district court of the United States to enjoin conduct in violation of this chapter. Upon a showing that standards for granting injunctive relief by courts of equity

are met and after notice to the defendant, the court may grant a temporary restraining order or preliminary injunction for a period not to exceed 10 days after the Commission has issued an order disposing of the complaint. Any such suit shall be brought in the district in which the defendant has been sued by the Commission under paragraph (1); or, if no suit has been filed, in a district in which the defendant resides or transacts business. A defendant that prevails in a suit under this paragraph shall be allowed reasonable attorney's fees to be assessed and collected as part of the costs of the suit.

(Pub. L. 98–237, § 11, Mar. 20, 1984, 98 Stat. 80; Pub. L. 98–595, § 3(b)(2), Oct. 30, 1984, 98 Stat. 3132; Pub. L. 105–258, title I, § 110, Oct. 14, 1998, 112 Stat. 1911.)

AMENDMENTS

1998—Subsec. (g). Pub. L. 105–258 substituted "1709(b)(3) or (6)" for "1709(b)(5) or (7)" and "1709(b)(4)(A) or (B)" for "1709(b)(6)(A) or (B)".

1984—Subsec. (g). Pub. L. 98–595 substituted "section 1709(c)(1) or (3) of this Appendix" for "section 1709(c)(1) or (4) of this Appendix".

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1705, 1718 of this Appendix.

## § 1710a. Foreign laws and practices

### (a) Definitions

For purposes of this section—

(1) "common carrier", "marine terminal operator", "ocean transportation intermediary", "ocean common carrier", "person", "shipper", "shippers' association", and "United States" have the meanings given each such term, respectively, in section 1702 of this Appendix;

(2) "foreign carrier" means an ocean common carrier a majority of whose vessels are documented under the laws of a country other than the United States;

(3) "maritime services" means port-to-port carriage of cargo by the vessels operated by ocean common carriers;

(4) "maritime-related services" means intermodal operations, terminal operations, cargo solicitation, agency services, ocean transportation intermediary services and operations, and all other activities and services integral to total transportation systems of ocean common carriers and their foreign domiciled affiliates on their own and others' behalf;

(5) "United States carrier" means an ocean common carrier which operates vessels documented under the laws of the United States; and

(6) "United States oceanborne trade" means the carriage of cargo between the United States and a foreign country, whether direct or indirect, by an ocean common carrier.

### (b) Authority to conduct investigations

The Federal Maritime Commission shall investigate whether any laws, rules, regulations, policies, or practices of foreign governments, or any practices of foreign carriers or other persons providing maritime or maritime-related services in a foreign country result in the existence of conditions that—

(1) adversely affect the operations of United States carriers in United States oceanborne trade; and

(2) do not exist for foreign carriers of that country in the United States under the laws of the United States or as a result of acts of United States carriers or other persons providing maritime or maritime-related services in the United States.

### (c) Investigations

(1) Investigations under subsection (b) of this section may be initiated by the Commission on its own motion or on the petition of any person, including any common carrier, shipper, shippers' association, ocean transportation intermediary, or marine terminal operator, or any branch, department, agency, or other component of the Government of the United States.

(2) The Commission shall complete any such investigation and render a decision within 120 days after it is initiated, except that the Commission may extend such 120-day period for an additional 90 days if the Commission is unable to obtain sufficient information to determine whether a condition specified in subsection (b) of this section exists. Any notice providing such an extension shall clearly state the reasons for such extension.

### (d) Information requests

(1) In order to further the purposes of subsection (b) of this section, the Commission may, by order, require any person (including any common carrier, shipper, shippers' association, ocean transportation intermediary, or marine terminal operator, or any officer, receiver, trustee, lessee, agent or employee thereof) to file with the Commission any periodic or special report, answers to questions, documentary material, or other information which the Commission considers necessary or appropriate. The Commission may require that the response to any such order shall be made under oath. Such response shall be furnished in the form and within the time prescribed by the Commission.

(2) In an investigation under subsection (b) of this section, the Commission may issue subpoenas to compel the attendance and testimony of witnesses and the production of records or other evidence.

(3) Notwithstanding any other provision of law, the Commission may, in its discretion, determine that any information submitted to it in response to a request under this subsection, or otherwise, shall not be disclosed to the public.

