Nos. 12-1369 (L), 12-1417, & 12-1494
_____

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

UNITED STATES ex rel. BUNK, et al.,

Plaintiffs-Appellants/Cross-Appellees,

v.

BIRKART GLOBISTICS, GmbH & Co. et al.,

Defendants-Appellees/Cross-Appellants.
_____

On Appeal from the U.S. District Court for the Eastern District of Virginia
Hon. Anthony J. Trenga, District Judge
_____

## BRIEF FOR RELATORS-APPELLANTS
_____

Michael T. Anderson
Ann Lugbill
Mark Hanna
Michelle L. Woolley
Murphy Anderson PLLC
1701 K Street, NW Suite 210
Washington, DC 20006
(202) 223-2620
(202) 223-8651 (Fax)

Richard E. Greenberg
John E. Petite
Greensfelder, Hemker, & Gale, P.C.
10 South Broadway, Suite 2000
St. Louis, MO 63102
(314) 241-9090
(314) 345-4792 (Fax)

Attorneys for Relators-Appellants

## CORPORATE DISCLOSURE STATEMENT
### [Rule 26.1]
_____

Kurt Bunk and Ray Ammons are individuals. They have not issued stock, and have no parent corporations.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

    A.    District Court Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Court of Appeals Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Procedural History Prior to Intervention . . . . . . . . . . . . . . . . . . . . . 2

        1.    Two relators independently allege fraud . . . . . . . . . . . . . . . . 2

        2.    Criminal and administrative proceedings against Gosselin . . . 3

            a.    U.S. criminal prosecution . . . . . . . . . . . . . . . . . . . . . . . 3

            b.    German Cartel Office decision . . . . . . . . . . . . . . . . . . . . 4

            c.    European Union decision . . . . . . . . . . . . . . . . . . . . . . . 5

        3.    Government intervened in ITGBL . . . . . . . . . . . . . . . . . . . . 5

    C.    Procedural History Through Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.    Most defendants settled . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.    Number of invoices stipulated . . . . . . . . . . . . . . . . . . . . . . . 6

i

3.    Jury verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

D.    Post-Trial Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

1.    District Court's denial of Gosselin's Rule 50 motion . . . . . . .   6

2.    Post-trial evidentiary hearing on civil penalties . . . . . . . . . . .   7

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

A.    Gosselin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

B.    The DPM Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

C.    DPM Bid-Rigging . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

1.    The February 2001 meeting of potential bidders . . . . . . . . . .   10

2.    Graf's testimony and email . . . . . . . . . . . . . . . . . . . . . . . . . .   11

3.    Smet's admissions and email . . . . . . . . . . . . . . . . . . . . . . . . .   14

4.    Relator Bunk's testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

D.    Gosselin Submits 9,136 Invoices Based on
      Certificate of Independent Pricing . . . . . . . . . . . . . . . . . . . . . . .   17

E.    Evidence of Tangible Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

1.    Relators' evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

2.    Defendants' evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

A.    Facts Found by Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

B.    Excessiveness of Fine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

ii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.    FALSE CERTIFICATIONS TO CONCEAL PRICE-FIXING
      AND BID COLLUSION ARE INHERENTLY HARMFUL. . . . . . . . . . 25

      A.    The District Court Wrongly Placed the
            Burden of Proof on the Government and the Relators . . . . . . . . . . 25

      B.    The "Harm" Justifying Statutory Penalties For Eighth
            Amendment Purposes Is Broader than Tangible Damages. . . . . . . 27

            1.    FCA penalties are recoverable even where damages are not. 27

            2.    Excessive Fine analysis looks to broader harm to
                  Government interests, in addition to tangible damages. . . . . 29

      C.    Price Fixing and Bid Rigging Are Harmful *Per Se*,
            Even Without Particularized Proof of Monetary Injury. . . . . . . . . 30

            1.    Price-fixing and bid-rigging are inherently
                  harmful, regardless of proof of pecuniary harm. . . . . . . . . . 31

            2.    The record shows substantial indication of tangible
                  harm even in short-term comparisons of contract price. . . . 33

                  a.    Chief Voucher Examiner Riedl's
                        calculations of about $1.8 million base loss . . . . . . . . . .33

                  b.    Gosselin's own figures show a 9.82% increase. . . . . . 35

                  c.    Loss of use of funds over ten years . . . . . . . . . . . . . . . 36

                  d.    Differences in contracts under comparison . . . . . . . . . 37

                  e.    The District Court mistakenly found that one firm
                        bidding on the contract was outside the conspiracy. . . 38

      D.    The Court Wrongly Minimized the Culpability
            of the False Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1.   The District Court may not make a legislative
     judgment that the CIPD was unworthy of enforcement.  . . . .  39

2.   The District Court ignored the
     harm of intentional concealment. . . . . . . . . . . . . . . . . . . . . . . .  41

3.   The District Court wrongly excused Gosselin's false claims
     because the Relators alleged the cartel to the Government. . .  43

4.   The District Court wrongly held that the
     collusion was limited to line item 1AA pricing . . . . . . . . . . .  46

5.   The District Court wrongly held the DPM
     conspiracy was unrelated to other crimes.  . . . . . . . . . . . . . . .  46

II.  THE DISTRICT COURT WRONGLY REFUSED TO AWARD
     PENALTIES FOR THE VIOLATIONS FOUND BY THE JURY. . . . . . .  48

     A.   The District Court Wrongly Awarded Zero Penalties. . . . . . . . . . .  49

          1.   The District Court confused Constitutional
               limits with its statutory mandate.  . . . . . . . . . . . . . . . . . . . . .  49

          2.   Excessive verdicts must be reduced
               to the Constitutional maximum. . . . . . . . . . . . . . . . . . . . . .  50

          3.   The District Court's rule gives violators a
               perverse incentive to commit more violations. . . . . . . . . . . .  51

     B.   The District Court May Not Depart from
          False Claims Act Law Just to Achieve a Desired Result. . . . . . . . . .  52

          1.   The District Court did not have the discretion to
               fashion an "appropriate" penalty. . . . . . . . . . . . . . . . . . . . . . .  52

          2.   The District Court had no authority to change
               the way false claims are counted to modify the result  . . . . . .  53

iv

C.    The District Court Wrongly Limited the
Constitutional Maximum to $1.5 Million.  . . . . . . . . . . . . . . . . . . . . .  57

1.    The District Court wrongly fixed
the base-line harm as $150,000 profit.  . . . . . . . . . . . . . . . .  57

2.    Harm is measured by volume of commerce affected  . . . . . . .  58

3.    The harm justifies the full $24 million sought by
the Government as within Eighth Amendment limits.  . . . . . .  59

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

STATUTORY ADDENDUM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62

REQUEST FOR ORAL ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  76

RULE 32 CERTIFICATE OF COMPLIANCE  . . . . . . . . . . . . . . . . . . . . . . . .  77

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  78

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332 (1982) . . . . . . . . . . . . 31

*Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320 (2006) . . . . . . 50

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) . . . . . . . . . . . . . . . . . . . . . 59

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980) . . . . . . . . . . . . . . . . . 31

*Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977) . . . . . . . . . . . . 32

*Cook County, Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119 (2003) . . . . . . . . . . . . . 36

*Gregg v. Ham*, 678 F.3d 333 (4th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320 (11th Cir. 1999) . . . . 50

*Korangy v. FDA*, 498 F.3d 272 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . 54, 55, 56

*Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*,
 285 F.3d 1146 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Lyerly v. U.S.,* 120 F.3d 261 (Table), 1997 WL 457528 (4th Cir. 1997) . . . . . . . 60

*Mayers v. U.S. Dept. of Health and Human Servs.*,
 806 F.2d 995 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . 24

*Rex Trailer Inc. v. United States*, 350 U.S. 148 (1956) . . . . . . . . . . . . . . . . . 27, 28

*Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041 (8th Cir. 2002) . . . . . . . 50

*San Huan New Materials High Tech, Inc. v. International Trade Com'n*,
    161 F.3d 1347 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519 (10th Cir. 2000) . . . . 45

*State Farm Mutual Automobile Insurance Co. v. Campbell*,
    538 U.S. 408 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*TFWS, Inc. v. Schaefer*, 242 F.3d 198 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . 32

*Toepleman v. United States*, 263 F.2d 697 (4th Cir. 1959) . . . . . . . . . . . 28, 45, 46

*Traficanti v. United States*, 227 F.3d 170 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . 40

*Tull v. United States*, 481 U.S. 412 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Ahmad*,
    213 F.3d 805 (4th Cir. 2000) . . . . . . . . . . . . . . . 21, 25, 29, 30, 42, 43, 44, 54

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . 58

*United States v. Bajakajian*, 524 U.S. 328 (1998) . . . . . . . . . . . . . . . 25, 42, 43, 54

*United States v. Bornstein*, 423 U.S. 303 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Brown*, 274 F.2d 107 (4th Cir. 1960) . . . . . . . . . . . . . . . . . . 25, 52

*United States v. Byrd*, 100 F.Supp.2d 342 (E.D.N.C. 2000) . . . . . . . . . . . . . . 56, 60

*United States v. Corrado*, 227 F.3d 543 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . 51

*United States v. Diamond*, 657 F.Supp. 1204 (S.D.N.Y. 1987) . . . . . . . . . . . . . . 61

*United States v. Giordano*, 261 F.3d 1134 (11th Cir. 2001) . . . . . . . . . . . . . . . . .  58

*United States v. Gosselin World Wide Moving, N.V.*,
      411 F.3d 502 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 47

*United States v. Gravely*, 840 F.2d 1156 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . .  32

*United States v. Hayter Oil Co.*, 51 F.3d 1265 (6th Cir. 1995) . . . . . . . . . . . . . . .  58

*United States v. Jalaram, Inc.*, 599 F.3d 347 (4th Cir. 2010) . . . . . . . . . .  24, 51, 57

*United States v. Kruse*, 101 F.Supp.2d 410 (E.D. Va. 2000) . . . . . . . . . . . . . . . .  29

*United States v. Lester*, 376 F.Supp.2d 679 (W.D. Va. 2005) . . . . . . . . . . . .  32, 59

*United States v. Mackby*, 339 F.3d 1013 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . .  60

*United States v. Mason*, 216 Fed.Appx. 287 (4th Cir. 2007) . . . . . . . . . . . . . . . .  25

*United States v. Oceanpro Industries, Ltd.*, 674 F.3d 323 (4th Cir. 2012) . . . . . .  30

*United States v. Portsmouth Paving Corp.*, 694 F.2d 312 (4th Cir. 1982) . . .  22, 32

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . .  42, 59

*United States v. Sarbello*, 985 F.2d 716 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . .  51

*United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83 (2d Cir. 1999) . . . . . . .  58

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) . . . . . . . . . . . . . .  31

*U.S. ex rel. Berge v. Board of Trustees of the Univ. of Alabama*,
      104 F.3d 1453 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

*U.S. ex rel. Davis v. District of Columbia*, 679 F.3d 832  (D.C. Cir. 2012) . . . . .  29

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.* (*Harrison I*),
    176 F.3d 776 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28, 29, 54

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.* (*Harrison II*),
    352 F.3d 908 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . .  28, 44, 45, 54

*U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) . . . . . . . . . . . . . . . . . .  40, 41, 53

*U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*,
    671 F.3d 1217 (11th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

*U.S. ex rel. Smith v. Gilbert Realty*, 840 F.Supp. 71 (E.D. Mich. 1993) . . . . . . . .  60

*U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*,
    488 F.Supp.2d 719 (N.D. Ill. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . .  56, 61

*U.S. ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445 (4th Cir. 2011) . . . . . . .  23, 48

*West Virginia CWP Fund v. Stacy*, 671 F.3d 378 (4th Cir. 2011) . . . . . . . . . . . .  50

## Constitution

U.S. Const. amend VIII . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 23, 24, 25, 27, 38, 40, 49,
                                        50, 51, 52, 54, 55, 56, 57, 59

## Statutes

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

31 U.S.C. §§ 3729-33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 5

## Regulations

48 C.F.R. § 52.203–2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17, 33, 40

## **Other Authorities**

U.S.S.G. § 2R1.1(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

Oberlandesgericht [OLG] Düsseldorf [Court of Appeals],
      Judgment of May 27, 2008 (VI-Kart 9-11/07 (Owi))
      *<available at:* http://www.justiz.nrw.de/nrwe/olgs/duesseldorf/j2008/
      VI_Kart_9_11_07__OWi_urteil20080527.html . . . . . . . . . . . . . . . . . . . . . .  4

Bundeskartellamt [BKartA] [German Federal Cartel Office]
      Decision of Nov. 17, 2003 (B9- 58/02) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

## JURISDICTIONAL STATEMENT

**A.    District Court Jurisdiction**

This action arose under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33. The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3730 and 3732.

