Nos. 12-1369 (L), 12-1417, & 12-1494
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

UNITED STATES EX REL. BUNK, ET AL.,

Plaintiffs-Appellants,

v.

GOSSELIN WORLD WIDE MOVING, ET AL.,

Defendants-Appellees.
_____

## BRIEF FOR
## DEFENDANTS-APPELLEES/CROSS-APPELLANTS
_____

Kerri Ruttenberg
Shay Dvoretzky
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3939

Counsel for Defendants-
Appellees/Cross-Appellants

Dated: October 9, 2012

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF ISSUES ..............................................................1

STATEMENT OF THE CASE.........................................................2

STATEMENT OF FACTS ...............................................................2

    A.    ITGBL Program .....................................................................2

        1.    Gosselin's and Bunk's Roles in the ITGBL Program ...............3

        2.    Costs of Through Transportation ...............................4

        3.    Landed Rate ....................................................4

        4.    Covan and Cartwright Channels .................................5

        5.    Prior Criminal Case............................................6

        6.    *Qui Tam* Complaints and Government Intervention ...............7

        7.    ITGBL Rulings Relevant to Appeal ............................7

    B.    DPM Contract........................................................8

        1.    Bunk's Abusive Practices on 1999 DPM Contracts .................9

        2.    New DPM Contract and Contracting Process ..........................9

        3.    Army's Pre-Proposal Meeting ................................10

        4.    Gosselin's DPM Offer ........................................11

        5.    Bunk's Allegations Regarding the 2001 DPM Contract ........11

        6.    Army Exercises Options to Renew 2001 Contract with Gosselin................................................12

        7.    Jury's DPM Finding and Parties' Stipulation ........................13

        8.    DPM Damages Claims...........................................13

            a.    Pre-trial ....................................................13

            b.    Trial........................................................14

            c.    Post-trial Civil Penalty Briefing and Hearing ..............14

        9.    Court's Opinion.................................................16

SUMMARY OF ARGUMENT ...............................................................17

I.    Cross-Appeal ...........................................................................17

II.   Response to Appellants' Arguments .......................................18

Cross-Appeal Argument ....................................................................21

I.    Bunk Lacked Article III Standing Because He Sought to Vindicate
      Only the Sovereign Interest of the United States .........................21

      A.    Article III Limits Federal Courts to Adjudication of "Cases" or
            "Controversies" in Which the Plaintiff Raises a Concrete,
            Individualized Injury .........................................................21

      B.    The Government's Sovereign Injury Alone Cannot Be Assigned
            to Bunk ...............................................................................24

            1.    *Vermont Agency*'s Rationale for Allowing the
                  Assignment of a Proprietary Injury Does Not Extend to a
                  Purely Sovereign Claim ............................................24

            2.    Allowing the Assignment of a Sovereign Interest Cannot
                  Be Reconciled with the Supreme Court's Clear
                  Command that Jurisdiction Must Be Based on an
                  Individualized Injury ................................................25

            3.    Assignment of Sovereign Interests Would Violate Article
                  II. ..............................................................................27

            4.    In Light of the Foregoing Constitutional Restrictions, the
                  False Claims Act Must Be Read as Allowing Only Suits
                  That Pursue Proprietary Interests .............................29

Response to Appellants' Arguments ...................................................30

I.    The District Court's Civil Penalty Analysis of Bunk's DPM Claim
      Was Correct ............................................................................30

      A.    The Eighth Amendment Compares the Statutory Penalty to
            Monetary Damage, Intangible Harm, and Culpability ......30

      B.    The District Court's Eighth Amendment Analysis of Mitigation
            Was Correct .......................................................................32

            1.    Gosselin's Profit on the 2001 DPM Contract was
                  Minimal ....................................................................34

            2.    Gosselin's Scienter Was Minimal ............................34

a. Gosselin Did Not Have Scienter for Each Submitted Invoice ...........................................34

b. The 2001 DPM Contract Involved a Unique Bidding Process .........................................35

3. The Army Renewed the DPM Contract with Gosselin Twice Despite Actual Knowledge of Bunk's Fraud Allegations ...............................................36

4. Gosselin's Pricing and Performance Benefited the Government............................................37

5. Bunk's Abusive Practices Put Gosselin's Conduct in Perspective and Explain a Fatal Flaw in His Damages Calculation .......................................39

C. The District Court Properly Considered Evidence Regarding Tangible and Intangible Harm...........................................40

1. Bunk Had the Burden to Prove the Government Sustained Monetary Damages Due to Gosselin's Conduct .....40

2. A *Per Se* Analysis Under Antitrust Law Does Not Obviate a Plaintiff's Burden to Prove Monetary Damages .....41

3. Bunk Failed to Prove the Government Sustained Any Monetary Damage From Gosselin's Conduct ........................43

a. Bunk's Methods for Calculating a Price Increase Were Flawed ................................................43

b. Any Price Increase Was Not an Impermissible Overcharge.....................................................48

c. Bunk Failed to Prove that Gosselin's Conduct Caused Any Price Increase in the 2001 DPM Contract......................................................49

4. The Excessive Fine Analysis Compares the Penalty to Actual, Single Monetary Damages ..........................................50

5. Intangible Harm to the Integrity of the Government's Contracting Process Is Insufficient to Justify the Statutory Minimum Penalty in this Case .................................53

6. There Is No Evidence Gosselin "Intentionally Concealed" the Subcontracting Agreement............................54

7.    The DPM Subcontracting Agreement Was Not "Related to" Other Wrongful Conduct ...................................................55

D.    FCA Damages Are Measured by the Amount the Government Overpaid Due to the Fraud ...............................................................57

E.    Appellants' Efforts to Salvage an Otherwise Unconstitutional Penalty by Lowering the "Requested" Penalty Amount Must Fail ...........................................................................................................59

    1.    Bunk Is Barred From Raising His "Constitutional Discretion" Argument ...........................................................60

        a.    Bunk Cannot Appeal From an Error He Invited ..........62

        b.    Bunk Waived the Argument He Now Asserts on Appeal ....................................................................................64

    2.    The Cases Bunk Relies on Do Not Support the "Constitutional Discretion" Argument He Now Advances on Appeal .................................................................................65

    3.    The Government's "Prosecutorial Discretion" Argument Fails .................................................................................................66

F.    Even if the District Court Had Discretion to Impose a Penalty Below the Statutory Minimum, $24 Million Is Still Unconstitutionally Excessive ...........................................................70

G.    The Court's Alternative Analyses Should Be Entered if this Court Finds the District Court Has Discretion to Impose a Penalty Below the Statutory Minimum ...............................................74

H.    The Award of No Civil Penalties Should Be Sustained Because Awarding Civil Penalties on the DPM Claim Would Violate Article II ...................................................................................................78

II.    The ITGBL Landed Rate Agreement Is Lawful Under the Shipping Act.........................................................................................................78

A.    The District Court's Ruling Was Consistent With *Gosselin* .............79

B.    Shipping Act Immunity Applies to Gosselin ....................................82

III.    Admitting the Tucor Decision Was Not Prejudicial Error ...........................85

CONCLUSION ................................................................................................87

REQUEST FOR ORAL ARGUMENT .................................................................89

# TABLE OF AUTHORITIES

**Page**

CASES

*AG Sys., Inc. v. United Decorative Plastics Corp.*,
  55 F.3d 970 (4th Cir. 1995) ................................................................. 63

*Allen v. Zurich Ins. Co.*,
  667 F.2d 1162 (4th Cir. 1982) ............................................................ 65

*Altemus v. Med. College of Va. Hosp.*,
  23 F. App'x 158 (4th Cir. 2001) (per curiam) .................................... 64

*Anderson v. City of Bessemer City*,
  470 U.S. 564 (1985) ............................................................................ 31

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ............................................................................ 41

*Barber & Ross Co. v. Lifetime Doors, Inc.*,
  810 F.2d 1276 (4th Cir. 1987) ............................................................ 43

*Bigelow v. RKO Radio Pictures, Inc.*,
  327 U.S. 251 (1946) ............................................................................ 43

*BMY-Combat Sys. Div. of Harsco Corp. v. United States*,
  44 Fed. Cl. 141 (1998) ........................................................................ 52

*Bordenkircher v. Hayes*,
  434 U.S. 357 (1978) ............................................................................ 67

*Brittingham v. Jenkins*,
  914 F.2d 447 (4th Cir. 1990) .............................................................. 52

*Browning-Ferris Indus. v. Kelco Disposal, Inc*,
  492 U.S. 257 (1989) ............................................................................ 31

*Buckley v. Valeo*,
  424 U.S. 1 (1976) (per curiam) .......................................................... 28

*Catalano, Inc. v. Target Sales, Inc.*,
  446 U.S. 643 (1980) ............................................................................ 42

*Coleman v. Hernandez*,
  490 F. Supp. 2d 278 (D. Conn. 2007).................................................59

*Cook Cnty. v. United States ex rel. Chandler*,
  538 U.S. 119 (2003).............................................................31, 51

*Cox v. Shalala*,
  112 F.3d 151 (4th Cir. 1997) .....................................................50

*Crowell v. Benson*,
  285 U.S. 22 (1932)................................................................29

*Dist. 17, United Mine Workers of Am. v. A & M Trucking, Inc.*,
  991 F.2d 108 (4th Cir. 1993) (per curiam) .......................................62

*Edmond v. United States*,
  520 U.S. 651 (1997)...............................................................28

*Ex parte Hennen*,
  13 Pet. 230 (1839)................................................................28

*Gladstone, Realtors v. Vill. of Bellwood*,
  441 U.S. 91 (1979)................................................................26

*Grunewald v. United States*,
  353 U.S. 391 (1957)...............................................................54

*Harrison v. Westinghouse Savannah River Co.*,
  176 F.3d 776 (4th Cir. 1999) ..........................................33, 37, 75

*Harvis v. Roadway Express, Inc.*,
  923 F.2d 59 (6th Cir. 1991) ......................................................62

*Johansen v. Combustion Eng'g, Inc.*,
  170 F.3d 1320 (11th Cir. 1999) ...................................................65

*Key Pharms. v. Hercon Labs. Corp.*,
  161 F.3d 709 (Fed. Cir. 1998) ....................................................63

*Korangy v. U.S. Food & Drug Admin.*,
  498 F.3d 272 (4th Cir. 2007) .....................................................35

*Lane v. United States*,
   286 F.3d 723 (4th Cir. 2002) ............................................................86

*Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*,
   285 F.3d 1146 (9th Cir. 2002) ..........................................................65

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...................................................................passim

*United States ex rel. Tyson v. Amerigroup Ill., Inc.*,
   488 F. Supp. 2d 719 (N.D. Ill. 2007)................................................51

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)...........................................................................26

*Mega Constr. Co. v. United States*,
   29 Fed. Cl. 396 (1993) ......................................................................52

*Modave v. Long Island Jewish Med. Ctr.*,
   501 F.2d 1065 (2d Cir. 1974) ...........................................................64

*Morrison v. Nat'l Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010)......................................................................85

*Moseley v. Branker*,
   550 F.3d 312 (4th Cir. 2008) ............................................................86

*Muth v. United States*,
   1 F.3d 246 (4th Cir. 1993) ................................................................64

*Myers v. United States*,
   272 U.S. 52 (1926).............................................................................28

*Nipper v. Snipes*,
   7 F.3d 415 (4th Cir. 1993) ................................................................56

*Ohler v. United States*,
   529 U.S. 753 (2000)...........................................................................87

*Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc.*,
   891 F.2d 1127 (4th Cir. 1989), *rev'd on other grounds*, 499 U.S. 365
   (1991)................................................................................................42

*Printz v. United States*,
　521 U.S. 898 (1997)........................................................................29

*Raines v. Byrd*,
　521 U.S. 811 (1997)........................................................................26

*Riley v. St. Luke's Episcopal Hosp.*,
　252 F.3d 749 (Smith, J., dissenting) (5th Cir. 2001) (en banc) ..........67

*Ross v. Kansas City Power & Light Co.*,
　293 F.3d 1041 (8th Cir. 2002) .........................................................65

*Ryder v. United States*,
　515 U.S. 177 (1995)........................................................................28

*Solem v. Helm*,
　463 U.S. 277 (1983)........................................................................31

*Spiller v. Atchison, Topeka & Santa Fe Ry.*,
　253 U.S. 117 (1920)...................................................................23, 24

*State Farm Mut. Auto Ins. Co. v. Campbell*,
　538 U.S. 408 (2003)...........................................................32, 76, 77

*Steel Co. v. Citizens for a Better Env't*,
　523 U.S. 83 (1998)..............................................................21, 23, 26

*Stewart v. Hall*,
　770 F.2d 1267 (4th Cir. 1985) .........................................................64

*Strawser v. Atkins*,
　290 F.3d 720 (4th Cir. 2002) ...........................................................84

*Suter v. United States*,
　441 F.3d 306 (4th Cir. 2006) ...........................................................78

*TFWS, Inc. v. Schaefer*,
　242 F.3d 198 (4th Cir. 2001) ...........................................................42

*United States ex rel. Bigham v. Rommel*,
　No. 03-CV-4048, 2006 WL 3253338 (S.D. Ill. 2006).........................51

*United States ex rel. Garibaldi v. Orleans Parish Sch. Bd.*,
46 F. Supp. 2d 546 (E.D. La. 1999), *judgment vacated on other grounds*,
244 F.3d 486 (5th Cir. 2001) .............................................................31

*United States ex rel. Giles v. Pratt*,
32 F. App'x 432 (9th Cir. 2002) .......................................................58

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
352 F.3d 908 (4th Cir. 2003) .......................................................40, 57

*United States ex rel. Marcus v. Hess*,
317 U.S. 537 (1943)................................................................passim

*United States ex rel. Miller v. Harbert Int'l Constr., Inc.*,
No. 95-1231, 2007 WL 851868 (D.D.C. Mar. 14, 2007)..................51

*United States ex rel. Roberts v. Aging Care Home Health, Inc.*,
474 F. Supp. 2d 810 (W.D. La. 2007) ..............................................52

*United States ex rel. Smith v. Gilbert Realty*,
840 F. Supp. 71 (E.D. Mich. 1993) ...............................32, 35, 51, 75

*United States ex rel. Stearns v. Lane*,
No. 2:08-cv-175, 2010 WL 3702538 (D. Vt. Sept. 15, 2010)...........59

*United States ex rel. Tyson v. Amerigroup Ill., Inc.*,
488 F. Supp. 2d 711 (N.D. Ill. 2007) ...............................................51

*United States v. Advance Tool Co.*,
902 F. Supp. 1011 (W.D. Mo. 1995)..................................32, 53, 75

*United States v. Ahmad*,
213 F.3d 805 (4th Cir. 2000) .......................................................54, 55

*United States v. Andreas*,
216 F.3d 645 (7th Cir. 2000) ...........................................................58

*United States v. Armstrong*,
517 U.S. 456 (1996).......................................................................67

*United States v. Bajakajian*,
524 U.S. 321 (1998).........................................................30, 31, 51

*United States v. Bickel*,
No. 02-3144, 2006 WL 1120439 (C.D. Ill. Feb. 22, 2006) ..........................69, 70

*United States v. Bornstein*,
423 U.S. 303 (1976).................................................................................58, 61, 75

*United States v. Cole*,
631 F.3d 146 (4th Cir. 2011) .............................................................................86

*United States v. DeBerry*,
430 F.3d 1294 (10th Cir. 2005) ........................................................................62

*United States v. Eghbal*,
548 F.3d 1281 (9th Cir. 2008) ..........................................................................31

*United States v. Ekelman & Assocs.*,
532 F.2d 545 (6th Cir. 1976) ............................................................................57

*United States v. Giordano*,
261 F.3d 1134 (11th Cir. 2001) ........................................................................58

*United States v. Gosselin World Wide Moving N.V.*,
411 F.3d 502 (4th Cir. 2005) ("*Gosselin*") ...................................................passim

*United States v. Gravely*,
840 F.2d 1156 (4th Cir. 1988) ..........................................................................42

*United States v. Hayter Oil Co.*,
51 F.3d 74 (6th Cir. 1995) ................................................................................58

*United States v. Herrera*,
23 F.3d 74 (4th Cir. 1994) ................................................................................63

*United States v. Hibbs*,
568 F.2d 347 (3d Cir. 1977) .............................................................................37

*United States v. Jackson*,
124 F.3d 607 (4th Cir. 1997) ............................................................................63

*United States v. Mackby*,
261 F.3d 821 (9th Cir. 2001) ............................................................................31

