Nos. 12-1369, 12-1417 & 12-1494

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES EX REL. KURT BUNK & RAY AMMONS,
*Plaintiffs-Appellants/Cross-Appellees*,

*v.*

BIRKART GLOBISTICS, GmbH & Co., et al.,
*Defendants-Appellees/Cross-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Virginia

**BRIEF FOR THE PHARMACEUTICAL RESEARCH AND
MANUFACTURERS OF AMERICA AS AMICUS CURIAE
IN SUPPORT OF DEFENDANTS-APPELLEES**

JAMES M. SPEARS
MELISSA B. KIMMEL
PHRMA
950 F Street, N.W.
Washington, D.C.  20004
(202) 835-3400

DAVID W. OGDEN
JONATHAN G. CEDARBAUM
NICOLE RIES FOX*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000

*Admitted only in California*

October 16, 2012

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)


_____

 who is _____, makes the following disclosure:
        (appellant/appellee/amicus)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.      Does party/amicus have any parent corporations?                              YES     NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                         YES     NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation (Local Rule 26.1(b))?      YES      NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                        YES      NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _____          Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************
I certify that on _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____                     _____
            (signature)                                            (date)

# TABLE OF CONTENTS

Page

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER
INTERESTS

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF AMICUS CURIAE .....................................................1

SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ......................................................................................4

I.      AS CURRENTLY INTERPRETED, THE FALSE CLAIMS ACT'S
        PENALTY PROVISION FREQUENTLY PRODUCES IRRATIONALLY
        MASSIVE MANDATORY PENALTIES THAT ARE UNCONNECTED TO
        ANY PLAUSIBLE MEASURE OF HARM TO THE GOVERNMENT
        AND THAT PRESSURE DEFENDANTS TO ACCEPT UNFAIR
        SETTLEMENTS .............................................................................4

II.     AS THE PARTIES RECOGNIZE, THE EIGHTH AMENDMENT'S
        EXCESSIVE FINES CLAUSE APPLIES TO THE FALSE CLAIMS ACT ..................10

III.    THE DISTRICT COURT APPLIED THE CORRECT FACTORS TO
        ASSESS THE PROPORTIONALITY OF FALSE CLAIMS ACT
        PENALTIES .................................................................................12

        A.      Harm To The Government ...................................................14

        B.      Relationship To Other Illegal Activity................................17

        C.      Benefits Derived By The Defendant ....................................18

        D.      Deference To Legislative Judgments ..................................19

        E.      Other Applicable Penalties.................................................21

IV.     THE RELATOR OR THE GOVERNMENT MUST BEAR THE BURDEN
        OF ESTABLISHING THE FACTUAL PREDICATES TO SUPPORT THE
        PERMISSIBILITY OF FALSE CLAIMS ACT PENALTIES .......................22

V.    THE DISTRICT COURT CORRECTLY HELD THAT IT LACKED
      DISCRETION TO FASHION A PENALTY LOWER THAN THE
      STATUTORY MINIMUM .....................................................................................25

CONCLUSION ....................................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985).................................................................15

*Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*,
492 U.S. 257 (1989).................................................................12

*City of Lakewood v. Plain Dealer Publishing Co.*,
486 U.S. 750 (1988).................................................................28

*Fisher v. King*,
232 F.3d 391 (4th Cir. 2000) ......................................................28

*Gasperini v. Center for Humanities, Inc.*,
518 U.S. 415 (1996).................................................................27

*Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999) ........................................................6

*Hays v. Hoffman*,
325 F.3d 982 (8th Cir. 2003) ......................................................11

*Hudson v. United States*,
522 U.S. 93 (1997)..................................................................11

*Kelly v. EPA*,
203 F.3d 519 (7th Cir. 2000) ......................................................19

*Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*,
285 F.3d 1146 (9th Cir. 2002) .....................................................27

*Ohio Hospital Ass'n v. Shalala*,
978 F. Supp. 735 (N.D. Ohio 1997) ................................................9

*Peterson v. Weinberger*,
508 F.2d 45 (5th Cir. 1975) ........................................................26

*United States ex rel. Doe v. DeGregorio*,
510 F. Supp. 2d 877 (M.D. Fla. 2007) ............................................11

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
    352 F.3d 908 (4th Cir. 2003) ..................................................................15, 24

*United States ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943).......................................................................................14

*United States ex rel. Smith v. Gilbert Realty Co.*,
    840 F. Supp. 71 (E.D. Mich. 1993) .............................................................24

*United States ex rel. Tyson v. Amerigroup Illinois, Inc.*,
    488 F. Supp. 2d 719 (N.D. Ill. 2007).........................................................23

*United States v. Ahmad*,
    213 F.3d 805 (4th Cir. 2000) .............................................13, 14, 15, 17, 22

*United States v. Alexander*,
    32 F.3d 1231 (8th Cir. 1994) .........................................................19, 23, 25

*United States v. Bajakajian*,
    524 U.S. 321 (1998)............................................................................ *passim*

*United States v. Bernitt*,
    392 F.3d 873 (7th Cir. 2004) ......................................................................22

*United States v. Bourseau*,
    531 F.3d 1159 (9th Cir. 2008) ....................................................................23

*United States v. Brown*,
    274 F.2d 107 (4th Cir. 1960) ......................................................................26

*United States v. Busher*,
    817 F.2d 1409 (9th Cir. 1987) ....................................................................14

*United States v. Diamond*,
    657 F. Supp. 1204 (S.D.N.Y. 1987) .........................................................6, 26

*United States v. Hughes*,
    585 F.2d 284 (7th Cir. 1978) ......................................................................26

*United States v. Incorporated Village of Island Park*,
    2008 WL 4790724 (E.D.N.Y. Nov. 3, 2008) ..............................................11

*United States v. Jose*,
499 F.3d 105 (1st Cir. 2007)..........................................................21