### (e) Action against foreign carriers

(1) Whenever, after notice and opportunity for comment or hearing, the Commission determines that the conditions specified in subsection (b) of this section exist, the Commission shall take such action as it considers necessary and appropriate against any foreign carrier that is a contributing cause to, or whose government is a contributing cause to, such conditions, in order to offset such conditions. Such action may include—

(A) limitations on sailings to and from United States ports or on the amount or type of cargo carried;

(B) suspension, in whole or in part, of any or all tariffs and service contracts, including the right of an ocean common carrier to use any or all tariffs and service contracts of conferences in United States trades of which it is a member for such period as the Commission specifies;

(C) suspension, in whole or in part, of the right of an ocean common carrier to operate under any agreement filed with the Commission, including agreements authorizing preferential treatment at terminals, preferential terminal leases, space chartering, or pooling of cargo or revenues with other ocean common carriers; and

(D) a fee, not to exceed $1,000,000 per voyage.

(2) The Commission may consult with, seek the cooperation of, or make recommendations to other appropriate Government agencies prior to taking any action under this subsection.

(3) Before a determination under this subsection becomes effective or a request is made under subsection (f) of this section, the determination shall be submitted immediately to the President who may, within 10 days after receiving such determination, disapprove the determination in writing, setting forth the reasons for the disapproval, if the President finds that disapproval is required for reasons of the national defense or the foreign policy of the United States.

**(f) Actions upon request of Commission**

Whenever the conditions specified in subsection (b) of this section are found by the Commission to exist, upon the request of the Commission—

(1) the collector of customs at any port or place of destination in the United States shall refuse the clearance required by section 91 of this Appendix to any vessel of a foreign carrier that is identified by the Commission under subsection (e) of this section; and

(2) the Secretary of the department in which the Coast Guard is operating shall deny entry, for purposes of oceanborne trade, of any vessel of a foreign carrier that is identified by the Commission under subsection (e) of this section to any port or place in the United States or the navigable waters of the United States, or shall detain any such vessel at the port or place in the United States from which it is about to depart for any other port or place in the United States.

**(g) Report**

The Commission shall include in its annual report to Congress—

(1) a list of the twenty foreign countries which generated the largest volume of oceanborne liner cargo for the most recent calendar year in bilateral trade with the United States;

(2) an analysis of conditions described in subsection (b) of this section being investigated or found to exist in foreign countries;

(3) any actions being taken by the Commission to offset such conditions;

(4) any recommendations for additional legislation to offset such conditions; and

(5) a list of petitions filed under subsection (c) of this section that the Commission rejected, and the reasons for each such rejection.

**(h) Administration and enforcement of other laws**

The actions against foreign carriers authorized in subsections (e) and (f) of this section may be used in the administration and enforcement of section 1712(b)(6) of this Appendix or section 876(1)(b)[1] of this Appendix.

**(i) Review of rules, regulations, and final orders of Commission; exclusive procedure**

Any rule, regulation or final order of the Commission issued under this section shall be reviewable exclusively in the same forum and in the same manner as provided in section 2342(3)(B) of title 28.

(Pub. L. 100–418, title X, §10002, Aug. 23, 1988, 102 Stat. 1570; Pub. L. 105–258, title I, §111, Oct. 14, 1998, 112 Stat. 1911.)

REFERENCES IN TEXT

Section 876(1)(b) of this Appendix, referred to in subsec. (h), was redesignated section 876(a)(2) of this Appendix by Pub. L. 105–258, title III, §301(b)(1), (2), Oct. 14, 1998, 112 Stat. 1915, 1916.

CODIFICATION

This section was enacted as part of the Foreign Shipping Practices Act of 1988 and also as part of the Omnibus Trade and Competitiveness Act of 1988, and not as part of the Shipping Act of 1984 which comprises this chapter.

AMENDMENTS

1998—Subsec. (a)(1). Pub. L. 105–258, §111(1), substituted "'ocean transportation intermediary'," for "'non-vessel-operating common carrier',".

Subsec. (a)(4). Pub. L. 105–258, §111(2), (3), struck out "forwarding and" before "agency services" and substituted "ocean transportation intermediary services and" for "non-vessel-operating common carrier".

Subsecs. (c)(1), (d)(1). Pub. L. 105–258, §111(4), substituted "transportation intermediary," for "freight forwarder,".