**B.    Court of Appeals Jurisdiction**

On February 14, 2012, the District Court issued an order that final judgment should be entered pursuant to Fed.R.Civ.P. 54(b) and 58.[1] JA 1618-21. Relators Kurt Bunk and Ray Ammons filed their notice of appeal on March 13, 2012. JA 3247. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Did the District Court misallocate the burden of proof when it required Plaintiffs to justify statutory penalties under the Excessive Fines Clause?

2.    Do knowingly false certifications to conceal price-fixing and bid collusion on Government contracts cause harm that the Government may constitutionally penalize?

3.    Did the District Court properly relieve Defendants of all liability for

---

[1]The District Court held in abeyance one substantive remaining claim relating to only one party, a claim relating to successor liability for Defendant Government Logistics N.V.  JA 1617.

1

penalties, where the District Court concluded that the full statutory penalty would yield an Excessive Fine under the Eighth Amendment?

4.     What is the proper measure of penalties under the Excessive Fines Clause for the False Claims Act violations found by the jury?

## STATEMENT OF THE CASE

We agree with the United States' Statement of the Case, U.S. Appellant's Br. 2-4. We outline the following further facts.

### A.     Nature of the Case

This is a False Claims Act ("FCA") case arising from Defendants' concealment of their scheme to violate bid-rigging and price-fixing rules in U.S. Government contracts for moving U.S. military household goods between the continental United States and Europe ("ITGBL Claim") and between European countries ("DPM Claim").

### B.     Procedural History Prior to Intervention

#### 1.     Two relators independently allege fraud

Relators-Appellants Kurt Bunk and Ray Ammons are *qui tam* relators who filed sealed complaints on behalf of the United States under the FCA. Relator Bunk filed his complaint on August 7, 2002 in the Eastern District of Virginia. JA 208-42. Relator Ammons filed his complaint in the Eastern District of Missouri on

2

September 17, 2002. JA 243-58. The Bunk and Ammons cases were consolidated in

the Eastern District of Virginia. JA 1198.

Both complaints alleged violations of the FCA as to the ITGBL Claim. In

addition, Mr. Bunk's complaint alleged that in 2001 Gosselin Worldwide Moving

N.V. (together with its successor Gosselin Group N.V. and its Managing Director

Marc Smet, described collectively as "Gosselin" or "the Gosselin Defendants") and

the other competing bidders "planned, coordinated, fixed and agreed upon the basic

prices at which the winning bidder would be obligated to share work with other"

bidders on the DPM Contract. JA 327. The Bunk Complaint alleged that the

Defendants agreed that the winner of the 2001 DPM Contract would "hire the other

Defendants and Relevant Persons as subcontractors at the cartel's agreed upon

rates." JA 327. Further, the Bunk Complaint alleged that the parties agreed as to the

territory that each bidder would service regardless of who ultimately won the DPM

Contract. JA 327. The Bunk Complaint alleged that these actions were taken in

knowing violation of the Certificate of Independent Pricing made a condition to the

Contract. JA 330-331.

## 2.    Criminal and administrative proceedings against Gosselin

### a.    U.S. criminal prosecution

While the case was under seal, the United States pursued criminal charges

3

against the Gosselin Defendants for their conduct towards Cartwright International Van Lines with respect to ITGBL. *See* U.S. Appellant's Br. 13-15. This Court reversed dismissal of criminal antitrust charges against Gosselin in *United States v. Gosselin World Wide Moving, N.V.*, 411 F.3d 502 (4th Cir. 2005).

### b.    German Cartel Office decision

The Gosselin Defendants' activities in connection with the ITGBL and DPM antitrust activity prompted the German Federal Cartel Office to investigate the same bid-rigging conduct that resulted in the DPM jury verdict. On November 17, 2003, it issued a decision:

> With regard to DPM, representatives of the companies Birkart, ITO, Gosselin, and Viktoria Schäfer Gruppe met on 15 February 2001 in the German Canteen in Grafenwöhr Camp and agreed that for the newly awarded Europe Contract (Solicitation DAJA 16-01-R-003/DAJA 16-01-0018, Germany, Italy, Belgium and Holland) their companies would set a minimum price for each other as subcontractors . . . and a fixed territorial allocation.

*See* Bundeskartellamt [BKartA] [German Federal Cartel Office] Decision of Nov. 17, 2003 (B9- 58/02)(JA 3253). *See also* Oberlandesgericht [OLG] Düsseldorf [Court of Appeals], Judgment of May 27, 2008 (VI-Kart 9-11/07 (OWi)) *available at:* http://www.justiz.nrw.de/nrwe/olgs/duesseldorf/j2008/VI_Kart_9_11_07

OWi_urteil20080527.html (imposing a fine of in the amount of €225,000)(JA 3279-95).

### c.     European Union decision

In 2009 the European Union found Gosselin guilty of bid-rigging in Belgium and fined it €2.32 million. U.S. Appellant's Br. 45 fn. 11.

### 3.     Government intervened in ITGBL

The Government intervened in this case on July 18, 2008 pursuant to 31 U.S.C. § 3730(c)(1) on the allegations concerning international shipping (ITGBL). It did not intervene in the claims involving shipping within Europe (DPM). JA 263-93. Pursuant to 31 U.S.C. § 3730(c)(3), Relators proceeded with the DPM Contract Claim.

## C.     Procedural History Through Trial

### 1.     Most defendants settled

Eleven defendants settled prior to trial, including Viktoria Schäfer International Spedition, GmbH ("Viktoria"), Andreas Christ Spedition & Möbeltransport GmbH ("Christ"), Birkart Globistics GmbH & Co. Logistik and Service KG ("Birkart") and ITO Möbeltransport ("ITO"). JA 378-537; 1227. The Gosselin Defendants were the only defendants to proceed to trial.

### 2. Number of invoices stipulated

Relators did not seek actual damages on the DPM Contract Claim. The case instead was presented to the jury to determine liability for false claims related to the Certificate of Independent Price Determination (CIPD) for purposes of a civil penalties award. The parties on July 25, 2011 stipulated that Gosselin issued 2,474 invoices in the first year of the DPM Contract (May 2001-April 2002), 4,259 in the first option year of the DPM Contract (May 2002-April 2003), and 2,403 in the second option year of the DPM Contract (May 2003-April 2004). JA 2847-51. The total number of invoices stipulated was 9,136.

### 3. Jury verdict

On August 4, 2011, the jury found that the Gosselin Defendants knowingly caused to be presented to the United States Government a false or fraudulent claim for payment or approval because of their violation of the CIPD. JA 1116-17.

### D. Post-Trial Proceedings

### 1. District Court's denial of Gosselin's Rule 50 motion

In denying Gosselin's Motion for Judgment as a Matter of Law on the DPM Claim, the District Court held that the evidence was sufficient for a reasonable jury to find in favor of the United States on the DPM claim and that as a matter of law, 9,136 false claims were submitted with respect to those claims, as stipulated. JA

1223-27; 2847-51.

The District Court held that the Gosselin Defendants were not entitled to a new trial with respect to the DPM claims. JA 1226-27. The Court found that "the heart of defendants' challenge – whether defendants possessed the requisite intent – is a classic jury issue; and the jury could have reasonably inferred such an intent . . . ." JA 1224-25. The District Court held that, given the admitted price-fixing among the potential subcontractors and the incorporation of the fixed subcontractor pricing in the Gosselin Defendants' DPM Contract bid, the jury's verdict was not against the clear weight of the evidence. JA 1226. The Court found no other ground that would justify a new trial as to the DPM Claim. JA 1226-27.

## 2.  Post-trial evidentiary hearing on civil penalties

On October 26, 2011, the Court held a post-trial evidentiary hearing regarding civil penalties for the DPM Contract.

On February 14, 2012, the District Court decided that Relators failed to establish that the Defendants' conduct caused the Government any provable harm with respect to the DPM claim. JA 1584-1617. The Court held that the mandatory civil penalty of at least $50,248,000 was an unconstitutionally excessive fine in

violation of the Eighth Amendment.[2] JA 1617. It concluded that it did not have the

discretion to determine an alternative reduced civil penalty and therefore declined to

impose any civil penalty at all. *Id.*

## STATEMENT OF FACTS

We agree with the United States' Statement of the Facts, U.S. Appellant's Br.

5-13. We outline the following further facts.

### A.    Gosselin

Gosselin was founded in 1937. JA 1962. Gosselin's business has included

shipping of United States military work for at least fifty years – in fact the company

followed the United States military from Paris to Belgium when French President

de Gaulle withdrew from NATO. JA 1963. Between 2000 and 2002, 75% of

Gosselin's business involved United States government work. JA 1967-68. In 2002,

Gosselin had revenue of $140 million. JA 1968-69. Marc Smet has been the

Managing Director of Gosselin since the late-1970s. JA 1969-70.

### B.    The DPM Program

The United States Department of Defense's Direct Procurement Method

(DPM) program provided transportation for military household goods owned by

---

[2]The Government and Relators waived all but $24 million of this penalty. JA
1615-16.

U.S. military personnel and their families at U.S. military installations in Germany, Italy, Belgium, The Netherlands, and Luxemburg. JA 1586. DPM program contracts were made directly with local providers in those countries, rather than indirectly through United States freight forwarders, as per the ITGBL program. *Id.* Before 2001, the DOD Consolidated Personal Property Shipping Office (CPPSO) in Grafenwöhr, Germany solicited and awarded DPM contracts regionally. *Id.* DPM services in Germany were provided pursuant to six separate contracts. JA 1245. These contracts were awarded for three year periods, one base year and two option years. *Id.*

In the late summer or early fall of 2000, the industry had notice that CPPSO would be soliciting a single contractor for DPM, a so-called "Europe" contract. JA 1586. This centralized contract would eliminate multiple regional providers. *Id.*

The U.S. Government's solicitation for proposals for the 2001 DPM Contract required bidders to list separate pricing for 51 separate tasks related to a possible move, and each noted in separate line items. JA 1594; 2878-3098. The principal task was the basic packing and loading of household goods, listed as line item 1AA. JA 1594.

Although there are 51 line items, the Request for Proposals (RFP) for the 2001 DPM Contract also recognized that the vast bulk of the 2001 DPM Contract

9

expenditures would be the 1AA basic packing service. The RFP provided estimated quantities for bidding purposes. JA 2696-2821, 2873. The estimated quantity in the RFP for line 1AA was 30,928 per hundredweight which generated an anticipated charge of €1.13 million per year at the €36 price bid by Gosselin. JA 2704. This amount was projected to be three times the next largest dollar item of the 2001 DPM Contract (1AB). *Id.* Of the €3.168 million spent in the first contract year of the 2001 DPM Contract, €1.556 million was spent on the basic packing service, 1AA. JA 1405. Similarly, in the second contract year, the United States spent €1.262 million on the 1AA service of the total €3.082 million spent in that year. *Id.* The total amount the United States paid on line 1AA during the course of the 2001 DPM Contract is €2,984,802.19. *Id.*

### C.    DPM Bid-Rigging

#### 1.    The February 2001 meeting of potential bidders

On February 15, 2001, after an Army briefing on the 2001 DPM Contract at Grafenwöhr and before bids were submitted, representatives of the Gosselin Defendants and the other interested bidders met privately to discuss the DPM Contract. JA 1953-54; 2065-68. At this meeting or shortly thereafter, the colluding bidders, including the Gosselin Defendants, agreed upon the prices to be charged to each other under the DPM Contract, and agreed upon which companies would

10

service each territory, regardless of which firm actually won the bid. JA 1586-87; 2068-70.