*United States v. Mackby*,
339 F.3d 1013 (9th Cir. 2003) ...............................................................51, 69, 70

*United States v. Nat'l Fin. Servs., Inc.*,
98 F.3d 131 (4th Cir. 1996) ...............................................................74

*United States v. Neal*,
78 F.3d 901 (4th Cir. 1996) ...............................................................63

*United States v. Portsmouth Paving Corp.*,
694 F.2d 312 (4th Cir. 1982) ...............................................................42

*United States v. Sarbello*,
985 F.2d 716 (3d Cir. 1993) ...............................................................65, 66

*United States v. SKW Metals & Alloys, Inc.*,
195 F.3d 83 (2d Cir. 1999) ...............................................................58

*United States v. Smith*,
395 F.3d 516 (4th Cir. 2005) ...............................................................78

*United States v. Tucor Int'l, Inc.*,
189 F.3d 834 (9th Cir. 1999) ...............................................................passim

*United States v. Williams*,
29 F.3d 172 (4th Cir. 1994) ...............................................................56

*United States v. Williams*,
No. 02C4990, 2003 WL 21384640 (N.D. Ill. June 12, 2003) ...........................35

*United States v. Wilson*,
262 F.3d 305 (4th Cir. 2001) ...............................................................67

*Vermont Agency of Natural Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000)...............................................................passim

*Warth v. Seldin*,
422 U.S. 490 (1975)...............................................................23, 26

*Zadvydas v. Davis*,
533 U.S. 678 (2001)...............................................................29, 30

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. art. II ...................................................................passim

U.S. Const. art. III ..................................................................passim

U.S. Const. amend. VIII ..........................................................passim

18 U.S.C. § 1963 ........................................................................65

28 U.S.C. § 1331 ..........................................................................1

31 U.S.C. § 3729(a) ...................................................................75

31 U.S.C. §§ 3729(a)(1) ............................................................69

31 U.S.C. § 3730 ..........................................................................1

31 U.S.C. §§ 3730(c)(2)(A), (B), (C) ........................................69

31 U.S.C. § 3730(d)(2) ...............................................................30

31 U.S.C. § 3732 ..........................................................................1

Shipping Act of 1984, 46 U.S.C. app. § 1709(d) (1984) ............83

Shipping Act of 1984, 46 U.S.C. app. §§ 1701-1719 (2000) .........passim

48 C.F.R. § 17.207(c) .................................................................12

48 C.F.R. § 17.207(d) .................................................................12

## FEDERAL RULES

Fed. R. App. P. 28(a)(9)(A) .......................................................86

Fed. R. Crim. P. 11(c)(3)(A)-(B) ...............................................67

Fed. R. Crim. P. 31(e) ................................................................66

Fed. R. Crim. P. 32.2(b) .............................................................66

Fed. R. Crim. P. 35.................................................................66, 67

Fed. R. Crim. P. 48(a) ................................................................67

Fed. R. Evid. 801(c), 802 ........................................................................56

**OTHER AUTHORITIES**

H.R. Rep. No. 98-53 (1983), *reprinted in* 1984 U.S.C.C.A.N. 167 .................83, 85

U.S.S.G. §§ 2R1.1(b)(2),  5K1.1 (2010)...........................................58, 67

**MISCELLANEOUS**

6 Am. Jur. 2d Assignments § 11 (2008) ................................................25

John T. Boese, *Civil False Claims and Qui Tam Actions*, (3d ed. Supp. 2012) .............................................................................37, 51

Arthur W. Campbell, *Law of Sentencing* § 7.5 (2012) ...........................56

Myriam E. Gilles, *Representational Standing: U.S. ex rel Stevens and the Future of Public Law Litigation*, 89 Cal. L. Rev. 315, 342-44 (2001) .............24

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this False Claims Act ("FCA") case under 31 U.S.C. §§ 3730 and 3732, and 28 U.S.C. § 1331. This Court has appellate jurisdiction over the instant cross-appeal for the same reasons it has jurisdiction over Appellants' appeals. *See* Gov. Br. at 1-2; Rel. Br. at 1.

## STATEMENT OF ISSUES

**CROSS-APPEAL:**

Whether the jury's DPM verdict should be set aside because Relator Kurt Bunk—having abandoned any monetary damage claims below—lacked Article III standing to pursue a claim only to vindicate a generalized interest in enforcing law.

**RESPONSE TO APPELLANTS:**

Appellees accept Appellants' statements of their issues for appeal. The instant response raises an independent ground to sustain the court's judgment below, namely, whether the award of no civil penalties should be sustained because allowing Bunk to pursue a purely sovereign claim would impermissibly vest executive power in a private party, contrary to Article II's Appointments and Take Care Clauses.

## STATEMENT OF THE CASE

This FCA case arises from relators' *qui tam* allegations of bid-rigging and price-fixing on two separate government contracting programs. The Government intervened in claims regarding one of those programs, but declined to intervene as to the single claim on the other program, which was brought and litigated only by Relator Kurt Bunk.

Appellees generally agree with the Government's "Statement of the Case and Course of Proceedings" and description of the "Statute Involved." Gov. Br. at 2-5. Appellees set forth additional background below.

## STATEMENT OF FACTS

### A.    ITGBL Program

Through the International Through Government Bill of Lading ("ITGBL") program, the United States selects American freight forwarding companies, or "carriers," to transport household goods of military personnel abroad. JA1120. The Department of Defense ("DOD") Surface Deployment and Distribution Command, formerly known as the Military Traffic Management Command, administers the ITGBL program and solicits bids for "through rates" from carriers. *Id.* "Through rates" encompass all costs for a door-to-door move of household goods between the United States and Europe (called "through transportation"). JA1120-21.

2

Carriers submit bids for six-month International Summer or International Winter cycles. JA1121. "IS01" refers to the six-month summer cycle for 2001; "IW01" is the six-month winter cycle for 2001. *Id*. For each cycle, there are 52 eastbound and 52 westbound ocean routes, or "channels," between the U.S. and Germany (the country at issue here). *Id*.

Interested carriers file through-rate bids for specific channels based on the cost per hundred pounds transported. *Id*. Thus, for each cycle, carriers may submit up to 104 different bids. *Id*. The low bid for each channel is called the "prime," and the prime carrier is guaranteed at least 10% of the volume for that channel. *Id*.

After the initial bids, DOD publishes the lowest five rates. *Id*. First-round carriers who did not file the prime rate may re-bid in a second round. *Id*. Any carrier matching the prime rate for a channel is guaranteed a percentage of the volume for that channel, though less than the prime carrier. JA1122.

### 1.    Gosselin's and Bunk's Roles in the ITGBL Program

Appellees are Gosselin World Wide Moving N.V., now known as Gosselin Group N.V., and Gosselin's CEO, Marc Smet (collectively "Gosselin"). Gosselin is a moving and logistics company based in Belgium. JA1969. Gosselin and similar companies are called "local agents." JA1966. U.S. carriers subcontract with local agents for the European portion of through transportation. JA1122.

3

Appellant Bunk, during the events at issue in this case, was a subcontractor for Birkart Globistics, a local agent in Europe. Bunk provided the actual packing services for Birkart's customers. JA1828, 1832.

### 2.    Costs of Through Transportation

The costs of through transportation (and a through rate) include the local (U.S. or foreign) packing of household goods; transporting the goods from the person's home to the ocean shipping port (or to a warehouse for storage); services at the port of origin; ocean transportation services; services at the destination port; transporting the goods from the destination port to the new home (or to a warehouse); and unpacking the goods. JA1122.

### 3.    Landed Rate

In the late 1990's, Gosselin developed a "landed rate," which bundled all services performed on the non-U.S. side of the move into one rate with Gosselin assuming the currency exchange and carrier non-payment risks. JA1123 n.5, JA2005-07. Other local agents began offering this service to their customers, as well. There are no allegations that the landed rate itself is unlawful in any respect. JA1740-42.

On November 14, 2000, Gosselin and other European local agents agreed in writing: "We, the undersigned companies agree that as of 4/1/2001 we will be using 'landed rates' for the U.S. Military business." JA1123 & n.4. In the case

below, this became known as the "landed rate agreement." Appellants alleged that the landed rate agreement violated antitrust laws and therefore any invoices the carriers submitted to the government for work performed by local agents violated the FCA. JA1127.

### 4. Covan and Cartwright Channels

In addition to working as local agents, Gosselin and other European companies worked as "general agents," coordinating the sale of local agent services to U.S. carriers, collecting money from the carriers, and paying the local agents. JA1123. General agents also advise carriers regarding rates for move services in Germany to assist carriers in filing through rates. JA2197.

In the IS01 bidding cycle, Covan International ("Covan") set the prime rate in 14 channels (the "Covan channels"). JA1125. Local agents determined those rates were too low to cover all local service charges, which meant Covan and carriers matching the prime rate might not pay the local agents. *Id.* This occurred frequently in the past, resulting in significant industry bankruptcies of carriers and local agents. JA1125 & n.6. Gosselin and others decided not to handle any business for carriers that matched the prime rate in the 14 Covan channels. JA1125. Appellants claimed Gosselin also endeavored to force Covan to cancel its prime rate and have other carriers match the second low rate. *Id.*

Gosselin and others engaged in similar conduct in the IS02 cycle when Cartwright International Van Lines, Inc. ("Cartwright") filed prime rates in 12 channels (the "Cartwright channels").  JA1125-26.

### 5.    Prior Criminal Case

In November 2003, DOJ's Antitrust Division indicted Gosselin and Smet for their Cartwright-channel conduct.  JA539.  The indictment did not include charges for the Covan channels or the landed rate agreement.  JA540.  As part of a conditional plea agreement in 2004, Smet was dismissed with prejudice from the case.  JA370.  Gosselin admitted its conduct on the Cartwright channels, but explained it believed its conduct was antitrust immune based on the language of the Shipping Act of 1984, 46 U.S.C. app. §§1701-1719 (2000), and the Ninth Circuit's decision in *United States v. Tucor International, Inc.*, 189 F.3d 834 (9th Cir. 1999).  JA539-40, 539 n.3.  The district court agreed with Gosselin, but this Court reversed in *United States v. Gosselin World Wide Moving N.V.*, 411 F.3d 502, 510 (4th Cir. 2005) ("*Gosselin*"), holding that Gosselin's conduct – endeavoring to have Cartwright withdraw its prime bid and have other U.S. carriers bid specific rates – went beyond the antitrust exemption in the Act.  The Government estimated that its actual damage relating to the Cartwright channels was $865,000.  JA545-46.  Gosselin and its co-defendant restituted that amount, and each also paid a $6 million criminal fine.  JA539-40.

### 6.    *Qui Tam* Complaints and Government Intervention

In 2002, Bunk and Ray Ammons filed separate *qui tam* complaints alleging that Gosselin and others violated the FCA.  The complaints included the Cartwright-channel conduct, and added the Covan-channel conduct.  JA278-87, 322.  The complaints also alleged that the landed rate agreement violated the FCA and affected all 416 channels in all four bidding cycles between 2001 and 2002. JA277-78, 320-26.

DOJ intervened in all ITGBL claims.  The Government claimed damages of approximately $72 million (trebled to $216 million), which included alleged "lingering effects" of the defendants' conduct through 2005.  JA814-15.  The Government also alleged that carriers collectively submitted 65,513 invoices between 2001 and 2002, which would total $360,321,500 to $720,643,000 in civil penalties.  SA93.

### 7.    ITGBL Rulings Relevant to Appeal

The district court found that because the landed rate agreement was limited to the non-U.S. segment of through transportation, the agreement was antitrust-immune conduct under the Shipping Act.  JA1134.  The court therefore dismissed claims relating to the landed rate agreement, although the jury was still free to consider Gosselin's conduct regarding that agreement in resolving the other claims.

The jury found Gosselin not liable for FCA violations on the Covan channels.

**B.    DPM Contract**

Bunk's complaint also alleged an FCA violation on an entirely separate contract and contracting process called the Direct Procurement Method ("DPM"). JA326-28.  The Government chose not to intervene in the DPM claim, and Bunk litigated it alone.

Unlike the ITGBL program, DPM contracts involved transporting military household goods between installations entirely within Europe.  JA1839-40.  Under the DPM program, the Army solicits bids from European companies and awards DPM contracts to them directly.  *Id*.

Before the contract at issue, DOD awarded separate DPM contracts for particular regions within Germany, Italy, and Benelux (Belgium, Netherlands, and Luxemburg).  JA1841-42.  Bidding companies submitted prices for each line item in the contract.  The most significant line item (item 1A) was for packing service. JA1844, 2075, 2341, 2633.  Standard shipping containers were priced separately, as were overflow and oversize containers.  JA2586-87.

In 1999, the Army awarded six regional DPM contracts in Germany – two to Gosselin, two to Birkart, one to Viktoria Schäfer, and one to Schock Weilerbach.

8

JA1296.  Bunk bid on behalf of Birkart and calculated prices to ensure Birkart was awarded the contracts.  JA1515.

### 1.    Bunk's Abusive Practices on 1999 DPM Contracts

Bunk bid 1 Deutsche Mark ("DM") for packing services, but charged substantial amounts for overflow and oversize boxes.  JA1420, 2506-7.  Although overflow and oversize boxes are not needed on most shipments of household goods, Bunk used at least one such box in nearly every shipment, significantly overcharging the Army.  JA2493-94, 2501-06, 2623-26.

### 2.    New DPM Contract and Contracting Process

The Army modified its entire DPM contracting process in direct response to Bunk's abusive practices.  JA2493-94, 2501-02, 2504-06.  In February 2001, it issued a new DPM solicitation requiring agents to obtain advance approval for the use of oversized and overflow boxes.  JA2504.  Moreover, for the first time, the Army solicited bids for a single contract covering all the aforementioned countries in Europe.  JA327, 1952, 2046.

The solicitation required the offeror to commit to a high minimum daily move capacity in each country with as little as one day's notice.  JA2051-53, 715.  The Army would be required to use the awardee for all of its needs in all of the covered countries.  JA3114.  The risk to awardees was high if they could not fulfill

their capacity commitments; if the Army secured services elsewhere at a higher price, it charged the awardee for the cost difference.  JA2227.

Unlike the prior DPM contracts, the 2001 contract was awarded on a "Best Value" basis.  JA1149, 2046-47.  Besides price, the Army also considered the offeror's technical and management capability and its performance risk.  *Id*.

Because no single company had the capacity to meet the requirements of the 2001 DPM contract alone, the solicitation provided:  "It is anticipated that significant subcontracting or joint ventures may be required for a single offeror to be able to perform throughout Germany, Benelux and Italy."  JA1149.  Further, "in order to be considered a qualified bidder" (JA2511), the solicitation required the bids to demonstrate how the offerors expected to carry out these obligations in each country, *e.g.*, to list their own warehouse and truck capacity, and the names and capacities of subcontractors in place and available in each geographic area. JA1153-54, 2048-49; *see also* JA70-02.

### 3.    Army's Pre-Proposal Meeting

On February 15, 2001, the Army held a pre-proposal meeting in Germany to discuss with potential offerors the 2001 contract and solicitation requirements. JA2065-66, 2505.  After the meeting, the offerors present went to the Army's cafeteria and discussed the contract's unique capacity challenges.  JA2065-68.  The companies agreed on rates they would charge each other for various subcontracting

services in the 2001 DPM contract, including packing. JA2071. Gosselin and the other offerors later each independently determined their offer prices on all line items and the total contract price. JA2079, 2081-82, 3316-17.

### 4. Gosselin's DPM Offer

Gosselin submitted its bid on February 28, 2001, naming all of the subcontractors it would use by region. JA1156-61. As required, Gosselin's offer included a signed Certificate of Independent Price Determination ("CIPD") that stated, in relevant part:

> (a)  The offeror certifies that—
> (1)  The prices in this offer have been arrived at independently, without, <u>for the purpose of restricting competition</u>, any consultation, communication, or agreement with any other offeror or competitor relating to (i) those prices, (ii) the intention to submit an offer, or (iii) the methods of [sic] factors used to calculate the prices offered;

JA2825 (emphasis added).

The Army awarded the 2001 DPM contract to Gosselin on April 11, 2001. JA2060.