*United States v. Killough*,
848 F.2d 1523 (11th Cir. 1988) .................................................26

*United States v. Krizek*,
111 F.3d 934 (D.C. Cir. 1997)....................................................6

*United States v. Mackby*,
261 F.3d 821 (9th Cir. 2001) ...............................................11, 12

*United States v. Mackby*,
339 F.3d 1013 (9th Cir. 2003) ........................................13, 15, 22

*United States v. Neifert-White Co.*,
390 U.S. 228 (1968)....................................................................6

*United States v. Rivera*,
55 F.3d 703 (1st Cir. 1995)..........................................................6

*United States v. Rogan*,
517 F.3d 449 (7th Cir. 2008) ...............................................11, 23

*United States v. Sarbello*,
985 F.2d 716 (3d Cir. 1993) .................................................25, 27

*United States v. TDC Management Corp.*,
288 F.3d 421 (D.C. Cir. 2002)...................................................14

*United States v. Wagoner County Real Estate*,
278 F.3d 1091 (10th Cir. 2002) ................................................18

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
529 U.S. 765 (2000)............................................................10, 11

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. amend. VIII............................................................10

18 U.S.C.
    § 287 ................................................................................21
    § 371 ................................................................................21
    § 983(g)(4) .....................................................................27

False Claims Act, 31 U.S.C.
    §§ 3729 *et seq.* ..............................................................1
    § 3729 ........................................................................5, 20
    § 3729(a) ...........................................................................5
    § 3729(c) ...........................................................................5

33 U.S.C. § 1319(d) .......................................................................20

42 U.S.C.
    § 1320a-7 ..........................................................................9
    § 1320a-7a ........................................................................9
    § 11045(d)(1) ..................................................................20

Federal Civil Penalties Inflation Adjustment Act of 1990,
    Pub. L. No. 101-410, 104 Stat. 890 ................................5

## ADMINISTRATIVE AGENCY MATERIALS

64 Fed. Reg. 47,099 (Aug. 30, 1999) ........................................5

## LEGISLATIVE MATERIALS

False Claims Act Amendments of 1980,
    S. Rep. No. 96-615 ........................................................26

False Claims Reform Act of 1985,
    S. Rep. No. 99-345 (1986)............................................27

## OTHER AUTHORITIES

Almashat, Sammy, et al., Public Citizen's Health Research Group,
    *Rapidly Increasing Criminal and Civil Monetary Penalties
    Against the Pharmaceutical Industry: 1991 to 2010* (2010),
    *available at* http://www.citizen.org/documents/rapidly
    increasingcriminalandcivilpenalties.pdf........................7

Eichel, Kristin McCreary, *Focusing on Fraud: The Federal Government Expands Its Use of the False Claims Act to Police Off-Label Pharmaceutical Promotion*, 8 Ind. Health L. Rev. 399 (2011)....................................................................................................9

Lansdale, Edward P., *Used As Directed? How Prosecutors Are Expanding the False Claims Act to Police Pharmaceutical Off-Label Marketing*, 41 New Eng. L. Rev. 159 (2006).......................................8

PhRMA, *2012 Pharmaceutical Industry Profile* (2012), *available at* http://www.phrma.org/sites/default/files/159/phrma_industry_ profile.pdf ...........................................................................................1

## INTEREST OF AMICUS CURIAE[1]

The Pharmaceutical Research and Manufacturers of America ("PhRMA") is an association whose members include the nation's leading research-based pharmaceutical and biotechnology companies.  PhRMA members are devoted to inventing medicines that allow patients to live longer, healthier, and more productive lives.  In 2011 alone, PhRMA members invested approximately $49.5 billion in discovering and developing new medicines, and in the past decade they have invested more than $380 billion to these ends.[2]

This case raises important issues about the application of the Excessive Fines Clause of the Eighth Amendment to penalties imposed under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*  These issues are of critical importance to the nation's pharmaceutical manufacturers, which in recent years have been the target of False Claims Act suits or investigations that have resulted in numerous multi-million-dollar settlements.  In many of these suits and investigations, the claimants (whether relators or the government itself) have sought penalties in the

---

[1]    The parties have consented to the filing of this brief.  This brief was not authored in any part by counsel for any of the parties, and no person or entity other than Amicus, its members, or its counsel has made a monetary contribution to the preparation or submission of this brief.

[2]    *See* PhRMA, *2012 Pharmaceutical Industry Profile* 28 fig. 10 (2012), *available at* http://www.phrma.org/sites/default/files/159/phrma_industry_profile .pdf.

1

millions (or tens or hundreds of millions) of dollars, based in large part on the mandatory penalty provision at issue in this case, even though the government in fact suffered little or no financial loss as a result of the alleged violations. As discussed in this brief, the threat of those penalties frequently drives outsized settlements or produces irrational judgments. PhRMA submits this brief in support of Defendants-Appellees in order to emphasize that through proper application of Eighth Amendment principles, courts should prevent the imposition of penalties that irrationally exceed the harm actually suffered by the government.

## SUMMARY OF ARGUMENT

The mandatory $50 million penalty Defendants faced in this case despite *zero* damages to the government is representative of a troubling trend in False Claims Act investigations and lawsuits. Because courts have interpreted the False Claims Act's penalty provision to require a penalty for each claim for payment a defendant submits, penalties often reach astronomical levels irrespective of the actual harm to the government or the defendant's culpability. These irrational results have led defendants—including ones in the pharmaceutical industry—to settle rather than contest even meritless False Claims Act allegations at a severe cost to the industry and thus, ultimately, to consumers.