Subsec. (e)(1)(B). Pub. L. 105–258, §111(5), (6), substituted "and service contracts," for "filed with the Commission," and inserted "and service contracts" before "of conferences".

Subsec. (h). Pub. L. 105–258, §111(7), substituted "(b)(6)" for "(b)(5)".

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1273a, 1709 of this Appendix.

## §1711. Subpenas and discovery

**(a) In general**

In investigations and adjudicatory proceedings under this chapter—

(1) depositions, written interrogatories, and discovery procedures may be utilized by any party under rules and regulations issued by the Commission that, to the extent practicable, shall be in conformity with the rules

---

[1] See References in Text note below.

applicable in civil proceedings in the district courts of the United States; and

(2) the Commission may by subpena compel the attendance of witnesses and the production of books, papers, documents, and other evidence.

**(b) Witness fees**

Witnesses shall, unless otherwise prohibited by law, be entitled to the same fees and mileage as in the courts of the United States.

(Pub. L. 98–237, § 12, Mar. 20, 1984, 98 Stat. 81.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1712 of this Appendix.

## § 1712. Penalties

**(a) Assessment of penalty**

Whoever violates a provision of this chapter, a regulation issued thereunder, or a Commission order is liable to the United States for a civil penalty. The amount of the civil penalty, unless otherwise provided in this chapter, may not exceed $5,000 for each violation unless the violation was willfully and knowingly committed, in which case the amount of the civil penalty may not exceed $25,000 for each violation. Each day of a continuing violation constitutes a separate offense. The amount of any penalty imposed upon a common carrier under this subsection shall constitute a lien upon the vessels operated by that common carrier and any such vessel may be libeled therefore in the district court of the United States for the district in which it may be found.

**(b) Additional penalties**

(1) For a violation of section 1709(b)(1), (2), or (7) of this Appendix, the Commission may suspend any or all tariffs of the common carrier, or that common carrier's right to use any or all tariffs of conferences of which it is a member, for a period not to exceed 12 months.

(2) For failure to supply information ordered to be produced or compelled by subpena under section 1711 of this Appendix, the Commission may, after notice and an opportunity for hearing, suspend any or all tariffs of a common carrier, or that common carrier's right to use any or all tariffs of conferences of which it is a member.

(3) A common carrier that accepts or handles cargo for carriage under a tariff that has been suspended or after its right to utilize that tariff has been suspended is subject to a civil penalty of not more than $50,000 for each shipment.

(4) If the Commission finds, after notice and an opportunity for a hearing, that a common carrier has failed to supply information ordered to be produced or compelled by subpoena under section 1711 of this Appendix, the Commission may request that the Secretary of the Treasury refuse or revoke any clearance required for a vessel operated by that common carrier. Upon request by the Commission, the Secretary of the Treasury shall, with respect to the vessel concerned, refuse or revoke any clearance required by section 91 of this Appendix.

(5) If, in defense of its failure to comply with a subpena or discovery order, a common carrier alleges that documents or information located in a foreign country cannot be produced because of the laws of that country, the Commission shall immediately notify the Secretary of State of the failure to comply and of the allegation relating to foreign laws. Upon receiving the notification, the Secretary of State shall promptly consult with the government of the nation within which the documents or information are alleged to be located for the purpose of assisting the Commission in obtaining the documents or information sought.

(6) If, after notice and hearing, the Commission finds that the action of a common carrier, acting alone or in concert with any person, or a foreign government has unduly impaired access of a vessel documented under the laws of the United States to ocean trade between foreign ports, the Commission shall take action that it finds appropriate, including the imposition of any of the penalties authorized under paragraphs (1), (2), (3), and (4) of this subsection.

(7) Before an order under this subsection becomes effective, it shall be immediately submitted to the President who may, within 10 days after receiving it, disapprove the order if the President finds that disapproval is required for reasons of the national defense or the foreign policy of the United States.

**(c) Assessment procedures**

Until a matter is referred to the Attorney General, the Commission may, after notice and an opportunity for hearing, assess each civil penalty provided for in this chapter. In determining the amount of the penalty, the Commission shall take into account the nature, circumstances, extent, and gravity of the violation committed and, with respect to the violator, the degree of culpability, history of prior offenses, ability to pay, and such other matters as justice may require. The Commission may compromise, modify, or remit, with or without conditions, any civil penalty.