### 2.     Graf's testimony and email

Jurgen Graf was a Managing Director of ITO, one of the 2001 DPM bidders. JA 1930; 1952. His meeting notes reveal that the bidders discussed that each would bid on the DPM Contract and that "Gosselin will make a high priced offer. . . ." JA 1953.[3]

Mr. Graf admitted to the agreement among competitors as to what each would charge the others for DPM Contract services and the territorial division. JA 1954. Mr. Graf testified in a video deposition played at trial:

Q.     During the meeting, you all agreed what rates you would charge whoever won the contract for services under that contract?

A.     Yes.

Q.     And in terms of that, according to this, the discussion included coordinating the billing rate for the most important services, do you see that?

A.     Yes.

_____

[3]Mr. Smet confirmed that he told Mr. Graf that he was going to bid a high price.  JA 2082.

11

* * *

Q.   Did you also agree to split the territories of the service under the DPM contract?

A.   Yes.

* * *

Q.   But you do recall that the participants in the February 15th meeting agreed to the prices that were going to be charged for services under the DPM contract?

A.   Yes.

Q.   I'm handing you what's been marked as Exhibit 37, do you recognize this document as an email that you issued to Marc Smet and Dieter Schmekel on or about May 2nd, 2001?

A.   Yes.

Q.   And on this document, does this memorialize in your mind the rates that were agreed by the participants in the February meeting for the services to be rendered under the DPM contract?

A.   Yes, I think so.

JA 1954.

In the email to Mr. Smet dated May 2, 2001 referenced in Mr. Graf's

12

testimony, Mr. Graf wrote: "As a remark to the rates we have agreed upon that those will be the net-rates the contract holder will pay to the participating parties without any further reduction." JA 2824. Mr. Graf confirmed the prices to which the bidders agreed in their pre-bid meeting, writing:

> From the meeting minutes we show the following rates:
>
> 35,00 EURO Outbound HHG - (1AA)
>
> 45,00 EURO Outbound UB - (3AC)
>
> 17,00 EURO Inbound HHG (12AA)
>
> 25,00 EURO Inbound UB (14AA)
>
> 135, - EURO Container 205cft - (8AA)
>
> 6,00 EURO SIT and Whse combined - (7+15)
>
> 3,00 EURO overflow - (BAC)

JA 2823-24. The codes in the parentheses above correspond to some of the 51 line items in the DPM Contract. JA 2883, 2885, 2890, 2893, 2894.

Mr. Graf's email concluded: "We find this very important as we go ahead and stabilize this business. We talk a lot about TRUST and we feel it is outmost [sic] important that we all work together in a good system, as we will trust you that things will happen just as they are being said." JA 2823-24.

13

### 3.    Smet's admissions and email

Gosselin Managing Director Marc Smet also admitted that the competing bidders agreed on pricing for services under the DPM Contract:

Q.    Mr. Smet, isn't it true that either at that meeting or in some other discussions later before the contract was awarded you entered into agreements with your colleagues as the prices that would be charged for some of the services on the DPM contract?

A.    At a certain time, we entered into agreements on pricing concerning some elements of the contract which were important to know.

Q.    It wasn't just you entering into an agreement, say, with Mr. Graf. It was you entering into an agreement with Mr. Graf [ITO] and with Mr. Baur [Christ] and with Mr. Schaefer for Viktoria. So you all knew what prices you would charge each other; is that right?

A.    We knew what the price would be for some line items in the contract if any of the other bidders would be a subcontractor to the other one.

JA 2068-2069.

14

Q.    …You agree that, in fact, prior to the award of the contract, you reached understandings with two other parties who bid on the DPM contract as to what each would charge the other; is that right?

A.    That's correct.

Q.    It wasn't just for one or two line items. You had a number of line items that you, Mr. Schaefer for Viktoria and Mr. Graf for ITO agreed to, the three of you, before the contract was awarded?

A.    I think there were maybe four or five line items. Two of them were irrelevant because they were concerning liftvans, and everybody knows the price of a liftvan.

JA 2069-70.

Q.    . . .Isn't it true that Mr. Weyand was also present with Jurgen Graf for the meeting in Grafenwoehr?

A.    Yes, he was.

Q.    And isn't it also true that Birkart was one of the other contractors who agreed to the 35 Euros for the 1AA packing and unpacking service?

A.    He agreed to that rate, yes.

JA 2193. Mr. Smet confirmed that Horst Baur of Christ was at the Grafenwöhr

15

meeting and that his firm was one of the firms that was part of the subcontractor price-fixing conspiracy. JA 2070-71.

The District Court summarized that "by email dated February 20, 2001, Gosselin confirmed with ITO, Birkart, Viktoria, and Andreas Christ - other bidders on the 2001 DPM contract - the rates to be paid agents or subcontractors for certain services under the 2001 DPM contract. In that same email, Gosselin also listed trucking rates and disclosed that 'a 5 [percent] rate increase per year is buil[t] into these rates.' Gosselin further instructed the other bidders to list certain agents as servicing agents for each country." JA 1587; 2836-43.

### 4.    Relator Bunk's testimony

When the Government solicited bids for the 2001 DPM Contract, Relator Kurt Bunk was a manager for UTD, a German transport company involved in the military household goods business as a subcontractor to Birkart, one of the participants in the February 15, 2001 price-fixing meeting. JA 1586-87; 1824-26; 1840-41.

In February 2001, prior to the award of the 2001 DPM contract, Mr. Bunk met with Erwin Weyand of Birkart and Mr. Bunk took notes during this meeting. JA 1910-11; 1915. Mr. Weyand told Mr. Bunk that under the competitors' agreement Mr. Bunk's firm was strictly prohibited from submitting a bid for the

2001 DPM Contract. JA 1843; 1897. Mr. Weyand told Mr. Bunk, "the different companies that followed the new rules are the ones who are going to do this kind of work"- *i.e.*, Gosselin, ITO, Viktoria and Christ. JA 1843. Mr. Bunk testified that Mr. Weyand told him, "that these prices were already fixed, that they agreed on the pricing, and the regions were already divided and defined. And so the commissions were divided among the companies who agreed to participate in this contract." JA 1843-44.

Mr. Bunk's notes from this meeting show how the conspirators assigned territories among themselves. JA 1844; 1911-13; 2846. Mr. Bunk testified that with respect to the conspirators and the territories demarcated, "no matter who would be awarded the contract, it was clear" that the listed competitor would be responsible for servicing the regions. 1911-13.

Mr. Bunk testified that each competitor would receive the €35 rate for the line 1AA service, which was approximately double the rate he, as a Birkart subcontractor was receiving under the previous 1999 DPM contracts. JA 1844-45;1914.

> **D.    Gosselin Submits 9,136 Invoices Based on Certificate of Independent Pricing.**

The Federal Acquisition Regulations, 48 C.F.R. § 52.203–2, require U.S. Government contractors to make a Certificate of Independent Pricing reflected in

Paragraph 52.203-2 of the Solicitation for the DPM Contract DAJA 16-01-R-0003.

It provides, in relevant part:

(a)    The offeror certifies that -

(1)    The prices in this offer have been arrived at independently,

without, for the purpose of restricting competition, any

consultation, communication or agreement with any other

offeror or competitor relating to (i) those prices, (ii) the intention

to submit an offer, or (iii) the methods of [sic] factors used to

calculate the prices offered.

(2)    The prices in this offer have not been and will not be knowingly

disclosed by the offeror, directly or indirectly, to any other offeror or

competitor before bid opening (in the case of a sealed bid solicitation)

or contract award (in the case of a negotiated solicitation) unless

otherwise required by law; and

(3)    No attempt has been made or will be made by the offeror to induce any

other concern to submit or not to submit an offer for the purpose of

restricting competition.

JA 3129. Gosselin accepted the contract on these terms. Gosselin never notified any

Government officer that any of its conduct had violated this Certificate.

18

### E.    Evidence of Tangible Harm

#### 1.    Relators' evidence

At the post-trial hearing on penalties, Relators presented the declaration of Guenter Riedl, the Chief Voucher Examiner for the Department of Defense Contracting Office in Grafenwöhr, formerly known as the CPPSO, who helped develop the 2001 DPM Contract's bid specifications. JA 1295-1303. Part of Mr. Riedl's job was to monitor contractor compliance. JA 1296. He testified that "On an everyday basis, my staff and I have worked with the DPM Contracts in effect during the period 1999 through 2004." JA 1296. Mr. Riedl presented evidence of a price increase after the bid-rigging conspiracy, based on a comparison of pricing under the 1999 DPM contracts and 2001 DPM Contract. JA 1295-1303.

Mr. Riedl testified that the average basic packing cost (line 1AA) more than doubled in the 2001 DPM Contract. JA1300. The average 1999 DPM contract price was €16. JA 1300. The 2001 line 1AA price was €36. JA 1300. Mr. Riedl also calculated a weighted average to confirm that the price comparison was not skewed because of the possibility that the work was distributed unevenly among the six 1999 DPM contractors. JA 1301-03. Using a weighted average calculation, Mr. Riedl found that the 1999 average contract price was €14. JA 1303.

Mr. Riedl compared the six 1999 DPM contracts and the 2001 DPM Contract

by looking at a typical move or a "standard load." JA 1298. Based on experience, he calculated that the standard load was 10,000 pounds and that 10 percent would be overflow or oversize items. JA 1298. He found that the 2001 DPM Contract price for a standard move was 87% more than the equivalent charges in the 1999 DPM contracts. JA 1299.

### 2. Defendants' evidence

Defendants presented three witnesses. Stephen Marshall, formerly employed by the Grafenwöhr CPPSO, testified about his positive dealings with Gosselin under the DPM contracts. JA 2489-2532. General Michael Kelleher, Ret., who served as ombudsman from 2004 until 2007 pursuant to an Administrative Settlement Agreement between Gosselin and the Army, testified about his positive interactions with Gosselin. JA 2533-77. Gen. Kelleher's oversight was required as part of the resolution of the criminal case against Gosselin concerning ITGBL. JA 2534-35. Gosselin had to cooperate with Gen. Kelleher to remain eligible to contract with the U.S. Government. *Id.*

Gosselin Managing Director Marc Smet testified, among other things, about Gosselin's 2001 DPM Contract profit. JA 2578-2682. Mr. Smet testified that Gosselin's three-year profit from the DPM Contract was €400,000. JA 2655. This "net profit" calculation was reached after €650,000 of unspecified, undefined costs

were deducted from DPM Contract income and additional costs of €1,418,000 was paid to a Gosselin subsidiary for liftvans. JA 2657-62. Mr. Smet testified that Gosselin charged the United States €135 for the liftvans, while Gosselin purchased them at a cost of €125. JA 2591.

Defendants presented a declaration from Keith R. Ugone criticizing Mr. Riedl's methodology as simplistic. JA 1365. In post-hearing briefing, Gosselin performed an analysis using the multiple line items that account for all seven "categories that were combined into line item 1AA in the 2001 contract." JA 1538-40. Gosselin calculated that average pricing increased by 9.82% in the 2001 DPM Contract compared to the 1999 contracts. JA 1540.

## SUMMARY OF ARGUMENT

The jury found that Gosselin knowingly submitted 9,136 false claims to conceal an extensive price-fixing and bid-rigging conspiracy. The District Court held that these false claims did not warrant any penalty at all.