### 5. Bunk's Allegations Regarding the 2001 DPM Contract

Before any offers were submitted, Bunk learned of the subcontracting agreement from a Birkart representative present at the cafeteria meeting in Germany. JA1841-43. Although Bunk testified that he believed the agreement was fraudulent, he worked under the 2001 DPM contract as Birkart's subcontractor for 10 months, earning 90% of Birkart's fees from that work. JA1828, 1832, 1846,

11

1903-04, 1915, 1139-41 (translation at JA2861-63). He demanded even more money for this and other work in an October 12, 2001 letter to Birkart. JA1864-69.

Gosselin fired Birkart (Bunk) as a subcontractor on the 2001 DPM contract due to Bunk's poor-quality work on February 21, 2002. JA1904. Birkart immediately demanded Bunk return the DPM goods he had not yet shipped. JA1166-71, 1871-79. That same day, Bunk telephoned Edwin A. Koschemann, a U.S. Army contracting officer in Germany, alleging bid-rigging and other unlawful conduct. *See* JA1139-41 (translation at JA2861-63). The next day, Bunk followed up with a letter to Koschemann specifically alleging unlawful price agreements and contract manipulations. *Id*. Instead of returning the unshipped goods to Birkart, Bunk had them moved to another warehouse, locked the door, and would not release them. JA1872-79. To assist the Army, Gosselin paid Bunk (through, at Bunk's request, a personal check that could not legally be canceled) approximately €26,300 to release the hostage goods. JA1876-79.

### 6.    Army Exercises Options to Renew 2001 Contract with Gosselin

The 2001 DPM contract was up for renewal in April 2002. Federal Acquisition Regulation ("FAR") 48 C.F.R. § 17.207(c) allows a contracting officer to exercise options "only after determining," *inter alia*, that "the exercise of the option is the most advantageous method of fulfilling the Government's need," considering "price and other factors." *See also* 48 C.F.R. § 17.207(d) (contracting

12

officer shall determine whether "the option price is better than prices available in the market or that the option is the more advantageous offer").

Despite Bunk's reports, in April 2002 Koscehmann, himself, renewed the 2001 DPM contract with Gosselin for 2003.  JA3211-12.  A year later, after Bunk's allegations had been investigated by the Government, the Army again renewed the DPM contract for 2004.  JA3198-99.

### 7.    Jury's DPM Finding and Parties' Stipulation

The jury found Gosselin liable for violating the FCA based on its submission of the CIPD.  JA1116.  Relators and Gosselin stipulated that Gosselin submitted 9,136 invoices for individual moves over the three-year life of the contract. JA2847-51.  Accepting Appellants' construction of the FCA, the court deemed each invoice a separate false claim.  JA1196-97.

### 8.    DPM Damages Claims

#### a.    Pre-trial

Bunk generally asserted damages on the DPM claim in his complaint. JA337.  During discovery, Bunk said DPM damages would be specified "once additional information is collected" and would be the subject of expert testimony. JA1187-88, 1191.  Bunk eventually identified a DPM damages expert (JA640), but Bunk did not produce an expert report.  Instead, Bunk adopted the Government's expert report (JA642), although DOJ's expert did not evaluate or address the DPM claim.  JA777.  On February 18, 2011, Bunk confirmed he was abandoning DPM

13

damage claims and was "pursuing statutory penalties only." JA1193. Thus, Bunk produced no discovery on DPM damages in response to Gosselin's requests and Gosselin undertook no analysis of DPM damages pre-trial. On June 27, 2011, Bunk said in his Trial Brief that he "is not seeking actual damages on his DPM claim, in that he could not procure from the government the evidence necessary to support a damages analysis and opinion."[1] JA903.

### b.    Trial

At trial, no DPM damages evidence was introduced. The court instructed the jury it was "not being asked to consider or calculate damages, if any, in this case." JA1101.

### c.    Post-trial Civil Penalty Briefing and Hearing

Following the jury's DPM liability finding, the parties briefed civil penalties under the FCA. Gosselin argued that the minimum statutory penalty would be unconstitutionally excessive as there were no monetary damages and Gosselin's culpability was extensively mitigated. Over Gosselin's objections (*see* JA1594

---

[1] Post-trial, Bunk claimed he "got the documents from the government on these points" and "produced them in discovery," but that he "could not get the amount of money necessary for an expert to provide damages testimony. So we withdrew it and said we'd only seek penalties." JA2449-50.

n.9),[2] Bunk attempted post-trial to prove through a declaration of contracting officer Guenter Riedl that Gosselin caused the Army monetary loss. Bunk also sought "no less than $25 million" in civil penalties on the DPM claim (SA56), which he later reduced to $24 million. JA1366, 2469.

The court held a full-day evidentiary hearing regarding civil penalties. Appellants presented no witnesses.[3] Gosselin presented three. Stephen Marshall, the Director of Operations for the Army's office in Germany that administered the 1999 and 2001 DPM contracts, testified that Gosselin performed well on the 2001 contract substantially benefited the Army. JA2490-91, 2495-99, 2514-20. He also testified about the 1999 contracts, explaining Bunk's abusive practices (JA2499-507) and saying he was "positive" Gosselin was not overcharging the Army on its contracts. JA2493-95.

General (Ret.) Michael Kelleher, assigned for three years to monitor Gosselin's compliance with a DOD Administrative Settlement Agreement ("ASA") in connection with Gosselin's 2004 plea on the Cartwright channels, also testified.

---

[2] If this Court remands the DPM penalty judgment for any reason, it should instruct the district court to first rule on the issues in footnote nine of its opinion. JA1594 n.9.

[3] Although Bunk repeatedly states that Riedl "testified" (*see, e.g.*, Rel. Br. at 19), in fact Riedl's testimony was presented only in the form of a written declaration, itself signed and dated the day of the evidentiary hearing. JA1303, 2434-35. Riedl did not testify live and was not made available for cross-examination.

Kelleher said Gosselin successfully complied with all terms of the ASA, including obeying all laws, and that Gosselin "continues to serve as a highly valued resource to the Department of Defense." JA2567-68, 1380.

Smet testified regarding, *inter alia*, additional service requirements (JA2580-83) and Gosselin's low profit under the 2001 DPM contract. JA2587.

Gosselin also introduced a declaration from a well-qualified expert economist, Dr. Keith Ugone, regarding the analytical errors and faulty assumptions in the Riedl declaration and Bunk's DPM damages calculations. JA1357-65.

After the hearing, the court ordered supplemental briefing to address, *inter alia*, Bunk's damage calculations, the constitutionality of the $50,248,000 statutory minimum penalty, and whether the court could impose a penalty below the statutory minimum if it found that amount unconstitutionally excessive.[4] JA1454.

### 9.    Court's Opinion

On February 14, 2012, the court issued a detailed 34-page opinion and order regarding civil penalties. JA1584-1621. After considering all evidence regarding tangible and intangible harm attributable to Gosselin's conduct and evidence mitigating Gosselin's culpability, the court held that the minimum statutory penalty was grossly disproportionate to the harm and was an unconstitutionally excessive

---

[4] The court ordered Bunk and the Government to file one consolidated brief. JA1454. Gosselin objected that DOJ lacked standing on the DPM claim as it never intervened, and therefore Gosselin responded only to "Relators." JA1571 n.1.

16

fine.  JA1617.  Further holding it had no discretion under the FCA to issue a penalty below the statutory minimum, the court did not award any penalties.  *Id*. And, in the event this Court were to rule that the district court has discretion to fashion a penalty below the FCA's minimum, the court determined three alternative penalties that would be constitutional.  JA1611-17.

## SUMMARY OF ARGUMENT

### I.    Cross-Appeal

This Court should set aside the jury's verdict regarding the DPM claim because Bunk lacked Article III standing to pursue that claim.  As a non-waivable prerequisite to federal jurisdiction, each plaintiff must show a concrete and particularized injury in fact.  Congress may not circumvent this requirement by giving private parties a legal interest in enforcing the law.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Yet that is the only interest Bunk asserted, having abandoned any monetary damage claims in the court below.  To be sure, in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), the Supreme Court held that a *qui tam* relator had standing under the FCA because he had been assigned the Government's *proprietary* interest in *damages*.  But no such proprietary interests are at issue here, and assignment of the Government's *sovereign* interest in enforcing the law cannot

17

confer standing because sovereign interests are analogous to personal rights, which were not assignable at common law.

Moreover, if the FCA were read to be an assignment of purely sovereign claims, it would impermissibly vest the executive power in private parties by operation of law, rather than by appointment by the President or his Officers, in violation of Article II's Appointments Clause.  It also would violate the related requirement of the Take Care Clause that a single executive control the Executive power and ensure that the laws are faithfully executed. To avoid such constitutional infirmities, the FCA should be interpreted to allow only suits by relators asserting, at minimum, a proprietary injury.

## II.    Response to Appellants' Arguments

If this Court disagrees with the cross-appeal arguments summarized above, it should affirm the district court's DPM judgment.  The Excessive Fines Clause prohibits civil penalties that are grossly disproportionate to the gravity of the defendant's offense.  The gravity of the offense encompasses any tangible and intangible damage caused by the defendant's conduct, as well as aggravating and mitigating factors bearing on the defendant's culpability.  Here, Bunk chose not to seek (and therefore did not prove) damages at trial, and failed to prove damages post-trial.  Gosselin affirmatively showed (though not required to do so) a lack of monetary damages and presented substantial uncontested mitigation of Gosselin's

18

conduct. Mitigation included Gosselin's modest profit on the 2001 DPM contract, Gosselin's lack of continuous scienter for each submitted invoice, the unique bidding process and requirements for the 2001 DPM contract, the history of DOD's modifications to the solicitations, the Army's considered decisions to renew the DPM contract with Gosselin twice despite Bunk's fraud allegations, and the significant benefits the Government received as a result of Gosselin's pricing and performance. The district court correctly held that a statutory penalty of over $50 million would violate the Eighth Amendment's Excessive Fines Clause.

Appellants do not contest on appeal that the statutory minimum penalty would be unconstitutional in this case. However, both Bunk and the Government consistently argued below that the court had absolutely no authority to impose a penalty below the statutory minimum. Appellants now argue the opposite on appeal, contending the court could and should have imposed a penalty below the statutory minimum. This argument is foreclosed by the doctrines of waiver, invited error and estoppel, and this Court should affirm the lower court's imposition of no penalties for this reason, alone.

The court's judgment awarding no civil penalties on Bunk's DPM claim should be sustained on the independent ground that imposing civil penalties where Bunk pursued only the Government's sovereign interest would violate Article II of the Constitution.

19

Further, Appellants' arguments misstate the law and distort the factual record. Among other things, even *per se* antitrust cases do not obviate Bunk's burden to prove monetary damages. Nor does Bunk's unreliable and belated post-trial attempt to calculate a price increase in the 2001 DPM contract and attribute it to Gosselin's conduct withstand scrutiny – let alone overcome the presumption of validity accorded to the district court's factual findings.

The Government's argument on appeal that Bunk was vested with "prosecutorial discretion" to seek a civil penalty below the statutory minimum fares no better. Relators are, at bottom, self-interested private parties who are not bestowed with whatever limited power the Government may have in this regard. Moreover, even government officials have little (if any) discretion under the FCA to request post-trial penalties below the statutory minimum. Neither Bunk nor the Government explain the court's authority to impose such a penalty upon the Government's request. And, the Government's authority is particularly limited where, as here, it does not intervene. In any event, the court correctly found that a $24 million penalty would be unconstitutionally excessive.

Moreover, the district court correctly held that the Shipping Act immunizes the landed rate agreement. This conclusion is entirely consistent with this Court's decision in the earlier *Gosselin* case, which explained that although conduct directed at specific bids in the United States was not exempt, agreements limited to

the foreign inland segment of through transportation are antitrust-immune. The district court also properly concluded that the landed rate agreement and the Covan and Cartwright conduct were not a single conspiracy aimed at the entire through transportation market. Finally, the Shipping Act's text and history foreclose the Government's argument that Shipping Act immunity is limited to marine terminal operators or ocean common carriers.

## CROSS-APPEAL ARGUMENT

### I.   Bunk Lacked Article III Standing Because He Sought to Vindicate Only the Sovereign Interest of the United States.

This Court should set aside the jury's DPM liability verdict, and not reach the merits of Appellants' DPM appeals, because Bunk lacked Article III standing when he abandoned claims for monetary damages. Bunk's assertion of the United States' sovereign interest provides no basis for standing here. While the FCA may properly grant a *qui tam* relator standing to pursue the Government's claims based on a *proprietary* injury, the FCA cannot permissibly assign purely *sovereign* claims to private relators.

### A.   Article III Limits Federal Courts to Adjudication of "Cases" or "Controversies" in Which the Plaintiff Raises a Concrete, Individualized Injury.

Federal courts must always answer the threshold, non-waivable question of whether they have jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Courts must verify that the plaintiff "suffered an 'injury in

21

fact'—an invasion of a legally protected interest which is … concrete and particularized." *Lujan*, 504 U.S. at 560. For this reason, a private plaintiff may not invoke federal court jurisdiction to assert a "generalized grievance" that is "undifferentiated and common to all members of the public." *Id.* at 575 (internal quotation marks omitted).

These limitations are essential to preserving the separation of federal powers; and Congress has no authority to expand federal jurisdiction by authorizing private individuals to sue based on diffuse public harms rather than an individualized, concrete injury:

> Vindicating the *public* interest (including the public interest in… observance of the Constitution and laws) is the function of Congress and the Chief Executive.… To permit Congress to convert the undifferentiated public interest in…compliance with the law into an "individual right" vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to "take Care that the Laws be faithfully executed," Art. II, § 3.…We have always rejected that vision of our role[.]

*Id.* at 576-77 (internal citations omitted) (emphasis in original).

The Court recently affirmed these principles in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000). There, *qui tam* relators alleged under the FCA that the Vermont Agency of Natural Resources "had overstated the amount of time spent by its employees on…federally funded projects, thereby inducing the Government to disburse more grant money than [the

agency] was entitled to receive." 529 U.S. at 770. The Court noted, "[i]t is beyond doubt that the complaint asserts an injury to the United States—both the injury to its sovereignty arising from violation of its laws (which suffices to support a criminal lawsuit by the Government) and the proprietary injury resulting from the alleged fraud." *Id*. at 771. However, the Court emphasized, "the Art. III judicial power exists only to redress or otherwise to protect against injury *to the complaining party*." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Moreover, although the relator would have received a "bounty" for a successful suit, that interest alone was insufficient to create standing because "an interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes." 529 U.S. at 773 (quoting *Steel Co.*, 523 U.S. at 107).

The United States, however, argued that the relator had standing because he had been assigned the Government's damages claim, and "'a claim *not for a penalty but for compensation*, is a property right assignable in its nature.'" Supp. Brief for United States at 9-10, *Vermont Agency*, 529 U.S. 765, No. 98-1828, 1999 WL 1086464 (quoting *Spiller v. Atchison, Topeka & Santa Fe Ry.*, 253 U.S. 117, 135 (1920)) (emphasis added). Accepting this argument, the Court recognized a narrow exception to the requirement that a plaintiff assert his *own* injury, and held that "[t]he FCA can reasonably be regarded as effecting a partial assignment of the

23

Government's *damages claim*." *Id.* at 773 (emphasis added). Accordingly, "the United States' injury in fact suffice[d] to confer standing on [the relator]." *Id.* at 774. However, because the relator in *Vermont Agency* contended the Government suffered harm as a contracting party, the case still involved a discrete injury, specific to an individual party—the Government as a contractor. Although the relator did not have standing based on a generalized right to a bounty, he had standing based on his assignment of the Government's particularized, individual interest—"the Government['s] disburse[ment of] more grant money than [the agency] was entitled to receive." *Id.* at 770, 71.

**B.    The Government's Sovereign Injury Alone Cannot Be Assigned to Bunk.**

By abandoning all claims for monetary damage, Bunk sought only a punishment for a sovereign interest. He had no standing to pursue such claims.

**1.    *Vermont Agency*'s Rationale for Allowing the Assignment of a Proprietary Injury Does Not Extend to a Purely Sovereign Claim.**

At common law, only proprietary claims arising from contracts, property interests, and torts to real or personal property are assignable. As the Government itself noted in *Vermont Agency*, "'a claim *not for a penalty but for compensation*, is a property right assignable in its nature.'" Supp. Brief for United States at 9-10, *Vermont Agency*, 529 U.S. 765 (No. 98-1828), 1999 WL 1086464 (quoting *Spiller*, 253 U.S. at 135) (emphasis added). *See also* Myriam E. Gilles, *Representational*

*Standing: U.S. ex rel Stevens and the Future of Public Law Litigation*, 89 Cal. L. Rev. 315, 342-44 (2001) ("[T]he government may assign the right to vindicate the proprietary injury it suffers *where the federal treasury is diminished*. Such claims look to *compensate* the government *for the loss* it directly suffers in its capacity as a proprietor, as the keeper of the public fisc and the owner of public property.") (footnotes omitted; emphasis added).