This case illustrates the importance of the Excessive Fines Clause in protecting against such irrational and punitive results. The district court correctly

held that the Excessive Fines Clause applies to False Claims Act penalties and that determining whether a penalty is unconstitutionally disproportionate requires a careful weighing of several factors: (1) how much, if any, harm the government actually suffered as a result of the defendants' conduct; (2) whether the violation was related to other illegal activity; (3) what, if any, benefits the defendants derived from the contract containing the false claim; (4) the False Claims Act's lack of direction as to what the unit for penalty calculation should be; and (5) the criminal penalties Defendants could have faced as a result of the conduct.    In applying these factors, the district court correctly placed the burden of demonstrating harm to the government on the Relator.

The district court was also correct in holding that the False Claims Act does not vest courts with discretion to impose a penalty below the statutorily mandated minimum.  When, as in this case, the mandatory minimum is constitutionally excessive, the False Claims Act's penalty provision is unconstitutional as applied and simply cannot be enforced.

# ARGUMENT

**I.    AS CURRENTLY INTERPRETED, THE FALSE CLAIMS ACT'S PENALTY PROVISION FREQUENTLY PRODUCES IRRATIONALLY MASSIVE MANDATORY PENALTIES THAT ARE UNCONNECTED TO ANY PLAUSIBLE MEASURE OF HARM TO THE GOVERNMENT AND THAT PRESSURE DEFENDANTS TO ACCEPT UNFAIR SETTLEMENTS**

The claims determined to be false in this case subjected Defendants to $50 million in civil penalties despite the district court's determination that they caused the government *zero damages*.  This kind of unfair and unwarranted penalty—with which relators and the government increasingly threaten False Claims Act defendants—is precisely the type of grossly disproportionate fine that the Eighth Amendment is meant to guard against.  Such irrationally large penalties arise with particular frequency in cases like this one—where a defendant has submitted many individual claims for payment, each of which involves a relatively small sum.  In such cases, the penalties imposed under the mandatory penalty provision of the False Claims Act, as construed by this and several other courts of appeals, frequently far exceed even the total outlays made by the government, to say nothing of any actual harm.  Thus, even when, as here, the government suffers little or no actual damage from any false statement, the relator or the government may nevertheless seek—and many courts feel compelled to assess—enormous penalties based on the view that the False Claims Act requires a separate penalty for each invoice submitted to the government.  As a result, many defendants reach

the conclusion that they have no real choice but to settle cases for very large amounts, even though they have caused little or no actual harm and even though no other reasoned calculation makes a huge penalty appropriate. This pattern of vast penalties untethered from either actual damage to the government or any other plausible gauge of culpability does not comport with the Eighth Amendment.

The False Claims Act imposes civil liability upon "[a]ny person who," *inter alia*, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to an officer, employee, or agent of the United States. 31 U.S.C. § 3729. Violating the False Claims Act subjects defendants not only to treble damages but also to "a civil penalty of not less than $5,500 and not more than $11,000" per violation. *Id.*[3] A "claim" under the False Claims Act "includes any request or demand … for money or property" where the government provides any portion of the money or property requested. *Id.* § 3729(c).

Courts, including this Court, have adopted an interpretation of the False Claims Act's penalty provision that permits a single purportedly false statement to snowball exponentially into millions of dollars in penalties. Under this interpretation, the Act requires a civil penalty for each separate *claim for payment*

---

[3]     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890, the minimum civil penalty for each violation of 31 U.S.C. § 3729(a) was increased from $5,000 to $5,500, and the maximum penalty was increased from $10,000 to $11,000, effective September 29, 1999. *See* 64 Fed. Reg. 47,099, 47,104 (Aug. 30, 1999).

made under a fraudulently induced contract.  *See, e.g.*, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) ("[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995))).  Under these precedents, each individual claim for payment need not itself be false or fraudulent.  *See Harrison*, 176 F.3d at 785-786 (rejecting the district court's interpretation that "would only find a false claim where a demand for payment is itself false or fraudulent"); *see also United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968).  Nor (under the language of the statute) need the government have suffered any actual damages as a result of the alleged fraud for a court to impose civil penalties.  *See Harrison*, 176 F.3d at 785 n.7.  Many courts have noted the unfairness of the resulting disparity between penalties, on the one hand, and any sensible measure of harm or culpability, on the other.  *See, e.g.*, *United States v. Krizek*, 111 F.3d 934, 940 (D.C. Cir. 1997) (noting the unfairness of a civil penalty when "the government's definition of claim permitted it to seek an astronomical $81 million worth of [penalties] for alleged actual damages of $245,392"); *United States v. Diamond*, 657 F. Supp. 1204, 1206 (S.D.N.Y. 1987) (court "troubled" by the possibility of injustice in a fine where there is little relationship between the fine imposed and the illicit gain).

This case exemplifies the problem, though sadly it is far from unique. Here, the Relator alleged that Defendants violated the False Claims Act by filing a false Certificate of Independent Price Determination contained in a bid for a moving service contract submitted to the Department of Defense, and the jury returned a verdict finding Defendants liable for this false statement. JA 1588. But the Relator could not prove *any* actual harm to the government and thus did not seek *any* damages at trial. *Id.* n.5. Nonetheless, he sought a civil penalty for each of the 9,136 invoices Defendants submitted to the government, which, as a matter of simple math, led to a civil penalty of between $50 and $100 million. JA 1592-1593. It was under these circumstances—a minimum $50 million fine based on a single purportedly false certification from which the government suffered no damages—that the district court correctly concluded that the fine violated the Excessive Fines Clause. *See* JA 1593-1607.