**(d) Review of civil penalty**

A person against whom a civil penalty is assessed under this section may obtain review thereof under chapter 158 of title 28.

**(e) Failure to pay assessment**

If a person fails to pay an assessment of a civil penalty after it has become final or after the appropriate court has entered final judgment in favor of the Commission, the Attorney General at the request of the Commission may seek to recover the amount assessed in an appropriate district court of the United States. In such an action, the court shall enforce the Commission's order unless it finds that the order was not regularly made or duly issued.

**(f) Limitations**

(1) No penalty may be imposed on any person for conspiracy to violate section 1709(a)(1), (b)(1), or (b)(2) of this Appendix, or to defraud the Commission by concealment of such a violation. Neither the Commission nor any court shall order any person to pay the difference between the amount billed and agreed upon in writing with a common carrier or its agent and the amount set forth in any tariff or service contract by that

common carrier for the transportation service provided.

(2) Each proceeding to assess a civil penalty under this section shall be commenced within 5 years from the date the violation occurred.

(Pub. L. 98–237, §13, Mar. 20, 1984, 98 Stat. 82; Pub. L. 105–258, title I, §112, Oct. 14, 1998, 112 Stat. 1911.)

#### AMENDMENTS

1998—Subsec. (a). Pub. L. 105–258, §112(a), inserted at end "The amount of any penalty imposed upon a common carrier under this subsection shall constitute a lien upon the vessels operated by that common carrier and any such vessel may be libeled therefore in the district court of the United States for the district in which it may be found."

Subsec. (b)(1). Pub. L. 105–258, §112(b)(1), substituted "section 1709(b)(1), (2), or (7)" for "section 1709(b)(1), (2), (3), (4), or (8)".

Subsec. (b)(4). Pub. L. 105–258, §112(b)(3), added par. (4). Former par. (4) redesignated (5).

Subsec. (b)(5). Pub. L. 105–258, §112(b)(2), redesignated par. (4) as (5). Former par. (5) redesignated (6).

Subsec. (b)(6). Pub. L. 105–258, §112(b)(2), (4), redesignated par. (5) as (6) and substituted "paragraphs (1), (2), (3), and (4)" for "paragraphs (1), (2), and (3)". Former par. (6) redesignated (7).

Subsec. (b)(7). Pub. L. 105–258, §112(b)(2), redesignated par. (6) as (7).

Subsec. (f)(1). Pub. L. 105–258, §112(c)(3), inserted at end "Neither the Commission nor any court shall order any person to pay the difference between the amount billed and agreed upon in writing with a common carrier or its agent and the amount set forth in any tariff or service contract by that common carrier for the transportation service provided."

Pub. L. 105–258, §112(c)(2), which directed that "(b)(1), (2)" be substituted for "(b)(1), (4)", could not be executed, because "(b)(1), (4)" does not appear in text.

Pub. L. 105–258, §112(c)(1), substituted "or (b)(2)" for "or (b)(4)".

#### EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

#### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1710a, 1718 of this Appendix.

### §1713. Commission orders

#### (a) In general

Orders of the Commission relating to a violation of this chapter or a regulation issued thereunder shall be made, upon sworn complaint or on its own motion, only after opportunity for hearing. Each order of the Commission shall continue in force for the period of time specified in the order or until suspended, modified, or set aside by the Commission or a court of competent jurisdiction.

#### (b) Reversal or suspension of orders

The Commission may reverse, suspend, or modify any order made by it, and upon application of any party to a proceeding may grant a rehearing of the same or any matter determined therein. No rehearing may, except by special order of the Commission, operate as a stay of that order.

#### (c) Enforcement of nonreparation orders

In case of violation of an order of the Commission, or for failure to comply with a Commission

subpena, the Attorney General, at the request of the Commission, or any party injured by the violation, may seek enforcement by a United States district court having jurisdiction over the parties. If, after hearing, the court determines that the order was properly made and duly issued, it shall enforce the order by an appropriate injunction or other process, mandatory or otherwise.

#### (d) Enforcement of reparation orders

(1) In case of violation of an order of the Commission for the payment of reparation, the person to whom the award was made may seek enforcement of the order in a United States district court having jurisdiction of the parties.