In Part I of the Argument, below, we show that the District Court wrongly minimized the harm of Gosselin's false claims. The Court mistakenly equated statutory civil penalties with damages. It erroneously placed the burden of proving "harm" for Excessive Fine analysis on the Government and the Relators. *See United States v. Ahmad*, 213 F.3d 805, 816 (4th Cir. 2000).

The District Court erred in holding that bid-rigging is not harmful unless the Government can show how much lower bids would have been but for the conspiracy. This is a common defense in bid-rigging cases, and it is uniformly rejected. Bid-rigging is inherently harmful precisely because the cartel makes it impossible to reconstruct what lawful competition would have looked like. *See*, *e.g.*, *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 317-18 (4th Cir. 1982).

In any case, the record does indicate significant tangible harm from the cartel. The Chief Voucher Examiner estimated costs were about $1.8 million higher in the rigged 2001 DPM contract. The District Court rejected this estimate as speculative, and based on dissimilar contracts - but this finding only confirms that bid-rigging is pernicious precisely because it makes proof of its harm difficult.

The District Court also excused the false claims by reasoning that the Government's requirement of Independent Pricing was not economically reasonable. That is not a policy judgment courts are allowed to make to nullify Congressional contracting requirements.

The District Court also reasoned that the Government ought to have discovered the cartel earlier, because Mr. Bunk had been accusing Gosselin of this conduct as early as 2002. But Gosselin denied those allegations, and continued to attack Relator Bunk's credibility throughout investigation and trial. The

22

Government was entitled to rely on Gosselin's certification. The False Claims Act mandates severe *post hoc* penalties for falsehood precisely to relieve the Government of the costs of investigation.

The District Court also refused to treat the DPM violation as related to Gosselin's multiple other instances of bid-rigging in the ITGBL case and elsewhere in Europe. Its sole reason was that the Government intervened in the ITGBL case, but not in the DPM. This is contrary to Circuit law that the Government's decision whether to intervene in a False Claims Act case is legally irrelevant to its merits. *U.S. ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 457 (4th Cir. 2011).

In Part II, we show that the District Court's alternative rationales for denying penalties are contrary to law. The District Court's refusal to award any reduced penalty confuses the statute with the Constitutional limitation on any penalty over the Eighth Amendment ceiling. Once any penalty over the Constitutional maximum is eliminated, the Court must carry out its statutory duty to enforce the remainder.

The District Court's alternative proposals to divine an "appropriate" penalty of $500,000, or to treat the claims as a single event subject to a single $11,000 penalty, are unsound. These alternatives replace settled False Claims law with a discretionary, result-oriented judicial authority that Congress did not permit.

As to the Constitutional maximum, the District Court wrongly judged that

23

Gosselin's supposed profit of $150,000 times the ten-to-one ratio in Due Process law would yield a Constitutional maximum of $1.5 million. The "harm" for Eighth Amendment purposes is not the defendant's profit. *See United States v. Jalaram, Inc.*, 599 F.3d 347, 356-57 (4th Cir. 2010). In a bid-rigging case, the "harm" is the total volume of commerce affected by the cartel. Because the total value of Gosselin's contract was about $8 million, the Relators' and the Government's requested penalty of $24 million is well within the single-digit ratio allowed in Constitutional cases.

## STANDARD OF REVIEW

### A.    Facts Found by Jury

In determining whether the evidence supports the jury's verdict, the Court "review[s] the evidence, and all reasonable inferences to be drawn therefrom, in favor of [the nonmoving party]." *Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir. 1996). In its plenary review of the District Court's decision, the Court of Appeals is bound by the same standard of deference to the jury's findings. *Id.*; *See also Gregg v. Ham*, 678 F.3d 333, 341 (4th Cir. 2012).

### B.    Excessiveness of Fine

Once the jury finds liability, the District Court independently fixes statutory penalties. *Tull v. United States*, 481 U.S. 412, 426 (1987). Under the False Claims

24

Act, the minimum statutory penalty (currently, $5,500 per violation) is mandatory. *See United States v. Brown*, 274 F.2d 107, 110 (4th Cir. 1960).

In reviewing a statutory penalty for Constitutional excessiveness, the Court reviews the District Court's decision *de novo*. *See United States v. Ahmad*, 213 F.3d 805, 815-16 (4th Cir. 2000). "The question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review of that question is appropriate." *United States v. Bajakajian*, 524 U.S. 328, 337 n.10 (1998).

## ARGUMENT

## I. FALSE CERTIFICATIONS TO CONCEAL PRICE-FIXING AND BID COLLUSION ARE INHERENTLY HARMFUL.

### A. The District Court Wrongly Placed the Burden of Proof on the Government and the Relators.

Where a defendant asserts that a statutory penalty violates the Eighth Amendment, the <u>defendant</u> bears the burden of proving that the penalty is excessive. *See United States v. Ahmad*, 213 F.3d 805, 816 (4th Cir. 2000); *United States v. Mason*, 216 Fed.Appx. 287, 289 (4th Cir. 2007).

The District Court ignored this rule. It equated civil penalties with damages, placing the burden of proving "harm" on the Government and the Relators. It treated any lack of definiteness in this proof as fatal to the Government's right to

25

statutory penalties: "[T]he Court concludes that the Plaintiffs have failed to

establish, based on reliable information, that the Defendants' conduct, in fact,

caused the government any economic harm." JA 1596. "Plaintiffs conced[e] that

they had no evidence that absent the conspiracy, anyone would have bid a lower

amount for item 1AA services under the 2001 DPM contract . . . . But this is

precisely the type of evidence needed to establish and calculate damages under the

FCA . . . . For these reasons, the Plaintiffs' analysis for economic harm does not

conform to any recognized measure of economic harm of damages." *Id.*, JA 1596-

97.

The Court relied on the inherent difficulty in comparing different contracts to

quantify the increased cost imposed by Gosselin's price-fixing. *See id.*, JA 1597-98

("the contracts Plaintiffs rely on for their pricing comparisons . . . make overall cost

comparisons with the 2001 DPM contract difficult."). It resolved this difficulty in

proof in Gosselin's favor: "The Court concludes that the evidence is insufficient to

quantify in any meaningful way any economic harm sustained by the government

under the 2001 DPM contract." JA 1599.

This was error. To the extent that the tangible harm to the Government is

difficult to quantify, the difficulty cuts against Gosselin's <u>defense</u>, not against the

Government and the Relators. The Relators proved Gosselin knowingly submitted

26

false claims – that is all that the False Claims Act requires to justify statutory penalties. The burden of showing that the mandatory penalties were unconstitutionally excessive fell on Gosselin. By requiring the Relators and the Government to prove the harm justifying statutory penalties, the District Court inverted the burden of proof.

**B.    The "Harm" Justifying Statutory Penalties For Eighth Amendment Purposes Is Broader than Tangible Damages.**

**1.    FCA penalties are recoverable even where damages are not.**

The False Claims Act presumes that penalties are available even where damages cannot be proven.

FCA penalties are a form of liquidated damages for deliberate falsehood by Government contractors. *Rex Trailer Inc. v. United States*, 350 U.S. 148, 152-54 (1956). Such penalties are not arbitrary or unexpected. They are known in advance by all government contractors as the price of false certifications. In *Rex Trailer*, the Court rejected the argument (accepted here by the District Court) that FCA penalties could not be awarded absent proof of damage: "It is insisted, however, that the failure of the Government to allege specific damages precludes recovery here. But there is no requirement, statutory or judicial, that specific damages be shown . . . . The Government's recovery here is comparable to the recovery under liquidated-damage provisions which fix compensation for anticipated loss. . . . The

27

damages resulting from this injury may be difficult or impossible to ascertain, but it is the function of liquidated damages to provide a measure of recovery in such circumstances." *Rex Trailer*, 350 U.S. at 152-54. *See also Toepleman v. United States*, 263 F.2d 697, 699 (4th Cir. 1959) ("to the Government a false claim, successful or not, is always costly. Just as surely, against this loss the Government may protect itself, though the damage be not explicitly or nicely ascertainable. . . . [E]ven when multiplied by a plurality of impostures, it still would [n]ot appear unreasonable when balanced against the expense of the constant Treasury vigil they necessitate. Obviously, the Congress in fixing this sum as the amount of the forfeiture cannot be justly accused to taking it without cause or due process." (*citing Rex Trailer*, 350 U.S. at 152-54.).

This is why the Government may recover FCA penalties even in the absence of provable damages. In *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.* (*Harrison I*), 176 F.3d 776, 785 n.7 (4th Cir. 1999), the Court held that liability for FCA penalties attaches without any requirement that the Government show damages at all. After remand and trial, the Court affirmed penalties for each of 26 separate submissions, despite the lack of provable pecuniary damages. *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.* (*Harrison II*), 352 F.3d 908, 920 n.13 (4th Cir. 2003) ("[e]ach claim for payment under the contract was. . .submitted

under a contract which was fraudulently approved. So, WSRC could face False Claims Act liability for each claim for payment under the GPC subcontract." *citing Harrison I*, 176 F.3d at 793-94). *See also U.S. ex rel. Davis v. District of Columbia*, 679 F.3d 832, 840 (D.C. Cir. 2012) ("The government got what it paid for and there are no damages. If Davis proves his claims he may still be eligible to share in the statutory penalties assessed against the District." (citations omitted)).

### 2. Excessive Fine analysis looks to broader harm to Government interests, in addition to tangible damages.

Under the Excessive Fines clause, the "harm" against which the penalty is judged is not limited to the Government's loss of revenue. It includes broader harm that would not support tangible damages, like the Government's loss of its ability to enforce contracting requirements. *See United States v. Ahmad*, 213 F.3d 805, 817 (4th Cir. 2000); *see also United States v. Kruse*, 101 F.Supp.2d 410, 412-14 (E.D. Va. 2000) (statutory penalties under the related Anti-Kickback Act were not excessive, even though the government could not prove specific damage from the kickback: "[k]ickbacks do harm the government, and there is a broad consensus (i) that it is difficult to prove the government's actual contract damages from a particular kickback scheme, and (ii) that the government must incur additional investigative and enforcement costs to ferret out and stop these abusive schemes."). This Court recently held that inchoate "harm" justifying statutory penalties need not

29

be limited to provable pecuniary damages. *United States v. Oceanpro Indus., Ltd.*, 674 F.3d 323, 331 (4th Cir. 2012) (for purposes of restitution, states' interests in protecting fish in their waters were "directly and proximately harmed" by illegal harvesting, even though the states had no proprietary rights in them.).

But if Defendants are correct, <u>any</u> civil penalty would be disproportionate to harm if the Government failed to prove pecuniary damages. That is exactly the theory this Court rejected in *Ahmad*, 213 F.3d at 816 n.5.

### C.     Price Fixing and Bid Rigging Are Harmful *Per Se*, Even Without Particularized Proof of Monetary Injury.

This is particularly true as to price-fixing and bid-rigging. When a cartel includes all or most of the major competitors in a market, the cartel's success prevents the Government from proving with certainty what competitive bidding would have produced.

Yet the District Court accepted a "no harm, no foul" defense, faulting the Relators and the Government for failing to prove that competitive bids would have been lower. JA 1596. It further found that the difficulty in making direct comparisons between earlier contracts and the 2001 DPM Contract operated to absolve Defendants of liability for penalties. JA 1597-98. The District Court accepted an argument that has been repeatedly rejected in price-fixing and bid-rigging cases.

30

### 1.    Price-fixing and bid-rigging are inherently harmful, regardless of proof of pecuniary harm.

The jury found that the Gosselin Defendants knowingly falsified their Certificate of Independent Pricing, by submitting thousands of invoices with knowledge that they had violated its condition against price-fixing and bid collusion. In assessing the harm of such conduct, the Court must look to the harm that the law attributes to price-fixing and bid-rigging.

Where most or all market competitors are party to the scheme, it will normally be impossible for the Government to prove what the contract price would have been with competitive bidding. This has never prevented courts from condemning the practice as inherently harmful. "Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 351 n.23 (1982) (*quoting United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 226, n.59 (1940)). "It has long been settled that an agreement to fix prices is unlawful *per se.* It is no excuse that the prices fixed are themselves reasonable." *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980).