In contrast, personal claims – *e.g.*, personal injury, false imprisonment, and marital claims – are not assignable. *See* 6 Am. Jur. 2d Assignments § 11 (2008) ("In general, rights that are personal to the assignor are incapable of assignment."). Here, the Government's sovereign interests cannot confer standing because, in contrast to proprietary interests, they are analogous to "personal" rights, which were not assignable at common law.

> ### 2.    Allowing the Assignment of a Sovereign Interest Cannot Be Reconciled with the Supreme Court's Clear Command that Jurisdiction Must Be Based on an Individualized Injury.

Congress may not circumvent Article III's injury-in-fact requirement by purporting to give private parties a legal interest simply in enforcing law. In *Lujan*, for example, the Court considered a provision of the Endangered Species Act ("ESA") stating "any person may commence a civil suit on his own behalf" to enjoin violators of the ESA. 504 U.S. at 571-72. The Court held this provision could not convey standing on uninjured private parties to enforce the ESA because

such claims would simply raise a "generally available grievance" that asserted "only harm to [the plaintiff's] and every citizen's interest in proper application of the Constitution and laws." *Id.* at 573-74. Moreover, the Court held, "the public interest in proper administration of the laws…can[not] be converted into an individual right by a statute that denominates it as such[.]" *Id.* at 576-77. So, although the Government could plainly sue to enforce the ESA, Congress could not by statute assign private parties the right to sue simply for violations of the law.

The Supreme Court has affirmed these principles repeatedly. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 516-17 (2007) ("We will not…entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws.") (internal quotation marks and citation omitted); *Steel*, 523 U.S. at 106 ("In requesting [civil penalties], respondent seeks not remediation of its own injury…but vindication of the rule of law.…This does not suffice [for standing]."); *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."); *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979) ("In no event…may Congress abrogate the Art. III minima: A plaintiff must always have suffered 'a distinct and palpable injury….'") (quoting *Warth*, 422 U.S. at 501).

26

Likewise, *Vermont Agency* simply allowed the assignment of the government's *proprietary* interest; it did not purport to give private parties the right to sue solely on behalf of the public interest. If *Vermont Agency*'s holding is not limited to the assignment of a proprietary interest, then it must have impliedly overruled *Lujan.* After all, there is no basis to infer that the FCA's *qui tam* provision (which gives relators *partial* control over FCA claims) constitutes an "assignment," but that the citizen-suit provision in *Lujan* (which gave private parties *complete* control over suits to enforce the law), was somehow not an "assignment." There is nothing in Justice Scalia's opinion in *Vermont Agency* suggesting it was remotely intended to overrule *sub silentio* Justice Scalia's opinion in *Lujan*, or to grant Congress the power to legislate away the constitutional requirements of Article III.

### 3. Assignment of Sovereign Interests Would Violate Article II.

Allowing Congress to assign claims vindicating sovereign interests would not only destroy Article III's separation of federal power, it would also violate Article II's Appointments Clause, which provides that appointment of "Officers of the United States" must be vested "in the President alone, in the Courts of Law, or in the Heads of Departments." Art. II, § 2, cl. 2. This Clause does not "merely deal[] with etiquette or protocol in describing 'Officers of the United States,'" but, rather, has "substantive meaning"; that is, "any appointee exercising significant

27

authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by [Art. II] § 2, cl. 2." *Buckley v. Valeo*, 424 U.S. 1, 125-26 (1976) (per curiam).

Because "the executive power" is vested in the President, he must at all times maintain control, directly or indirectly, over the appointment of those who wield it. *See Ryder v. United States*, 515 U.S. 177, 182 (1995); *Myers v. United States*, 272 U.S. 52, 116 (1926). The Appointments Clause "preserves political accountability relative to important Government assignments." *Edmond v. United States*, 520 U.S. 651, 659, 663 (1997).

If read to be an assignment allowing Bunk to pursue a purely sovereign claim, the FCA would vest "the executive power" in a private party. The ability to institute a punitive lawsuit solely to enforce the United States sovereign interest clearly constitutes "significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 126; *see also id*. at 126 (citing *Myers*, 272 U.S. 52, and *Ex parte Hennen*, 13 Pet. 230 (1839)). Indeed, the Supreme Court held in *Buckley* that "responsibility for conducting civil litigation in the courts of the United States for vindicating public rights" may be exercised "*only* by persons who are 'Officers of the United States.'" *Id.* at 140 (emphasis added). If interpreted to allow standing in this case, the FCA would vest a *qui tam* relator with a core Executive

function by operation of law, rather than appointment by the President or his Officers, and would violate the Appointments Clause.

For similar reasons, allowing Bunk to invoke the Government's sovereign interest in law enforcement would violate the related requirement of Article II, § 3 that the Executive "shall take Care that the Laws be faithfully executed." The Take Care Clause reflects the "insistence of the Framers upon unity in the Federal Executive," *i.e.*, that a single executive must control the Executive power. *Printz v. United States*, 521 U.S. 898, 922 (1997). However, "[t]hat unity would be shattered, and the power of the President would be diminished, if Congress could act as effectively without the President as with him, by simply [allowing private parties] to execute its laws." *Id*. at 923.

### 4. In Light of the Foregoing Constitutional Restrictions, the False Claims Act Must Be Read as Allowing Only Suits That Pursue Proprietary Interests.

"'It is a cardinal principle' of statutory interpretation…that when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'th[e] Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

An interpretation of the FCA allowing relators to sue *only* to recover civil penalties would raise "a serious doubt" as to the FCA's constitutionality.

*Zadvydas*, 533 U.S. at 689. That problem may easily be avoided, however, by interpreting the FCA to allow a relator to sue for civil penalties only where the relator *also* asserts the government's proprietary injury.

Moreover, interpreting the FCA to authorize only suits by relators asserting a proprietary injury is certainly "fairly possible" in light of the statutory text. The FCA states that "[i]f the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty *and damages*." 31 U.S.C. § 3730(d)(2) (emphasis added). Thus, the FCA precisely contemplates that a relator must assert a proprietary claim to damages.

## RESPONSE TO APPELLANTS' ARGUMENTS

**I.    The District Court's Civil Penalty Analysis of Bunk's DPM Claim Was Correct.**

**A.    The Eighth Amendment Compares the Statutory Penalty to Monetary Damage, Intangible Harm, and Culpability.**

Whether a penalty constitutes an excessive fine in violation of the Eighth Amendment is reviewed by this Court *de novo*. *United States v. Bajakajian*, 524 U.S. 321, 336 n.10 (1998). However, factual findings of the district court – including that Gosselin did not overcharge the government for the 2001 DPM contract – must be accepted unless clearly erroneous. *Id*. So long as the district court's findings are "plausible in light of the record viewed in its entirety, the court

of appeals may not reverse." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). Here, the district court engaged in a careful, thorough and fair review of the evidence, most of which was uncontested. Its factual findings regarding the lack of any financial harm attributable to Gosselin's conduct and mitigation of Gosselin's culpability were accurate and compelling.

The FCA's civil penalty provision has a deterrent purpose and is "essentially punitive in nature." *Vermont Agency*, 529 U.S. at 784; *see also Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003). As Appellants agree, civil penalties therefore must be analyzed under the Excessive Fines Clause of the Eighth Amendment. SA60, 72 (citing *Browning-Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 264 (1989) and *Bajakajian*, 524 U.S. at 328); *see also United States v. Mackby*, 261 F.3d 821, 830 (9th Cir. 2001); *United States ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 46 F. Supp. 2d 546, 565 (E.D. La. 1999), *judgment vacated on other grounds*, 244 F.3d 486 (5th Cir. 2001).

A fine is unconstitutionally excessive if "the payment is grossly disproportionate to the gravity of the defendant's offense." *Mackby*, 261 F.3d at 829; *see also Bajakajian*, 524 U.S. at 335. To evaluate the gravity of the offense, courts must consider: (1) the *actual damages* resulting from the defendant's conduct, and (2) the *egregiousness* of the defendant's conduct. *See, e.g.*, *Solem v. Helm*, 463 U.S. 277, 292 (1983); *United States v. Eghbal*, 548 F.3d 1281, 1285

(9th Cir. 2008). This analysis requires the court to compare the civil penalties to tangible and intangible harm to the government, and to consider aggravating and mitigating factors regarding the level of the defendant's culpability. *See, e.g.*, *United States ex rel. Smith v. Gilbert Realty*, 840 F. Supp. 71, 74-75 (E.D. Mich. 1993); *United States v. Advance Tool Co.*, 902 F. Supp. 1011, 1018 (W.D. Mo. 1995).

Courts have been reluctant to set a fixed threshold for a constitutionally excessive ratio between punitive awards and actual damages. The Supreme Court has, however, observed that awards exceeding even a 4:1 ratio "might be close to the line of constitutional impropriety." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 424-25 (2003). The Supreme Court also noted that greater ratios might be appropriate where "a particularly egregious act has resulted in only a small amount of economic damage," thus recognizing that the egregiousness of the defendant's conduct is a key consideration in the Eighth Amendment analysis, particularly where actual monetary damage is low. *Id.*

## B. The District Court's Eighth Amendment Analysis of Mitigation Was Correct.

Bunk contends that the court's consideration of mitigation evidence amounted to "wrongly minimiz[ing] the culpability of the false claims." Rel. Br. at 39. In particular, he asserts that "[i]n effect, the District Court held that the Government should not have required a Certificate of Independent Pricing [sic] in

32

the first place," *id.*, and that the court "excused any violation" of the FCA because it "judged that the prohibition on collusion did not make economic sense for the 2001 DPM Solicitation." *Id.* at 40. Bunk's spin is inconsistent with the court's well-reasoned analysis and holding.

In fact, the court followed this Court's decision in *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999) (interpreting the Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943)), and deemed all 9,136 invoices Gosselin submitted under the DPM contract "false claims." JA1589, 1592-93, 1602. And, the court held "there is no doubt that the kind of price-fixing conspiracy that the jury found existed in this case is fundamentally inimical to the integrity of the procurement process and the public interest." JA1600. As required, however, the court also considered mitigating evidence and explained that, "without minimizing Defendants' conduct, there exist a number of facts and considerations that bear on the extent to which Defendants' conduct compromised the integrity of the contracting process that resulted in the 2001 DPM contract." *Id.* Based on the totality of these facts and circumstances, summarized below, the court held that the statutory minimum penalty of $50,248,000 was grossly disproportional to the harm Gosselin's conduct caused – *a determination that neither Bunk nor the Government contested below or challenge on appeal.*

33

### 1. Gosselin's Profit on the 2001 DPM Contract was Minimal.

Gosselin "realized an overall profit of 4.4355% [$411,626] on the 2001 DPM contract over three years[.]" JA1605; *see also* JA1401, 2587-91. That margin can hardly be characterized as "egregious," and instead proves that Gosselin was not overcharging the Army for its services. Had Gosselin profited substantially from the 2001 DPM contract, Appellants no doubt would assert that large gain demonstrates the anticompetitive effect of the agreement and, therefore, its egregiousness. The converse is also true. The court properly recognized that "[t]here is nothing about this level of gain that would justify the minimum mandated civil penalty of over $50 million." JA1605.

### 2. Gosselin's Scienter Was Minimal.

#### a. Gosselin Did Not Have Scienter for Each Submitted Invoice.

The district court correctly found that Gosselin's scienter, and thus its FCA liability on the 2001 DPM contract, "was based on the one-time filing of a single CIPD." JA1602, 1613. None of the 9,136 invoices Gosselin submitted under the contract "contained or referenced the false CIPD," and none "contained any factually false information. Rather, they are deemed false as a matter of law based on judicial constructions of the FCA." JA1602. Indeed, Gosselin had no control over the number of individual moves the Army asked it to perform. Though Bunk repeatedly asserted below (and does so again on appeal) that the number of

34

submitted invoices demonstrates Gosselin's conduct was egregious, the court

appropriately disagreed:

> [T]he number of invoices, in and of themselves, is not reflective of Defendants' level of culpability, particularly since the number of invoices that Defendants ultimately filed was determined by the number of jobs the government assigned to Gosselin over the life of the contract; and how Gosselin decided to bill those jobs.  In other words, Defendants' false CIPD did not necessarily cause or correspond to any particular number of invoices that Gosselin would ultimately file; and there could have been substantially more or fewer invoices than actually filed without any real difference in Defendants' overall level of culpability.

*Id.* at 1602-03; *accord Gilbert Realty*, 840 F. Supp. at 75 (landlord could not be

expected to consider terms of false certifications to housing authority in rental

agreement each time he cashed a rental check); *cf. United States v. Williams*, No.

02C4990, 2003 WL 21384640, at *6 (N.D. Ill. June 12, 2003) (finding continuous

scienter that "cannot be characterized as an isolated lapse in judgment"); *Korangy*

*v. U.S. Food & Drug Admin.*, 498 F.3d 272, 278 (4th Cir. 2007) (finding "very

grave" conduct where defendant's knowing use of faulty medical equipment

jeopardized a patient's life every time it was used).

### b. The 2001 DPM Contract Involved a Unique Bidding Process.

The district court properly recognized that Gosselin's "level of culpability

must be assessed within the overall context of the solicitation" for the 2001 DPM

contract.  JA1601.  The new performance requirements "encouraged, if not

required, discussions with potential subcontractors." *Id.*; *see also* JA2512. While this "did not suggest or justify collusive subcontract pricing, it did require a certain amount of communication and collaboration among otherwise competing companies." JA1601.

Similarly, the court properly considered the "substantial transparency" in Gosselin's bid (*e.g.*, listing expected subcontractors and their capacities in various geographic regions) and the "government's own substantial knowledge and experience in contracting for the services" at issue. *Id.*

### 3. The Army Renewed the DPM Contract with Gosselin Twice Despite Actual Knowledge of Bunk's Fraud Allegations.

Bunk asserts that the district court wrongly "excused Gosselin's false claims because the Relators alleged the cartel to the Government." Rel. Br. at 43. Bunk allows that the Government's prior knowledge of the cartel and exercise of options might have significance if Gosselin reported the collusion itself (*id.* at 44), but he asserts a defendant cannot rely on government knowledge of alleged fraud "to absolve it." *Id.* at 45. Bunk's assertions misconstrue the court's findings and Gosselin's arguments.

The district court held that the government's knowledge was insufficient to relieve Gosselin of *liability*. JA1602. However, the court also correctly noted that "the extent of the government's knowledge and its conduct in light of what it knew remain relevant considerations to the Court in considering an appropriate penalty."

36

JA554 n.14; *see also* JA1602; *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008); *Harrison*, 176 F.3d at 788; *United States v. Hibbs*, 568 F.2d 347, 351 (3d Cir. 1977); John T. Boese, *Civil False Claims and Qui Tam Actions*, § 3.01[C] at 3-32.5 (3d ed. Supp. 2012). Indeed, the Army's considered decisions to exercise both contract options with Gosselin despite knowing and investigating Bunk's allegations, combined with DOJ's decision not to intervene in Bunk's DPM claim or bring criminal charges against Gosselin for its DPM conduct, beg the question whether the Government believed Gosselin did anything fraudulent or harmed the integrity of its DPM procurement process.[5]

### 4. Gosselin's Pricing and Performance Benefited the Government.

The undisputed evidence showed that Gosselin's services under the 2001 DPM contract were commendable, and the Army renewed the contract based on new, positive evaluations of Gosselin's pricing and performance. JA1600. The Army also received significant additional benefits by awarding Gosselin the 2001 DPM contract, and from Gosselin generally. JA2496, 2514-21.

---

[5] Gosselin also presented undisputed evidence that it specifically litigated from December 2005 - December 2010 the Army's non-payment on item 1AA of the 2001 DPM contract, a dispute Gosselin ultimately won, and the Army never accused Gosselin of any wrongdoing on the contract or that line item during that litigation. SA3-4, 10-16, 40 n.9.

These benefits included, for example, Gosselin's unique quality incentive program to financially motivate subcontractors, at Gosselin's expense, to perform quality work. *See, e.g.*, JA1979-80. The Army recognized this program as a significant benefit not offered by other companies. *See* JA2514-17.