Pharmaceutical companies face irrational and constitutionally improper False Claims Act penalties of this sort with increasing frequency. *See* Almashat et al., Public Citizen's Health Research Group, *Rapidly Increasing Criminal and Civil Monetary Penalties Against the Pharmaceutical Industry: 1991 to 2010*, at 3 (2010), *available at* http://www.citizen.org/documents/rapidlyincreasingcriminal andcivilpenalties.pdf ("Over the past two decades, especially during the past 10 years, there has been a marked increase in both the number of government

settlements with pharmaceutical companies and the size of the accompanying financial penalties."). This is because, in the pharmaceutical context, relators or the government often rely on a vast number of small-value prescriptions or insurance claims to threaten astronomical penalties that far exceed the value of the underlying transactions, without being required to allege serious harm to the government, or indeed any harm at all. In the pharmaceutical industry, where under most courts' interpretation each such invoice or prescription can constitute a "claim," the total penalty can easily reach hundreds of millions of dollars, even when the violation is technical and the government sustains little actual harm. *See, e.g.*, Lansdale, *Used As Directed? How Prosecutors Are Expanding the False Claims Act to Police Pharmaceutical Off-Label Marketing*, 41 New Eng. L. Rev. 159, 177 (2006) ("While actual damages collected by the government might be relatively modest, the sheer volume of prescriptions written along with attendant reimbursement requests, which easily number in the tens of thousands, can quickly translate into hefty fines.").

The prospect of gigantic penalties, coupled with the increasing frequency of suits and investigations, has led manufacturers to settle False Claims Act allegations rather than contest them, even when the underlying case of fraud may

have been weak.[4]  "Because the risk of loss in a False Claim[s] Act case carries

potentially devastating penalties, unlike most litigation or even an administrative

recoupment action," companies are discouraged from even attempting to defend

themselves in court.  *Ohio Hosp. Ass'n v. Shalala*, 978 F. Supp. 735, 740 n.6 (N.D.

Ohio 1997), *aff'd in part, rev'd in part*, 201 F.3d 418 (6th Cir. 1999); *see id.*

(litigating in court "is a risk the hospitals feel they cannot take—even if they

believe their chances of prevailing would be great"); *see also* Eichel, *Focusing on*

*Fraud: The Federal Government Expands Its Use of the False Claims Act to Police*

*Off-Label Pharmaceutical Promotion*, 8 Ind. Health L. Rev. 399, 419 (2011)

("Between 2003 and 2007, the DOJ has settled at least eleven cases involving off-

label marketing allegations against various pharmaceutical companies.  Of these

settlements, at least nine involved the imposition of civil monetary fines through

the FCA.").

    These costly lawsuits severely diminish the resources available to

pharmaceutical companies to engage in the research and development needed to

produce new life-saving and life-sustaining medicines to the detriment of

American patients.  The importance of compliance with laws designed to prevent

---

[4]    Other features of current law contribute to the outsized leverage that
produces these irrational settlements.  For example, certain violations carry
mandatory or discretionary exclusion from federal health care programs, *see* 42
U.S.C. §§ 1320a-7, 1320a-7a, and that draconian consequence (on top of the
outsized penalties of the kind at issue here) provides the government another tool
to make massive settlement demands in exchange for withholding such charges.

fraud is indisputable, and PhRMA's member companies fully support appropriate

enforcement of the False Claims Act. But there is currently a fundamental

disconnect between the Act's punitive effects and the conduct justifying

punishment.

## II. AS THE PARTIES RECOGNIZE, THE EIGHTH AMENDMENT'S EXCESSIVE FINES CLAUSE APPLIES TO THE FALSE CLAIMS ACT

The irrationally large penalties defendants frequently face under the penalty

provision of the False Claims Act impose precisely the kind of harm the Excessive

Fines Clause is meant to avert. The Eighth Amendment provides: "Excessive bail

shall not be required, nor excessive fines imposed, nor cruel and unusual

punishments inflicted." U.S. Const. amend. VIII. The Excessive Fines Clause

"limits the government's power to extract payments, whether in cash or in kind, as

punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 327

(1998) (citation and internal quotation marks omitted). Because "the current

version of the [False Claims Act] imposes damages that are essentially punitive in

nature," *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S.

765, 784 (2000), the parties agreed and the district court correctly recognized that

False Claims Act penalties are subject to the Excessive Fines Clause. JA 1591.

The United States acknowledges as much again in its opening brief (at 26).

But there remains some uncertainty among federal courts as to whether the

False Claims Act's civil penalties are "fines" for purposes of the Eighth

Amendment. *Compare United States v. Mackby*, 261 F.3d 821, 829-831 (9th Cir. 2001) (subjecting False Claims Act to Eighth Amendment analysis), *and Hays v. Hoffman*, 325 F.3d 982, 992 (8th Cir. 2003) (in dicta, Eighth Amendment applies to FCA), *with United States v. Rogan*, 517 F.3d 449, 453-454 (7th Cir. 2008) ("It is far from clear that the Excessive Fines Clause applies to civil actions under the False Claims Act."); *United States v. Incorporated Vill. of Island Park*, 2008 WL 4790724, at *6 (E.D.N.Y. Nov. 3, 2008) (rejecting Eighth Amendment objection because the False Claims Act judgment "was entirely remedial"); *United States ex rel. Doe v. DeGregorio*, 510 F. Supp. 2d 877, 892 (M.D. Fla. 2007) (noting in dicta, "given the remedial nature of the False Claims Act, it is unlikely that statutory penalties would constitute an excessive fine").

PhRMA urges this Court to state unequivocally that the Excessive Fines Clause constrains penalties under the False Claims Act. The Supreme Court has held that civil fines may fall within the scope of the Eighth Amendment. *See Hudson v. United States*, 522 U.S. 93, 103 (1997) ("The Eighth Amendment protects against excessive civil fines, including forfeitures."). The district court was correct that the False Claims Act's penalties are "punitive." *See Bajakajian*, 524 U.S. at 328 (explaining that a payment is a fine if it constitutes punishment for an offense); *Stevens*, 529 U.S. at 784 ("the current version of the [False Claims Act] imposes damages that are essentially punitive in nature"). As the Ninth

11

Circuit explained in *Mackby*, several features of the False Claims Act make clear that penalties imposed under it are sufficiently punitive to bring them within the scope of the Excessive Fines Clause: (1) "[n]o damages to the government need be shown"; (2) "in addition to the sanction, treble damages are recoverable, demonstrating that the sanction's purpose is not to provide a form of damages"; and (3) "the legislative history of the False Claims Amendments Act of 1986 indicates that the statute has a deterrent purpose." 261 F.3d at 830. And even though the Act allows relators to retain a portion of any recovery, the government retains most of the proceeds, even when a relator prosecutes the action alone. Thus, the involvement of a private party poses no bar to the Eighth Amendment's applicability to qui tam suits. *Cf. Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 263-264 (1989) (Excessive Fines Clause "does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action *nor has any right to receive a share of the damages awarded*" (emphasis added)).