(2) In a United States district court the findings and order of the Commission shall be prima facie evidence of the facts therein stated, and the petitioner shall not be liable for costs, nor for the costs of any subsequent stage of the proceedings, unless they accrue upon his appeal. A petitioner in a United States district court who prevails shall be allowed reasonable attorney's fees to be assessed and collected as part of the costs of the suit.

(3) All parties in whose favor the Commission has made an award of reparation by a single order may be joined as plaintiffs, and all other parties in the order may be joined as defendants, in a single suit in a district in which any one plaintiff could maintain a suit against any one defendant. Service of process against a defendant not found in that district may be made in a district in which is located any office of, or point of call on a regular route operated by, that defendant. Judgment may be entered in favor of any plaintiff against the defendant liable to that plaintiff.

#### (e) Statute of limitations

An action seeking enforcement of a Commission order must be filed within 3 years after the date of the violation of the order.

(Pub. L. 98–237, §14, Mar. 20, 1984, 98 Stat. 83.)

#### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1718 of this Appendix; title 28 section 2342.

### §1714. Reports

The Commission may require any common carrier, or any officer, receiver, trustee, lessee, agent, or employee thereof, to file with it any periodical or special report or any account, record, rate, or charge, or memorandum of any facts and transactions appertaining to the business of that common carrier. The report, account, record, rate, charge, or memorandum shall be made under oath whenever the Commission so requires, and shall be furnished in the form and within the time prescribed by the Commission. Conference minutes required to be filed with the Commission under this section shall not be released to third parties or published by the Commission.

(Pub. L. 98–237, §15, Mar. 20, 1984, 98 Stat. 84; Pub. L. 98–595, §3(b)(3), Oct. 30, 1984, 98 Stat. 3133; Pub. L. 105–258, title I, §113, Oct. 14, 1998, 112 Stat. 1912.)

AMENDMENTS

1998—Pub. L. 105–258 struck out "and certificates" after "Reports" in section catchline, struck out "(a) Reports" before "The Commission", and struck out heading and text of subsec. (b). Text read as follows: "The Commission shall require the chief executive officer of each common carrier and, to the extent it deems feasible, may require any shipper, shippers' association, marine terminal operator, ocean freight forwarder, or broker to file a periodic written certification made under oath with the Commission attesting to—

"(1) a policy prohibiting the payment, solicitation, or receipt of any rebate that is unlawful under the provisions of this chapter;

"(2) the fact that this policy has been promulgated recently to each owner, officer, employee, and agent thereof;

"(3) the details of the efforts made within the company or otherwise to prevent or correct illegal rebating; and

"(4) a policy of full cooperation with the Commission in its efforts to end those illegal practices. Whoever fails to file a certificate required by the Commission under this subsection is liable to the United States for a civil penalty of not more than $5,000 for each day the violation continues."

1984—Subsec. (b). Pub. L. 98–595 substituted "Whoever fails to file a certificate required by the Commission under this subsection is liable to the United States for" for "Failure to file a certificate shall result in" before "a civil penalty".

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

## § 1715. Exemptions

The Commission, upon application or on its own motion, may by order or rule exempt for the future any class of agreements between persons subject to this chapter or any specified activity of those persons from any requirement of this chapter if it finds that the exemption will not result in substantial reduction in competition or be detrimental to commerce. The Commission may attach conditions to any exemption and may, by order, revoke any exemption. No order or rule of exemption or revocation of exemption may be issued unless opportunity for hearing has been afforded interested persons and departments and agencies of the United States.

(Pub. L. 98–237, § 16, Mar. 20, 1984, 98 Stat. 84; Pub. L. 105–258, title I, § 114, Oct. 14, 1998, 112 Stat. 1912.)

AMENDMENTS

1998—Pub. L. 105–258 substituted "result in substantial reduction in competition or be detrimental to commerce." for "substantially impair effective regulation by the Commission, be unjustly discriminatory, result in a substantial reduction in competition, or be detrimental to commerce."

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1706, 1709 of this Appendix.

## § 1716. Regulations

(a) The Commission may prescribe rules and regulations as necessary to carry out this chapter.

(b) The Commission may prescribe interim rules and regulations necessary to carry out this chapter. For this purpose, the Commission is excepted from compliance with the notice and comment requirements of section 553 of title 5. All rules and regulations prescribed under the authority of this subsection that are not earlier superseded by final rules shall expire no later than 270 days after March 20, 1984.