This Court applied this *per se* rule to a bid-rigging scheme similar to the one

31

concealed here in *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 317-18

(4th Cir. 1982). This Court rejected defense arguments that the bid rigging was

economically reasonable, and inflicted no provable harm: "[T]he collusive bid

rigging dimension of the conspiracy charged makes the arrangement little less than

a cartel, which is never legally nor economically justifiable. . . . As a result, we do

not hesitate to conclude that the Government was not required to establish the

unreasonableness of the conspiracy charged." *Id.* (footnote and citation omitted).

*Per se* violations arise from "certain agreements or practices which because of their

pernicious effect on competition and lack of any redeeming virtue are conclusively

presumed to be unreasonable and therefore illegal without elaborate inquiry as to

the precise harm they have caused or the business excuse for their use." *TFWS, Inc.*

*v. Schaefer*, 242 F.3d 198, 209 (4th Cir. 2001) *quoting Continental T.V., Inc. v.*

*GTE Sylvania, Inc.*, 433 U.S. 36, 50 (1977) (emphasis added). For this reason, this

Court rejects defense arguments based on expert studies that purport to show that

price-fixing had no effect on actual prices. *See United States v. Gravely*, 840 F.2d

1156, 1161 (4th Cir. 1988); *see also United States v. Lester*, 376 F.Supp.2d 679,

684  (W.D. Va. 2005) (assessing harm of bid-rigging based on total volume of

commerce affected: "Because of the nature of most of the work, it is now

impractical, if not impossible, to determine in hindsight what the work would have

32

cost the government had the illegal and fraudulent bids not been accepted.").

Yet here the District Court precluded any penalty against Defendants' collusive bid-rigging and price-fixing, in large part because it found no proven damage from the particular practice. This nullifies the Federal Acquisition Regulations, 48 C.F.R. § 52.203–2, on a theory that contradicts decades of federal law about the inherent harm of such restraints.

### 2. The record shows substantial indication of tangible harm even in short-term comparisons of contract price.

In any case, there is ample indication of tangible harm to the United States.

Given the many changes in the DPM contracts between 1999 and 2001 and the lack of admission from any cartel conspirator about what they would have bid absent the cartel, Relators had to rely on comparisons between contracts reached at different times under differing conditions. The District Court's rejection of Mr. Riedl's proof only confirms why price-fixing is *per se* unlawful – because proof is so difficult in the face of a price-fixing conspiracy.

### a. Chief Voucher Examiner Riedl's calculations of about $1.8 million base loss

Guenter Riedl, the U.S. Government employee who helped develop the 2001 DPM Contract specifications, testified that the average basic packing price (line 1AA) under the 1999 DPM contracts doubled in the 2001 DPM Contract. JA 1300.

33

The average 1999 price of the six contracts was €16. *Id.* The 2001 line 1AA price was €36. *Id.* As the United States paid €3 million for line 1AA in the 2001 Contract and the two option years, the resulting price increase is $1.67 million[4] for the 1AA line item alone. JA 1405. Using a weighted average calculation, Riedl found that the 1999 contracts' average price was €14 for the 1AA line alone. JA 1303. Compared to the €36 price after the price fixing, the increase is about $1.84 million for the 1AA line item alone.

Mr. Riedl also compared the six 1999 DPM contracts and the 2001 DPM Contract by looking at a typical move, a "standard load." JA 1298-99. He calculated the standard load was 10,000 pounds and that 10% would be overflow or oversize items. JA 1298. He found that the 2001 DPM Contract price for a standard move was 87% more than the equivalent charges in the 1999 DPM contracts. JA 1299. This amounts to about $1.87 million more paid for a standard move for the course of the 2001 DPM Contract compared to the 1999 contracts.

_____

[4]The parties have assumed throughout this case that for the duration of the 2001 DPM Contract, 1 DM was roughly equivalent to €50, and €1 was roughly equivalent to $1. JA 1595. *See also* FED. RESERVE, FED. RESERVE STATISTICAL RELEASE: G.5A FOREIGN EXCHANGE RATES (ANNUAL) (Jan. 2, 2004), *available at* http://www.federalreserve.gov/releases/g5a/20040102/ (last visited Aug. 8, 2012)(calculating the average dollar to euro exchange rates to be .8952 in 2001, .9454 in 2002, and 1.1321 in 2003).

### b.    Gosselin's own figures show a 9.82% increase.

In response to Mr. Riedl's declaration, Gosselin performed an analysis based on the actual cost per hundred pounds using multiple line items that account for all seven "categories that were combined into line item 1AA in the 2001 contract." JA 1539-40. Even Gosselin calculated that average pricing increased by 9.82%. JA 1540.

The flaw in the Gosselin Defendants' effort to minimize Mr. Riedl's cost figures is that it compares a <u>total</u> move cost under the 1999 DPM contracts to a <u>partial</u> move cost under the 2001 DPM Contract. Defendants compare "the cost per hundred pounds for an average move" under the 1999 DPM contracts to "the 2001 1AA price of 72 DM (€36)" to reduce the calculated price increase to 9.82%. JA 1539-40. But the 2001 DPM Contract cost was not just the 1AA basic packing cost. Rather, the equivalent move should include the amounts paid by the United States for crates (€135) and a surcharge of €3 per cubic foot for oversize and overflow crates. JA 1297-99; 1302; 1569. These costs were not part of Gosselin's calculations and constituted an additional 37% of the average, actual cost to pack or "move" one hundred pounds under the 2001 DPM Contract. JA 1297-99; 1569.

When costs for the surcharge and containers are added to the 2001 DPM 1AA basic packing costs to make the comparison of "moves" equivalent, and the actual

35

data relied upon by the Gosselin Defendants is used in the calculation, the actual,

average cost to move one hundred pounds was €50 under the 2001 DPM Contract,

the equivalent of 100 DM. *Id.* Gosselin computed the same cost under the 1999

DPM contracts to be 65 DM. JA 1540. The resulting 35 DM difference reveals that

the 2001 average, actual cost per hundredweight "move" was 54% greater than the

average, actual cost under the 1999 DPM contracts. JA 1569.

### c.    Loss of use of funds over ten years

Assuming approximately $1.87 million in higher prices as of 2002, the

carrying cost to the United States from lost use of the funds for a decade adds

approximately $1 million to the harm. JA 1459-60.

Gosselin argued that prejudgment interest is improper in an FCA case. This

misses the point. The Government's loss of this money is not itself the basis of a

separate claim for prejudgment interest. Rather, the Government's loss of money

over time (otherwise reflected in prejudgment interest) is subsumed in the False

Claims Act's provisions for multiple damages. *See Cook County, Ill. v. U.S. ex rel.*

*Chandler*, 538 U.S. 119, 131 n.9 (2003). While no damages are sought here, the

FCA clearly treats the Government's loss of money over time as a relevant harm,

for which the statute intends to compensate. This loss must therefore be included in

evaluating the degree of harm.

36

#### d.    Differences in contracts under comparison

The District Court held that because the various contractors in the 1999 DPM program used different line items as profit centers, it would be unfair to compare the contracts. JA 1597-99. Gosselin suggested that one of its two 1999 DPM contracts should not have been used. JA 1357-65. Gosselin also cherry picked "representative moves" of its own choosing to argue that the 2001 DPM Contract was less expensive than some 1999 Birkart moves. *Id.*

But this lets Gosselin have it both ways –  when Chief Voucher Examiner Riedl found a significant price increase in the 2001 DPM Contract, the District Court held that the differences in conditions were too great to draw a meaningful comparison. But the Court relied on exactly the same comparison to hold that the contracts had "substantially" the same price (apparently discounting the 9.82% increase because of alleged changes in circumstances). JA 1597-99.

This misses the point. Mr. Riedl as the CPPSO officer testified he saw an 87% increase, or about $1.8 million, in increased costs (not including the interest from loss of the money over ten years). Gosselin's strategy at the penalty hearing was primarily to argue that no proof about pecuniary loss was possible. This approach improperly conflates harm and damages. Gosselin bore the burden of proof on its Excessive Fine defense, so the difficulty in deciding whether Mr.

Riedl's estimates were more probative than Gosselin's, or the effect of changes between 1999 and 2001, militate against Gosselin's Eighth Amendment defense.

Even Gosselin's analysis concedes that the prices increased under the 2001 DPM Contract, which is a compelling indication of some minimum harm. Mr. Riedl's analysis shows a more significant increase. However it is calculated, such an apparent price increase must be viewed as significant tangible harm.

> ### e.  The District Court mistakenly found that one firm bidding on the contract was outside the conspiracy.

The District Court also claimed that an unidentified bidder outside the conspiracy submitted a bid. JA 1596. The Court reasoned that this tended to make the conspiracy harmless. *Id*. Even if this were true, it would be legally irrelevant to the violation.

In any case, the District Court misread the record. Apparently, the District Court misunderstood the "Notification of Unsuccessful Offeror" dated April 11, 2001 from the Army to one of the unsuccessful bidders Viktoria. JA 650. The letter says that the "Request for Proposals was submitted to 19 proposed offerors, of whom 4 responded with an offer." JA 650. But all four of the offerors (Gosselin, ITO-Birkart's joint bid, Viktoria and Christ) were members of the conspiracy and submitted bids, as the District Court elsewhere found and which was admitted to by Mr. Smet. JA 1587; 2068-71; 2193. The District Court recited that ". . . Gosselin

38

confirmed with ITO, Birkart, Viktoria and Andreas Christ– other bidders on the

2001 DPM contract – the rates to be paid agents or subcontractor for certain

services under the 2001 DPM contract." JA 1587. There is no credible evidence that

any firm outside the bid-rigging conspiracy made an offer.

> **D.**     **The Court Wrongly Minimized the Culpability of the False Claims.**

The District Court acknowledged that price-fixing and bid collusion are

"fundamentally inimical to the integrity of the procurement process and the public

interest." JA 1600. The District Court's analysis, however, diminished that interest

to nothing.

> **1.**     **The District Court may not make a legislative judgment that the CIPD was unworthy of enforcement.**

The District Court found that the price-fixing was not especially culpable,

because the 2001 DPM Contract Solicitation "presented new, if not novel,

contracting and performance requirements that at least encouraged, if not required

discussions with potential subcontractors." JA 1601. Although the Court held that

this did not "justify collusive subcontract pricing," it reached that conclusion

anyway, by holding that "novel conditions" excused Gosselin's cartel. *Id.*

In effect, the District Court held that the Government should not have

required a Certificate of Independent Pricing in the first place. Because the District

39

Court judged that the prohibition on collusion did not make economic sense for the 2001 DPM Solicitation, it excused any violation.

The District Court's approach turns the Excessive Fine Clause into a vehicle for substantive-due-process review, where courts assert the Constitutional authority to nullify regulations they deem "unjustified" economic policy. The Supreme Court forbade this approach in *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 542 (1943), where (as here) the lower court withheld FCA penalties against contractors who concealed their bid-rigging. The Supreme Court reinstated the penalties, because the decision to penalize bid-rigging is a judgment for Congress, not the courts: "Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it; to nullify the criminal statute because of dislike of the independent informer sections would be to exercise a veto power which is not ours." *Marcus*, 317 U.S. at 542.

The Excessive Fine Clause does not give defendants a vehicle to change this rule. *See Traficanti v. United States*, 227 F.3d 170, 176-77 (4th Cir. 2000). The Executive Branch promulgated 48 C.F.R. § 52.203–2 to prohibit collusive bidding, without making exceptions for "novel" economic circumstances. Congress enacted a minimum penalty of $5,500 per false claim, without allowing courts to exempt violations of rules they consider to be economically unjustified. The District

40

Court's approach oversteps its authority.