Additionally, although not required by any contract, Gosselin developed and paid for a tracking system for customers to determine where their belongings were throughout the move process, a benefit no other company offered. JA2518-19. This reduced the administrative burden and cost of "constant" calls the Army received from customers trying to locate their shipments. JA2520.

Gosselin also handled deployment shipments not required by any contract on very short notice and often on weekends, whereas other companies would not. JA2495-99, 2520-21.

Further, Gosselin regularly rescued stranded shipments when other companies, including Bunk's, held service members' belongings hostage or went bankrupt. *See, e.g.*, JA1874-78, 1999-2001. And, finally, when Gosselin pointed out that it had mistakenly underbid one line item to its detriment and asked for modest equitable relief, the Army rejected that request, saving €40,000. JA1389-91, 1399-1400.

38

5. **Bunk's Abusive Practices Put Gosselin's Conduct in Perspective and Explain a Fatal Flaw in His Damages Calculation.**

Gosselin's low scienter also starkly contrasted with Bunk's wrongful intent on the DPM contracts. Certainly, the uncontested fact that Bunk cheated the government on Birkart's 1999 DPM contracts does not absolve Gosselin of its own FCA liability. But the Army's restructuring of the DPM solicitation process and contract requirements in direct response to Bunk's "abusive pricing and billing" is important to the civil penalty analysis here. JA1598. First, one key reason Bunk's money damages analysis is unreliable is its dependence on Bunk's abusive 1999 pricing. *See* pages 46-47, *infra*. Second, Bunk's DPM conduct puts Gosselin's culpability in perspective. Bunk overcharged the Army on the 1999 DPM contracts, then worked for 10 months under the 2001 DPM contract and demanded more money while supposedly believing the contract was fraudulently obtained. *See* JA1854, 1864-67, 1914-15. In stark contrast, Gosselin improved shipment quality, handled short-notice shipments when other companies would not, and developed ways to improve services and reduce the Army's administrative burden and expense at no additional cost to the Army or its soldiers.

### C. The District Court Properly Considered Evidence Regarding Tangible and Intangible Harm.

#### 1. Bunk Had the Burden to Prove the Government Sustained Monetary Damages Due to Gosselin's Conduct.

Bunk contends that the district court wrongly put the burden of proving "harm" on the plaintiffs (Rel. Br. at 25), when it is the defendants who have the burden of proof in an Excessive Fines analysis. Bunk conflates the Excessive Fines burden with his own threshold burden to prove monetary damage in the first instance.

It is axiomatic that the plaintiff has the burden to prove monetary damages:

> We decline to shift the burden of proof on damages as Harrison proposes. The FCA specifically places the burden of proving damages on the government. 31 U.S.C. § 3731(c). Because Harrison, as the *qui tam* relator, stands in the place of the government, he must assume the government's burden of proof as to damages in an FCA case.

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 923 (4th Cir. 2003).

Bunk does not contest that proving damages was his burden at trial. Choosing not to do so did not shift that burden to the defendants. Entering the penalty phase of this case, no monetary damages had been proven. Gosselin, having raised an Excessive Fines argument, then had to demonstrate that the minimum statutory penalty of over $50 million would be grossly disproportionate

40

to the tangible ($0) and intangible (general) harm caused by its conduct and Gosselin's low culpability.

Gosselin met its obligation, and even proved through "strong evidence" – although it was not obligated to do so – a lack of <u>any</u> monetary damages. JA1599. Based on multiple rounds of briefing and an evidentiary hearing, the district court found Gosselin's pricing under the 2001 DPM contract "was substantially the same as, and perhaps less than, its pricing for comparable services to the United States during 1999 and 2000." JA1597. And, the court found that any potential increase from the 1999 to the 2001 DPM contract was more than accounted for by factors such as increases in fuel and labor costs, increased reprocurement cost, and other factors in the 2001 contract, and could not reliably be attributed to Gosselin's conduct. *Id.* Even if the court's placement of the burden were erroneous, any error clearly was harmless.

### 2.    A *Per Se* Analysis Under Antitrust Law Does Not Obviate a Plaintiff's Burden to Prove Monetary Damages.

Implicitly recognizing his own failure to prove any monetary damage, Bunk next argues on appeal that bid-rigging and price-fixing are *per se* unlawful and therefore *per se* harmful. Rel. Br. at 31-33. But even in antitrust cases – which this FCA case is not – the plaintiff still must prove the amount of damages even where the restraint is declared *per se* unreasonable. *See, e.g.*, *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341-42 (1990) (rejecting plaintiff's argument

41

that antitrust injury and damages need not be shown for a *per se* violation); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 649 (1980) (*per se* unlawful conduct "may turn out to be harmless in a particular set of circumstances"). The cases Bunk cites do not contravene this principle, as they all address proof needed to establish the unreasonableness of a restraint, not damages. *See TFWS, Inc. v. Schaefer*, 242 F.3d 198 (4th Cir. 2001) (plaintiff sought injunctive relief only and did not have to prove actual damages); *United States v. Gravely*, 840 F.2d 1156 (4th Cir. 1988) (in criminal antitrust case, government need not prove unreasonableness of price-fixing, a *per se* violation of the Sherman Act); *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 317-19 (4th Cir. 1982) (same).

Likewise, Bunk cannot escape his burden by relying on a relaxed standard of proof applicable in some antitrust cases. Rel. Br. at 26. To begin with, even in those cases, the plaintiff's burden is not eliminated entirely, *and the burden certainly does not shift to the defendant*. *Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc.*, 891 F.2d 1127, 1143 (4th Cir. 1989) ("An antitrust plaintiff, of course, like any other plaintiff, has the burden of proving damages."), *rev'd on other grounds*, 499 U.S. 365 (1991). Moreover, in those antitrust cases the burden as to the amount of injury is relaxed only *after* the fact of injury has been proven, and the damage calculation still must be "a just and reasonable estimate of the damage based on relevant data" and may not be based

42

on "speculation or guesswork." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946); *see also Barber & Ross Co. v. Lifetime Doors, Inc.*, 810 F.2d 1276, 1281-82 (4th Cir. 1987).

### 3. Bunk Failed to Prove the Government Sustained Any Monetary Damage From Gosselin's Conduct.

Post-trial, "[r]ecognizing that a penalty [of over $50 million] might raise Eighth Amendment concerns" (Gov. Br. at 32), Bunk "requested" a lower penalty and attempted to prove monetary damages to create a purportedly acceptable penalty-to-harm ratio under the Eighth Amendment. Inexplicably, however, Bunk's post-trial "damages" analysis was based entirely on *information he asserted pre-trial was insufficient to prove damages*. Bunk had no expert, and he refused without explanation to rely on the actual DPM pricing and shipment data – that *he* produced pretrial in discovery – which obviously would form the basis for any expert analysis of an overcharge. Instead, Bunk submitted the Riedl declaration, itself based on overly simplistic and unreliable methodology and on assumptions Gosselin proved were false.

### a. Bunk's Methods for Calculating a Price Increase Were Flawed.

Bunk first asserted a monetary damage figure in his post-trial brief filed September 12, 2011. Per Riedl's declaration, Bunk claimed that monetary damages from the 2001 DPM contract were **$2.455 million**. SA55. Bunk argued,

43

however, that the court should "double" that amount for "interest" and compare the civil penalty to **$5 million**. *Id*.

Then, during a post-trial motions hearing, Bunk's counsel conceded his damages calculation was too high because he used the wrong Euro-to-dollar exchange rate. SA91-92.

In his next filing, the night before the evidentiary hearing, Bunk increased his claimed actual damages estimate to **$3 million** with no explanation. JA1368, 1371-72. He also contended the court should "double" that amount as "remedial damages" to **$6 million**. JA1372.

In his supplemental brief filed November 14, 2011, Bunk alleged the Army's actual damages were either **$1.87 million** (JA1458, 1459 n.1) or **$1.67 million** (JA1459, 1459 n.2), which he then **rounded up** to **$2 million** without explanation. JA1459; *see also* JA1595 n.10. Later in that same filing, Bunk claimed the direct financial loss to the government on the DPM contract was **$3 million** (JA1474), but urged the court to consider the government's damages as **$6 million**, which he claimed was a "conservative estimate" at "twice that loss." *Id*.

Gosselin separately evaluated each of Bunk's vacillating money damages analyses. Using the *actual data* from the 1999 and 2001 DPM contracts that Bunk produced pre-trial, Gosselin conclusively proved that the core assumptions Riedl

44

used to calculate damages were wrong. These false assumptions artificially inflated any asserted increase between 1999 and 2001 prices.

Determining the cost for a move or for service on a particular shipment requires multiplying the price per hundred pounds for the service by the actual weight of the shipment. Riedl purported to calculate the prices for an average packing job for a 10,000 pound shipment under the 1999 DPM contracts and compare them to the price for the same packing job under the 2001 DPM contract, presumably to demonstrate a price increase. To do this, he first averaged the prices for line item 1A (packing services) in the six 1999 DPM contracts and compared that average to line item 1AA (packing services) in the 2001 DPM contract. Riedl then multiplied the 1999 average and the 2001 line item price by his assumed 10,000 pound average shipment. Next, he purported to add the cost of overflow and oversize containers (JA1298-99), and assumed "[a]pproximately 10% of [each] shipment requires one overflow and one or more oversize container(s)." JA1298.

Riedl's analysis was flawed for multiple reasons. First, using the *actual* pricing and shipment data, Gosselin demonstrated that the *actual* average weight of a shipment was below half of Riedl's assumed 10,000 pounds. JA1363, 2619, 2622-23, 2630-31. (Bunk eventually conceded the average "was actually only 4,431 pounds," yet he inexplicably rounded to 5,000 pounds for his calculations. JA1461.) Second, Riedl's assertion that 10% of every shipment requires an

45

overflow and one or more oversize containers was false.  Overflow and oversize containers were not used on most shipments, the exception being Bunk's abusive overuse of these containers under Birkart's 1999 DPM contracts.  JA2624-25.

This disparity illustrates another key flaw in Riedl's analysis – his averaging the prices for line item 1A in the six 1999 contracts.  JA1359-65.  Bunk priced line item 1A in Birkart's two contracts at a mere 1 Deutsche Mark ("DM") and 10 DM (JA1420, 1411), while the other four contracts priced item 1A at 72, 40, 35.75 and 35.70 DM.  JA1406, 1436, 1445, 1429.  But Bunk significantly overcharged the Army for non-standard boxes and used them in *almost every* Birkart shipment.[6] The unrealistically low 1A prices won Birkart two contracts, but Bunk's exorbitant charges for and overuse of non-standard containers allowed him to make up the difference and overcharge the Army.  The pricing on item 1A clearly was interdependent with other line items; averaging the six 1A prices in isolation was therefore meaningless and misleading.  JA2606-07, 1360-62.  And, averaging a small number of observations (six) with a very large range (from Birkart's 1 DM to

_____

[6] Bunk's prices for overflow and oversize boxes (line items 3A(1)a and 3A(1)b) were 70 and 700 DM on one 1999 Birkart DPM contract and 425 and 625 DM on the other.  JA1411, 1420.  Goselin charged 85 DM for overflow and oversize containers in one of its 1999 DPM contracts and 20 DM in the other. JA1406, 1436.  Neither Viktoria nor Schock Weilerbach charged the Army for these containers.  JA1445, 1429.

46

Gosselin's 72 DM) cannot in any event serve as a proxy of the claimed "but-for" price. JA1360-61.

Moreover, in the 1999 contracts, the costs for packing, special containers and other items was disbursed over several line items. In the 2001 contract, those costs were included in line item 1AA, which was priced by the weight of the shipment no matter the type of box used to ship the goods. Gosselin demonstrated that Riedl's approach of comparing the broader 2001 line item 1AA with only one 1999 line item (1A) led to an entirely unreliable but-for proxy, a fourth fatal flaw in his analysis.

Faced with uncontestable proof that Riedl's assumptions and methods were flawed, Bunk gradually adjusted his calculations. Not surprisingly, Bunk's alleged actual money damages figure decreased. Still, with no explanation, Bunk continued relying on assumptions instead of actual data, rounded his calculations up for no reason, and compounded the problem by multiplying those rounded-up numbers by various amounts for interest and other supposedly remedial reasons.[7]

---

[7] Remarkably, on appeal, Bunk reverts to Riedl's *original* analysis, complete with its demonstrably false assumptions and flawed methodology. Rel. Br. at 33-34. Bunk's assertion that Gosselin's analysis was "flawed" (Rel. Br. at 35-36) is of no moment. Gosselin simply employed Riedl's methodology, correcting erroneous assumptions and using actual shipment data, to demonstrate its unreliability.

### b.    Any Price Increase Was Not an Impermissible Overcharge.

The Excessive Fine analysis requires comparing the harm the Army sustained *as a result of Defendants' conduct* (including actual monetary damages) to the magnitude of the minimum statutorily mandated civil penalty.  Even if Bunk had reliably proven a price increase from the 1999 DPM contracts to the 2001 DPM contract, he failed to demonstrate that the increase was improper, or that it was attributable in whole or in part to Gosselin's conduct.

Gosselin presented evidence of multiple external and internal factors that naturally would have led to an increase in prices between the 1999 and 2001 DPM contracts.    External factors included fuel, labor and other cost increases and general inflation.  JA1361, 2586.  Internal factors included at least five material differences between the 1999 and 2001 contracts that directly impacted pricing.  Specifically, the 2001 contract required the awardee to:  (1) pay the cost difference if it failed to fulfill its commitments and the Army had to procure services elsewhere at a higher cost (JA2584-85); (2) mobilize high daily capacity across a significantly broader geographic scope on short notice (JA2585-86); (3) fulfill additional requirements for packing (line item 1AA) including conducting a pre-move survey, disassembling furniture, tracking which shipments moved in Government containers, and caulking shipping containers (JA2583); (4) install

48

multiple new levels of local area management (JA1362); and (5) perform for the same price for three years if the Army exercised its renewal options (JA2603-04).

Bunk never accounted for or challenged *any* of the above facts in his claimed "overcharge" calculations.

### c.    Bunk Failed to Prove that Gosselin's Conduct Caused Any Price Increase in the 2001 DPM Contract.

Bunk presented no evidence of what any bidder, including Gosselin, would have charged for 1AA packing services under the 2001 DPM contract absent the subcontracting agreement.  JA2469-70.  Thus, there was no proof adduced of the actual but-for price.  The only direct statement Bunk makes on appeal to support his argument that Gosselin's conduct *caused* any supposed price increase is that "prices increased under the 2001 DPM Contract, which is a compelling indication of some minimum harm."  Rel. Br. at 38.  Even if this Court credits Bunk's conclusory and unproven statement, Bunk still cannot articulate how Gosselin's conduct *caused* that unquantified harm.  As the district court explained:

> [T]here was no evidence that any bidder on the 2001 DPM contract would have offered or the government would have accepted a lower overall bid or even a lower price for line item 1AA.…  In short, there was no evidence that the United States could have or would have obtained item 1AA services under the 2001 DPM contract for a lower cost, absent the subcontract pricing conspiracy.

JA1596 (*citing* JA2469-70 where plaintiffs conceded they had no evidence that absent the conspiracy, anyone would have bid a lower amount for item 1AA

49

services under the 2001 contract).[8] Yet, "this is precisely the type of evidence needed to establish and calculate damages under the FCA: the amount the government paid over and above what the government would have paid if not for the fraudulent activity." *Id.* (citing *Hess*, 317 U.S. at 551-52). There simply was no proof in this case of an actual "overcharge" attributable to Gosselin's conduct.

### 4. The Excessive Fine Analysis Compares the Penalty to Actual, Single Monetary Damages.

Bunk contends that $1 million in prejudgment interest should be added to his unreliable damages figure "in evaluating the degree of harm." Rel. Br. at 36. The district court rejected this argument below, and this Court should do the same.

At the outset, any analysis of prejudgment interest in this case would be moot, as proven damages are $0 and any interest would also be $0. And, even if some amount of damages were proven, prejudgment interest would be very modest here, as it is assessed from the date the plaintiff makes the defendant aware of the amount of damages he seeks. *See Cox v. Shalala*, 112 F.3d 151, 155-56 (4th Cir. 1997). Here, no damages calculation was presented until after trial, and Bunk did

---

[8] The district court also noted that Bunk failed to account for one rejected bid on the 2001 DPM contract submitted by a company not a party to the subcontracting agreement. JA1596. Bunk asserts this factual finding was incorrect. Rel. Br. at 38. Regardless, this fact clearly did not impact the court's finding that there was no evidence the Army could or would have obtained 1AA services absent the conspiracy and therefore could not constitute reversible error.

not assert his present calculation until his November 14, 2011 supplemental brief. JA1459 nn.1, 2.