## III. THE DISTRICT COURT APPLIED THE CORRECT FACTORS TO ASSESS THE PROPORTIONALITY OF FALSE CLAIMS ACT PENALTIES

The district court correctly looked to several factors to evaluate whether the $50 million False Claims Act penalty it determined was mandated by the Act was constitutionally excessive. In *Bajakajian*, the Supreme Court established the standard for evaluating challenges under the Excessive Fines Clause: "[A] punitive

12

forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." 524 U.S. at 334. The *Bajakajian* Court identified four factors to "compare the amount of the forfeiture to the gravity of the defendant's offense": (1) the severity of the defendant's offense, (2) its relation to other criminal activity, (3) the maximum criminal penalty the defendant faced, and (4) the harm he caused to the government. *Id.* at 336-337. Although "*Bajakajian* does not mandate the consideration of any rigid set of factors in deciding whether a punitive fine is 'grossly disproportional to the gravity of a defendant's offense,'" courts often look to these factors to determine whether a fine is excessive. *United States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003); *see id.* at 1016-1017 (citing cases). In *United States v. Ahmad*, 213 F.3d 805, 816 (4th Cir. 2000), for example, this Court applied the *Bajakajian* factors to consider whether a civil forfeiture violated the Excessive Fines Clause.

In this case, the district court applied five factors modeled on those the Court offered in *Bajakajian* to determine whether the penalty Defendants faced violated the Excessive Fines Clause. *See* JA 1591. The court considered (JA 1593-1607): (1) whether the government suffered any economic or non-economic harm as a result of Defendants' conduct; (2) whether the violation was related to other illegal activity; (3) the benefits Defendants derived from the contract containing the false certification, (4) the "deference to be afforded to legislative judgments as reflected

13

in the statutory language," and (5) the criminal penalties Defendants could have faced as a result of the conduct (JA 1604-1607).  These factors provide an appropriate basis for "compar[ing] the amount of the [penalty] to the gravity of the defendant's offense."  *Bajakajian*, 524 U.S. at 336-337.

### A.    Harm To The Government

In assessing the gravity of a defendant's conduct, the court must first and foremost consider "the harm caused."  *Ahmad*, 213 F.3d at 817.  Courts can measure this harm by considering, for example, "the dollar volume of the loss caused, whether physical harm to persons was inflicted, threatened or risked, or whether the [conduct] has severe collateral consequences."  *United States v. Busher*, 817 F.2d 1409, 1415 (9th Cir. 1987).  The most common harm resulting from a False Claims Act violation is monetary loss to the government.  *See, e.g.*, *United States v. TDC Mgmt. Corp.*, 288 F.3d 421, 428 (D.C. Cir. 2002) ("'[T]he chief purpose of the statutes [which formed the basis for the False Claims Act] … was to provide for restitution to the government of the money taken from it by fraud[.]'" (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551-552 (1943) (alterations in original))).  Thus, in the ordinary case in which the government actually suffers some harm, the measure of the government's damages under the False Claims Act would be "the amount of money the government paid by reason of the false statement above what it would have paid absent the false

statement." *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 922 (4th Cir. 2003).

In this case, the Relator did not even attempt to prove damages at trial and failed to advance "any cognizable theory of damages under the FCA" during the civil penalty proceedings. JA 1593-1594. Thus, the criterion of economic damage indicated zero harm to the government.[5]

It may also be appropriate in certain circumstances for courts to consider harm to the government "beyond the money paid out of the treasury." *Mackby*, 339 F.3d at 1019; *see* JA 1599-1603. In *Ahmad*, for example, the defendant's conduct "not only deprived the government of important information, but also affected a financial institution's ability to comply with the law and jeopardized the funds of other persons." 213 F.3d at 817. The district court in this case gave some weight to non-economic harm because it concluded that "the kind of price-fixing conspiracy that the jury found existed" was "inimical to … the integrity of the procurement process and the public interest." JA 1600.

---

[5]     As Defendants explain, this Court must review the district court's factual findings with respect to damages for clear error. *See* Defs.' Br. 30-31 (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). Neither the Relator nor the government has demonstrated that the district court's conclusion that "the evidence is insufficient to quantify in any meaningful way any economic harm sustained by the government" (JA 1599) is clearly erroneous.

15

But the inquiry cannot end there.  Any such harm, as the district court recognized, must be considered both in relation to the magnitude of the penalty and in relation to aspects of the defendant's conduct that reflect reduced culpability. *See Bajakajian*, 524 U.S. at 339 (the government's "loss of information regarding the amount of currency leaving the country" was "minimal" when compared to a civil forfeiture of $357,144).  In particular, the district court concluded that any harm to the government here was limited because (1) Defendants' services under the contract were in no way deficient; (2) the pricing conspiracy affected only subcontracting prices and did not affect the overall bid; (3) the demands of the contract solicitation were novel and would require some amount of communication among companies; (4) the government renewed Defendants' contract, which demonstrated that it provided value; and (5) Defendants' liability was based "on the one-time filing of a single CIPD that was false with respect to one line item of the 51 line item bid."  JA 1600-1603.  These were precisely the sorts of considerations *Bajakajian* took into account when determining that the harm to the government the defendant caused was "minimal."  524 U.S. at 339.  Each of these factors mitigated Defendants' culpability and any resulting harm to the integrity of the procurement process the government might have suffered.  These findings, to which this Court must defer absent clear error, were entirely proper means of weighing the amount of the fine against the gravity of Defendants' violation.