(Pub. L. 98–237, § 17, Mar. 20, 1984, 98 Stat. 84.)

REGULATIONS

Pub. L. 105–258, title II, § 203, Oct. 14, 1998, 112 Stat. 1915, provided that: "Not later than March 1, 1999, the Federal Maritime Commission shall prescribe final regulations to implement the changes made by this Act [see Tables for classification]."

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in title 28 section 2342.

## § 1718. Ocean transportation intermediaries

### (a) License

No person in the United States may act as an ocean transportation intermediary unless that person holds a license issued by the Commission. The Commission shall issue an intermediary's license to any person that the Commission determines to be qualified by experience and character to act as an ocean transportation intermediary.

### (b) Financial responsibility

(1) No person may act as an ocean transportation intermediary unless that person furnishes a bond, proof of insurance, or other surety in a form and amount determined by the Commission to insure financial responsibility that is issued by a surety company found acceptable by the Secretary of the Treasury.

(2) A bond, insurance, or other surety obtained pursuant to this section—

(A) shall be available to pay any order for reparation issued pursuant to section 1710 or 1713 of this Appendix, or any penalty assessed pursuant to section 1712 of this Appendix;

(B) may be available to pay any claim against an ocean transportation intermediary arising from its transportation-related activities described in section 1702(17) of this Appendix with the consent of the insured ocean transportation intermediary and subject to review by the surety company, or when the claim is deemed valid by the surety company after the ocean transportation intermediary has failed to respond to adequate notice to address the validity of the claim; and

(C) shall be available to pay any judgment for damages against an ocean transportation intermediary arising from its transportation-related activities under section 1702(17) of this Appendix, provided the claimant has first attempted to resolve the claim pursuant to subparagraph (B) of this paragraph and the claim has not been resolved within a reasonable period of time.

(3) The Commission shall prescribe regulations for the purpose of protecting the interests of claimants, ocean transportation intermediaries, and surety companies with respect to the process of pursuing claims against ocean transportation intermediary bonds, insurance, or sureties through court judgments. The regulations shall provide that a judgment for monetary damages may not be enforced except to the extent that the damages claimed arise from the transportation-related activities of the insured ocean transportation intermediary, as defined by the Commission.

(4) An ocean transportation intermediary not domiciled in the United States shall designate a resident agent in the United States for receipt of service of judicial and administrative process, including subpoenas.

**(c) Suspension or revocation**

The Commission shall, after notice and hearing, suspend of[1] revoke a license if it finds that the ocean transportation intermediary is not qualified to render intermediary services or that it willfully failed to comply with a provision of this chapter or with a lawful order, rule, or regulation of the Commission. The Commission may also revoke an intermediary's license for failure to maintain a bond, proof of insurance, or other surety in accordance with subsection (b)(1) of this section.

**(d) Exception**

A person whose primary business is the sale of merchandise may forward shipments of the merchandise for its own account without a license.

**(e) Compensation of intermediaries by carriers**

(1) A common carrier may compensate an ocean transportation intermediary, as defined in section 1702(17)(A) of this Appendix, in connection with a shipment dispatched on behalf of others only when the ocean transportation intermediary has certified in writing that it holds a valid license, if required by subsection (a) of this section, and has performed the following services:

(A) Engaged, booked, secured, reserved, or contracted directly with the carrier or its agent for space aboard a vessel or confirmed the availability of that space.

(B) Prepared and processed the ocean bill of lading, dock receipt, or other similar document with respect to the shipment.

(2) No common carrier may pay compensation for services described in paragraph (1) more than once on the same shipment.

(3) No ocean transportation intermediary may receive compensation from a common carrier with respect to a shipment in which the intermediary has a direct or indirect beneficial interest nor shall a common carrier knowingly pay compensation on that shipment.

(4) No conference or group of 2 or more common carriers in the foreign commerce of the United States that is authorized to agree upon the level of compensation paid to an ocean transportation intermediary, as defined in section 1702(17)(A) of this Appendix, may—

(A) deny to any member of the conference or group the right, upon notice of not more than 5 calendar days, to take independent action on any level of compensation paid to an ocean transportation intermediary, as so defined; or

(B) agree to limit the payment of compensation to an ocean transportation intermediary, as so defined, to less than 1.25 percent of the aggregate of all rates and charges which are applicable under a tariff and which are assessed against the cargo on which the intermediary services are provided.