### 2. The District Court ignored the harm of intentional concealment.

The District Court also excused Gosselin's violations by asserting that the overall DPM Contract was performed in the context of "substantial transparency." JA 1601. The Court pointed to the Government's "regulatory obligation to determine, before accepting Gosselin's bid, whether the DPM pricing was the 'overall Best Value' to the Government." *Id.*

This is a circular argument. The Government's acceptance of the DPM pricing as the "Best Value" <u>was based on Gosselin's Certificate of Independent Pricing</u>. The Government could not canvass other market players for competing bids, because the relevant competing firms were all part of the bid-rigging conspiracy. The very fact that it is impossible now to determine what bids would have been filed but for the conspiracy (a fact the District Court stressed elsewhere, JA 1596), contradicts any finding that the overall process was "transparent."

The Government requires certifications like the CIPD because it depends on truthful disclosures by the affected contractors. If the Government is obligated to investigate the facts independently, there is little reason to require the certification in the first place. Congress meant the FCA to have teeth – to deter falsehood so that government officers may rely on contractors' assurances at face value. "The United

41

States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers; the False Claims Act does this by insisting that persons who send bills to the Treasury tell the truth." *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008); *see also U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1229 (11th Cir. 2012) (where the contract obligates a contractor to report specified facts, the government is entitled to rely on the contractor's certification). To absolve a violator with the excuse that the Government should have uncovered the fraud independently nullifies the False Claims Act entirely.

The District Court disregarded that Gosselin made the false claims <u>knowingly</u>, as the jury found. This distinguishes the unintentional failure to report currency in *United States v. Bajakajian*, 524 U.S. 321, 339 (1998). This was not a mere failure to report. It was a deliberate concealment by an experienced Government contractor of a cartel arrangement that would have instantly disqualified Gosselin from the contract had it truthfully disclosed the price-fixing conspiracy.

In *United States v. Ahmad*, 213 F.3d 805, 815-17 (4th Cir. 2000), this Court explained the difference between such a deliberate scheme and the innocent mistake in *Bajakajian*. "Ahmad's conduct . . . was not a single, isolated untruth affecting

only the government, but rather a series of sophisticated commercial transactions over a period of years . . . Ahmad's structuring not only deprived the government of important information, but also affected a financial institution's ability to comply with the law . . . ." *Ahmad*, 213 F.3d at 817. The Court distinguished the single reporting offense in *Bajakjian*, 524 U.S. at 339, on the ground that "presenting Customs with false invoices constitutes an affirmative action and clearly worked a 'fraud on the United States,' unlike Bajakajian's failure to make a declaration. . . [F]raudulent invoices, for which Ahmad was responsible, repeatedly passed through Customs. The nature and extent of the criminal activity here, therefore, contrasts sharply with Bajakajian's isolated reporting violation." *Ahmad*, 213 F.3d at 818. Gosselin's conduct is no different than Ahmad's. The District Court was wrong to excuse it.

### 3. The District Court wrongly excused Gosselin's false claims because the Relators alleged the cartel to the Government.

The District Court also found Gosselin's falsehood to be harmless because Relator Bunk wrote a Government contracting official, Edwin A. Koschemann, in February 2002 about the cartel's activities before the Government exercised its options on the DPM contract's final two years. JA 1139-41; 1602.

The District Court's reliance on this fact is ironic. The Court discounted the Contracting Office official, Mr. Riedl, who estimated at the conclusion of trial that

43

the cartel cost the Government 87% more than the previous contracts, or about $1.8 million. JA 1299-1303. Yet the District Court held that another Contracting Office official's receipt of reports from the Relator in 2002 was effective to put the Government on complete notice of the fraud. JA 1602. In the District Court's analysis, Mr. Koschemann should have instantly analyzed all initial reports in full to understand the harm of the cartel; but when his colleague Mr. Riedl performed that analysis after years of investigation and evidence at trial, the Court rejected Mr. Riedl's analysis as faulty and incomplete.

This was error. Prior Government knowledge of the cartel might have significance if it came from the conspirators themselves. If Gosselin had notified Mr. Koschemann in 2002 that its CIPD was incorrect, and that it had in fact colluded in all the ways later discovered, the Government's exercise of the option in the two later years might have more significance. A voluntary disclosure by the defendants may be relevant to rebut a finding of *scienter*. *See U.S. ex rel. Harrison v. Westinghouse Savannah River Co.* (*Harrison II*), 352 F.3d 908, 920 & n.14 (4th Cir. 2003). But here, the Gosselin Defendants did not confess to their cartel, and the jury properly found that they deceived the Government with *scienter*.

The only reports to the Government as of 2002 were anecdotal reports from Relator Bunk. When the prior disclosure of wrongdoing comes from the Relator

44

rather than the defendant, the defendant cannot rely on "government knowledge" of the relator's report to absolve it. *See Harrison II*, 352 F.3d at 920 & n.14; *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000). The full proof of the conspiracy was not fully documented until the litigation years later, which produced smoking-gun admissions like Mr. Graf's and Mr. Smet's emails and testimony. As of 2002, a Government officer like Koschemann had no way to know whether Mr. Bunk was merely a disgruntled conspiracy theorist. Ironically, Gosselin disputed Mr. Bunk's testimony throughout this case, attacking his credibility to the jury. JA 1729-32. Now that the jury has found Mr. Bunk was telling the truth, Gosselin may not avoid responsibility by arguing that Mr. Bunk should have been believed all along.

The District Court's refusal to penalize Gosselin because the Government renewed its 2001 DPM Contract options is essentially the same as the decision reversed in *Toepleman v. United States*, 263 F.2d 697, 700 (4th Cir. 1959). In *Toepleman*, a contractor who had pledged cotton as fraudulent security offered to redeem the cotton before the market fell. The government refused and sold the cotton years later after the price had dropped. While the trial court absolved the contractor because of the government's knowing retention of the cotton, this Court reversed: "Having by his fraud thrust this burden on the United States, the

45

[defendant] cannot be exonerated by the failure of the Government to cast it off at the most propitious time." *Toepleman*, 263 F.3d at 700. By the same token, the Government's exercise of the DPM options in 2002-03, despite Mr. Bunk's allegations, cannot affect Gosselin's culpability now that Mr. Bunk has been proved right.

### 4. The District Court wrongly held that the collusion was limited to line item 1AA pricing.

The District Court held that Gosselin's conduct was not especially harmful because it was somehow "isolated" to the 1AA line item. JA 1600-02.

This misreads the record. While line item 1AA (the line for average packing cost) was the basis for Mr. Riedl's cost comparisons, the trial evidence showed price fixing for at least seven line items (1AA, 3AC, 12AA, 14AA, 8AA, 7+15, BAC). JA 2823-24. Mr. Graf's testimony was that the conspirators agreed to rates for services under the contract generally. JA 1953-54. Even Gosselin's Managing Director Marc Smet admitted that there were maybe "four or five" line items on which prices were fixed. JA 2069-70. The District Court's effort to isolate the conspiracy to a single line item is contrary to the record.

### 5. The District Court wrongly held the DPM conspiracy was unrelated to other crimes.

The District Court held that the DPM conspiracy was unrelated to any other crime for Eighth Amendment purposes. JA 1603-04.

46

This is contrary to the record. Gosselin is a repeat offender by any standard. The actors involved in the DPM bid-rigging were involved in the ITGBL bid-rigging (Gosselin, ITO, Birkart, Christ and Victoria), which resulted in the United States criminal conviction against Gosselin, a $6 million fine, a restitution award in the amount of $865,000 and trebled civil damages in the amount of $2,595,000 in this case. JA 539-40; 1123; 1231; 2690; 2694. The bid-rigging schemes occurred in the same period of time.[5] The bid-rigging scheme involved the same niche industry, the moving of household goods of U.S. Army employees. JA 1198-99. The bid-rigging schemes were both led by Gosselin and Mr. Smet. *See United States v. Gosselin World Wide Moving, N.V.*, 411 F.3d 502 (4th Cir. 2005). The European antitrust authorities and the German Cartel Office have found Gosselin guilty of antitrust wrongdoing. *See* U.S. Appellant's Br. 45 fn. 11. It is ironic that one of Gosselin's corporate-character witnesses, Gen. Kelleher, was its "ombudsman," a position he served in only as a condition of the ITGBL criminal settlement.

The District Court's sole reason for treating the ITGBL violations as irrelevant is that the Government chose to intervene in the ITGBL case, but not in

---

[5]The Sonthofen price-fixing agreement was entered into on November 14, 2000. JA 1123; 2690. The DPM bid-rigging agreement was entered into on February 15, 2001. JA 1586-1587. The Raunheim bid-cancellation agreement was entered into on January 8, 2002. JA 876; 1125.

the DPM case. JA 1603-04. This is not a legally meaningful distinction. Under the

law, the Government's decision not to intervene is legally irrelevant. "[T]he plain

language of the [FCA] clearly anticipates that even after the Attorney General has

diligently investigated. . . the Government will not necessarily pursue all

meritorious claims; otherwise there is little purpose to the *qui tam* provision

permitting private attorneys general." *U.S. ex rel. Berge v. Board of Trustees of the*

*Univ. of Alabama*, 104 F.3d 1453, 1458 (4th Cir. 1997). "The government's

decision not to intervene in an FCA action does not mean that the government

believes the claims are without merit, [cit.om.], and the government's decision not

to intervene therefore is not relevant in an FCA action brought by a private party."

*U.S. ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 457 (4th Cir. 2011) (emphasis

added).

     The District Court's refusal to treat the DPM violation as related to the

ITGBL violation – solely because the Government intervened in ITGBL but not in

the DPM case – is directly contrary to Circuit law.

## II.    THE DISTRICT COURT WRONGLY REFUSED TO AWARD PENALTIES FOR THE VIOLATIONS FOUND BY THE JURY.

     The Court awarded zero penalties. It reasoned that the total statutory

minimum penalty for 9,136 false claims was over $50 million, an amount which it

held exceeded the Constitutional maximum. But because the Court lacked the

<u>statutory</u> discretion to reduce the minimum, it concluded it had no authority to award less than $50 million. It therefore absolved Defendants of any liability at all.

The Court, anticipating review, outlined alternative formulas to adjust the law of the False Claims Act in a result-oriented way, either to arrive at an "appropriate" discretionary figure, JA 1616, or to define the violation as only one false claim instead of 9,136. JA 1612-14. The Court also explained its alternative view that the Constitutional maximum should be the alleged $150,000 profit times the ten-times multiplier applied in Due Process cases, for a maximum of $1.5 million. JA 1615. We address each in turn.

### A.    The District Court Wrongly Awarded Zero Penalties.

#### 1.    The District Court confused Constitutional limits with its statutory mandate.

The District Court confused the statutory bar against reduction of penalties with the Constitutional bar against excessive fines.

Even if the Court is forbidden by <u>statute</u> to award less than the minimum penalty, the Constitution trumps any statutory mandate. If a statutory minimum penalty were excessive under the Eighth Amendment, the statute cannot prohibit the Court from reducing it on <u>Constitutional</u> grounds.

But by the same token, a Constitutional reduction can only reduce the statutory penalty to the highest "non-Excessive" amount (i.e.,"the Constitutional

49

maximum") within the bounds of proportionality. Once the reduction reaches the outer threshold permitted by the Excessive Fines clause, the Court has no further statutory discretion to reduce it. "[T]he normal rule is that partial, rather than facial, invalidation is the required course, such that a statute may. . . be declared invalid to the extent that it reaches too far, but otherwise left intact," *West Virginia CWP Fund v. Stacy*, 671 F.3d 378, 383 n.2 (4th Cir. 2011) *quoting Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006).

### 2.    Excessive verdicts must be reduced to the Constitutional maximum.

This is the rule in reviewing punitive damage verdicts.