In any event, it is the FCA's treble damages provision, not its civil penalty provision, that accounts for prejudgment interest. *See, e.g.*, *Cook Cnty*, 538 U.S. at 131; *United States ex rel. Miller v. Harbert Int'l Constr., Inc.*, No. 95-1231, 2007 WL 851868, at *2 (D.D.C. Mar. 14, 2007); *see also* SA63 (Bunk post-trial brief citing *Mackby, United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719, 744 (N.D. Ill. 2007), and *United States ex rel. Bigham v. Rommel*, No. 03-CV-4048, 2006 WL 3253338 (S.D. Ill. 2006), and noting that each case analyzed whether a penalty was excessive compared to actual, single damages). Interest is not an appropriate consideration in an Excessive Fines analysis, which compares the statutory penalty to the *actual, single damages* the defendant's conduct caused, as actual damage is viewed as an indicator of the defendant's culpability. *See, e.g.*, *Bajakajian*, 524 U.S. at 332; *Gilbert Realty*, 840 F. Supp. at 74-75; Boese, *Civil False Claims and Qui Tam Actions*, *supra* at 3-62 ("Because treble damages are seen as adequate to make [the] government whole, most courts that have addressed the issue have held that no prejudgment interest is allowable as part of the single-damage calculation."). Nor is prejudgment interest, itself determined by how quickly the litigation comes to an end, a reliable barometer of the egregiousness of the defendant's underlying conduct.

51

Moreover, prejudgment interest clearly should not be considered where, as here, the plaintiffs would not be entitled to recover it in the first instance. Entitlement to prejudgment interest turns on the defendant's financial condition, the time it took to bring the litigation to an end, and the defendant's apparent good faith. *See, e.g.*, *Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 503 (1993); *BMY-Combat Sys. Div. of Harsco Corp. v. United States*, 44 Fed. Cl. 141, 152-53 (1998). Bunk repeatedly argued below that Gosselin's financial condition was irrelevant to an excessive fine analysis and that Gosselin should be precluded from introducing evidence regarding inability to pay. *See, e.g.*, JA1373-75. And, neither Relators nor the Government have ever contended that Gosselin acted in bad faith to delay the litigation.[9]

Bunk argues that he is not seeking to *collect* prejudgment interest, so Gosselin's argument that Bunk is not entitled to it "misses the point." Rel. Br. at 36. But it is Bunk who does not understand. If prejudgment interest could not be

---

[9] Relators filed their *qui tam* complaints in 2002, but the Government did not file its intervention complaint until 2008. Throughout the pre-trial litigation Gosselin – not Relators or the Government – repeatedly requested a trial date. *Cf. United States ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810, 821 (W.D. La. 2007) (government's 18-month delay precluded award of prejudgment interest); *Brittingham v. Jenkins*, 914 F.2d 447, 457 (4th Cir. 1990) (overturning prejudgment interest award because plaintiff was responsible for the unreasonable delay).

collected, then it certainly should not be used to multiply the alleged monetary harm attributable to a defendant's conduct.

### 5. Intangible Harm to the Integrity of the Government's Contracting Process Is Insufficient to Justify the Statutory Minimum Penalty in this Case.

Appellants assert Gosselin's conduct harmed the integrity of the DPM program. Gov. Br. at 40-41; Rel. Br. at 29. But generalized intangible harm, present in every FCA case, suggests nothing about the relative gravity of Gosselin's conduct compared to any other defendant's. Indeed, if every fraud on the Government causes intangible harm, then that intangible harm adds no more to an Excessive Fines analysis than the fact of liability itself. Here, however, any harm Gosselin caused to the DPM contracting process was essentially *de minimis* in light of substantial and uncontested mitigation, including the Army's affirmative analysis of Gosselin's pricing and performance before renewing the 2001 DPM contract twice. JA1600-03; 2512 (Stephen Marshall testified "I don't see how there could have been a prohibition [on bidders having subcontracting agreements] because it would have to coordinate with the other agents to know their capacity to provide it to [the Army] to be a valid bidder."); *see also Advance Tool*, 902 F. Supp. at 1018 (lower penalty due in part to "confusing regulatory and contractual purchasing agreements"). And, in any event, Bunk introduced no evidence of any specific consequences of intangible harm.

53

### 6.    There Is No Evidence Gosselin "Intentionally Concealed" the Subcontracting Agreement.

Bunk accuses Gosselin of an "intentional" and "deliberate concealment by an experienced Government contractor."  Rel. Br. at 42; *see also id*. at 2, 25, 41-43. Beyond the filing of the CIPD itself, however, there is no evidence Defendants took any steps to conceal anything or that Gosselin was ever asked questions about DPM pricing that it did not answer truthfully, including in the written and oral bid submission process.  That Gosselin did not explicitly volunteer to the Army its subcontracting agreement does not amount to "concealment" or make the underlying conduct "egregious."  *See, e.g.*, *Grunewald v. United States*, 353 U.S. 391, 402 (1957) (even affirmative steps to conceal a conspiracy do not support an implied subsidiary conspiracy to conceal, as "every conspiracy is by its very nature secret.").    And, Bunk's assertion that submitting invoices amounted to "concealment" (Rel. Br. at 21) is completely illogical, as the invoices contained no false information and did not (and were not expected to) reference the CIPD. Moreover, it is disingenuous for Bunk to portray the Army as unaware of the subcontracting agreement after he reported his allegations in early 2002.

Bunk's reliance on *United States v. Ahmad* to demonstrate Gosselin's "intentional concealment" is unavailing.  In *Ahmad*, this Court found a criminal forfeiture was not excessive because the defendant "repeatedly structured transactions" to evade the law as part of a "complicated larger scheme related to

54

customs fraud violations." *United States v. Ahmad*, 213 F.3d 805, 816-17 (4th Cir. 2000). *Unlike Gosselin's conduct*, Ahmad's conduct was "not a single, isolated untruth affecting only the government, but rather a series of sophisticated commercial transactions over a period of years that were related to a customs fraud scheme" and "affected a financial institution's ability to comply with the law and jeopardized the funds of other persons." *Id*. at 817. Gosselin took no affirmative FCA-violative action after filing one CIPD, and there is no evidence its conduct was part of any larger scheme.

### 7.    The DPM Subcontracting Agreement Was Not "Related to" Other Wrongful Conduct.

Appellants incorrectly assert that the district court should have found Gosselin was a "repeat offender" to justify a higher civil penalty. Gov. Br. at 45-46; Rel. Br. at 46-48.

The assertion that Gosselin is a "repeat offender" due to its Covan-channel conduct and the landed rate agreement is meritless. Gov. Br. at 45. The jury and the court absolved Gosselin of any liability for these courses of conduct; clearly, they should not be considered "offenses" that would justify an increased civil penalty.

The district court also properly declined to consider decisions by the German Cartel Authority and the European Commission as evidence Gosselin is a "repeat offender." The underlying judicial findings of fact in those decisions are

inadmissible hearsay which the court correctly excluded and therefore they were not in evidence.  JA910; SA76-77; *see also* Fed. R. Evid. 801(c), 802; *Nipper v. Snipes*, 7 F.3d 415, 417-18 (4th Cir. 1993) (no hearsay exception for judicial findings of fact from another proceeding).  It would be particularly absurd for the court to consider the German case as demonstrating Gosselin is a "repeat offender," as that case involved the very same DPM conduct at issue here (Rel. Br. at 4-5) and by definition is not a "repeat" offense.

Nor should Gosselin be deemed a "repeat offender" for purposes of evaluating the egregiousness of its DPM conduct based on Gosselin's <u>later</u> Cartwright-channel conduct.  Whether Gosselin was a "repeat offender" here should be judged from the time of its FCA-violative DPM conduct in February 2001.  *See* Arthur W. Campbell, *Law of Sentencing* § 7.5 (2012) ("As a matter of logic, before a prior conviction can trigger repeat offender status, the prior must precede the commission of the principal offense."); *United States v. Williams*, 29 F.3d 172, 174 (4th Cir. 1994) (two burglary convictions that post-dated the present offense could not form basis of career offender sentencing enhancement).  The Cartwright conduct (and later conviction) did not occur until *after* the DPM conduct, and thus cannot be the basis for characterizing Gosselin as a repeat offender when determining penalties for the earlier DPM conduct.  Appellants, themselves, even argued below that the $6 million fine for the Cartwright conduct

was irrelevant to determining the penalty for the DPM conduct.  SA89; *see also* JA1604 n.13, 2599.

Contrary to Bunk's contention, the Government's decision not to intervene in the DPM claim below was not the "sole reason" the court found the Cartwright conduct irrelevant.  Rel. Br. at 47-48.  To be sure, the Government's decision not to intervene in the DPM claim undercuts Relators' assertion that the DPM and Cartwright conduct were part of a single conspiracy.  However, the court also considered DOJ's decision not to bring criminal charges for the DPM conduct despite its investigation, and the Government's renewal of the DPM contract twice despite investigating and pursuing criminal charges on the Cartwright channels. JA1603.

> ### D.  FCA Damages Are Measured by the Amount the Government Overpaid Due to the Fraud.

As Bunk recognized by attempting to prove the government was "overcharged," the appropriate measure of damages here is the amount – if any – that the Army paid over what it would have paid absent the fraud.  *See, e.g.*, *Harrison*, 352 F.3d at 922 (citing *United States v. Ekelman & Assocs.*, 532 F.2d 545, 550 (6th Cir. 1976)).  Because Bunk cannot demonstrate an overcharge, he next tries to equate the "baseline measure of harm" to the "volume of commerce affected" by the DPM contract, approximately €8 million.  Rel. Br. at 57-58.  This measurement of harm is inappropriate.

"[U]nder the False Claims Act, damages should be determined according to the actual loss suffered by the United States as a result of false claims and not according to the total cost of a contract that may have included fraudulent claims." *United States ex rel. Giles v. Pratt*, 32 F. App'x 432, 433 (9th Cir. 2002) (citing *United States v. Bornstein*, 423 U.S. 303, 317 n.13 (1976)). The antitrust cases Bunk relies on are inapposite because, unlike the FCA, the advisory Antitrust Sentencing Guidelines specifically provide for sentence enhancements (in cases where the anticompetitive effect of the conduct has been proved beyond a reasonable doubt) based on the total "volume of commerce…affected" by the anticompetitive conduct. U.S.S.G. § 2R1.1(b)(2) (2010). This was not an antitrust case. To be sure, an antitrust suit would have been unsuccessful here, as proof of damage is necessary for antitrust liability. *See supra* at 41-43.

Moreover, even Bunk's criminal antitrust cases hold that the volume of "commerce affected" does not include sales that were completely unaffected by the anticompetitive conduct. *United States v. Giordano*, 261 F.3d 1134, 1146-47 (11th Cir. 2001); *United States v. Andreas*, 216 F.3d 645, 678 (7th Cir. 2000); *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 91 (2d Cir. 1999).

Finally, Bunk's argument that it would be "an anomaly to declare price-fixing illegal *per se*, without regard to its success…but to provide for a fine only if the price-fixing were successful" has no merit. Rel. Br. at 58 (quoting *United*

*States v. Hayter Oil Co.*, 51 F.3d 1265, 1274 (6th Cir. 1995)). That the FCA provides for liability and penalties without proof of damages – which Gosselin has never contested – obviously cannot trump the Eighth Amendment prohibition on excessive fines. The Eighth Amendment requires, *inter alia*, an assessment of the actual financial harm caused by the defendants' conduct. Having failed to establish any financial damages with reasonable certainty, Bunk should not now be permitted simply to deem the full contract value – itself more than four times the amount of his own best estimate of actual financial harm – "monetary damage" caused by Gosselin's conduct. *See, e.g.*, *United States ex rel. Stearns v. Lane*, No. 2:08-cv-175, 2010 WL 3702538 (D. Vt. Sept. 15, 2010) (harm in FCA Section 8 housing subsidy case was excess rent, not total rent received); *Coleman v. Hernandez*, 490 F. Supp. 2d 278, 282 (D. Conn. 2007) (same).[10]

### E. Appellants' Efforts to Salvage an Otherwise Unconstitutional Penalty by Lowering the "Requested" Penalty Amount Must Fail.

Recognizing that the statutory minimum civil penalty award of over $50 million would be unconstitutionally excessive in this case, Bunk informed the district court that he would instead seek "at least $25 million" (SA56), which he

---

[10] In one sentence with no legal support or factual analysis, Bunk asserts that the harm for the DPM claim could be compared to the fines for the ITGBL Cartwright channel conduct or Gosselin's unrelated conduct in Europe. Rel. Br. at 58. This illogical assertion should be summarily rejected, as fines for wholly unrelated conduct cannot possibly be a proxy for harm on the DPM contract.

then reduced to $24 million.  JA1366, 2469.  At the same time, Bunk (and the Government in "joint" briefs) consistently argued that the court had no discretion to award less than 9,136 civil penalties of at least $5,500 each.  On appeal, Bunk reasserts this position while *simultaneously taking the opposite position*, spun as "constitutional discretion," to now claim the court had authority to assess a civil penalty below the statutory minimum.

The Government takes a very different position on appeal.  Rather than contending the *court* has discretion to *impose* a lower penalty, the Government contends *it* had the "prosecutorial discretion" to *request* a lower penalty – and presumably, to make the court impose it.  Thus, despite not intervening in the DPM claim below, the Government now asserts that Bunk's "request" for a $24 million penalty was actually the Government's own exercise of "prosecutorial discretion." Gov. Br. at 46.  Appellants' arguments should be rejected.

### 1. Bunk Is Barred From Raising His "Constitutional Discretion" Argument.

Bunk consistently argued below that the court had *no* discretion under the FCA either to reduce the number of civil penalties to be awarded, or to award a per-penalty amount below the statutory minimum of $5,500.  SA49-50, 52-53, 58-59; JA1366-67, 1373, 1463-69, 1522-24, 1526; *see also* JA1610 n.15.  When Gosselin suggested the court could consider fashioning a penalty below the

statutory minimum because "the Constitution trumps the statute" (JA1506), Bunk vehemently disagreed.  JA1522-24, 1526**.**

Even when the court sought additional briefing regarding its legal authority to impose a constitutional penalty below the statutory minimum if it determined $5,500 on 9,136 invoices was an Excessive Fine (JA1454-55), Bunk and the Government "jointly" responded by arguing at length that "the Court *must* issue one civil penalty of at least $5,500 for each false claim submitted to the United States," because "the Court is *obligated* to follow the statutory scheme set forth by Congress."  JA1465, 1467 (emphasis added); *see also id*. at JA1464 ("The court has *no discretion* to reduce the number of civil penalties below the amount required under the statute.…[t]he legislative history of the [FCA] makes clear that civil penalties are '*automatic and mandatory* for each claim which is false.'") (emphasis added); JA1522 (in joint filing, Appellants reference "statutorily-mandated civil penalties of $50,248,000").  Appellants also contended that "[u]nder Fourth Circuit case law, the Court must issue one civil penalty of at least $5,500 for each false claim submitted to the United States."  JA1465.  Likewise, Appellants argued that the Supreme Court's decision in *Bornstein* supports "the imposition of one civil penalty per false claim" and that "[c]ourts may not adopt 'alternative statutory constructions' on the question of statutory penalties." JA1465-66.

Now, after a district court judgment *adopting* Bunk's argument that reducing the statutory minimum penalty to one within constitutional limits "would be inconsistent with both binding judicial constructions and the presumed intent of Congress" (*see* JA1610 & n.15), Bunk argues the opposite. Bunk now contends that the district court "confused the statutory bar against reduction of penalties with the Constitutional bar against excessive fines" (Rel. Br. at 49), and argues that the court was *obligated* to award a reduced penalty rather than decline to award any penalty at all. *See id*. at 49-51. Bunk is barred from taking this bait-and-switch approach on appeal.

### a.     Bunk Cannot Appeal From an Error He Invited.

The invited error doctrine is "a cardinal rule of appellate review." *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir. 1991). The doctrine "precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt." *United States v. DeBerry*, 430 F.3d 1294, 1302 (10th Cir. 2005); *see also Dist. 17, United Mine Workers of Am. v. A & M Trucking, Inc.*, 991 F.2d 108, 111 (4th Cir. 1993) (per curiam) (invited error doctrine allows courts to "prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside").