## B.    Relationship To Other Illegal Activity

It is also appropriate for courts to consider, as the district court here did, "whether the violation was related to other illegal activity, and the nature and extent of that illegal activity." JA 1603. Where the conduct giving rise to the fine is related to other unlawful conduct, a heavier penalty may be justified. In *Bajakajian*, for example, the Supreme Court found it significant for purposes of assessing the defendant's culpability that the defendant's crime was "unrelated to any other illegal activities." 524 U.S. at 337-338. In *Ahmad*, by contrast, this Court found that the defendant's conduct was more egregious in part because the structuring violation "bore an intimate connection" to "a complicated larger scheme related to customs fraud violations." 213 F.3d at 816.

The district court noted that although Defendants "engaged in other unlawful conduct" during the same period as the violation at issue here, that conduct "was distinct from and unrelated to" this violation. JA 1603. This was "evidenced by, *inter alia*, the government's decisions not to pursue any criminal charges or intervene in the litigation" surrounding the instant claim. *Id.* Unlike in *Ahmad*, where the defendant "repeatedly structured transactions involving his clients' money to evade reporting requirements," 213 F.3d at 816, Defendants here were found to have made a single false representation that was then ascribed to each invoice Defendants submitted to the government. The district court properly

17

concluded that because any other illegal conduct and any harm caused by that conduct were unrelated to the conduct that formed the basis for the penalty, that conduct was "not relevant or material" in justifying the enormous size of the penalty. JA 1603; *see also* Defs.' Br. 56-57 (explaining why Defendants cannot be considered "repeat" offenders).

### C.    Benefits Derived By The Defendant

In assessing the excessiveness of the penalty, the district court also properly considered "the benefits derived by the Defendants" from the conduct at issue. JA 1605. Having calculated Defendants' profit on the key line item at issue as approximately $150,000, the court reasonably concluded that "there is nothing about this level of gain that would justify the minimum mandated civil penalty of over $50 million." *Id.*

Like the district court, other courts have looked to the benefit to the defendant to compare the severity of the offense with the harshness of the sanction imposed. *See, e.g.*, *United States v. Wagoner Cnty. Real Estate*, 278 F.3d 1091, 1101 (10th Cir. 2002) (in undertaking a proportionality analysis, "the severity of the offense must be evaluated, taking into account," *inter alia*, "the personal benefit reaped by the claimant"); *United States v. Alexander*, 32 F.3d 1231, 1236 (8th Cir. 1994) (in considering whether the sanction is grossly disproportionate, "helpful inquiries" include, *inter alia*, "an assessment of the personal benefit

18

reaped by the defendant"). Assessing the benefit the defendant gains as a result of the violation provides an important objective metric with which to assess the proportionality of the penalty, especially in cases like this one in which there was no harm to the government or in cases where that harm is difficult to measure. Where, as is often the case, the defendant's actual gain is a mere fraction of the penalty sought to be imposed, that discrepancy should be a powerful indicator that the penalty is grossly disproportionate.

### D.    Deference To Legislative Judgments

In *Bajakajian*, the Supreme Court explained that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." 524 U.S. at 336. Thus, courts will sometimes approve a statutory penalty in part because the statutory language makes clear that "Congress has made a judgment about the appropriate punishment." *Kelly v. EPA*, 203 F.3d 519, 524 (7th Cir. 2000). The False Claims Act, however, is not such a statute. On the contrary, as the district court accurately explained, "there is nothing in the language Congress adopted in the [False Claims Act] that suggests that Congress ever contemplated that civil penalties would be imposed at the level required here." JA 1605.

The False Claims Act's penalty provision stands in stark contrast to nearly every other civil penalty provision in the U.S. Code. Nearly all federal statutes that

19

authorize civil penalties in particular amounts also precisely specify the unit by which the penalties are to be calculated, such as "per claim," "per day," or per "violation." *See, e.g.*, 42 U.S.C. § 11045(d)(1) ("trade secret claimant is liable for a penalty of $25,000 *per claim*") (emphasis added); 33 U.S.C. § 1319(d) (imposing civil penalties for violation of Clean Water Act "not to exceed $25,000 *per day for each violation*") (emphasis added); JA 1605-1606 (citing other statutes).  When a statute sets both the amount of the penalty and the penalty unit in this way, it is reasonable to conclude that Congress—through its express choice of wording— made a judgment about the level of penalties that would be appropriate in different circumstances.  In the False Claims Act, Congress made no such judgment.  On the contrary, the False Claims Act is silent on the unit by which the penalty amount should be multiplied to reach an appropriate penalty.  The Act itself only provides that a person who violates it in any of the enumerated ways "is liable to the United States Government for *a* civil penalty."  31 U.S.C. § 3729 (emphasis added).  It is the courts, not Congress, that have filled in the Act's silence with a determination that False Claims Act penalties should be calculated per "claim."

Thus, in the False Claims Act Congress made no "judgment[] about the appropriate punishment" to be imposed through the Act's penalty provision to which courts need give any deference in judging excessiveness. *Bajakajian*, 524 U.S. at 336.  The absence of such a legislative judgment should only make courts

20

all the more skeptical about the permissibility of astronomically disproportionate penalties like the one in this case.

### E.    Other Applicable Penalties

*Bajakajian* instructs that "[i]n considering an offense's gravity, the other penalties that the Legislature has authorized are … relevant evidence." 524 U.S. 339 n.14. In *Bajakajian*, for example, the Supreme Court looked to the maximum sentence the defendant could have received under the Sentencing Guidelines and found that those penalties "confirm a minimal level of culpability." *Id.* at 339.