(Pub. L. 98–237, §19, Mar. 20, 1984, 98 Stat. 87; Pub. L. 105–258, title I, §116, Oct. 14, 1998, 112 Stat. 1912.)

AMENDMENTS

1998—Pub. L. 105–258, §116(1), substituted "transportation intermediaries" for "freight forwarders" in section catchline.

Subsec. (a). Pub. L. 105–258, §116(2), added subsec. (a) and struck out heading and text of former subsec. (a). Text read as follows: "No person may act as an ocean freight forwarder unless that person holds a license issued by the Commission. The Commission shall issue a forwarder's license to any person that—

"(1) the Commission determines to be qualified by experience and character to render forwarding services; and

"(2) furnishes a bond in a form and amount determined by the Commission to insure financial responsibility that is issued by a surety company found acceptable by the Secretary of the Treasury."

Subsec. (b). Pub. L. 105–258, §116(4), added subsec. (b). Former subsec. (b) redesignated (c).

Subsec. (c). Pub. L. 105–258, §116(6), substituted "a bond, proof of insurance, or other surety in accordance with subsection (b)(1) of this section." for "a bond in accordance with subsection (a)(2) of this section."

Pub. L. 105–258, §116(5)(D), substituted "intermediary services" for "forwarding services" in first sentence.

Pub. L. 105–258, §116(5)(B), substituted "an intermediary's" for "a forwarder's" in second sentence.

Pub. L. 105–258, §116(5)(A), substituted "transportation intermediary" for "freight forwarder" in first sentence.

Pub. L. 105–258, §116(3), redesignated subsec. (b) as (c). Former subsec. (c) redesignated (d).

Subsec. (d). Pub. L. 105–258, §116(3), redesignated subsec. (c) as (d). Former subsec. (d) redesignated (e).

Subsec. (e). Pub. L. 105–258, §116(3), (7), redesignated subsec. (d) as (e) and substituted "intermediaries" for "forwarders" in heading.

Subsec. (e)(1). Pub. L. 105–258, §116(9), substituted "license, if required by subsection (a) of this section," for "license" in introductory provisions.

Pub. L. 105–258, §116(8), substituted "an ocean transportation intermediary, as defined in section 1702(17)(A) of this Appendix," for "an ocean transportation intermediary" in introductory provisions.

Pub. L. 105–258, §116(5)(A), substituted "transportation intermediary" for "freight forwarder" in two places in introductory provisions.

Subsec. (e)(3). Pub. L. 105–258, §116(10), redesignated par. (4) as (3) and struck out former par. (3) which read as follows: "No compensation may be paid to an ocean transportation intermediary except in accordance with the tariff requirements of this chapter."

Pub. L. 105–258, §116(5)(A), substituted "transportation intermediary" for "freight forwarder".

Subsec. (e)(4). Pub. L. 105–258, §116(11), added par. (4). Former par. (4) redesignated (3).

Pub. L. 105–258, §116(5)(C), substituted "intermediary has" for "forwarder has".

Pub. L. 105–258, §116(5)(A), substituted "transportation intermediary" for "freight forwarder".

[1] So in original. Probably should be "or".

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1709 of this Appendix.

## § 1719. Contracts, agreements, and licenses under prior shipping legislation

### (a) to (c) Omitted

### (d) Effects on certain agreements and contracts

All agreements, contracts, modifications, licenses, and exemptions previously issued, approved, or effective under the Shipping Act, 1916, or the Shipping Act of 1984, shall continue in force and effect as if issued or effective under this Act, as amended by the Ocean Shipping Reform Act of 1998, and all new agreements, contracts, and modifications to existing, pending, or new contracts or agreements shall be considered under this Act, as amended by the Ocean Shipping Reform Act of 1998.

### (e) Savings provisions

(1) Each service contract entered into by a shipper and an ocean common carrier or conference before March 20, 1984, may remain in full force and effect and need not comply with the requirements of section 1707(c) of this Appendix until 15 months after March 20, 1984.