Where a jury awards punitive damages in excess of Constitutional limits, the Court does not allow the defendant to escape without any liability at all. Nor does the Court order a new trial. Instead, the Court must reduce the verdict to the Constitutional maximum allowable. This is not the same as a discretionary remittitur. The Constitutional limit creates a legal ceiling on the verdict, which must otherwise be preserved up to the maximum. *See Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*, 285 F.3d 1146, 1151 (9th Cir. 2002); *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049-50 (8th Cir. 2002); *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1332 (11th Cir. 1999) ("When we hold a jury's verdict to be unconstitutionally excessive, we do not reexamine any

50

facts; we merely adjust the verdict to the maximum the Constitution allows in that case.").

This rule applies to Eighth Amendment challenges to statutory penalties. For example, forfeiture statutes are often mandatory. But in cases where the full statutory forfeiture is excessive under the Eighth Amendment, the defendant does not escape all liability – the court is charged with reducing the statutory forfeiture to the maximum amount allowable. "Though the statute appears to require total forfeiture of illegal proceeds, courts can reduce the forfeiture to make it proportional to the seriousness of the offense so as not to violate the Eighth Amendment prohibition against. . . 'excessive fines.'" *United States v. Corrado*, 227 F.3d 543, 552 (6th Cir. 2000)*, quoted in United States v. Jalaram, Inc.*, 599 F.3d 347, 355 n.7 (4th Cir. 2010); *see also United States v. Sarbello*, 985 F.2d 716, 724 (3d Cir. 1993).

### 3.    The District Court's rule gives violators a perverse incentive to commit more violations.

The District Court's approach actually rewarded Gosselin for committing <u>many</u> violations rather than a few.

Had Gosselin only submitted ten false claims, the resulting minimum penalty of $55,000 apparently would have been acceptable to the District Court. But because Gosselin made 9,136 false claims, the sheer volume of its violations

51

absolved Gosselin of <u>any liability at all</u>. Under the District Court's approach, Gosselin's submission of thousands of false claims guaranteed that it would face no penalty, by driving the aggregate above what the Court deemed the Constitutional threshold. Because the District Court held it had no power to reduce the penalty, Gosselin's multiplication of its false claims gave it total immunity once the volume of its fine crossed the Constitutional threshold. The result is that if a contractor submits a single false claim, it may have to pay a $5,500 penalty, but if it does so thousands of times, it will be liable for nothing. This is not a defensible rule of law.

**B.     The District Court May Not Depart from False Claims Act Law Just to Achieve a Desired Result.**

**1.     The District Court did not have the discretion to fashion an "appropriate" penalty.**

The District Court held that, if it were authorized to fashion a penalty "appropriate to the circumstances of the case," it would choose a penalty of $500,000. JA 1616-17.

This discretionary figure cannot be the basis of the penalty. While the Court has the power under the Eighth Amendment to fix the Constitutional maximum, once that maximum is reached the Court has no discretionary authority to substitute its own more lenient view of an "appropriate" penalty for that of Congress. *United States v. Brown*, 274 F.2d 107, 110 (4th Cir. 1960).

52

### 2.    The District Court had no authority to change the way false claims are counted to modify the result.

The District Court also proposed changing FCA law to treat the 9,136 invoices as a single violation meriting only one $5,500 - $11,000 penalty. JA 1612-14. The District Court appeared to judge that the Defendants had only committed a single offense, rather than 9,136 separate false claims.

The District Court acknowledged that this is not the way the FCA is interpreted. *United States v. Bornstein*, 423 U.S. 303, 311 (1976). In *Bornstein*, the Court stressed that "the language of the statute focuses on false claims, not on contracts." *Id*. The Court rejected the argument that liability should turn only on the general transaction than the specific certifications to the government. "To equate the number of forfeitures with the number of contracts would in a case such as this result almost always in but a single forfeiture, no matter how many fraudulent acts the subcontractor might have committed. This result would not only be at odds with the statutory language; it would also defeat the statutory purpose. Such a limitation would . . . convert the Act's forfeiture provision into little more than a $2,000 license for subcontractor fraud." *Bornstein*, 423 U.S. at 311. Where a defendant (as here) did directly make false statements with *scienter* in filing its own claims, a separate violation arises for each claim. *See also U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 552 (1943) (even though there was a single bid-rigging scheme, a

53

separate FCA penalty would attach for each project fraudulently billed); *U.S. ex rel.*

*Harrison v. Westinghouse Savannah River Co.* (*Harrison II*), 352 F.3d 908, 920

n.13 (4th Cir. 2003) ("[e]ach claim for payment under the contract was. . .submitted

under a contract which was fraudulently approved. So, WSRC could face False

Claims Act liability for each claim for payment under the GPC subcontract." *citing*

*Harrison I*, 176 F.3d at 793-94).

This Court's Excessive Fines law recognizes that the multiplication of fines

due to multiple repeated claims is not unconstitutional. In *United States v. Ahmad*,

213 F.3d 805, 815-17 (4th Cir. 2000), the Court rejected the argument that repeated

false statements concealing currency reporting violations constituted a "single"

reporting offense. The Court distinguished the single reporting offense in *United*

*States v. Bajakajian*, 524 U.S. 321, 339 (1998): "[F]raudulent invoices, for which

Ahmad was responsible, repeatedly passed through Customs. The nature and extent

of the criminal activity here, therefore, contrasts sharply with Bajakajian's isolated

reporting violation." *Ahmad*, 213 F.3d at 818 (emphasis added). Gosselin's conduct

is no different than the defendant's in *Ahmad*.

This Court also rejected an Excessive Fine objection to multiplied penalties

in *Korangy v. FDA*, 498 F.3d 272, 278 (4th Cir. 2007). In *Korangy*, a radiologist

was warned that his mammography equipment was defective. He continued to use

54

the equipment 193 times during the certification lapse. The FDA sought the minimum penalty of $3,000 per violation against both doctor and clinic, causing an aggregate penalty of over a million dollars – $579,000 assessed against both the doctor and his clinic KRA.The doctor argued that this multiplied penalty violated the Excessive Fines clause. This Court rejected that argument: "This case, of course, does not involve a single violation of the [Act]. It involves 193 violations committed by Korangy and 193 violations committed by KRA, resulting in a combined penalty of more than $1,000,000. While we recognize that this is a substantial penalty, the amount of the penalty is the direct result of the number of individual offenses committed by Korangy and KRA. Contrary to the suggestion of the petitioners, the gravity of their offenses does not diminish because they repeatedly committed the same offense." *Korangy*, 498 F.3d at 278.

Separate penalties for each separate violation are necessary for the deterrent value of the statute. "[I]f the FDA could not impose separate penalties for repeated violations, that would serve as perverse encouragement for out-of-compliance clinics to perform as many mammograms as possible. Clinics could put off for as long as possible purchasing expensive new equipment and continue to profit from each mammography performed, secure in the knowledge that their profits would

exceed any sanctions that might ultimately be imposed." *Korangy*, 498 F.3d at 278 n.2.

This is a common issue in FCA prosecutions over repeated fraudulent transactions like food-stamp fraud. In *United States v. Byrd*, 100 F. Supp. 2d 342, 345 (E.D.N.C. 2000), the court rejected an Excessive Fine defense to the minimum FCA penalty for each of 264 redemptions of food stamps, for a total of $1,575,036 under the FCA. The *Byrd* Court held that multiple penalties for each illegal claim did not violate the Excessive Fines clause, because "[t]he statutory penalties sought by the Government here, however, pertain to . . .separate acts and [laws] imposing separate penalties. They cannot be grouped together as a single offense and thus did not violate the Excessive Fines Clause." *Id.*

The invoices in this case are no different than the multiple fraudulent claims for food stamps. If Gosselin were permitted to treat 9,136 false claims as only a single violation, the single $11,000 penalty would be a minimal cost of doing business defrauding the Government. While the submission of thousands of invoices multiplies Gosselin's liability, that is a problem for Gosselin, not for Congress. "It is not Congress' obligation, when setting statutory penalties, to make illegal behavior affordable, particularly for multiple violations." *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F.Supp.2d 719, 747 (N.D. Ill. 2007).

## C. The District Court Wrongly Limited the Constitutional Maximum to $1.5 Million.

In an effort to derive the "constitutional maximum" for an alternative finding, the District Court multiplied Gosselin's alleged $150,000 profit by the ten-fold multiplier in Due Process cases. JA 1614-16.

### 1. The District Court wrongly fixed the base-line harm as $150,000 profit.

The District Court accepted $150,000 as the baseline measure of harm, based on Gosselin' Managing Director Smet's claim that Gosselin made only $150,000 profit on line item 1AA.[6]

This is erroneous. The Excessive Fine Clause does not measure harm or culpability from the amount of profit the defendant made from the violation. *See United States v. Jalaram, Inc.*, 599 F.3d 347, 356-57 (4th Cir. 2010) ($357,144 forfeiture of proceeds from money laundering was not excessive, even though maximum fine was $5,000 and even though defendant did not receive a significant profit, where defendant "stood at the heart of the conspiracy's day-to-day operations for a six-month period.").

---

[6]Even if profit were the correct measure of harm, this figure was incorrect. Gosselin's price-fixing was not limited to line item 1AA. *See* Part I.D.5. of the Argument, above. The three year profit played out over the entire contract was at least €400,000. JA 2655.

Instead, the harm may be compared to the severity of the $6 million fine

Gosselin agreed to for its related ITGBL price-fixing, or the €2.32 million the

European Union fined Gosselin for price-fixing in Belgium. The most exact

measure of harm is the volume of commerce affected by the price-fixing - the €8

million billed by Gosselin on the 2001 DPM Contract. JA 1405.

## 2.     Harm is measured by volume of commerce affected.

The law treats the "harm" in price-fixing cases, for purposes of criminal

sentencing, as the volume of commerce affected by the conduct. Because the

monetary loss (or profit to the defendant) may be hard to quantify, the law looks to

the overall volume of commerce affected by the price-fixing. "It would be an

anomaly to declare price-fixing illegal *per se*, without regard to its success, merely

because of its plainly anticompetitive effect, but to provide for a fine only if the

price-fixing were successful. Such a rule would result in the government being

relieved of the burden of ascertaining a conspiracy's effect and success for

purposes of obtaining a conviction only to have to bear that very burden to

establish the propriety of any fine." *United States v. Hayter Oil Co.*, 51 F.3d 1265,

1274 (6th Cir. 1995). *See United States v. Giordano*, 261 F.3d 1134, 1145 (11th

Cir. 2001); *United States v. Andreas*, 216 F.3d 645, 678 (7th Cir. 2000); *United*

*States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 89-93 (2d Cir. 1999); *United*

*States v. Lester*, 376 F.Supp.2d 679, 684 (W.D. Va. 2005) (using total value of laundered money used in bid-rigging for harm: "Because of the nature of most of the work, it is now impractical, if not impossible, to determine in hindsight what the work would have cost the government had the illegal and fraudulent bids not been accepted."); U.S.S.G. § 2R1.1(d). *See also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

The base-line "harm" here should be at least the €8,000,000 value of the DPM contract tainted by the bid-rigging.

### 3. The harm justifies the full $24 million sought by the Government as within Eighth Amendment limits.

The District Court was correct that baseline harm is subject to the ten-to-one multiplier applicable in Due Process cases. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). As Judge Easterbrook held in affirming an FCA penalty award four times higher than actual damages: "It's hard to see why the Court's approach to punitive damages under the Fifth Amendment would differ dramatically from analysis under the Excessive Fines Clause. (If there is to be a difference, one would think that a fine expressly authorized by statute could be higher than a penalty selected ad hoc by a jury.)" *United States v. Rogan*, 517 F.3d

449, 454 (7th Cir. 2008); *see also San Huan New Materials High Tech, Inc. v. Int'l Trade Comm'n*, 161 F.3d 1347, 1364 (Fed. Cir. 1998) (applying 10-to-1 punitive damage standards to civil penalties). The difficulty of detecting a violation where the  conspirators were part of a single undisclosed cartel also justifies a higher multiplier: "The lower the rate of a fraud's detection, the higher the multiplier required to ensure that crime does not pay.*" Rogan*, 517 F.3d at 454.