A party should not win reversal of a district court decision that was based on a position the party itself advanced.  As the Federal Circuit stated in condemning such an approach:

> Ordinarily, doctrines of estoppel, waiver, invited error, or the like would prohibit a party from asserting as "error" a position that it had advocated at the trial.…
>
> The impropriety of asserting a position which the trial court adopts and then complaining about it on appeal should be obvious on its face, and litigants hardly need warning not to engage in such conduct.

*Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 714-15 (Fed. Cir. 1998) (ultimately reviewing the alleged error because the panel could not find precedent in its own court publicly condemning appeals from invited error).

This Court has precluded appeals from invited error in a variety of circumstances.  *See, e.g.*, *United States v. Jackson*, 124 F.3d 607, 616-17 (4th Cir. 1997); *United States v. Neal*, 78 F.3d 901, 904 (4th Cir. 1996); *United States v. Herrera*, 23 F.3d 74, 76 (4th Cir. 1994).  As this Court stated in *AG Systems, Inc. v. United Decorative Plastics Corporation*, "We have never held in this court that an appeal may lie from an invited error."  55 F.3d 970, 972 (4th Cir. 1995).  The Court should reject Appellants' efforts to do so now.

### b.     Bunk Waived the Argument He Now Asserts on Appeal.

"Arguments raised for the first time on appeal are generally deemed waived[.]" *Altemus v. Med. College of Va. Hosp.*, 23 F. App'x 158, 159 (4th Cir. 2001) (per curiam).  The Fourth Circuit has applied this principle "repeatedly," with exceptions made "only in very limited circumstances, such as where refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice." *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993).  This Court has even suggested that, in the context of waiver, "plain error" should be limited to criminal cases, with "the doctrine applicable in civil cases…the more limited one of 'fundamental error'—an error so serious and flagrant that it goes to the very integrity of the trial." *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985) (quoting *Modave v. Long Island Jewish Med. Ctr.*, 501 F.2d 1065, 1072 (2d Cir. 1974) (Friendly, J.)).  Here, Appellants have not asserted, and the district court did not commit, a plain or fundamental error.

Finally, the doctrine of estoppel often applies alongside the doctrines of invited error and waiver and should preclude Appellants' argument.  "In certain circumstances a party may properly be precluded as a matter of law from adopting a legal position in conflict with one earlier taken in the same or related litigation.  'Judicial estoppel' is invoked in these circumstances to prevent the party from

playing 'fast and loose' with the courts, and to protect the essential integrity of the judicial process." *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982).

### 2. The Cases Bunk Relies on Do Not Support the "Constitutional Discretion" Argument He Now Advances on Appeal.

Bunk asserts that unconstitutionally excessive verdicts must be reduced to the maximum amount allowable under the Constitution. Rel. Br. at 50-51. None of the cases Bunk relies on support this proposition, and in any event all are inapposite because they do not involve constitutional reductions below a statutory minimum penalty. *See Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146 (9th Cir. 2002) (punitive damage award violated due process and was unconstitutionally excessive; no applicable statutory minimum); *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049-50 (8th Cir. 2002) (punitive damages reduced in 42 U.S.C. § 1981 employment discrimination claim; statute provided no minimum for punitive damages); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1332 (11th Cir. 1999) (punitive damages reduced in nuisance and trespass action; statute allowed punitive damages with no minimum for willful misconduct, and greater recovery if plaintiff proved specific intent to harm).

Bunk's reliance on *United States v. Sarbello* and its progeny is also misplaced. 985 F.2d 716 (3d Cir. 1993). *Sarbello* addressed the RICO criminal forfeiture statute, 18 U.S.C. § 1963. Although the statute seemed to require

forfeiture of all property described therein, the court recognized then Federal Rule of Criminal Procedure 31(e) – now Rule 32.2(b) – required the jury to determine the *extent* of criminal forfeitures, thus "suggesting the propriety of partial forfeitures under the statute." *Id*. at 722. Criminal Rule 35(b)(4) also gives courts express authority to reduce statutory minimum sentences in the criminal context. There are no provisions in the civil rules granting courts such discretion.

Finally, as the district court recognized, the fact that the FCA provides a statutory range of penalties reflects Congress's intent for courts to fashion a penalty within the given range *in light of the particular facts of a case*, not to punish all violations to the maximum statutory or constitutional extent. JA1616.

### 3. The Government's "Prosecutorial Discretion" Argument Fails.

Unlike Bunk, the Government does not argue on appeal that the *court* had discretion to impose a penalty below the statutory minimum. Instead, the Government relies entirely on "prosecutorial discretion," claiming Bunk acted in "close consultation" with the Government and therefore he had the discretion to seek *and to have the court impose* a penalty below the statutory minimum. Gov. Br. at 32. As it did below, however, the Government fails to explain "how the government, through the exercise of 'prosecutorial discretion,' can require the Court to impose a civil penalty it is not authorized by statute to impose." JA1616 n.19. Beyond this fatal flaw, the Government's argument fails because neither it

66

nor Bunk had "prosecutorial discretion" to seek a civil penalty below the statutory minimum in the first instance.

In a criminal case, which this is not, prosecutors have expansive pre-indictment discretion over whether, when, and what to charge. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)); *United States v. Wilson*, 262 F.3d 305, 315 (4th Cir. 2001). Even this discretion is "narrowed considerably," however, after the charging decision. *See, e.g.*, *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 756-57 (Smith, J., dissenting) (5th Cir. 2001) (en banc) (judicial approval required to dismiss indictment without prejudice; plea agreements unenforceable absent court approval); Fed. R. Crim. P. 48(a) (judicial approval required for dismissal of indictment, information or complaint; defendant's consent required for dismissal during trial); Fed. R. Crim. P. 11(c)(3)(A)-(B) (judicial control over plea agreements).

Likewise, although a criminal prosecutor can move for a downward departure under § 5K1.1 of the Sentencing Guidelines, or for a post-sentence reduction under Rule 35, the court retains ultimate discretion over sentencing. Express provisions in the Sentencing Guidelines and the criminal procedure rules are what allow a prosecutor to seek, and the court to impose, a lesser sentence than that provided by statute. As no such provisions exist in the civil context or within

the FCA, neither the Government nor Bunk could exercise "discretion" by simply reducing the statutorily mandated minimum penalty and forcing the court to impose it.

Moreover, the record here reflects that no real "discretion" was exercised by Appellants. As the court noted, "the $24 million civil penalty does not result from any principled application of the FCA, as it is not a multiple of 9,136 and any number within the statutory range of $5,500 and $11,000." JA1616 n.19. In fact, Bunk urged that "at least the minimum *number* of penalties should be awarded" SA50 (emphasis added), and he consistently asserted that the submission of 9,136 false claims demonstrated egregious conduct and justified a substantial penalty. *See, e.g.*, JA1373, 1471, 1474. *Bunk continues to do so on appeal. See* Rel. Br. at 21, 31, 51, 53, 56, 61. Notably, so does the Government. Gov. Br. at 28, 44-45. Even if there were a rule or statute in the civil context analogous to allowing a prosecutor to reduce the number of convictions actually penalized, that clearly is not what Bunk (or the Government) was asking the court to do. *See* Rel. Br. at 53 (arguing the district court "had no authority to change the way false claims are counted"). The Government's demonstrably false revisionist history should be ignored.

Furthermore, compared to criminal prosecutions, government officials under the FCA have little discretion, *particularly where they do not intervene. See, e.g.*,

31 U.S.C. §§ 3729(a)(1), 3730(c)(2)(A), (B), (C) (the government cannot control the initiation of litigation, dismiss a case without court approval, control the scope and pace of the litigation, or control the procedures used by the lawyer prosecuting the case). Here, of course, the Government chose not to intervene in the DPM claim; rather, a private *qui tam* relator litigated the DPM claim and "requested" the reduced penalty he argued the court had no discretion to impose.

That the "penalty request was developed in close consultation with attorneys for the United States," Gov. Br. at 37, is of no moment. The Government could not have conferred sweeping prosecutorial discretion – which it does not have to give in the first instance – on private civil litigants. The Government's late intervention on appeal does not allow it retroactively to deem Bunk's proposed penalty a prior exercise of prosecutorial discretion, or retroactively to vest Bunk with such discretion.

The cases on which the Government relies do not contravene this principle. In *United States v. Bickel*, No. 02-3144, 2006 WL 1120439, at *1 (C.D. Ill. Feb. 22, 2006), and *United States v. Mackby*, 339 F.3d 1013, 1015 (9th Cir. 2003), the Government itself commenced the actions under the FCA. *Mackby* also involved the Government's considered decision to seek penalties commensurate with the defendant's culpability, which did not occur here. *Id.* at 1019. Finally, the question at bar – whether the court has discretion to impose a penalty *below the*

*statutory minimum* – simply was not at issue in either *Mackby* or *Bickel* and was not analyzed by either court. The government requested, and the courts imposed, lower penalties without objection from the defendants.[11] *Mackby* and *Bickel* certainly do not stand for the proposition that the government *unilaterally* may seek and impose a civil penalty below the FCA minimum, particularly one that is itself unconstitutional on the facts of the case.

### F.    Even if the District Court Had Discretion to Impose a Penalty Below the Statutory Minimum, $24 Million Is Still Unconstitutionally Excessive.

Where there is no monetary harm, a civil penalty still may be imposed under the FCA. Appellants have never contended, however, that $24 million would be a constitutional penalty *in this case* absent any monetary damage. In fact, it would not. Here, not only were no money damages proven, there also was *substantial, uncontested evidence mitigating Gosselin's culpability.*

On appeal, the Government claims the court erred by failing to "evaluate the constitutionality of the penalty actually requested," and instead "focused on the statutory minimum." Gov. Br. at 33. But the court "focused" on the statutory minimum because that is the proper starting point in the Excessive Fines analysis – whether the penalty mandated by the statute is grossly disproportional to the harm.

---

[11] To the extent the courts in these cases correctly imposed civil penalties below the statutory minimum, this would support the district court's alternative penalty analyses here.

And, contrary to the Government's assertion, the court *expressly* evaluated the penalty requested: "As a second alternative…the Court has considered what penalty could be imposed were this Court permitted simply to enforce the mandated civil penalty up to an amount that [ ] would be within constitutional limits[.]" JA1614. After conducting an Excessive Fines analysis, the court concluded "the amount of $24 million proposed by the Plaintiffs would not be within constitutional limits since it would be grossly disproportional to any harm caused by the Defendants." JA1615.

In contrast, Appellants' primary justification for a $24 million penalty was that it "constitutes an acceptably low multiple of the government's claimed economic harm." JA1615 n.17; *see also* JA1473-75. But the court found no monetary damages caused by the subcontracting agreement, and therefore "Plaintiffs' principal justification for the proposed $24 million civil penalty fails completely for Eighth Amendment purposes." JA1615 n.17.[12]

Now, the Government claims the $24 million penalty is constitutional because (1) it "furthers Congress's specific intent to impose penalties that will

---

[12] The Government also asserts that $24 million is a constitutional penalty because it is "less than half the minimum authorized by statute," and is "22 percent of the maximum authorized by statute." Gov. Br. at 32-33. But the Eighth Amendment analysis compares the *statutory penalty* to the *harm*, not the *desired penalty* to the *unconstitutional penalty*. The Government's simple assertion that it will take "less than" a penalty it could not have recovered in the first instance does not *ipso facto* make the desired penalty constitutional.

deter offenders," (2) there are "special difficulties of detecting and deterring fraud in defense procurement," (3) Gosselin entered into a subcontracting agreement, falsely signed a CIPD, and then submitted over nine thousand invoices, and (4) Defendants are "repeat offenders." Gov. Br. at 42-46.

None of these arguments justifies a $24 million penalty. As to the Government's first claim, Appellants consistently argued below that imposing a penalty below the statutory minimum would frustrate Congressional intent. *See, e.g.*, JA1466-67. On appeal, the Government argues that the court's *failure* to issue a penalty below the statutory minimum frustrates Congressional intent. Gov. Br. at 26-27, 29-32. The Government's conflicting positions are circular and unsupported. The district court was correct that Congress "required the imposition of a mandatory minimum penalty, with a mandatory maximum, and gave the courts the limited discretion to determine the amount of that penalty only within that minimum-maximum range." JA1609. Having determined that even the minimum statutory penalty would be an unconstitutionally excessive fine in this case, awarding a lesser amount would require the court "in effect, to grant to itself the discretion that Congress chose not to give it. Basically, the Court would need to rewrite the FCA, as given to this Court, in order to fashion a constitutional civil penalty under the facts of this case." JA1609-10. The court noted that doing so "is particularly ill-advised given that Congress has repeatedly revised and amended

72

the FCA following the judicial constructions, binding on this Court, without amending the civil penalty provision." JA1610. The court refused to engage in "an unauthorized exercise of statutory revision" (*id.*), and doing so through imposition of a penalty below the statutory minimum is not suddenly consistent with Congressional intent merely because it was requested by Bunk (or the Government).

The Government's second claim regarding the difficulties of detecting fraud also fails. Whether or not defense procurement fraud is difficult to detect as a general matter is not a proper consideration under an Excessive Fines analysis, and the Government provides no legal support suggesting otherwise. In this case, of course, such a consideration is also entirely irrelevant. No evidence was presented suggesting Gosselin affirmatively concealed its conduct, and the 2001 DPM bidding process involved substantial transparency. JA1601. Additionally, Bunk reported his allegations of fraud before the Army renewed the contract with Gosselin for two more years.

Nor does the Government's third claim – the fact Gosselin was found liable for violating the FCA on the DPM contract – justify a $24 million penalty. Every Eighth Amendment analysis of a penalty necessarily follows a liability finding – the simple fact of liability, alone, cannot justify an otherwise unconstitutional fine.

The Government's fourth claim, that Gosselin is a "repeat offender," also cannot justify a $24 million fine in this case, as discussed previously. There is no evidence suggesting a need to deter Gosselin. The Government renewed the 2001 DPM contract in both option years, and Gosselin performed on those contracts. After three years (2004-2007) monitoring Gosselin for general compliance with the law, General Kelleher concluded that Gosselin continues to serve as a highly valued DOD resource. JA2567-68. The conduct here is over a decade old, and Gosselin no longer directly contracts with the Government. And, there was no evidence introduced in this case that imposing a high penalty on Gosselin now would deter anyone else, or that such deterrence is necessary.

### G. The Court's Alternative Analyses Should Be Entered if this Court Finds the District Court Has Discretion to Impose a Penalty Below the Statutory Minimum.

If this Court holds that the district court has discretion to impose a penalty below the FCA minimum, or that the FCA does not require imposition of one civil penalty per false claim, the Court should sustain the district court's alternative penalty analyses, which should not be disturbed absent an abuse of discretion. *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 140 (4th Cir. 1996) ("Civil penalty assessments are reviewed for abuse of discretion.").

The court's first alternative analysis, imposing a penalty for each *act* that violates the statute, is a reasonable interpretation of the FCA. The FCA itself does

74

not mandate a civil penalty for each invoice, but rather states that a person who violates the act "is liable to the United States Government for a civil penalty." 31 U.S.C. § 3729(a). Penalizing only Gosselin's FCA-violative conduct – the filing of one false certification – is entirely consistent with the statutory language. *Accord Hess*, 317 U.S. at 552 (Supreme Court affirmed penalty not "for every form submitted by respondents in the course of their enterprise," but rather "for each separate P.W.A. project" procured through bid-rigging); *Bornstein*, 423 U.S. at 313 (focusing on "the specific conduct of the person from whom the government seeks to collect statutory forfeitures"); *Gilbert Realty*, 840 F. Supp. at 72-75 (reducing number of claims previously deemed "false" to focus on the defendants' actual conduct, then imposing civil penalties for that number of claims); *Advance Tool*, 902 F. Supp. at 1018-19 (penalties for 686 invoices for non-conforming tools yielded excessive fine, so court reduced false claims to the 73 types of non-conforming tools).[13]

The district court's determination that the maximum constitutional fine in this case would be $1.5 million also may be reasonable. Because Gosselin's

---

[13] Gosselin recognizes that this Court's decision in *Harrison* (interpreting the Supreme Court's decision in *Hess*) binds a three-judge panel of this Court. However, Gosselin reserves the right to seek *en banc* review in this Court and/or review by the Supreme Court regarding whether, as a matter of statutory construction, the FCA requires that civil penalties be assessed in this case on the basis of the violative certification, rather than each invoice thereafter submitted.

conduct did not result in an overcharge to the Government, the court looked to Gosselin's "demonstrable financial gain" as a proxy for the harm caused by the offense.    JA1615.    Although Gosselin's modest profit certainly does not demonstrate any harm to the Government – and in fact the court recognized it as a factor *mitigating* Gosselin's culpability – this approach is not as grossly disproportionate to Gosselin's actions as Bunk's arbitrary request for damages. Under Supreme Court precedent, a fine of no more than ten times the harm may be constitutional.  *See generally State Farm*, 538 U.S. at 424-25.  Thus, the district court concluded that a civil penalty of $1.5 million (ten times Gosselin's $150,000 profit on line item 1AA) was the maximum constitutionally permissible amount. JA1615.