The district court here similarly looked to "certain federal criminal fines pertaining to false claims and other statutory civil penalties" for guidance as to "what penalties Congress thought are proportional to the conduct that would justify them." JA 1606. The court determined that there are two criminal statutes that apply to the filing of false claims and that under either party's interpretation of the statutes, the maximum criminal fines that could be imposed for Defendants' conduct "would be a small fraction of the civil penalties mandated under the [False Claims Act] on the facts of this case." JA 1607 (citing 18 U.S.C. §§ 287 and 371).

This analysis accords with other courts' application of this *Bajakajian* factor. In *United States v. Jose*, 499 F.3d 105, 112 (1st Cir. 2007), for example, the court calculated the maximum Guidelines sentence the defendant could have received and concluded that the fact that the forfeiture at issue was "less than 4 times the

21

maximum fine allowable under the Guidelines" "undermine[d] [the defendant's] argument that the forfeiture order is grossly out of proportion to the gravity of his offense."  Similarly, in *United States v. Bernitt*, 392 F.3d 873, 880 (7th Cir. 2004), the maximum punishment for the defendant's offense led the court to conclude that "Congress has construed [the defendant]'s offense as quite grave."  Because the proposed penalty was "significantly lower than the total penalty that the district court could have imposed," the forfeiture was "not grossly disproportionate to the gravity of the harm" the defendant caused.  *Id.* at 880-881.

Unlike in those cases, the penalty that Defendants faced here was substantially greater than the criminal penalties they could have faced.  *Cf. Mackby*, 339 F.3d at 1018 ("The substantially greater criminal penalties that Mackby hypothetically could have faced for his conduct do not 'confirm a minimal level of culpability.'" (quoting *Bajakajian*, 524 U.S. at 339)).  The district court thus correctly concluded that this factor weighed in favor of its finding that the penalty was grossly disproportionate to Defendants' violation.

## IV.  THE RELATOR OR THE GOVERNMENT MUST BEAR THE BURDEN OF ESTABLISHING THE FACTUAL PREDICATES TO SUPPORT THE PERMISSIBILITY OF FALSE CLAIMS ACT PENALTIES

As the district court recognized, in an Excessive Fines Clause inquiry the defendant has the burden to make a prima facie showing that the fine is excessive. JA 1591; *see Ahmad*, 213 F.3d at 816 (the court "place[s] the burden on Ahmad, as

the party challenging the constitutionality of the forfeiture, to demonstrate excessiveness" (citing *Bajakajian*, 524 U.S. at 348 (Kennedy, J., dissenting))); *Alexander*, 32 F.3d at 1235 ("Other circuits have been unanimous in holding that the defendant has the initial burden of making a prima facie showing of 'gross disproportionality.'" (citations omitted)).  But the Relator and the government also attempt to shift to Defendants the "burden of both producing relevant economic evidence and of proving the lack of economic harm."  U.S. Br. 40 n.9; *see* Rel. Br. 25-26.  Neither authority nor logic supports that approach.

When courts evaluate excessiveness under the standards described in Part III above, the defendant's showing must be compared against, *inter alia*, the harm to the government caused by the defendant's violation.  *See Bajakajian*, 524 U.S. at 336-337.  This analysis must be based on the damages to the government proved *by the relator or the government* during the trial, which is the approach many courts have followed.  *See, e.g.*, *United States v. Bourseau*, 531 F.3d 1159, 1173 (9th Cir. 2008) (evaluating defendants' excessiveness claim against its finding during a bench trial that the government had proven that it "sustained harm to its treasury"); *United States v. Rogan*, 517 F.3d 449, 454 (7th Cir. 2008) (same); *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 745 (N.D. Ill. 2007) (evaluating "the extent and harm of the violations" by reference to the amount of damages the plaintiffs proved to the jury); *United States ex rel.*

23

*Smith v. Gilbert Realty Co.*, 840 F. Supp. 71, 74 (E.D. Mich. 1993) (comparing actual damages found by the court on plaintiff's motion for summary judgment against the amount of the civil penalty).

This Court has already "decline[d] to shift the burden of proof on damages" to the defendant, noting that the False Claims Act "specifically places the burden of proving damages on the government." *Harrison*, 352 F.3d at 923. Because the relator "stands in the place of the government, he must assume the government's burden of proof as to damages in [a False Claims Act] case." *Id.* The Relator here could not meet that burden, so he did not even ask the jury to find any damages. *See* JA 1588. Even when given a second chance to do so during the civil penalty proceedings, the Relator failed to advance "any cognizable theory of damages under the [False Claims Act]." JA 1593-1594.

Once Defendants made their prima facie showing that the penalty was excessive, the district court correctly considered the *Relator's* evidence as to economic harm to the government to determine whether the penalty was grossly disproportionate. It would be nonsensical to assign to Defendants the burden of "producing relevant economic evidence and of proving the lack of economic harm" (U.S. Br. 40 n.9). Indeed, pursuant to a rational allocation of that burden, the Relator here already received two opportunities to prove that there *was* economic harm and could not do so. Rather, it is the relator's burden to produce relevant

evidence to prove damages or other harm to the government against which the penalty can be measured.

This assignment of burdens is consistent with the approach courts take in the criminal forfeiture context. In those cases, the defendant has the initial "burden of showing gross disproportionality." *Alexander*, 32 F.3d at 1235-1236. If the defendant satisfies that burden, "the court must then consider the government's evidence of 'just proportionality' and analyze in detail whether there has been a violation of the Excessive Fines Clause." *Id.*; *see also United States v. Sarbello*, 985 F.2d 716, 724 (3d Cir. 1993) ("The government's failure to proffer evidence of just proportionality in response to the defendant's showing of gross disproportionality will trigger judicial mitigation of the forfeiture commensurate with the nature of the crime."). This allocation of burden—the proponent of the fine must prove the facts that justify it, while the defendant retains the overall burden to show that the fine is excessive in light of those facts—accords with the parties' respective interests and access to proof. This Court should reject Appellants' attempt to shift to Defendants the burden that the Relator failed to meet.