(2) This Act and the amendments made by it shall not affect any suit—

(A) filed before March 20, 1984; or

(B) with respect to claims arising out of conduct engaged in before March 20, 1984, filed within 1 year after March 20, 1984.

(3) The Ocean Shipping Reform Act of 1998 shall not affect any suit—

(A) filed before the effective date of that Act; or

(B) with respect to claims arising out of conduct engaged in before the effective date of that Act filed within 1 year after the effective date of that Act.

(4) Regulations issued by the Federal Maritime Commission shall remain in force and effect where not inconsistent with this Act, as amended by the Ocean Shipping Reform Act of 1998.

(Pub. L. 98–237, § 20, Mar. 20, 1984, 98 Stat. 90; Pub. L. 105–258, title I, § 117, Oct. 14, 1998, 112 Stat. 1914.)

REFERENCES IN TEXT

The Shipping Act, 1916, referred to in subsec. (d), is act Sept. 7, 1916, ch. 451, 39 Stat. 728, as amended, which is classified generally to chapter 23 (§ 801 et seq.) of this Appendix. For complete classification of this Act to the Code, see section 842 of this Appendix and Tables.

The Shipping Act of 1984 and this Act and the amendments made by it, referred to in text, is Pub. L. 98–237, Mar. 20, 1984, 98 Stat. 67, as amended, which is classified principally to this chapter (§ 1701 et seq.). For complete classification of this Act to the Code, see Short Title note set out under section 1701 of this Appendix and Tables.

The Ocean Shipping Reform Act of 1998, referred to in subsecs. (d) and (e)(3), (4), is Pub. L. 105–258, Oct. 14,

1998, 112 Stat. 1902. For the effective date of this Act, see section 2 of Pub. L. 105–258, set out as an Effective Date of 1998 Amendment note under section 1701 of this Appendix. For complete classification of this Act to the Code, see Short Title of 1998 Amendment note set out under section 1701 of this Appendix and Tables.

CODIFICATION

Section is comprised of subsecs. (d) and (e) of section 20 of Pub. L. 98–237. Subsecs. (a) to (c) of section 20 amended sections 801, 812, 814, 815, 816, 817, 819, 820, 821, 824, 828, 829, 830, 831, 841c, 1122, and 1124 of this Appendix and repealed sections 813, 813a, 825, and 841b of this Appendix and provisions set out as a note under section 801 of this Appendix.

AMENDMENTS

1998—Subsec. (d). Pub. L. 105–258, § 117(1), added subsec. (d) and struck out heading and text of former subsec. (d). Text read as follows: "All agreements, contracts, modifications, and exemptions previously approved or licenses previously issued by the Commission shall continue in force and effect as if approved or issued under this chapter; and all new agreements, contracts, and modifications to existing, pending, or new contracts or agreements shall be considered under this chapter."

Subsec. (e)(3), (4). Pub. L. 105–258, § 117(2), added pars. (3) and (4).

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–258 effective May 1, 1999, see section 2 of Pub. L. 105–258, set out as a note under section 1701 of this Appendix.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1706 of this Appendix.

## CHAPTER 37—INTERNATIONAL MARITIME AND PORT SECURITY

| Sec. | |
|---|---|
| 1801. | International measures for seaport and shipboard security. |
| 1802. | Threat of terrorism to United States ports and vessels. |
| 1803. | Security standards at foreign ports. |
| | (a) Assessment of security measures. |
| | (b) Consultation with Secretary of State. |
| | (c) Report of assessments. |
| | (d) Determination and notification to foreign country. |
| | (e) Antiterrorism assistance related to maritime security. |
| 1804. | Travel advisories concerning security at foreign ports. |
| | (a) Travel advisory. |
| | (b) Lifting of travel advisory. |
| | (c) Notification to Congress. |
| 1805. | Suspension of passenger service. |
| | (a) President's determination. |
| | (b) Prohibition. |
| | (c) Penalty. |
| 1806. | Sanctions for seizure of vessels by terrorists. |
| 1807. | Definitions. |
| 1808. | Authorization of appropriations. |
| 1809. | Reports. |
| | (a) Consolidation. |
| | (b) Submission to committees. |

## § 1801. International measures for seaport and shipboard security

The Congress encourages the President to continue to seek agreement through the International Maritime Organization on matters of international seaport and shipboard security, and commends him on his efforts to date. In de-