Even if the harm is limited to the $3 million the United States paid on the 1AA line item alone, the $24 million penalty is still within the 10-to-1 ratio of *State Farm.* There is nothing unusual about this application of the FCA. Courts' awards of civil penalties often include higher ratios of damages and civil penalties in FCA actions than here. *See Lyerly v. U.S.,* 120 F.3d 261 (Table), 1997 WL 457528 *1-2 (4th Cir. 1997) (unpublished) (actual damages for Food Stamp false claims of $180; civil penalties of $23,040 - ratio of 1:128); *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) (the ratio of single damages $58,151.64 to civil penalties of $555,000 for approximate ratio of 9 to l); *Mayers v. U.S. Dept. of Health and Human Servs.*, 806 F.2d 995, 999 (11th Cir. 1986) (award of $24,697.73 in damages and $1,791,100 in civil penalties for an approximate ratio of 70 to l); *United States v. Byrd*, 100 F.Supp.2d 342, 344-45 (E.D.N.C. 2000) (ratio of 15.5: 1)*; U.S. ex rel. Smith v. Gilbert Realty*, 840 F.Supp. 71, 75

60

(E.D.Mich. 1993) (ratio of 21 to 1); *United States v. Diamond*, 657 F.Supp. 1204,

1206 (S.D.N.Y. 1987) (ratio of 144 to l). Some courts have awarded lower ratios.

*See U.S. ex rel. Tyson v. Amerigroup Illinois Inc.*, 488 F.Supp.2d 719, 745-48

(N.D.Ill. 2007) (ratio of 6 to 1).

This Court should therefore direct the award of the full $24 million in

penalties sought by the Government and Relators as the straightforward

consequence of making 9,136 false certifications.

## CONCLUSION

The District Court's judgment denying relief should be reversed. The

penalty sought of $24 million on the DPM claim should be reinstated.

August 14, 2012                    Respectfully submitted,

                                   /s/ Michael T. Anderson

Michael T. Anderson              Richard E. Greenberg
Ann Lugbill                      John E. Petite
Mark Hanna                       Greensfelder, Hemker, & Gale, P.C.
Michelle L. Woolley              10 South Broadway, Suite 2000
Murphy Anderson PLLC             St. Louis, MO 63102
1701 K Street, NW Suite 210      (314) 241-9090
Washington, DC 20006             (314) 345-4792 (Fax)
(202) 223-2620
(202) 223-8651 (Fax)

61

# STATUTORY ADDENDUM

**U.S. Const. amend VIII**

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

**31 U.S.C. §§ 3729-32**

**§ 3729. False claims**

(a)     Liability for Certain Acts.—

    (1)     In general.—Subject to paragraph (2), any person who—

        (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

        (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

        (C)     conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

        (D)     has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

        (E)     is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

        (F)     knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

62

(G)   knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 1), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(2)   Reduced damages.—If the court finds that—

(A)   the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

(B)   such person fully cooperated with any Government investigation of such violation; and

(C)   at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,

the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

(3)   Costs of civil actions.—A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b)   Definitions.—For purposes of this section—

(1)    the terms "knowing" and "knowingly"—

    (A)    mean that a person, with respect to information—

        (i)    has actual knowledge of the information;

        (ii)    acts in deliberate ignorance of the truth or falsity of the information; or

        (iii)    acts in reckless disregard of the truth or falsity of the information; and

    (B)    require no proof of specific intent to defraud;

(2)    the term "claim"—

    (A)    means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

        (i)    is presented to an officer, employee, or agent of the United States; or

        (ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

            (I)    provides or has provided any portion of the money or property requested or demanded; or

            (II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

    (B)    does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal

64

employment or as an income subsidy with no restrictions on that individual's use of the money or property;

    (3)    the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

    (4)    the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

(c)    Exemption From Disclosure.—Any information furnished pursuant to subsection (a)(2) shall be exempt from disclosure under section 552 of title 5.

(d)    Exclusion.—This section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986.

## § 3730. Civil actions for false claims

(a)    Responsibilities of the Attorney General.—The Attorney General diligently shall investigate a violation under section 3729. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person.

(b)    Actions by Private Persons.—(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

    (2)    A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the

defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

(3)    The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

(4)    Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall—

(A)    proceed with the action, in which case the action shall be conducted by the Government; or

(B)    notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

(5)    When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

(c)    Rights of the Parties to Qui Tam Actions.—(1) If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).

(2)    (A)    The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

66

(B)   The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

(C)   Upon a showing by the Government that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may, in its discretion, impose limitations on the person's participation, such as—

(i)    limiting the number of witnesses the person may call;

(ii)   limiting the length of the testimony of such witnesses;

(iii)  limiting the person's cross-examination of witnesses; or

(iv)   otherwise limiting the participation by the person in the litigation.

(D)   Upon a showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation.

(3)   If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

67

(4)    Whether or not the Government proceeds with the action, upon a showing by the Government that certain actions of discovery by the person initiating the action would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts, the court may stay such discovery for a period of not more than 60 days. Such a showing shall be conducted in camera. The court may extend the 60-day period upon a further showing in camera that the Government has pursued the criminal or civil investigation or proceedings with reasonable diligence and any proposed discovery in the civil action will interfere with the ongoing criminal or civil investigation or proceedings.

(5)    Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section. Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section. For purposes of the preceding sentence, a finding or conclusion is final if it has been finally determined on appeal to the appropriate court of the United States, if all time for filing such an appeal with respect to the finding or conclusion has expired, or if the finding or conclusion is not subject to judicial review.

(d)    Award to Qui Tam Plaintiff.—(1) If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government 1 Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds,

68

taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation. Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

(2)    If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

(3)    Whether or not the Government proceeds with the action, if the court finds that the action was brought by a person who planned and initiated the violation of section 3729 upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive under paragraph (1) or (2) of this subsection, taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation. If the person bringing the action is convicted of criminal conduct arising from his or her role in the violation of section 3729, that person shall be dismissed from the civil action and shall not receive any share of the proceeds of the action. Such dismissal shall not prejudice the right of the United States to continue the action, represented by the Department of Justice.

(4)    If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

69

(e)    Certain Actions Barred.—(1) No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

    (2)    (A)    No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

        (B)    For purposes of this paragraph, "senior executive branch official" means any officer or employee listed in paragraphs (1) through (8) of section 101(f) of the Ethics in Government Act of 1978 (5 U.S.C. App.).

    (3)    In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

    (4)    (A)    The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

        (i)    in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

        (ii)    in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

        (iii)   from the news media,

        unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

        (B)    For purposes of this paragraph, "original source" means an

70

individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

(f)    Government Not Liable for Certain Expenses.—The Government is not liable for expenses which a person incurs in bringing an action under this section.

(g)    Fees and Expenses to Prevailing Defendant.—In civil actions brought under this section by the United States, the provisions of section 2412(d) of title 28 shall apply.

(h)    Relief From Retaliatory Actions.—

(1)    In general.—Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

(2)    Relief.—Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

(3)    Limitation on bringing civil action.—A civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred.

71

## § 3731. False claims procedure

(a)    A subpena requiring the attendance of a witness at a trial or hearing conducted under section 3730 of this title may be served at any place in the United States.

(b)    A civil action under section 3730 may not be brought—

   (1)    more than 6 years after the date on which the violation of section 3729 is committed, or

   (2)    more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

   whichever occurs last.

(c)    If the Government elects to intervene and proceed with an action brought under 3730(b),1 the Government may file its own complaint or amend the complaint of a person who has brought an action under section 3730(b) to clarify or add detail to the claims in which the Government is intervening and to add any additional claims with respect to which the Government contends it is entitled to relief. For statute of limitations purposes, any such Government pleading shall relate back to the filing date of the complaint of the person who originally brought the action, to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person.

(d)    In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.

(e)    Notwithstanding any other provision of law, the Federal Rules of Criminal Procedure, or the Federal Rules of Evidence, a final judgment rendered in

72

favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730.

## § 3732. False claims jurisdiction

(a)     Actions Under Section 3730.—Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred. A summons as required by the Federal Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States.

(b)     Claims Under State Law.—The district courts shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730.

(c)     Service on State or Local Authorities.—With respect to any State or local government that is named as a co-plaintiff with the United States in an action brought under subsection (b), a seal on the action ordered by the court under section 3730(b) shall not preclude the Government or the person bringing the action from serving the complaint, any other pleadings, or the written disclosure of substantially all material evidence and information possessed by the person bringing the action on the law enforcement authorities that are authorized under the law of that State or local government to investigate and prosecute such actions on behalf of such governments, except that such seal applies to the law enforcement authorities so served to the same extent as the seal applies to other parties in the action.

## 48 C.F.R. § 52.203-2

As prescribed in 3.103–1, insert the following provision. If the solicitation is a Request for Quotations, the terms Quotation and Quoter may be substituted for Offer and Offeror.

Certificate of Independent Price Determination (APR 1985)

(a)    The offeror certifies that—

    (1)    The prices in this offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to (i) those prices, (ii) the intention to submit an offer, or (iii) the methods or factors used to calculate the prices offered;

    (2)    The prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law; and

    (3)    No attempt has been made or will be made by the offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

(b)    Each signature on the offer is considered to be a certification by the signatory that the signatory—

    (1)    Is the person in the offeror's organization responsible for determining the prices being offered in this bid or proposal, and that the signatory has not participated and will not participate in any action contrary to subparagraphs (a)(1) through (a)(3) above; or

    (2)    (i)    Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated, and will not participate in any action contrary to subparagraphs (a)(1) through (a)(3) above_____ _____

            [ insert full name of person(s) in the offeror's organization responsible for determining the prices offered in this bid or proposal, and the title of his or her position in the offeror's organization ];

74

(ii)    As an authorized agent, does certify that the principals named in subdivision (b)(2)(i) above have not participated, and will not participate, in any action contrary to subparagraphs (a)(1) through (a)(3) above; and

(iii)   As an agent, has not personally participated, and will not participate, in any action contrary to subparagraphs (a)(1) through (a)(3) above.

(c)    If the offeror deletes or modifies subparagraph (a)(2) above, the offeror must furnish with its offer a signed statement setting forth in detail the circumstances of the disclosure.

## U.S.S.G. § 2R1.1(d)

(d)    Special Instructions for Fines - Organizations

(1)    In lieu of the pecuniary loss under subsection (a)(3) of §8C2.4 (Base Fine), use 20 percent of the volume of affected commerce.

(2)    When applying §8C2.6 (Minimum and Maximum Multipliers), neither the minimum nor maximum multiplier shall be less than 0.75.

(3)    In a bid-rigging case in which the organization submitted one or more complementary bids, use as the organization's volume of commerce the greater of (A) the volume of commerce done by the organization in the goods or services that were affected by the violation, or (B) the largest contract on which the organization submitted a complementary bid in connection with the bid-rigging conspiracy.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Relators Kurt Bunk and Ray Ammons respectfully request oral argument. Resolution of the issues in this case, both legal and factual, would benefit from colloquy with the Court. The participation of the United States as intervenor highlights the importance of the case for administration of the False Claims Act.

## <u>RULE 32 CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed.R.App.P. 32(a)(3)(B)(i), I, Michael T. Anderson, hereby

certify the attached Brief for the Relators Kurt Bunk and Ray Ammons as Appellants

in Case No. 12-1369 is in 14 point, proportionally spaced, Times New Roman type

face and contains less than 13,300 words, excluding the partes of the brief exempted

by Fed.R.App.P. 32(a)(3)(B)(iii), on the basis of a word count made by WordPerfect

version XP word processing software that counts words in both text and footnotes.

<u>/s/ Michael T. Anderson</u>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Brief for the Relators Kurt Bunk and Ray Ammons as Appellants was filed this 14th day of August, 2012, using the CM/ECF system, which will automatically send electronic notification of filing to all counsel of record.

<u>/s/ Michelle L. Woolley</u>

78