Bunk argues that the district court erred in concluding that 1AA was the only line item tainted by Gosselin's conduct.  Rel. Br. at 46.  However, the court simply stated, in connection with looking for some measure to "serve as a touchstone for a determination of proportionality," that there was "demonstrable financial gain" to Gosselin associated with "the tainted line item 1AA services" (JA1615) – which is entirely consistent with Bunk's position below and on appeal.  That there may be gain on other line items is of no moment for this analysis.  Bunk's focus was 1AA, he did not even attempt to prove monetary damages for any other line item, and he repeatedly argued that 1AA was the single largest and most costly line item in the

76

contract. *See, e.g.*, JA1405; SA54. At trial, Bunk testified that the subcontracting agreement was an agreement to pay €35 for packing, transporting, and storing of outbound household goods in Germany – *i.e.*, an agreed price on line item 1AA. JA1844. The court's second alternative simply multiplied the profit on the line item Bunk focused on at trial and in his post-trial damages calculations and determined that that figure – $1.5 million – would reflect "the outer limit of a constitutionally permissible fine." JA1615. If profit on additional line items had been determined and multiplied by ten, the result may exceed constitutional propriety in light of the court's separate determination that an appropriate fine on the facts of this case is $500,000. Indeed, as the Supreme Court recognized in *State Farm*, even a 4:1 ratio between the fine and the harm may be unconstitutional. 538 U.S. at 424-25.

The district court's third alternative penalty of $500,000 similarly is well within the court's discretion. The FCA itself reflects Congress's intent for district courts to fashion appropriate penalties within a set range in light of the particular facts of each case, not to punish all FCA violations to the maximum extent. JA1616. Contrary to Bunk's assertion that the court "held that these false claims did not warrant any penalty at all" (Rel. Br. at 21), the court thoroughly considered the need for punishment and deterrence, the government's interest in protecting the integrity of its contracting process, and evidence mitigating Gosselin's culpability,

and determined that a $500,000 penalty, which is approximately three times Gosselin's profit on line item 1AA and roughly equivalent to Gosselin's total profit on the contract, would be warranted.  JA1616-17, 1617 n.21.

### H. The Award of No Civil Penalties Should Be Sustained Because Awarding Civil Penalties on the DPM Claim Would Violate Article II.

The court's judgment awarding no civil penalties on Bunk's non-intervened DPM claim should be upheld on the independent ground that, as set forth in pages 27-29, *supra*, imposing civil penalties in this case would violate Article II of the Constitution.  *See, e.g.*, *Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006) ("[W]e are not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record." (quoting *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005)).

## II. The ITGBL Landed Rate Agreement Is Lawful Under the Shipping Act.

The district court held that the Shipping Act immunizes Gosselin's agreement with local German agents to fix prices for local packing and moving services within Germany and to provide those services only to carriers purchasing them as part of a landed rate.  JA1134.  The Government asserts that this holding is erroneous because it is "inconsistent" with this Court's decision in the company's prior criminal case, *Gosselin*.  Gov. Br. at 47-50.  The Government also argues that the Shipping Act does not confer immunity on Gosselin because Gosselin is

78

neither an ocean carrier nor a marine terminal operator.  *Id*. at 50-60.  Both arguments fail.

### A.    The District Court's Ruling Was Consistent With *Gosselin*.

The Shipping Act, specifically 46 U.S.C. app. § 1706(a)(4), provides antitrust immunity for "any agreement or activity concerning the foreign inland segment of through transportation that is part of transportation provided in a United States import or export trade."  The court below analyzed whether the Shipping Act conferred immunity on two distinct sets of conduct the government alleged was unlawful – namely, the landed rate agreement and Gosselin's conduct on the Covan channels.

First, the court held that § 1706(a)(4) rendered the landed rate agreement lawful.  JA1134.  Absent other conduct rendering the invoices false or fraudulent, of which there was none, simply submitting claims under this agreement could not violate the FCA.  JA1138-A.

Second, the court held that the Shipping Act did *not* immunize the Covan-channel conduct for the same reason this Court found Gosselin's Cartwright-channel conduct was not immune.  JA1134-35.  The Covan-channel conduct was therefore submitted to the jury, which found Gosselin not liable for violating the FCA because Appellants failed to prove Defendants acted knowingly or that they

made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the government.  JA1114.

The district court's holdings are completely consistent with this Court's decision in *Gosselin*.  There, this Court recognized that "defendants' original agreement with the German local agents may have had the relationship to a 'foreign inland segment' that the statute requires" and thus "[t]here is an argument to be made that the agreement defendants made with the local German firms fits under the immunity announced in *Tucor*."  411 F.3d at 510.  However, this Court held that the statutory exemption did not extend to Gosselin's additional conduct directed at specific U.S. carrier bids.  *Id*. at 510-11.

On appeal, the Government argues that the district court should have treated the landed rate agreement and the Covan and Cartwright bid-rigging schemes as a single conspiracy.  Gov. Br. at 48.  In that vein, the Government contends that the landed rate agreement "could not work unless it was linked to concerted action to inflate bids for the entirety of through transportation to or from the United States."  Gov. Br. at 49-50.  These arguments are demonstrably false.  To the extent the lawful landed rate agreement "worked" at all, it did so without any bid-rigging for the 90 non-Covan channels in IS01, the 92 non-Cartwright channels in IS02, all 104 channels in IW01, and all 104 channels in IW02.

Moreover, it is quite clear that the conduct at issue falls into two distinct categories: (1) an agreement among local German agents to only work under a landed rate within Germany, and (2) specific efforts to influence U.S. carrier bids in the ITGBL bidding process. This conduct was not viewed or carried out as a single conspiracy, and the court properly did not treat it in that manner. JA1127-28.

This Court also should reject the Government's attempt to characterize the landed rate agreement as being "*aimed at* the entire through transportation market" and thus bring it within *Gosselin*. Gov. Br. at 47-48 (emphasis added). Merely because the rates for local services in Germany are part of the total price carriers charge the Army does not mean the landed rate agreement is "aimed at" through transportation. The Shipping Act specifically immunizes agreements regarding "the foreign inland segment *of through transportation*." 46 U.S.C. app. § 1706(a)(4) (emphasis added). "Through transportation" encompasses the entire door-to-door move. Thus, in *every case* to which the immunity could conceivably apply, the immunized foreign inland segment will be part of an overall through transportation bid. This Court made clear in *Gosselin* that the non-exempt conduct on the Cartwright channels was the effort to rig U.S. carriers' *actual bids* for *through transportation rates*:

> "Gosselin['s]…contacts with [Cartwright]…related not to foreign inland services, but to defendants' desire that [Cartwright] *withdraw*

81

> *the prime through rate* bid it had filed with MTMC.  Similarly, the agreement defendants secured from other U.S. freight forwarders to *file bids at or above the second low level* had little to do with the German inland segment of the through services these forwarders offered."

*Gosselin*, 411 F.3d at 511 (emphasis added); *id*. at 510 ("Indeed, defendants fixed bids for through transportation rates, *i.e.* door-to-door rates, not just rates for the 'foreign inland segment' of the routes.").  This Court recognized, however, that Gosselin's agreement with the German local agents to not work for carriers who failed to match the second-low rate – an agreement similar in kind to the landed rate agreement – "may have had the relationship to a 'foreign inland segment' that the statute requires" and that it "fits under the immunity announced in *Tucor*."  *Id.* at 510.

### B.    Shipping Act Immunity Applies to Gosselin.

The Government next contends that the Shipping Act's immunity, based on its legislative history and underlying policies, is limited to agreements by marine terminal operators or ocean common carriers.  Gov. Br. at 50-60.  The plain text and structure of the Shipping Act, as well as a proper understanding of the Act's legislative history and policies, squarely foreclose this argument.

Recognizing that U.S. shipping companies were placed at a competitive disadvantage by the "undue extension of antitrust principles into the regulation of international maritime transportation," Congress passed the Shipping Act to

"considerably reduce the regulatory control over international shipping while broadening existing antitrust immunity." H.R. Rep. No. 98-53, at 9, 27 (1983), *reprinted in* 1984 U.S.C.C.A.N. 167, 174, 192.

One way the Shipping Act accomplished this Congressional policy goal was through 46 U.S.C. app. § 1706(a)(4), exempting the foreign inland segment of through transportation. That section is not limited to agreements or activities by "marine terminal operators" and "ocean common carriers," but rather extends immunity to "*any* agreement or activity." *Id.* (emphasis added).

Although section 1703 states that "[t]his Act applies to agreements by or among ocean common carriers…[or] marine terminal operators," this language does not, as the Government suggests (Gov. Br. at 54-55), implicitly limit the scope of *every* provision in the Act. The foreign inland segment exemption does not contain this limitation, although another exemption just a few lines earlier does. *Compare id.* § 1706(a)(2) with *id.* § 1706(a)(4).

Moreover, other provisions of the Act plainly apply to transactions aside from agreements by marine terminal operators and ocean common carriers. *See, e.g.*, *id.* § 1709(a) ("[n]o person" may use a false measurement "to obtain ocean transportation for property" at lower rates); *id.* § 1709(d) (1984) and § 1702(19) (imposing licensing requirements on "Ocean Freight Forwarders," which are not marine terminal operators or ocean common carriers). And, as the Ninth Circuit

recognized in *Tucor*, 189 F.3d at 837, section 1706(a)(3) grants antitrust immunity to agreements relating to "transportation services within or between *foreign countries*, whether or not via the United States," 46 U.S.C. app. § 1706(a)(3) (emphasis added).   Yet, marine terminal operators are defined as "person[s] engaged in [providing terminal facilities] *in the United States*,"  *id.* § 1702(14) (emphasis added), and ocean common carriers are defined as providing transportation "between the United States and a foreign country" only. *Id.* § 1702(6).  Contrary to the Government's suggestion, section 1706(a)(3) is not at all limited to ocean common carriers or marine terminal operators. *See* Gov. Br. at 56-57.

The Government attempts to overcome this conclusive textual and structural evidence by arguing that the legislative history shows Congress intended "to exempt from the antitrust laws [only] those agreements subject to regulation by the Federal Maritime Commission ["FMC"]."  Gov. Br. at 52-53.  First, appeals to legislative history cannot overcome the plain meaning of statutory text. *Strawser v. Atkins*, 290 F.3d 720, 732 (4th Cir. 2002).  In any event, the Act's overarching goal was *not* merely to exempt agreements subject to filing within the FMC.  Rather, Congress's intent was to "considerably reduce[] the regulatory control over international shipping while broadening existing antitrust immunity," in large part because the prior law had "undu[ly] exten[ded]…antitrust principles into the

regulation of international maritime transportation."  1984 U.S.C.C.A.N. at 174, 192.  Thus, for example, the Act expressly grants antitrust immunity to agreements regarding wholly foreign commerce, 46 U.S.C. app. § 1706(a)(4), even though such agreements are *excluded* from filing with the FMC.  *Id.* § 1704(a).  Such an exemption reflects the sensible policy that U.S. antitrust laws should not indiscriminately attempt to police the globe.  *Cf. Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010) ("[U]nless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions.") (internal quotation marks omitted).

For similar reasons, the Government is plainly wrong when it contends that granting antitrust immunity to Gosselin would not reflect any "plausible" policy (Gov. Br. at 58) and would create "a loophole in the law that serves no discernible congressional purpose."  *Id*. at 59.  To the contrary, such immunity serves an obvious purpose: it curtails the "undue extension of antitrust principles into the regulation of international maritime transportation" that is better left to regulation by foreign countries.  1984 U.S.C.C.A.N. at 174.

## III.    Admitting the *Tucor* Decision Was Not Prejudicial Error.

In a single paragraph at the end of its brief, the Government asserts that the district court's admission of the *Tucor* decision into evidence was "prejudicial

error" compelling reversal of the jury's verdict in Gosselin's favor regarding the Covan channels. Gov. Br. at 60-61. The Government's basis appears to be irrelevance, as it contends *Tucor* "has no bearing" on whether Gosselin had a good faith belief that its Covan-channel conduct was lawful because *Tucor* did not involve carriers bidding for through rates. *Id*. at 60.[14] The Court should reject this straw argument.

This Court "review[s] a trial court's rulings on the admissibility of evidence for abuse of discretion, and []will only overturn an evidentiary ruling that is arbitrary and irrational." *United States v. Cole*, 631 F.3d 146, 153 (4th Cir. 2011) (internal quotation omitted). Here, the *Tucor* decision clearly was relevant to a material element of the Government's claim and Gosselin's defense, and it was not error for the district court to admit the decision into evidence.

Below, the Government relied on a fraudulent inducement theory based on *Hess*, 317 U.S. 537, arguing that the invoices were false claims because they were submitted pursuant to a contract that had been procured through a fraudulent bidding process. To prove fraud, the Government had to prove Gosselin made an "intentional or knowing misrepresentation" to obtain the contract. *Lane v. United*

---

[14] The Government failed to argue any basis other than relevance in its opening brief; the Court should reject any effort by the Government to raise additional bases in its reply. *Moseley v. Branker*, 550 F.3d 312, 325 n.7 (4th Cir. 2008); Fed. R. App. P. 28(a)(9)(A).

*States*, 286 F.3d 723, 731 (4th Cir. 2002). Smet testified that he read *Tucor* prior to the subcontracting agreement and, based on *Tucor*, he believed his conduct was lawful.[15] JA2210-13. Thus, the court properly admitted *Tucor* because it was relevant to Gosselin's knowledge of whether the submitted claims were fraudulent.

Finally, the Government itself introduced the *Tucor* decision as Government Exhibit 10 in lieu of calling Gosselin's outside counsel, Alan Wohlstetter, to testify about his advice regarding the *Tucor* case. SA79, 82, 83-87. Any error in admitting *Tucor* was invited error to which the Government cannot now object. *Ohler v. United States*, 529 U.S. 753, 755 (2000).

## CONCLUSION

For the foregoing reasons, the jury's DPM verdict should be set aside and the Appellants' appeal on the DPM claim should not be reached. If this Court reaches the merits, the district court's judgment on the DPM claim should be affirmed. All other judgments at issue in the appeal likewise should be affirmed.

---

[15] Whether Smet was correct that his conduct was lawful obviously is not dispositive of whether he *believed* his conduct was lawful. Good faith encompasses honest mistakes. The Government was free to (and did) elicit testimony and argue to the jury that differences between the conduct in *Tucor* and Defendants' conduct on the Covan channels undermined Smet's reliance on *Tucor*. *See, e.g.*, JA2240. The jury, however, found that Defendants did not knowingly defraud the Government on the Covan channels. JA1114.

Respectfully submitted,

    /s/   Kerri Ruttenberg

Kerri Ruttenberg
Shay Dvoretzky
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939

Counsel for Defendants-
Appellees/Cross-Appellants

Dated:  October 9, 2012

## <u>REQUEST FOR ORAL ARGUMENT</u>

Defendants-Appellees/Cross-Appellants respectfully request oral argument. Oral argument will illuminate the position of the parties and aid the Court in reaching a decision.

## **Rule 32 Certificate of Compliance**

I certify that this brief complies with FRAP 32(a)(7)(B).  The brief is printed in a 14-point, proportionally spaced font and, based on word processing software, contains 19,947 words.  This word count is within the 20,000 word limit set by the Court's Order dated August 14, 2012, granting Defendants-Appellees/Cross-Appellants' June 21, 2012 Motion for Leave to File Oversized Brief of 20,000 words.

   /s/   Kerri Ruttenberg, Attorney

**<u>Certificate of Service</u>**

I certify that on October 9, 2012, I electronically filed the foregoing Brief for Defendants-Appellees/Cross-Appellants with the Clerk of Court using the Court's Case Management/Electronic Case Filing system, which will serve a copy on counsel of record for the other parties.

/s/   Kerri Ruttenberg, Attorney