## V.  THE DISTRICT COURT CORRECTLY HELD THAT IT LACKED DISCRETION TO FASHION A PENALTY LOWER THAN THE STATUTORY MINIMUM

The False Claims Act does not vest courts with discretion to impose a penalty below the statutorily mandated minimum. As the district court noted,

neither the Supreme Court nor this Court "has dealt specifically" with the question

whether a court possesses such discretion. JA 1608. But the courts of appeals that

have addressed the question have all agreed that "imposition of forfeitures under

the Act is not discretionary, but is mandatory for each claim found to be false."

*United States v. Killough*, 848 F.2d 1523, 1533 (11th Cir. 1988); *United States v.*

*Hughes*, 585 F.2d 284, 286 (7th Cir. 1978) ("This [civil fine] provision is

mandatory; it leaves the trial court without discretion to alter the statutory

amount."); *see also United States v. Brown*, 274 F.2d 107, 108, 110 (4th Cir. 1960)

(noting that the civil penalty is "mandatory" and that a district court does not have

"discretionary power … to reduce or remit it"); *United States v. Diamond*, 657 F.

Supp. 1204, 1206 (S.D.N.Y. 1987) ("[N]either the FCA nor cases interpreting this

act state that forfeiture penalties should bear a direct relationship to the amount

obtained through the filing of false claims. Instead, substantial authority supports

the view that '[t]his forfeiture provision is mandatory; it leaves the trial court

without discretion to alter the statutory amount.'" (quoting *Hughes*, 585 F.2d at

286)).[6] Thus, the district court properly calculated the fine and used $50 million as

---

[6]     In *Peterson v. Weinberger*, 508 F.2d 45, 55 (5th Cir. 1975), the Fifth Circuit
suggested in dicta "that the Government tacitly admits that the court may exercise
discretion where the imposition of forfeitures might prove excessive and out of
proportion to the damages sustained by the Government." Because the
government did not contest the award, that issue was not before that court. The
Fifth Circuit has not to date considered this issue. *See also* False Claims Act
Amendments of 1980, S. Rep. No. 96-615, at 2 & n.4 (explaining that the penalty

the baseline against which to determine whether the penalty comported with the Eighth Amendment.  *See, e.g.*, JA 1607.

If Congress had wanted to authorize such discretion under the False Claims Act, it knew how to do so, having given such authorization for criminal forfeitures. In that context, Congress has provided that "[i]f the court finds that the forfeiture is grossly disproportional to the offense it shall reduce or eliminate the forfeiture as necessary to avoid a violation of the Excessive Fines Clause."  18 U.S.C. § 983(g)(4); *see, e.g.*, *Sarbello*, 985 F.2d at 717-718 (court may reduce otherwise mandatory statutory criminal forfeiture if it violates the Excessive Fines Clause).[7]

In the False Claims Act, however, Congress has imposed a mandatory penalty without a similar provision granting the court discretion to reduce it under any circumstance.  If a fine under the False Claims Act exceeds the Constitution's limits, the district court may not fashion an alternative to Congress's prescribed

---

is "automatic and mandatory for each claim which is found to be false" and specifically "disapprov[ing]" of the *Peterson* dicta).

When Congress amended the Act in 1987 to raise the fixed statutory penalty, the Senate Judiciary Committee "reaffirm[ed] the apparent belief of the act's initial drafters that defrauding the Government is serious enough to warrant an automatic forfeiture rather than leaving fine determinations with district courts, possibly resulting in discretionary nominal payments."  False Claims Reform Act of 1985, S. Rep. No. 99-345, at 17 (1986).

[7]    When a jury awards punitive damages, a court has discretion to order remittitur when the award is excessive.  *See, e.g.*, *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1151-1152 (9th Cir. 2002).  But that power derives from the court's historic authority to grant a new trial.  *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996).

amount.  In that situation, the False Claims Act is unconstitutional as applied and may not be enforced.  *See, e.g.*, *Fisher v. King*, 232 F.3d 391, 395 n.4 (4th Cir. 2000) ("[A]n 'as-applied' challenge consists of a challenge to the statute's application only to the party before the court.  If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758-759 (1988))).

## CONCLUSION

For the foregoing reasons, the district court's judgment that no penalty should be imposed on Defendants should be affirmed.

Respectfully submitted.

s/ David W. Ogden

| | |
|---|---|
| JAMES M. SPEARS | DAVID W. OGDEN |
| MELISSA B. KIMMEL | JONATHAN G. CEDARBAUM |
| PHRMA | NICOLE RIES FOX* |
| 950 F Street, N.W. | WILMER CUTLER PICKERING |
| Washington, D.C.  20004 | HALE AND DORR LLP |
| (202) 835-3400 | 1875 Pennsylvania Avenue, N.W. |
| | Washington, D.C.  20006 |
| | (202) 663-6000 |
| | *Admitted only in California* |

October 16, 2012

28

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that the foregoing Brief For The Pharmaceutical Research and Manufacturers of America As Amicus Curiae In Support Of Defendants-Appellees complies with the type-volume limitation of Rule 32(a)(7)(B)(ii) because the brief contains 6,707 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii), as measured by the word count feature of the word processing system used to prepare this brief. I further certify that the foregoing Brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in 14-point Times New Roman.


s/Jonathan G. Cedarbaum
JONATHAN G. CEDARBAUM


October 16, 2012

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2012, I caused the foregoing Brief For The Pharmaceutical Research And Manufacturers Of America As Amicus Curiae In Support Of Defendants-Appellees to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the Court's CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. Eight paper copies are also being filed with the Clerk of the Court by overnight courier.

s/Jonathan G. Cedarbaum

JONATHAN G. CEDARBAUM

October 16, 2012