Nos. 12-1369, 12-1417 & 12-1494
_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

UNITED STATES EX REL.
KURT BUNK & RAY AMMONS

Plaintiffs-Appellants/Cross-Appellees,

v.

BIRKART GLOBISTICS, GmbH & Co., et al.,

Defendants-Appellees/Cross-Appellants.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
_____

RESPONSE/REPLY BRIEF FOR THE UNITED STATES
_____

STUART F. DELERY
Principal Deputy Assistant Attorney
 General
NEIL H. MacBRIDE
 United States Attorney
MICHAEL S. RAAB
 (202) 514-4053
JEFFREY CLAIR
 (202) 514-4028
 Attorneys, Civil Division
 Room 7243, Department of Justice
 950 Pennsylvania Ave., N.W.
 Washington, D.C.  20530

# TABLE OF CONTENTS

<u>**Page**</u>

INTRODUCTION AND SUMMARY ................................................................... 1

ARGUMENT ............................................................................................................3

    I.    Relators Have Article III Standing To Bring Suit
        For Civil Money Penalties Authorized By The
        False Claims Act ..................................................................................3

            A.    Under *Vermont Agency,* The Statutory
                    Assignment Of Civil Money Penalty
                    Claims Based On Injury to The
                    Government's Sovereign Interests
                    Satisfies Article III......................................................................7

            B.    Congress Has Authority To Assign Civil
                    Money Penalty Claims To A Private Party .............................16

    II.    Defendants' Article II Claims Are Meritless ......................................20

            A.    Defendants Waived Their Article II Claims
                    By Failing To Present Them In District
                    Court And By Failing To Adequately Brief
                    Them Here .................................................................................20

            B.    *Qui tam* Relators Are Not
                    Officers Of The United States Subject To
                    The Appointments Clause of Article II ...................................22

            C.    The FCA's *Qui tam* Provisions Are
                    Consistent With The Executive's Obligation
                    Under Article II To "Take Care" That the
                    Laws Be Faithfully Executed...................................................28

i

III.    The District Court Erred In Concluding That The
        Excessive Fines Clause Bars The Imposition Of
        Substantial Civil Money Penalties On Defendants
        Who Have Repeatedly Engaged In Fraud And
        Unlawful Price Fixing ........................................................................32

        A.    The Relators and The Government Invoked
              Rather Than Waived The District Court's
              Remedial Discretion To Award Reduced
              Penalties That Would Comport With The
              Excessive Fines Clause ............................................................35

        B.    Defendants' Profit And Contract
              Performance Have No Bearing On Whether
              The Requested Penalties Are
              Unconstitutionally Excessive ..................................................39

        C.    Defendants Failed To Carry Their Burden
              Of Proving That Their Collusive
              Price-Fixing Did Not Harm The
              Government ..............................................................................45

        D.    The Penalties Requested By Relators and
              The United States Are Commensurate With
              The Public And Private Harms Caused By
              Defendants' Fraud, The Scale and Duration
              of Defendants' Fraud, The Demonstrable
              Need For A Strong Deterrent, And
              Defendants' History Of Similar Misconduct ...........................51

IV.     Defendants' "Landed Rate" Price-Fixing
        Agreement Is Not Made Lawful By The Shipping
        Act ..................................................................................................54

CONCLUSION ...........................................................................................59

RULE 32 CERTIFICATE OF COMPLIANCE .......................................60

CERTIFICATE OF SERVICE ....................................................................60

## TABLE OF AUTHORITIES

**<u>Cases</u>:**

*A Helping Hand, LLC v. Baltimore County, MD.*,
    515 F.3d 356 (4th Cir. 2008) ......................................................20

*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*,
    106 F.3d 11 (2d Cir. 1997) .........................................................17

*Alabama* v. *Texas*, 347 U.S. 272 (1954)..............................................17

*Ayotte v. Planned Parenthood of Northern New*
    *Eng.*, 546 U.S. 320 (2006) .........................................................34

*Bigelow v. RKO Radio Pictures,* 227 U.S. 251 (1946).........................46

*Bly-Magee v. California,* 256 F.3d 1014 (9th Cir. 2001) .......................8

*BMW v. Gore*, 517 U.S. 559 (1996) .....................................................53

*Buckley v. Valeo*, 424 U.S. 1 (1976).......................23, 24, 25, 26, 27, 28

*Corti v. Storage Technology Corp.*, 304 F.3d 336
    (4th Cir. 2002) ..........................................................................20

*Davis v. Federal Election Comm'n*, 554 U.S. 724 (2008) ......................9

*Davis v. Passman*, 442 U.S. 228 (1979)...............................................29

*El Paso & Northeastern R. Co. v. Gutierrez,*
    215 U.S. 87 (1909) ....................................................................36

*Environmental Defense Fund, Inc. v. Lamphier*,
   714 F.2d 331 (4th Cir. 1983) ........................................................37

*Eriline Co. S.A. v. Johnson*, 440 F.3d 648 (4th Cir. 2006) ...................22

*F. Hoffman-La Roche Ltd v. Empargan S.A.*,
   542 U.S. 155 (2004) ...................................................................57

*F.W. Woolworth Co. v. Contemporary Arts*,
   344 U.S. 228 (1952) ...................................................................16

*FMC v. Seatrain Lines, Inc.*, 411 U.S. 726 (1973)...............................56

*Friends of the Earth v. Laidlaw Environmental Servs., Inc.*,
   528 U.S. 167 (2000)....................................................................12

*Freytag v. Commissioner*, 501 U.S. 868 (1991)...................................23

*FTC v. Superior Court Trial Lawyer's Ass'n*,
   493 U.S. 411 (1990) ...................................................................47

*Granfinaciera S.A. v. Nordberg*, 492 U.S. 33 (1989)...........................13

*Hancock v. Train*, 426 U.S. 167 (1976)..............................................19

*Harrison v. Westinghouse Savannah River Co.*,
   176 F.3d 776 (4th Cir. 1999) ........................................8, 35, 43, 44

*Kelly v. Boeing Co.*, 9 F.3d 743 n.21 (9th Cir. 1993)...............23, 28, 31

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................6, 11, 12

*Massachusetts v. EPA*, 549 U.S. 497  (2007) .......................................13

*Mayo v. United States*, 319 U.S. 441 (1976) .......................................19

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819).......................19

*Morrison v. Olson*, 487 U.S. 654 (1988) .................................28, 30, 31

iv

*Pacific Seafarers, Inc. v. Pacific Far East Line, Inc.*,
    404 F.2d 804 (D.C. Cir. 1968) ......................................................57

*Pequignot v. Solo Cup Co.*, 640 F. Supp. 2d 714
    (E.D. Va. 2009)........................................................................7, 19

*Rainwater v. United States*, 356 U.S. 590 n.8 (1958)............................27

*Regan v. Time, Inc.*, 468 U.S. 641 (1984) ............................................34

*Rex Trailer Co. v. United States*, 350 U.S. 148 (1956) ....................8, 16

*Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749
    (5th Cir. 2001) ..............................................23, 24, 25, 28, 29, 31

*Shalala v. Illinois Council on Long Term Care*,
    529 U.S. 1 (2000) ...................................................................... 8

*Singelton v. Wulff*, 428 U.S. 106 (1976)...............................................20

*Spiller v. Atchison, Topeka & Santa Fe Ry*,
    253 U.S. 117 (1920) ...................................................................18

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).......................10

*Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321
    (Fed. Cir. 2010) ...................................................1, 5, 7, 15, 19, 20

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998) ...................................................................... 4

*Stern v. Marshall*, 131 S. Ct. 2594 (2011)............................................13

*Taylor v. Sturgell*, 553 U.S. 880 (2008) ...............................................48

*Toepleman* v. *United States*, 263 F.3d 697 (4th Cir. 1959)............................16, 51

*United States ex rel. Kreindler, v. United Technologies*,

985 F.2d 1148 (2d Cir. 1993) ....................................................31

*United States ex rel. Milam v. Univ. of Texas M.D.*
*Anderson Cancer Center*, 961 F.2d 46 (4th Cir. 1992).................................12

*United States ex rel. Owens v. First Kuwaiti General*
*Trading and Contracting Co.*, 612 F.3d 724
(4th Cir. 2010) .................................................................42

*United States ex rel. Sanders. v. American-Amicable*
*Life Ins. Co.*, 545 F.3d 256 (3d Cir. 2008) ......................................8

*United States ex rel. Stone v. Rockwell Int'l Corp.*,
282 F.3d 787 (10th Cir. 2002)...............................................23, 28

*United States ex rel. Taxpayers Against Fraud v. Gen Elec.*
*Co.*, 41 F.3d 1032 (6th Cir. 1994) ........................................23, 28, 31

*United States v. Ahmad*, 213 F.3d 805 (4th Cir. 2000) .............................40, 46, 48

*United States v. Alexander*, 32 F.3d 1231 (8th Cir. 1991) ....................................49

*United States v. Bajakajian,* 524 U.S. 328
(1998)..........................................40, 42, 45, 46, 48, 49, 50, 53, 54

*United States v. Bollin*, 264 F.3d 391 (4th Cir. 2001) ......................................41, 51

*United States v. Bourseau*, 531 F.3d 1159 (9th Cir. 2008) ..................................49

*United States v. Buculei*, 262 F.3d 322 (4th Cir. 2001)........................................22

*United States v. Germaine*, 99 U.S. 508 (1879) ........................................22, 25, 26

*United States v. Gosselin World Wide Moving N.V.*,
411 F.3d 502 (4th Cir. 2005)................................................54, 55

*United States v. Jalaram, Inc.*, 599 F.3d 347 (4th Cir. 2010) ..............................41

*United States v. Jiminez*, 507 F.3d 13 (1st Cir. 2007)...........................................52

*United States v. Killough*, 848 F.2d 1523 (11th Cir. 1988) ................................46

*United States v. M.C.C. of Florida, Inc.*, 863 F.2d 802
(11th Cir. 1989) ........................................................................37

*United States v. Mackby*, 339 F.3d 1013
(9th Cir. 2003) ...........................................................33, 35, 38, 41, 51

*United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131
(4th Cir. 1996) ........................................................................40

*United States v. Powell*, 650 F.3d 388 (4th Cir. 2011) ...........................................53

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008) ........................................49

*United States v. Sarbello*, 985 F.2d 716 (3d Cir. 1994) ........................................49

*Varijen v. Cleveland Gear Co., Inc.*, 250 F.3d 426
(6th Cir. 2001) ..........................................................................8

*Vermont Agency of Natural Resources v. United States
ex rel. Stevens*, 529 U.S. 765
(2000)...............................1, 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 19, 20, 21, 29

*Warth v. Seldin*, 422 U.S. 490 (1975)..................................................11

*Williams v. New York*, 337 U.S. 241 (1949).........................................53

## United States Constitution:

Art. II..................................... 1, 2, 3, 18, 20, 21, 22, 23, 24, 25, 28, 29, 30, 31
Art. III ..................................................3, 4, 5, 6, 7, 10, 11, 13, 14, 15
Art. IV, § 3, cl. 2 ........................................................................17

Seventh Amend........................................................................13, 14
Eighth Amend. ....................................................................35, 43, 50, 51

**Statutes:**

False Claims Act:

31 U.S.C. § 3729(a) ...................................................................37

31 U.S.C. § 3729(a)(1) ................................................................7

31 U.S.C. § 3703(b) ...................................................................17

31 U.S.C. § 3703(b)(2)-(4) .........................................................30

31 U.S.C. § 3730(b)(4) ...............................................................30

31 U.S.C. § 3730(b)(4)(A) & (c) ................................................27

31 U.S.C. § 3730(c)(2)(A)......................................................27, 30

31 U.S.C. § 3730(c)(2)(B) ..........................................................30

31 U.S.C. § 3730(c)(3) ...............................................................30

31 U.S.C. § 3730(d)(1) & (2) ................................................10, 17


35 U.S.C. § 292 .........................................................................5

35 U.S.C. § 292(a) ......................................................................5

35 U.S.C. § 292(b) (2006) ...........................................................5

Shipping Act:

46 U.S.C. § 1702(19)..................................................................58

46 U.S.C. § 1702(24)..................................................................57

46 U.S.C. § 1703(a) ...................................................................58

46 U.S.C. § 1703(a)(1) ..........................................................56, 58

46 U.S.C. § 1709(a) ...................................................................58


2 U.S.C. § 437c(a)(1) .................................................................26

2 U.S.C. § 437c(a)(2) .................................................................26

2 U.S.C. § 437c(a)(4) .................................................................26


18 U.S.C. § 287 .........................................................................27


Pub. L. No. 112-29, § 16(b), 125 Stat. 284 (2011)................................5

**Legislative Materials:**

H.R. Rep. No. 98-53, Pt. 2, 98th Cong., 1st Sess. (1983),
*reprinted in* 1984 U.S.C.C.A.N. 221 ............................................................57

S. Rep. No. 99-345, 99th Cong., 2d Sess. at 9, *reprinted in*
1986 U.S.C.C.A.N. 5274 ......................................................44, 52

**Miscellaneous:**

Richard A. Posner, *Economic Analysis of Law* 262
(8th ed. 2011) ................................................................................52

## INTRODUCTION AND SUMMARY

Defendants presented more than nine thousand false claims to the United States. They nonetheless assert that the district court correctly relieved them of *all* liability for the civil money penalties mandated by the False Claims Act. Defendants maintain that the relators had neither standing nor authority under Article II of the Constitution to bring suit in the first instance. They further argue that the Excessive Fines Clause bars the imposition of any of the statutory penalties prescribed by Congress. None of these contentions, however, supports excusing defendants of all liability for defrauding the United States.

First, in *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U.S. 765, 771-78 (2000), the Supreme Court held that *qui tam* relators have Article III standing. The Court made clear that claims arising out of injuries to the United States may be assigned to relators, and that the government's interests in the suit present a case or controversy properly amenable to judicial resolution. Defendants assert that this holding does not apply to claims for civil penalties. That contention, however, is inconsistent with *Vermont Agency*, which itself involved a claim for civil penalties, and it has been firmly rejected by the only court of appeals to address it. *See Stauffer* v. *Brooks Bros., Inc.*, 619 F.3d 1321 (Fed. Cir. 2010).

Second, defendants' assertion that *qui tam* cases violate the Appointments and Take Care clauses of Article II are meritless. Defendants did not raise these contentions in district court and have not preserved them for review here. Moreover, contentions that *qui tam* litigation violates Article II have been rejected by four courts of appeals and cannot be reconciled with the relator's wholly private status or the Executive Branch's substantial practical control over the proceedings.

Third, defendants err in asserting that the Excessive Fines Clause excuses them of all penalty liability. A substantial penalty is authorized by statute and plainly warranted in light of the scale and duration of defendants' fraud, their history of similar misconduct, the harm to a fair procurement process, and the need for a substantial deterrent. The district court, in nonetheless imposing *zero* penalty liability, violated principles requiring a reviewing court to accord great deference to Congress' judgment on appropriate sanctions for unlawful conduct and misconstrued its duty to enforce the statute to the fullest extent consistent with the Constitution.

Finally, the Shipping Act does not immunize any of defendants' collusive price-fixing agreements. The Shipping Act creates a narrow exception to the anti-trust laws for certain agreements by or between marine terminal operators or ocean common carriers. It does not apply to defendants or other entities that are not

2

subject to the FMC's regulatory oversight and thus does not make lawful

defendants' efforts to fix the price for the foreign inland segment of transportation

to the United States.

## ARGUMENT

I.     Relators Have Article III Standing To Bring Suit For
       Civil Money Penalties Authorized By The False Claims
       Act.

In *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*,

529 U.S. 765, 771-78 (2000), the Supreme Court held that relator suits brought

under the *qui tam* provisions of the False Claims Act satisfy the "case or

controversy" requirements of Article III of the Constitution.  The Court reasoned

that the FCA, by providing the relator a share of the government's monetary

recovery, effects a partial assignment of the government's statutory claims to the

relator.  *Id*. at 773.  It concluded that the assignment to the relator of monetary

claims arising out of an injury-in-fact to the United States suffices to give the

relator standing.  *Id.* at 771-74.

The Court further reasoned that a relator's Article III standing is confirmed

by the long tradition of *qui tam* actions in England and the American Colonies.  It

explained that "Article III's restriction of the judicial power to 'Cases' and

'Controversies' is properly understood to mean 'cases and controversies of the sort

traditionally amenable to, and resolved by, the judicial process.'"  *Id*. at 774,

3

quoting *Steel Co.* v. *Citizens for a Better Environment*, 523 U.S. 83, 102 (1998). It thus concluded that constitutional standing requirements should be construed in light of the historical understanding of the types of disputes that were properly within the cognizance of a court of law. *Id*. at 774.

Turning to that inquiry, the Court concluded that *qui tam* provisions like those at issue here have a long historical pedigree stretching back to the end of the 13th century and were prevalent in America as well as in England in the period immediately before and after the framing of the Constitution. *Id*. at 774-78. The Framers' conception of a "case or controversy" was thus developed at a time when *qui tam* and similar suits were well-established and firmly within the category of disputes subject to judicial resolution.

The Court concluded:

> We think this history well nigh conclusive with respect to the question before us here: whether *qui tam* actions were "cases or controversies" of the sort traditionally amenable to, and resolved by, the judicial process." *Steel Co.*, 523 U.S. at 102. When combined with the theoretical justification for relator standing discussed earlier, it leaves no room for doubt that a *qui tam* relator has Article III standing.

*Id.* at 777-78.

Defendants nonetheless argue that a relator lacks standing where he only seeks civil money penalties. They argue that where penalties alone are sought, without being joined to a claim for damages, the relator's *qui tam* action seeks to

4

vindicate a purely sovereign interest that cannot be assigned by the government to a private party.  Defendants further maintain that a suit for civil money penalties merely asserts a generalized, public interest in proper administration of the law that cannot support Article III standing.

The only court of appeals to address these contentions has rejected them. In *Stauffer* v. *Brooks Bros., Inc.*, 619 F.3d 1321 (Fed. Cir. 2010), the Federal Circuit addressed whether a relator suing under the *qui tam* provisions of the "false patent marking" statute, 35 U.S.C. § 292, has standing to sue for statutory fines imposed on one who marks an item in a manner that falsely states or implies it is patented.  This statute provides that violators shall be fined up to $500 for each such offense.  35 U.S.C.  § 292(a).  And, until recently amended, the false marking statute, like the FCA, had *qui tam* provisions providing that "[a]ny person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States."  35 U.S.C. § 292(b) (2006).[1]

---

[1] Congress eliminated the *qui tam* provisions of the False Marking Statute in 2011. *See* Pub. L. No. 112-29, § 16(b), 125 Stat. 284, 329  (2011).  The amendments, however, have no bearing on *Stauffer*'*s* analysis of whether a statutorily authorized *qui tam* suit for collection of a statutory penalty satisfies the requirements of Article III.

Relying on *Vermont Agency*, the Federal Circuit rejected the same standing arguments pressed by defendants here and held that the relator's suit satisfied the requirements of Article III.   First, the court held that a relator's standing under *Vermont Agency* does not turn on whether the injury suffered by the United States pertains to proprietary or sovereign interests.  Rather, the court of appeals recognized that "[t]he Supreme Court considered both types of injuries and found them collectively to be sufficient to confer standing on the government and therefore on the relator" as the government's partial assignee. *Id.* at 1326-27.

Second, the court held that the relator's suit was not barred by standing principles holding that a plaintiff must assert more than a generalized public interest in enforcing compliance with the law.  The court recognized that such interests are insufficient to support suit *against* the government.  It reasoned, however, that this principle does not apply in instances where, as in *qui tam* statutes, "'Congress has created a concrete private interest in the outcome of a suit against a private party for the Government's benefit, by providing a cash bounty for the victorious plaintiff.'"  *Id*. at 1326, quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 572-73 (1992).

Finally, the court rejected defendant's contention that claims arising out of an injury to a sovereign interest are not assignable at common law.   The Court again noted that there is a deep-seated tradition of permitting such suits to go

6

forward. *Id*. at 1327 n.3. It concluded that, in light of *Vermont Agency*'s heavy reliance on this historical underpinning, it is settled that the United States may assign even claims based on injury to a purely sovereign interest. *Ibid.*; *accord Pequignot* v. *Solo Cup Co.*, 640 F. Supp. 2d 714, 724 n.15 (E.D. Va. 2009).

Defendants and their amicus, the Chamber of Commerce, now press the same arguments the Federal Circuit rejected, thus asserting: (1) that a *qui tam* suit for FCA civil money penalties is based on a generalized injury to the public interest in compliance with the law that is too diffuse to support individual standing, and (2) that a suit for FCA penalties is based on claims arising out of an injury to sovereign interests that cannot be assigned to an individual. As *Stauffer* holds, however, each of these contentions is incorrect.

> A.   Under *Vermont Agency,* The Statutory Assignment
>      Of Civil Money Penalty Claims Based On Injury to The
>      Government's Sovereign Interests Satisfies Article III.

Defendants' standing arguments are at odds with decades of FCA case law recognizing that *qui tam* relators may bring suit for civil money penalties without regard to whether the false claims have caused the government economic damages. An individual violates the FCA whenever he "knowingly presents, or causes to be presented" a  false claim to the United States, regardless of whether the claim is financial or economic harm to the government. 31 U.S.C. § 3729(a)(1). This Court as well as many others has accordingly held that *qui tam* suits may go

7

forward without regard to whether the United States has suffered economic damages as a result of the false or fraudulent claim. *Harrison* v. *Westinghouse Savannah River Co.*, 176 F.3d 776, 785 n.7 (4th Cir. 1999)(holding, in a *qui tam* case, that "there is no requirement that the government have suffered damages as a result of the fraud"); *accord Bly-Magee* v. *California*, 256 F.3d 1014, 1017 (9th Cir. 2001); *Varijen* v. *Cleveland Gear Co., Inc.,* 250 F.3d 426, 429 (6th Cir. 2001); *United States ex rel. Sanders*. v. *American-Amicable Life Ins. Co.,* 545 F.3d 256, 259 (3d Cir. 2008); *see also Rex Trailer Co.* v. *United States,* 350 U.S. 148, 152-53 & n.5 (1956).

The upshot of defendants' argument is that *Vermont Agency* impliedly overrules all these precedents by limiting relator standing to instances in which the government has suffered economic damages or some other injury to its proprietary interests.   But had the Supreme Court intended to effect that sea change in FCA law, it surely would have referenced this long string of contrary precedent and expressly held that these cases are no longer good law. *See Shalala* v. *Illinois Council on Long Term Care*, 529 U.S. 1,18 (2000) (Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*").

*Vermont Agency* supports rather than overrules precedents recognizing a relator's authority to sue for FCA penalties without regard to whether the pertinent false claims caused the government economic injury.   First, the *Vermont Agency*

8

relator's complaint expressly sought damages and civil penalties (*see ibid.,* No.

98-1828 (U.S. 2000),  App. 40-41)  and the petitioner expressly advised the Court

that both damages and civil money penalties were at issue in the case.  *See id.*, Br.

for Petitioner at 5, noting that relator "seeks twenty-five percent of treble damages

and civil penalties arising out of the allegedly false claims * **."  The Supreme

Court accordingly found that the relators' "complaint asserts an injury to the

United States – *both the injury to its sovereignty arising from violation of its laws*

(which suffices to support a criminal lawsuit by the Government) and the

proprietary injury resulting from the alleged fraud."  *Vermont Agency*, 529 U.S. at

771 (emphasis added).   The Court nonetheless held that the relator had standing to

sue, without any suggestion that the relator lacked standing to assert the subset of

claims seeking civil penalties.

    That omission is telling.  Standing is not dispensed in gross.  Rather, the

settled rule is that "a plaintiff must demonstrate standing for each claim he seeks

to press and for each form of relief that is sought."  *Davis v. Federal Election

Comm'n*, 554 U.S. 724, 734 (2008) (internal quotation omitted).   Thus, the

relator's standing to assert civil money penalty claims was squarely before the

*Vermont Agency* Court, and settled standing doctrine required the Court to

determine whether there was a specific basis for relator's standing to pursue the

penalty claims, *independent* of the relator's standing to pursue his treble damages

claim.  The Court, however, affirmed the relator's standing to seek *both* compensatory damages and penalties, thus recognizing that a relator has Article III standing to assert both claims.

Amicus argues that because the Court stated that "[t]he FCA can reasonably be regarded as effecting a partial assignment of the Government's *damages* claim," the Court's standing holding impliedly forecloses suits for civil penalties.  *See* Brief of Chamber of Commerce as Amicus Curiae at 13, quoting, with added emphasis, *Vermont Agency*, 529 U.S. at 773.   But if this negative inference were correct, it would suggest that the Court meant to hold that the FCA does not assign penalty claims to the relator in the first instance – a contention that is at odds with the plain language of the statute (*see* 31 U.S.C. §§ 3730(d)(1) & (2), affording relator a share of the *entire* monetary recovery), the Court's recognition that the relator's complaint sought recovery for claims arising out of injuries to both proprietary and sovereign interests (*see Vermont Agency*, 529 U.S. at 771), and the Court's statement that it intended to explicate standing for "the portion of the recovery retained by the relator (*id*. at 772)."

Construction of the Court's holding must rest on the entirety of the Court's reasoning, not a negative inference drawn from a single word in a single sentence. *See*, *e.g*., *St. Mary's Honor Center* v. *Hicks*, 509 U.S. 502, 515 (1993).  Had the Court intended to limit the relator's standing to the treble damages authorized by

10

the FCA and to foreclose *qui tam* suits for civil penalties, it would have expressly held that the relator did not have standing to assert the penalty claims set forth in the complaint and articulated its reasoning for drawing such a distinction.   It instead held, without qualification and with respect to a complaint plainly understood to assert both penalty and damages claims, that "a *qui tam* relator under the FCA has Article III standing." *Id*. at 778.

Second, defendants err in relying on *Lujan*, *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83 (1998), and similar cases holding that citizen suits to vindicate a generalized public interest in proper administration of the law do not meet the requirements of Article III.   *Vermont Agency* refutes this point directly.  There, the Court reasoned that: (1) unlike the general public, the government as sovereign has standing to bring claims based on injury to its sovereign powers and thus can bring an action merely to enforce compliance with the law (*id*. 529 U.S. at 771), (2) that the FCA partially assigns to a relator claims arising out of an injury to these sovereign interests, (*id*. at 773,  and (3) that while a party must ordinarily base standing on his own injuries (*see id*. at 772, citing *Warth* v. *Seldin*, 422 U.S. 490 (1975)), standing doctrine nonetheless holds that "the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Id*. at 773.

The Court thus expressly held that *the United States*' injury suffices to confer standing on the FCA relator.  *Id*. at 774; *accord Lujan*, 504 U.S. at 572-72.

11

As this Court explained, in reasoning that closely tracks the analysis subsequently adopted in *Vermont Agency*, the government is the real party in interest in a *qui tam* suit, the damages and penalties at issue are for an injury to the government, and it is the government's injury, not the relator's, that supports the justiciability of the suit. *United States ex rel. Milam* v. *Univ. of Texas M.D. Anderson Cancer Center*, 961 F.2d 46, 49 (4th Cir. 1992).[2]

None of the "citizen suit" cases cited by defendants involves a *qui tam* action or suits similarly based on injuries to the government. *Lujan*, which predates *Vermont Agency*, expressly distinguished "citizen suits" based on a generalized interest in enforcing the law from suits in which "Congress has created a concrete private interest in the outcome of a suit against a private party for the Government's benefit, by providing a cash bounty for the victorious plaintiff." *Id*., 504 U.S. at 572-72. *Vermont Agency* itself relies on this distinction in concluding that relators have standing on the basis, not of an individual's generalized interest in enforcing the law, but on the injury-in-fact suffered by the United States and the

---

[2] Moreover, in *Friends of the Earth* v. *Laidlaw Environmental Servs., Inc.*, 528 U.S. 167 (2000), the Court made clear that where civil money penalties serve to deter unlawful conduct that may be injurious to the plaintiff, suits seeking their recovery are justiciable, even where the *entire* penalty is paid to the government. *Id*. at 185-86. That affords a further basis for standing where the relator is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit.

subsequent partial assignment to the relator of claims arising out of that injury. *Id.* at 772-74.

*Steel Co.*, which also predates *Vermont Agency*, is inapposite. It holds that a plaintiff who brings suit seeking the award of statutory penalties payable wholly to the United States cannot base standing on his own, generalized interest in enforcing the law. *Id*., 523 U.S. at 106. That case, however, did not involve a statute that affirmatively authorizes suits on the basis of a partial assignment of claims arising out of injury to the United States.

*Massachusetts* v. *EPA*, 549 U.S. 497, 518-19 (2007) also does not support defendants' position. It holds that an injury to sovereign interests is sufficient to support the government's standing to sue. It is thus consistent with *Vermont Agency*, which similarly holds that where claims arising out of an injury to sovereign interests are assigned to a private party, the sovereign's injury-in-fact satisfies the requirements of Article III.

*Granfinaciera S.A.* v. *Nordberg*, 492 U.S. 33 (1989), is even further afield. *Granfinanciera* is part of a line of precedent recognizing that while the Seventh Amendment and Article III may require disputes over certain "private rights" to be adjudicated by a jury or Article III tribunal, Congress may assign resolution of disputes involving "public rights" to a non-Article III tribunal. *Id*. at 51 n.8; *see also Stern* v. *Marshall*, 131 S. Ct. 2594, 2611-15 (2011). While the Supreme

Court has not articulated a precise definition of such public rights, they include statutory rights arising between the government and persons subject to its constitutional authority (*id.* at 2612-13) – a scope that would plainly include penalty claims based on a violation of the FCA.

Contrary to amicus' assertion, these "public rights" cases focus on whether adjudication by a jury or an Article III forum is constitutionally required and do not address the question of whether claims based on injury to a public right are assignable.  They are relevant here only insofar as they demonstrate that, notwithstanding the constraints of the Seventh Amendment or Article III, Congress has plenary authority to determine how "public rights" arising out of a federal statute should be adjudicated – a point that further supports  Congress's power to assign them to a private party.

Finally, defendants' ignore the substantial historical evidence supporting the justiciability of *qui tam* suits based on claims for penalties or fines due the government.  *Vermont Agency* makes clear that the contours of Article III's "case or controversy" requirement are best understood in light of the historical understanding of what types of cases were fit for judicial resolution.  The Court thus found "well nigh conclusive" evidence that *qui tam* cases were well established in English and American law when the Framers drafted Article III. *Vermont Agency*, 529 U.S. at 777-78.

14

As *Stauffer* reasons, many of those cases entailed suits in which the relator sought fines or penalties to vindicate the sovereign interests of the United States in obedience to federal law. *Stauffer*, 619 F.3d at 1326-27. For example, the Supreme Court relied on statutes enacted by the First Congress allowing a *qui tam* plaintiff or citizen "informer" to sue for, and receive half the fine for, an individual's failure to file a census return (*id.* at 777 n.6, citing 1 Stat. 102 (1790)), penalty suits for violations of laws pertaining to the carriage of seaman (*ibid.*, citing 1 Stat. 131, 133 (1790)), and penalty suits for violations of law regulating trading with Indian tribes (*ibid.*, citing 1 Stat. 137-78 (1790)).

These statutes demonstrate that *qui tam* suits that only seek fines or penalties for violation of the law, without regard to whether the government has also suffered a proprietary injury, were historically regarded as presenting cases or controversies fit for judicial resolution. Neither defendants nor their amici make any attempt to reconcile their position with this historical record. Under *Vermont Agency*, however, the long tradition of permitting *qui tam* suits to go forward in a court of law is virtually dispositive evidence that such cases present a "case or controversy" within the meaning of Article III.

B.   Congress Has Authority To Assign Civil Money Penalty
     Claims To A Private Party.

Defendants' related contentions that the government's "sovereign interests" cannot be assigned to a private party in the first instance are based on a false premise and unsupported by any pertinent authority.  As an initial matter, defendants err in asserting that civil money penalty claims are necessarily and exclusively based upon the government's sovereign interests in ensuring compliance with the law.  That is of course a principal objective of imposing civil money penalties.  But civil penalties also further a "proprietary" interest in ensuring that the government is adequately compensated for its pecuniary losses – especially in cases where actual economic damages may not be susceptible to ready proof.  *See Rex Trailer*, 350 U.S. at 152-53 (comparing FCA civil penalties to liquidated damages); *Toepleman* v. *United States*, 263 F.3d 697, 699 (4th Cir. 1959) (noting that civil penalties provide reasonable indemnity for government in cases where calculable damages have not been proven); *cf. F.W. Woolworth Co.* v. *Contemporary Arts*, 344 U.S. 228, 231-32 (1952) (purpose of statutory damages under the Copyright Act is to ensure adequate redress for injured party where actual damages are difficult or impossible to prove).

16

In any event, the FCA does not assign the government's underlying sovereign or proprietary interests to a private party. The statute rather makes violators liable to the government for civil money penalties, authorizes the relator to bring suit in the name of the United States for those penalties (*see* 31 U.S.C. § 3703(b)), and permits the relator to retain a maximum of 30% of the recovery (*see* 31 U.S.C. §§ 3730(d)(1) & (2)), with the balance of the recovery going to the United States. Thus, what is assigned to the relator under the FCA is not some attribute of the government's sovereignty but rather the right to sue on civil, monetary claims arising out of injuries to the government. Put another way, it is the *claim* – the right to demand payment – that is partially assigned to the relator, not the interests whose infringement gives rise to the claim.

Contrary to defendants' contentions, the right to bring suit on such monetary, civil claims is a "chose in action" that is freely assignable to a third party. As a matter of general common law, a chose in action is freely assignable. *See*, *e.g. Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 17 (2d Cir. 1997) ("In general, claims or choses in action may be freely transferred or assigned to others"). The Property Clause of the Constitution, (Art. IV, § 3, cl. 2), moreover, vests in Congress the power to dispose of *any* kind of property belonging to the United States, "without limitation." *Alabama* v. *Texas*, 347 U.S. 272, 273 (1954). We are aware of no precedent or principle suggesting that this

17

all-encompassing authority excludes the authority to dispose of the right to bring suit on a civil claim.[3]

Even if defendants were correct in asserting that the FCA effects an assignment of a sovereign interest rather than a mere chose in action, they err in asserting that the *qui tam* provisions of the FCA exceed Congress's authority. Apart from defendants' Article II arguments (which we address below), the only substantive limitation on the government's assignment power identified by defendants is a common law doctrine holding that personal claims – such as claims based on personal injury, false imprisonment, or breach of marital obligations – are not assignable.  Def. Appellee Br. at 25, citing 6 Am. Jur. 2d Assignments, § 11 (2008).

These common law limitations on assignments have no application here. Defendants identify no common law case prohibiting – or even addressing -- the power to assign a sovereign interest.  And while they attempt to draw an analogy to claims pertaining to personal injury or marital rights, the analogy is so strained

---

[3] *Spiller* v. *Atchison, Topeka & Santa Fe Ry*, 253 U.S. 117, 135 (1920), is not to the contrary.  It holds that a private party's claim for reparations on account of injuries caused by the exaction of unreasonable charges for the carriage of freight is a claim for compensatory "damages" that is authorized by the Interstate Commerce Act.  The Court's holding is confined to a construction of the cause of action established by that statute and does not purport to establish a general prohibition on authorizing private parties to sue for penalties where such suits are, as in this case, expressly authorized by law.

18

that it only serves to demonstrate that sovereign interests are *sui generis* and are not addressed by the common law in the first instance.

In any event, a putative common law rule cannot trump Congress's authority to enact a federal statute. Congress, within constitutional limits, is free to enact such provisions as it deems appropriate, including authorizing the assignment of claims in circumstances where the assignment would otherwise be impermissible under state common law. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo* v. *United States*, 319 U.S. 441, 445 (1976); *accord McCulloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316, 426 (1819); *Hancock* v. *Train*, 426 U.S. 167, 178 (1976). Thus, to the extent that the common law could be deemed to direct a result different from that set forth in the FCA, it is preempted under the Supremacy Clause and wholly inapplicable here.

Finally, as *Stauffer* reasons, the Supreme Court in *Vermont Agency* noted a long historical practice of permitting relators to bring suit for recovery of fines and penalties due the government. *See Stauffer*, 619 F.3d at 1327 n.3. *Stauffer* concluded that "[g]iven the [Supreme] Court's heavy reliance upon that historical underpinning, we consider the question decided, that the United States may assign even a purely sovereign interest." *Id*. at 1327 n.3; *accord Pequignot* 640 F. Supp. 2d at 724 n.15.

19

For all these reasons, defendants err in asserting that relators lack standing to bring suit for FCA civil money penalties.

## II.   Defendants' Article II Claims Are Meritless.

### A.   Defendants Waived Their Article II Claims By Failing To Present Them In District Court And By Failing To Adequately Brief Them Here.

In a sum total of two pages of argument, defendants assert that the FCA's *qui tam* provisions violate both the Appointments and Take Care clauses of Article II of the Constitution.   Neither of these contentions, however, was raised below or addressed by the district court.   That precludes consideration of these issues for the first time on appeal.   "[I]t remains the law of this circuit that when a party to a civil action fails to raise a point at trial, that party waives review of the issue unless there are exceptional or extraordinary circumstances justifying review." *Corti* v. *Storage Technology Corp.*, 304 F.3d 336,343 (4th Cir. 2002) (Niemeyer, CJ., concurring); *accord Singelton* v. *Wulff,* 428 U.S. 106, 120 (1976).   Moreover, as *Vermont Agency* makes clear, the Article II issues pressed by defendants are not jurisdictional and do not otherwise fall within a category of issues that the reviewing court is obligated to address without regard to whether they have been adequately preserved by the parties.  *Vermont Agency*, 529 U.S. at 778 n.8; *Stauffer*, 619 F.3d at 1327.

20

Thus, defendants can only obtain review if they demonstrate "exceptional or extraordinary circumstances" excusing their failure to present their claims in district court. This exception to the waiver doctrine, however, is inapplicable. First, defendants have waived this basis for excusing their failure to preserve their Article II arguments below. It is incumbent upon the party who seeks to invoke an "exceptional circumstances" excuse to advise the Court that the issues were not developed below, and to affirmatively demonstrate that extraordinary circumstances nonetheless warrant consideration of the issue for the first time on appeal. *See A Helping Hand, LLC* v. *Baltimore County, MD*., 515 F.3d 356, 369 (4th Cir. 2008). Defendants, however, neither explain the procedural posture of the Article II issue nor offer the Court any reason for entertaining the matter for the first time on appeal. They have thus waived the "exceptional circumstances" basis for considering their Article II claims now.

Second, no exceptional circumstances are in fact present. Defendants have been represented by counsel throughout this litigation and had a full and fair opportunity to present their claims in district court. The Article II issues, moreover, were flagged by *Vermont Agency* and, as we will explain more fully below, have been previously considered – and rejected – by four courts of appeals. Defendants thus had clear notice of these issues. There is no conceivable basis for excusing their failure to raise them in district court.

21

Finally, even if some basis for excusing defendants' district court waiver

could be found, that would not relieve defendants of the obligation to adequately

address the merits in their opening brief to this Court.  Conclusory assignments of

error without supporting argument are insufficient to preserve a merit-based

challenge to a district court's order on appeal.  *Eriline Co. S.A.* v. *Johnson*, 440

F.3d 648, 653 n.7 (4th Cir. 2006).  Defendants cannot place important

constitutional questions at issue by merely making passing reference to them.[4]

B. *Qui tam* Relators Are Not Officers Of The United
   States Subject To The Appointments Clause of Article II.

The Appointments Clause, U.S. Const. art. II, § 2, cl. 2, provides:

> [The President] shall nominate, and by and with the
> Advice and Consent of the Senate, shall appoint
> Ambassadors, other public Ministers and Consuls,
> Judges of the supreme Court, and all other Officers of the
> United States, whose Appointments are not herein
> otherwise provided for, and which shall be established by
> Law:  but the Congress may by Law vest the
> Appointment of such inferior Officers, as they think
> proper, in the President alone, in the Courts of Law, or in
> the Heads of Departments.

Thus, "[t]he Constitution for purposes of appointment * * * divides all its

officers into two classes." *United States* v. *Germaine*, 99 U.S. 508, 509 (1879).

---

[4]  Defendants' amicus, in contrast, does devote considerable attention to the
Appointments Clause issue.  An amicus submission, however, cannot preserve an
issue that has not been adequately preserved by a party.  *See United States* v.
*Buculei*, 262 F.3d 322, 333 n. 11 (4th Cir. 2001) (collecting cases).

"Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary." *Buckley* v. *Valeo*, 424 U.S. 1, 132 (1976). Lesser functionaries, who are neither principal nor inferior officers, are "government employees," who may be selected without regard to Article II. *Id.* at 126 n.162; *see Freytag* v. *Commissioner*, 501 U.S. 868, 881-82 (1991).

Defendants and their amicus maintain that the responsibility to conduct civil litigation intended to vindicate public rights must be vested in "officers" of the United States who are appointed in accordance with Article II, and that the FCA, by assertedly vesting this function in a non-appointed private party, violates this constitutional requirement. As the amicus (but not the defendants) acknowledges, four courts of appeals have rejected this contention. *United States ex rel. Stone* v. *Rockwell Int'l Corp.*, 282 F.3d 787, 805 (10th Cir. 2002); *Riley* v. *St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud* v. *Gen Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *Kelly* v. *Boeing Co.*, 9 F.3d 743, 758 n.21 (9th Cir. 1993). These precedents reason that *qui tam* relators lack the tenure, salary, scope of duties, and other indicia of governmental officers and thus are not subject to the Appointments Clause in the first instance. *See*, *e.g.*, *Stone*, 282 F.3d at 805.

23

Defendants and their amicus, principally relying on *Buckley* v. *Valeo*, 424 U.S. 1, 125-26, 140 (1976) (per curiam), nonetheless argue that "officers" must be deemed to include anyone exercising significant authority pursuant to the laws of the United States, irrespective of whether they have the tenure, salary, scope of duties, and other indicia of a federal office.  Defendants conclude that relators meet this test because relators have the authority to institute civil litigation aimed at furthering public rights.

Defendants' effort to replace the "officer" requirement with a functional test focusing on whether individuals are wielding significant executive authority is at odds with a long history of Supreme Court precedent.  The term "Officer" in Article II "embraces the ideas of tenure, duration, emolument and duties [that are] * * * continuing and permanent, not occasional or temporary."  *Germane*, 99 U.S. at 511-12.  Thus, as the Fifth Circuit has explained, "Supreme Court precedent has established that the constitutional definition of an 'officer' encompasses, at a minimum, a continuing and formalized relationship of employment with the United States Government."  *Riley*, 252 F.3d at 757.

*Qui tam* relators have none of these characteristics.  They hold no established position, serve for no particular period, receive no federal salary or other employment compensation, and have no formal duties.  They thus are not "Officers" subject to the Appointments Clause.  *See Auffmordt*, 137 U.S. at 326-27

24

(holding that a person who performs public duties for a "particular case" but "has no general functions, nor any employment which has any duration as to time" is not an Officer because his "position is without tenure, duration, continuing emolument, or continuous duties, and he acts only occasionally and temporarily").

Amicus nonetheless argues that limiting Appointments Clause constraints to individuals who hold these indicia of federal office would frustrate Article II limitations by permitting Congress or the Judiciary to assign important federal functions to private individuals, free of the necessity of appointment by the President or appropriate subordinates.  There is, however, no basis for reading the "officer" requirement out of the Constitution.  The Appointments Clause applies only to individuals who, in addition to wielding substantial and continuing federal authority, enjoy the tenure, salary, and emoluments of continuing federal employment.  If, as in this case, these indicia of office are absent, the Appointments Clause does not apply.  See *Riley*, 252 F.3d at 757.

*Buckley* v. *Valeo* is not to the contrary.  Defendants and their amicus construe *Buckley* as holding that any individual who is vested with significant authority to prosecute civil litigation vindicating public rights is an "officer" who must be appointed in accordance with the Appointments Clause.  *Buckley*, however, does not purport to overrule the longstanding requirement of *Germaine* and *Auffmordt* that the Appointments Clause be limited to individuals who have a

25

substantial and continuing employment relationship to the federal government. To the contrary, *Buckley* cites both *Germaine* and *Auffmordt* with apparent approval, 424 U.S. at 125-26 & n.12, and gives no indication that in citing these cases it was in fact overruling them *sub silentio*.

At issue in *Buckley* was whether officials of the Federal Election Commission had been appointed in accordance with the Appointments Clause. These agency officials were selected pursuant to specific statutory provisions empowering the President, the Speaker of the House, and the President pro tempore of the Senate to designate who would serve in the office. *Buckley*, 424 U.S. at 161-62, reprinting 2 U.S.C. § 437c(a)(1) . The FEC statute provided for appointments for a six-year term. *Id*. at 162, reprinting § 437c(a)(2). And it provided that once appointed, Commissioners would receive federal salary. *Id*. at 163, reprinting § 437c(a)(4). The Commissioners, in short, were "appointed" by other governmental officials and had all the traditional indicia of holding a federal office. Nothing in *Buckley* suggests that the Appointments Clause would have applied if these indicia of appointment to office were absent.

Even if amicus' functional test were applicable to the Appointments Clause, the FCA's *qui tam* provisions make a limited partial assignment of the government's monetary claim to a relator and do not generally vest the relator with plenary authority to wield the government's prosecutorial power. *Qui tam* cases

26

are civil in character and do not authorize the relator to bring criminal cases based on the fraud committed against the government. Rather, Congress enacted separate criminal provisions pertaining to fraud on the United States, and the core, sovereign function of prosecuting these criminal offenses remains vested exclusively in the Attorney General and subordinate federal officers. *See* 18 U.S.C. § 287; *see also Rainwater* v. *United States*, 356 U.S. 590, 592 n.8 (1958) (noting separation of criminal fraud prosecutions from civil FCA).

Moreover, unlike the statute at issue in *Buckley*, the FCA does not afford a specific, individual relator "primary responsibility" for prosecuting an entire category of claims against the United States. In *Buckley*, the pertinent statute vested the appointed Commissioners of the FEC with broad authority to investigate misconduct, to bring civil enforcement actions pertaining to violations of the election laws, and to make referrals for criminal prosecution in appropriate cases. *See* 424 U.S. at 111-12 & n.153.

A relator's power under the FCA is far more limited. A relator's authority is generally confined to the claims at issue in a single suit. And even as to those claims, he cannot continue with the prosecution if the government elects to take over the case itself (*see* 31 U.S.C. §§ 3730(b)(4)(A) & (c)) or if the government seeks its dismissal (see 31 U.S.C. § 3730(c)(2)(A)). Thus, "a *qui tam* relator who

27

litigates only a single case does not have 'primary responsibility' within the meaning of *Buckley* for enforcing the FCA." *Kelly*, 9 F.3d at 759.

### C. The FCA's *Qui tam* Provisions Are Consistent With The Executive's Obligation Under Article II To "Take Care" That the Laws Be Faithfully Executed.

The "Take Care" Clause of the Constitution provides that the Executive must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Defendants assert that the FCA's *qui tam* provisions violate these requirements by "allowing [relator] to invoke the Government's sovereign interest in law enforcement * * *." Def. Br. as Appellant at 29.

Four courts of appeals have rejected these contentions. *Stone*, 282 F.3d at 805-07; *Riley*, 252 F.3d at 753-57; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 750-55. These courts reason: (1) that there is a long history of permitting private suits to collect fines and penalties, and that the Framers accordingly did not regard such suits as inconsistent with separation of powers principles, and (2) that under *Morrison* v. *Olson*, 487 U.S. 654 (1988), the government's practical control over *qui tam* litigation satisfies the Executive's Article II responsibility to take care that the laws are faithfully executed.

Defendants' one-paragraph argument does not refer to this body of precedent or offer any reasoned basis for distinguishing it. First, defendants' suggestion that *qui tam* litigation violates the Take Care clause is at odds with the

28

historical record.  As *Vermont Agency* notes, there is a longstanding practice of permitting private parties to bring suits for statutory penalties or fines in order to vindicate the sovereign's interest in enforcing compliance with the law.  *Id*., 529 U.S. at 774-778 & nn. 5-7.  The long historical record permitting such litigation to go forward demonstrates that the Framers did not regard private suits to enforce civil penalties or fines as inconsistent with the Executive's obligation to Take Care that the laws are faithfully executed.  *Id*. at 807 (Stevens, J., dissenting).[5]  There is thus no fundamental Article II problem in statutes that supplement the government's enforcement powers by permitting private parties to file civil suits that advance public interests as well as their own.  *See Riley*, 252 F.3d at 753.  Rather, "[s]tatutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition, who may enforce them and in what manner."  *Davis* v. *Passman*, 442 U.S. 228, 241 (1979).

Second, the FCA does not vest relators with plenary authority to prosecute civil fraud claims on behalf of the United States.  It instead reserves to the Attorney General and his delegatees substantial control over prosecution of the claims pressed in a *qui tam* complaint.  Once filed, the *qui tam* complaint remains

---

[5] The *Vermont Agency* majority found that the Article II issue had not been preserved for review and therefore did not address it on the merits. *Id.* at 778 n.8.

under seal until the government completes an investigation of the relator's

allegations.  31 U.S.C. §§ 3730(b)(2)-(4).  The government can take over the case

at that time or, upon establishing good cause, intervene after the prosecution

moves forward and assume primary responsibility for the litigation later in the

proceedings.  31 U.S.C. § § 3730(b)(4), (c)(3).  Even if the government does not

take over the case, it retains the right to require the relator to inform it of

developments in the case (§ 3730(c)(3)), to require the relator to provide copies of

material evidence (*ibid*.), to settle the action (§ 3730(c)(2)(B)), and to compel

dismissal of the case (§ 3730(c)(2)(A)).

Under *Morrison* v. *Olson*, 487 U.S. 654 (1988), this practical control over

the relator's prosecutorial authority satisfies the requirements of the Take Care

Clause.  In *Morrison*, the Supreme Court considered whether provisions of the

Ethics in Government Act violated Article II.  That statute authorized the

appointment of an independent counsel to investigate and prosecute certain high-

ranking government officials for violations of federal criminal law.  *Id*. at 662.  It

further provided that costs relating to the establishment and operation of the

independent counsel were to be paid with public funds.  *Id*. at 663 n.7.  The

independent counsel, moreover, was not generally subject to supervision by the

President or the Attorney General and could be removed only for good cause,

physical disability, mental incapacity, or other condition substantially impairing

the performance of his or her duties. *Id*. at 662-63. The Court nonetheless held that this ultimate power to terminate for good cause left the Executive Branch with sufficient control over the independent counsel to satisfy the Take Care Clause of Article II. *Id*. at 662-63.

As all the courts of appeals to address the question have held, *Morrison* demonstrates that the FCA's *qui tam* provisions are consistent with Article II. On the one hand, the FCA vests considerably less prosecutorial power in a *qui tam* relator. Unlike the independent counsel in *Morrison,* a relator does not have a general warrant to prosecute claims beyond those at issue in his complaint. *Qui tam* suits, moreover, are civil in character and do not entail delegation of the government's core sovereign function of enforcing the criminal law. *See Riley*, 252 F.3d at 755. And throughout the proceedings, the relator litigates at his own expense with his own private resources, not the prosecutorial resources of the United States. On the other hand, the Attorney General retains substantially greater control over a *qui tam* case, including the authority to take over the litigation at its outset and to compel dismissal of the case. *See Kelly*, 9 F.3d at 755; *Taxpayers Against Fraud*, 41 F.3d at 1041; *United States ex rel. Kreindler*, v. *United Technologies*, 985 F.2d 1148 1155 (2d Cir. 1993). Defendants' passing suggestion that the *qui tam* statute violates the Take Care Clause is thus meritless.

### III. The District Court Erred In Concluding That The Excessive Fines Clause Bars The Imposition Of Substantial Civil Money Penalties On Defendants Who Have Repeatedly Engaged In Fraud And Unlawful Price Fixing.

Defendants lied to the Department of Defense in order to obtain a contract for moving services and, over the course of the next three years, submitted more than nine thousand false claims to the government. It is undisputed that this fraudulent conduct violated the FCA, and that Congress, in order to punish and deter those who deny the government the benefit of honest commercial dealings, has authorized the imposition of inflation-adjusted civil money penalties of between $5,500 and $11,000 for every false claim submitted.

The district court nonetheless concluded that the Excessive Fines Clause bars the imposition of *any* civil money penalty on defendants. It reasoned that if the minimum statutory penalty were imposed on each of the more than nine thousand false claims, the resulting penalty would be grossly disproportional to the offense and thereby violate the Excessive Fines Clause. And though itself finding that a reduced penalty of $1.5 million would be constitutionally permissible (JA. 1615), the court concluded that it had no discretion to award any penalty other than the minimum mandated by the statute for every established false claim. It accordingly held that although defendants had submitted more than nine

thousand false claims to the government, they were not liable for any civil penalty whatsoever.

The district court's holding is inconsistent with bedrock principles of constitutional adjudication.   It is well-established that the reviewing court, upon determining that a particular application of a statute is unconstitutional, has an unflagging obligation to structure relief that will give effect to as much of the statute as is constitutionally permissible.

Here, it is plain that, if the statutorily-mandated minimum penalty is unconstitutional, the award of a reduced penalty would be far more consistent with congressional intent than excusing penalty liability altogether.  This case does not present a circumstance in which the unconstitutional aspect of the statute is inextricably entwined with the operation of the statute as a whole, such that if one part of the statute cannot be enforced the entirety of the statute must fall as well. Rather, if the total penalty for all proven false claims is excessive, the court can vindicate congressional intent by imposing a penalty for a smaller subset of claims until the constitutional maximum is reached.  *See*, *e.g., United States* v. *Mackby*, 339 F.3d 1013, 1015 (9th Cir. 2003) (awarding civil penalties for only 111 of the 8,499 false claims proven at trial).

That this is not the full measure of all that Congress desired does not divest the court of the obligation to fashion a remedy that will vindicate as much of

congressional intent as is feasible.  Indeed, that is the very point of the Supreme

Court's repeated pronouncements that a court, upon finding a constitutional

violation, has an obligation to preserve as much of the statute as is possible, even

if the result differs from the original congressional design:

> In exercising its power to review the constitutionality of a legislative
> Act, a federal court should act cautiously. A ruling of
> unconstitutionality frustrates the intent of the elected representatives
> of the people. Therefore, a court should refrain from invalidating
> more of the statute than is necessary. As this Court has observed,
> whenever an act of Congress contains unobjectionable provisions
> separable from those found to be unconstitutional, it is the duty of
> this court to so declare, and to maintain the act in so far as it is valid.

*Regan* v. *Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion) (internal

quotation omitted); *accord Ayotte* v. *Planned Parenthood of Northern New Eng.*,

546 U.S. 320, 328–329 (2006).

Defendants make no attempt to reconcile their position with these Supreme

Court precedents.  They instead assert: (1) that relators waived the right to seek

reduced penalties comporting with the Constitution and (2) that, in light of

benefits assertedly accorded the government, the putative lack of economic harm

caused by their fraud, and other mitigating factors, the imposition of any civil

penalty would be disproportionate to their offense and therefore inconsistent with

the Excessive Fines Clause.  None of these contentions is correct.

34

A.  The Relators And The Government Invoked Rather Than Waived
The District Court's Remedial Discretion To Award Reduced
<u>Penalties That Would Comport With The Excessive Fines Clause.</u>

After the district court concluded that defendants had submitted more than

nine thousand false claims on their Direct Procurement Method contract, it issued

an order directing relators and the government to file a joint brief addressing

whether the imposition of the statutory minimum penalty for every proven false

claim would comport with the Eighth Amendment.  JA. 1452-55.  In response, we

noted that the statute attaches liability to *every* false claim submitted on a

fraudulently obtained contract. JA. 1465, citing *Harrison, supra*.  We nonetheless

advised the Court that, in the exercise of  "prosecutorial discretion, the United

States and Relators had agreed to seek a lesser amount of penalties than the full

amount to which they are entitled under the False Claims Act."  JA. 1463.  We thus

asked the court to "issue one civil penalty per false claim requested by the United

States and Relators, totaling $24 million."  JA. 1467.

In support of this discretion, we cited the district court decision in *Mackby*,

*supra,* in which the reviewing court awarded a reduced penalty based on a small

subset of the total number of false claims proven at trial.  JA. 1463-64.  We also

argued that a reduced penalty demand would avoid the need to resolve whether the

FCA's minimum mandated penalties comport with the Eighth Amendment,

35

consistent with prudential principles that require a court to avoid unnecessary adjudication of a statute's constitutionality. *Ibid*.

Defendants' contention that this somehow amounts to a waiver of limitations on the district court's remedial discretion is at odds with the record and untenable as a matter of law. The parties cannot in the first instance waive a reviewing court's obligation to preserve as much of a statute as is feasible and otherwise consistent with congressional intent. That obligation is an inherent limitation on the reviewing court's remedial discretion, one that emanates from separation of powers principles requiring a court to act with the utmost judicial restraint when called upon to strike down a statute on constitutional grounds. The reviewing court accordingly has a duty to narrowly tailor a remedy to the constitutional violation and to preserve as much of the statute as is constitutionally permissible. *See El Paso & Northeastern R. Co.* v. *Gutierrez*, 215 U.S. 87, 96 (1909). That duty is part and parcel of a court's power of judicial review, and it persists regardless of the conduct of the parties.

Even if this fundamental limitation on a court's remedial power is deemed waivable, defendants err in contending that the government and relators waived the issue here. Defendants seize on our statements asserting – correctly – that the statute attaches a minimum penalty to every false claim submitted. But the plain language of the statute provides only that the defendant "is liable" for a civil

36

penalty for each false claim.  31 U.S.C. § 3729(a).  It does not afford the court a

roving commission to impose penalties for claims not placed at issue by the

government or the relator.  Nor does it require the court to impose remedies

beyond those sought by the plaintiff.  *Cf. Environmental Defense Fund, Inc.* v.

*Lamphier*, 714 F.2d 331, 336 (4th Cir. 1983) (recognizing plaintiffs' authority to

waive right to civil penalties authorized by the Resource Conservation and

Recovery Act); *United States* v. *M.C.C. of Florida, Inc.*, 863 F.2d 802, 803 (11th

Cir. 1989) (recognizing government's authority to waive demand for civil

penalties authorized by Clean Water Act provisions stating that  violators "shall be

subject to a civil penalty not to exceed $10,000 per day").  We at no time

suggested that the FCA bars the relators or the government from seeking penalties

for fewer than the number of false claims proven at trial.  To the contrary, we cited

case precedent recognizing that authority and *expressly* requested that remedy.  JA.

1463-67.

Defendants further argue that neither the relators nor the government had

any basis for asserting in district court that there is "prosecutorial discretion" to

seek penalties for a smaller number of false claims than have been proven at trial.

As we have shown in our opening brief, that contention is fundamentally

misplaced.  The relator, like any plaintiff, is master of his complaint and is not

obligated to pursue every possible claim or every possible remedy – particularly

37

where doing so would implicate constitutional issues that can be readily avoided by a reduced penalty demand.   The Ninth Circuit, moreover, has expressly applied this principle to the FCA and approved the government's request that penalties be imposed on only a small subset of the number of false claims proven at trial. *Mackby*.[6]  The salient point here, however, is that the government and relators *invoked* rather than waived this authority.

At bottom, the district court's holding rests on the erroneous conclusion that if the statutory minimum penalty for every claim proven results in an unconstitutionally excessive award, a court has no authority to award a lower penalty that would comport with the Constitution.  That is inconsistent with a long line of Supreme Court precedent and leads to the nonsensical conclusion that the worst FCA offenders – ones who submit thousands of false claims over a period of years -- may be excused from all penalty liability.  Indeed, it would create a perverse incentive for defendants to stipulate to submitting a large number of false claims in order to push the penalty over the constitutional limit and, under the district court's analysis, thereby avoid all liability.  No principle of law or

---

[6] Defendants assert that *Mackby* is distinguishable because it was prosecuted by the United States directly rather than a *qui tam* relator.  Def. Br. as Appellant at 69. That is a distinction without a difference.  The principle that a plaintiff is master of his complaint and can therefore choose which civil claims and remedies to present to the court applies to private parties as well as the United States.

constitutional adjudication supports such anomalous distinctions in the application of the statute.  Defendants' baseless contention that the United States and relators waived this objection merely reflects their inability to defend on the merits the linchpin of the district court's "zero penalty" holding.

B.  Defendants' Profit And Contract Performance Have No Bearing On Whether The Requested Penalties Are Unconstitutionally Excessive.

Defendants argue, in the alternative, that if the district court did have authority to impose a reduced penalty below the statutory minimum for every established false claim, the district court's determination that $1.5 million is the maximum, constitutionally permissible penalty "may be reasonable."  Def. Brief as Appellee at 75.

The district court's alternative finding underscores the disparity between the district court's holding imposing *zero* penalty liability and the level of penalties that would be constitutionally permissible in light of the fraud defendants perpetrated on the United States.  Defendants nonetheless stop short of conceding that even this reduced sum is appropriate and do not clearly take a position on the maximum, constitutionally permissible penalty.  They instead point the Court to a set of factors that assertedly show that their conduct was neither culpable nor harmful.  They thus focus on their post-fraud contract performance rather than their wrongdoing and generally ignore the extraordinary deference the reviewing

39

court must accord to Congress's legislative judgment in defining unlawful conduct and fixing an appropriate penalty.

The factors on which defendants principally rely, however, are singularly inappropriate for consideration in an Excessive Fines analysis. They do not support the district court's zero liability holding. They do not support the district court's alternative finding that a $1.5 million is the maximum, constitutionally permissible. And they do not establish that the demand for a $24 million penalty – an amount that is less than half the statutory *minimum* penalty for all the false claims established at trial – would amount to an Excessive Fine in the context of this case.

As a threshold matter, defendants err in asserting that the district court's determination of the maximum constitutionally permissible penalty is reviewed for abuse of discretion. That standard applies to review of a district court's exercise of its discretion to fix a penalty within the range of penalties specified by the statute. *United States* v. *Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 140 (4th Cir. 1996). But "the question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review of that question is appropriate." *United States* v. *Bajakajian*, 524 U.S. 328, 336 n.10 (1998); *accord United States* v. *Ahmad*, 213 F.3d 805, 815-16 (4th Cir. 2000).

40

Here, many of the factors considered by the district court, and echoed by defendants on appeal, are inappropriate as a matter of law. This Court has held that in determining whether a statute imposing a punitive sanction violates the Excessive Fines clause, the court should consider "the nature and extent of the criminal activity, its relation to other crimes, its penalties, and the harm it caused." *United States* v. *Bollin*, 264 F.3d 391, 417 (4th Cir. 2001); *accord Mackby*, 339 F.3d at 1016-17. Though not exhaustive, these factors all focus on the defendants' culpability, harm inflicted, and history of related criminal activity. Many of the factors cited by defendants, however, are unrelated to these considerations and have no place in an Excessive Fines analysis.

First, the profit realized by a defendant on a fraudulently procured contract has no bearing on the defendants' culpability or whether the fine is grossly disproportional to the offense. As the Court held in *United States* v. *Jalaram, Inc.*, 599 F.3d 347, 356 (4th Cir. 2010), the fact that a defendant may have reaped only a small gain from his unlawful activity establishes only that the offense was not lucrative and does not speak to the offender's culpability. Defendants here lied to the government in order to obtain a government contract. They consequently denied the government the benefit of honest commercial dealings, harmed the integrity of the procurement process, obtained an unlawful advantage over any business attempting to compete for the contract on fair terms, and thereafter

41

submitted more than nine thousand false claims to the government over a three-year period. That defendants assertedly generated only a modest profit from their fraud affords no basis for mitigating their penalty liability.

Second, defendants' performance on their fraudulently-procured contract is also irrelevant. Though a contractor may be liable for making false certifications of contract compliance in order to get a claim paid, an FCA suit is not an action for breach of contract. *United States ex rel. Owens* v. *First Kuwaiti General Trading and Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010). It does not seek contract damages and does not measure liability by the quality of contract performance or the asserted value of the contract services rendered the government. Rather, at its heart is the presentment of false claims to the government. Accordingly, under *Bajakajian*, the constitutional validity of the penalties incurred under the statute turns on the gravity of the offense, the defendants' relative culpability, the need for a penalty sufficient to deter future wrongdoing, and the public harms caused by defendants' fraud. The putative merits of defendants' post-fraud contract performance have no role in this constitutional analysis.

Third, defendants further err in asserting that their fraud should be excused by the government's exercise of an option to extend its Direct Procurement Method contract with defendants, despite knowledge of relator's fraud allegations. This Court has held that the government's continued dealings with a contractor,

despite *actual* knowledge of a contractor's prior wrongdoing, do not relieve the contractor of FCA liability. *Harrison*, 352 F.3d at 916-17. Rather, statutory liability "focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered." *Ibid*.

Continued dealings with a contractor despite knowledge of mere *allegations* of wrongdoing afford even less basis for deeming a penalty unconstitutionally excessive. Allegations are not proof, and a relator's own interests in a case may make reliance on his uninvestigated and unproven assertions of wrongdoing especially inappropriate.

Finally, defendants err in asserting that their wrongdoing ended with the lie they told in order in obtain the contract for moving services and did not extend to the thousands of false claims subsequently submitted for payment on their fraudulently procured contract. The district court adopted this reasoning, finding that "the number of invoices, in and of themselves, is not reflective of Defendants' level of culpability * * *." JA. 1602.

That, however, is at odds with this Court's precedents, the clear purposes of the FCA, and settled principles of Eighth Amendment review. This Court has held that *every* claim submitted under a fraudulently obtained contract is "false" and actionable under the FCA. *Harrison* v. *Westinghouse Savannah River Co.*, 176 F.3d 776, 786 (4th Cir. 1999). Moreover, the legislative history of the FCA

43

expressly states that "each and every claim submitted under a contract * * * which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim" and is therefore subject to a civil penalty.   S. Rep. No. 99-345, 99th Cong., 2d Sess. at 9, *reprinted in* 1986 U.S.C.C.A.N. 5274.   Congress thus regarded each submission of a claim under a fraudulently obtained contract as a separate, culpable act warranting the imposition of a separate civil penalty.

There are sound policy reasons for this approach.  Every false claim submitted on a fraudulently obtained contract compounds the potential injury to the United States.  The statutory scheme accordingly reflects a congressional determination that each successive effort to reap the benefits of a fraudulently obtained contract is a wrongful act that may harm the government.  Thus, by attaching a penalty to each such submission, the statute establishes a strong deterrent to any wrongdoer who seeks to perpetuate his initial fraud in this manner.

In nonetheless asserting that the submission of further claims on a fraudulently procured contract is an innocent act warranting no further penalty, the district court, defendants, and their amicus, violate the cardinal principle of Excessive Fines review:  deference to Congress's determination of what conduct should be deemed culpable and what penalties should attach to a statutory

44

violation. In *Bajakajian*, the Supreme Court stressed that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature," and that courts "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments * * *." *Id.*, 524 U.S. at 336. The district court and defendants may disagree with Congress's assessment of whether the continued submission of claims under a fraudulently procured contract is a separate culpable act warranting imposition of a separate penalty. But the Excessive Fines Clause demands substantial deference to Congress's contrary view. It does not authorize a reviewing court to substitute its judgment for that of the legislature.

### C. Defendants Failed To Carry Their Burden Of Proving That Their Collusive Price-Fixing Did Not Harm The Government.

At the liability stage of the case, the district court held that the jury reasonably found that defendants had entered a price-fixing agreement with prospective subcontractors, and that defendants had falsely certified to the Department of Defense that it had not entered into any such agreement in order to obtain the contract. JA. 1223-25. The court nonetheless concluded, at the penalty stage of the case, that "*Plaintiffs* have failed to establish, based on reliable information, the Defendants' conduct, in fact caused the government any economic harm." JA. 1596 (emphasis added). Defendants now assert that this finding

45

cannot be disturbed on appeal unless clearly erroneous, and that it supports the district court's judgment relieving them of all penalty liability for the submission of more than nine thousand false claims on the Direct Procurement Method contract.

We do not dispute that economic harm is one of several factors a reviewing court may consider in determining whether a civil penalty is unconstitutionally excessive. The district court's assessment of economic harm, however, is fundamentally flawed. The burden is on the *defendants*, as the party challenging the constitutionality of the sanction, to demonstrate that the penalties imposed by the statute are grossly disproportional to the harm incurred and therefore unconstitutional. *United States* v. *Ahmad*, 213 F.3d 805, 816 (4th Cir.); *Bajakajian*, 524 U.S. at 348 (Kennedy, J., dissenting). That follows from long established principles holding that uncertainties as to the precise quantum of harm caused by a wrongdoer should not enable him to evade responsibility for the victim's injury. Rather, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow* v. *RKO Radio Pictures*, 227 U.S. 251, 264-65 (1946); *accord United States* v. *Killough*, 848 F.2d 1523, 1531 (11th Cir. 1988).

This principle applies with particular force here. The gist of defendants' contention is that their price-fixing agreement did not cause the government to

incur any significant increase in cost for comparable moving services – either because the price did not in fact increase, or because any increase must be attributed to factors other than defendants' price-fixing agreement.  As defendants brief demonstrates, however, that is a highly complex calculation that requires the court, years after the fact, to determine the relative "before and after" costs of comparable services, to speculate as to what other competitors might have done 'but for" the fraud, and to isolate the cost impact of defendants fraud from a myriad of other market factors such as fuel cost, labor costs, and general inflation. *See* Defendants' Br. as Appellant at 45-49.

Despite these complexities, there is substantial evidence that defendants' fraud did in fact increase the cost to the government by 87 percent. JA. 1299.  As relators have demonstrated, the very purpose of a price fixing agreement is to inflate costs above those that would be determined in fair competition, and it is for that reason that price-fixing agreements are generally presumed to cause anti-competitive harm in the context of antitrust litigation.  S*ee*, *e.g. FTC* v. *Superior Court Trial Lawyer's Ass'n*, 493 U.S. 411, 434-36 (1990).  Moreover, credible testimony showed that cost increases are precisely what occurred here as a result of defendants' fraud.  JA. 1298-1303. That the district court nonetheless found this evidence insufficient to affirmatively prove that the fraud caused the government economic harm misses the essential point.  It was the *defendants*' burden to prove

47

that prices were unaffected. The district court made a deeply prejudicial error of law in shifting this burden to the relators.

The contrary arguments of defendants and their amicus are unavailing. *Harrison, supra,* does not support defendants' position. That case holds that an FCA plaintiff has the burden of proving *damages* under FCA provisions authorizing recovery of treble damages. It does not address which party bears the burden of establishing that civil penalties are grossly disproportional to the harm caused the government and therefore unconstitutional under the Excessive Fines Clause. The Court's decision in *Ahmad* addresses that fundamentally different issue directly, and it places the burden of proof squarely on the defendant.

Amicus similarly errs in asserting that the defendant's burden is confined to making out a *prima facie* case that economic harm is lacking. We assume that amicus means that the defendant only has the burden of making an initial evidentiary showing but does not have the ultimate burden of proof. That contention is at odds with *Ahmad*, which expressly places on the defendant the burden to "demonstrate excessiveness." *Id.*, 213 F.3d at 816; *accord Bajakajian*, 524 U.S. at 348 (Kennedy, J., dissenting). It is also at odds with the rule that the burden of pleading *and proving* an affirmative defense generally lies with the defendant. *Taylor* v *Sturgell*, 553 U.S. 880, 907 (2008).

48

*United States* v. *Alexander*, 32 F.3d 1231 (8th Cir. 1991) and similar cases arising under criminal forfeiture statutes are not to the contrary. The forfeiture cases cited by amicus all pre-date *Bajakajian* and *Ahmad*. These cases, moreover, hold that "the burden of mitigating a draconian forfeiture verdict rests with the defendant," *Alexander*, 32 F.3d at 1235, quoting *United States* v. *Sarbello*, 985 F.2d 716, 724 (3d Cir. 1994), and they therefore make clear that the government's burden of demonstrating the proportionality of a forfeiture arises only if the defendant first "satisfies his burden of *showing* gross disproportionality." *Ibid* (emphasis added).[7]

Finally, cases such as *United States* v. *Bourseau*, 531 F.3d 1159, 1173 (9th Cir. 2008), and *United States* v. *Rogan*, 517 F.3d 449 (7th Cir. 2008), do not support amicus' attempt to shift the burden of proof to the United States. These cases demonstrate that a court, in considering an Excessive Fines Clause challenge, may properly consider an FCA penalty's relation to actual damages in cases where actual damages have been proven. That is a far cry from holding that

---

[7] The forfeiture cases, moreover, are not directly comparable because the amount of the penalty for each criminal violation – the value of the forfeited property associated with the underlying criminal conduct – varies from case to case and is not fixed in advance by Congress. That arguably requires a different method of proving disproportionality than would be appropriate for statutes like the FCA, which reflects a more specific legislative determination of the applicable civil penalty.

49

a civil penalty must be deemed grossly disproportional to the offense if the
government or relator does not establish that actual damages have been incurred.

Questions of proof aside, defendants misconceive the role of economic harm
to the government in an Excessive Fines Clause analysis.  The Excessive Fines
Clause does not engraft onto the FCA an additional condition requiring a relator or
the United States to prove economic damages before any penalty may be assessed.
As the relators have demonstrated, there is in fact credible evidence that
defendants' collusion and price fixing substantially inflated the government's
costs.  But even if such harm is deemed absent, that, standing alone, would not
establish that the imposition of a civil penalty would be "grossly disproportional"
to the offense for purposes of the Eighth Amendment.  Nor would it support
overriding Congress's considered determination that false claims are always
injurious to the interests of the United States and warrant the imposition of a
substantial penalty, even in cases where no economic damage to the United States
is incurred.

The case law applying *Bajakajian* accordingly recognizes that factors other
than economic harm to the government – factors such as the need for deterrence,
the defendant's history of other wrongdoing, other tangible and intangible harms
to the public interest, and the requested penalty's relation to the statutory
maximum prescribed by Congress  – may afford a constitutionally sufficient basis

50

for a substantial penalty.  *See Mackby*, 339 F.3d at 1016-18; *Bollin*, 264 F.3d at

417.  All these factors are present here.

> D.  The Penalties Requested By Relators and The United States Are
>      Commensurate With The Public And Private Harms Caused By
>      Defendants' Fraud, The Scale and Duration of Defendants' Fraud,
>      The Demonstrable Need For A Strong Deterrent, And Defendants'
>      History Of Similar Misconduct.

Defendants dismiss any damage to the integrity of the government's

procurement process as *de minimis* and blithely suggest that such "generalized

intangible harm" carries no weight in assessing whether the penalties prescribed

by Congress are grossly disproportional to the offense.  *See* Defendants Br. as

Appellant at 53.   Thus, in defendants' view, if contract price and performance are

unaffected, obtaining a government contract by lying about compliance with an

essential contracting requirement is of no moment.

Neither the case law nor the legislative history of the FCA supports this

extraordinary assertion.  This Court has held that even where the trial court has

determined that the government has not sustained any economic damages, "no

proof is required to convince one that to the Government a false claim, successful

or not, is always costly."  *Toepleman* v. *United States*, 263 F.3d 697, 699 (4th Cir.

1959).  Congress, echoed that view in the legislative history to the FCA's 1986

amendments, thus stating that "fraud erodes public confidence in the government's

ability to efficiently and effectively manage its programs" and concluding that,

51

even in cases where there is no dollar loss, fraud undermines the integrity of procurement programs. S. Rep. No. 99-345 at 3, *reprinted in* 1986 U.S.C.C.A.N. at 5268. Indeed, for competitors who seek to obtain a sole-source contract *without* misrepresenting their compliance with contracting requirements, the integrity of the procurement process is far from a generalized abstraction. It is rather an essential guarantee of their ability to compete fairly for the government's business, a guarantee that, when breached, may translate directly into lost business and lost economic opportunity. Congress, in the FCA, has concluded that such conduct warrants a substantial sanction. Its concern for protecting the integrity of a vulnerable and all too frequently abused procurement process is, standing alone, substantial justification for imposing stiff penalties on violators.

Moreover, the nature of defendants' offense, the scale and duration of their fraud, and their history of similar misconduct demonstrate the need for penalties that will serve as a strong deterrent to future wrongdoing. Courts and scholarly commentators recognize that "[f]rom a deterrence perspective, a stiffer penalty is logically called for when the risk of detection decreases." *United States* v. *Jiminez*, 507 F.3d 13, 20 (1st Cir. 2007); *accord* Richard A. Posner, *Economic Analysis of Law* 262, 277 (8th ed. 2011). Thus, in the case of collusive price-fixing, penalties must be structured to ensure that the low risk of detection is counterbalanced by a steep cost if the illicit activity is uncovered.

52

Defendants' history of similar wrong-doing further underscores the need for a significant sanction here.   Defendants have, on two other occasions, entered into price-fixing agreements intended to inflate the government's costs of procuring moving services.  In addition, they were fined €2.32 million by the European Union for engineering an anti-competitive price-fixing agreement in Belgium. The conduct at issue here was not an isolated occurrence.  It was a way of doing business.[8]

Finally, the requested penalty is less than half the *minimum* penalty attached to the number of false claims submitted.  It is in keeping with the three-year duration of defendants' misconduct as well as the volume of government business they obtained through their deliberate misrepresentation to the government.  It is also fairly proportional to the $6

---

[8] Defendants assert that the foreign penalty judgment may not be considered because it entails hearsay and concerns unlawful conduct occurring after the acts at issue.  Nothing in *Bajakajian*, however, suggests that the court is barred from considering the entirety of a defendant's record in determining whether a civil fine is "grossly disproportional" to the defendant's misconduct.  *Cf. Williams* v. *New York*, 337 U.S. 241, 247 (1949) ("Highly relevant-if not essential - to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics"); *see also BMW* v. *Gore*, 517 U.S. 559, 573 n.19 (1996) (sentencing court may consider convictions from other jurisdictions); *United States* v. *Powell*, 650 F.3d 388, 393-94 (4th Cir. 2011) (reliable hearsay may be considered at sentencing).

million fine imposed on them for the Cartwright bid-rigging scheme – a criminal scheme of more limited scope and duration.

Defendants and their amicus complain that, where penalties escalate for every false claim submitted on fraudulently procured contract, the sanction can mushroom into exorbitant amounts. Congress, however, has spoken directly and expressly to this issue. Its decision to attach a penalty to every false claim submitted ensures that parties dealing with the government are not "home free" if their initial fraud escapes detection. *Bajakajian* requires that the Court defer to the legislative judgment in this regard. Contentions that the legislative scheme is too draconian must therefore be directed to Congress.

IV.  Defendants' "Landed Rate" Price-Fixing Agreement Is Not Made Lawful By The Shipping Act.

In *United States* v. *Gosselin World Wide Moving N.V.*, 411 F.3d 502, 510 (4th Cir. 2005), the Court held that a collusive price-fixing agreement that extends beyond the "foreign inland" segment of the market and is intended to affect "through transportation" rates is not exempted from the antitrust laws by the Shipping Act. That holding is controlling here.

Defendants assert that the "landed rate" agreement stands separate and apart from their other unlawful efforts to manipulate "through

54

transportation" rates and thus conclude that *Gosselin* is distinguishable. That contention cannot be reconciled with the record. Just days after the concluding the "landed rate" agreement, defendant Smet e-mailed a freight forwarder bidding on through transportation to advise him of the agreement and to urge carriers to base their proposed "through transportation" rates on these pre-established charges. JA. 2692.

Indeed, there is no other plausible explanation for defendants' participation in the Cartwright and Covan bid rigging schemes. Defendants were not themselves bidders for through transportation. They targeted low "through transportation" bids for manipulation in the Cartwright and Covan bid rigging schemes to ensure that carriers would command rates high enough to in turn pay the defendants the inflated charges established in the "landed rate" agreement. Thus, the landed rate agreement was, from its inception, part of a single overarching scheme, not merely to fix prices for the inland foreign segment of the trip, but to inflate "through transportation" rates to the level necessary to defray defendants' collusively established charges to carriers. *Gosselin* makes plain that the Shipping Act does not render such conduct lawful.[9]

---

[9] *Gosselin* also demonstrates that the district erred in admitting the Ninth Circuit's *Tucor* decision as evidence that defendants had a good faith belief that their Covan

Even if the landed rate agreement is assumed to be aimed solely at the inland foreign segment of through transportation, it is not exempted from the antitrust laws by the Shipping Act.  Section 4 of the Shipping Act, 46 U.S.C. app. § 1703(a)(1), states that the "foreign inland segment" exemption extends only to agreements by or among ocean common carriers or marine terminal operators – entities that do not include the defendants.  That conforms with Congress's intent to exempt from the antitrust laws only such agreements as will be subject to alternative regulatory oversight by the Federal Maritime Commission or its predecessor agencies.  It is also consistent with the Supreme Court's directive that the Shipping Act's exemptions from antitrust liability be strictly and narrowly construed.  *FMC* v. *Seatrain Lines, Inc.,* 411 U.S. 726, 732-35 (1973).

Defendants' contention that this would result in a disfavored, extraterritorial application of the antitrust laws is meritless.  It has long been

---

bid rigging scheme was lawful.  *Tucor* did not involve a similar conspiracy to manipulate through transportation rates, and the United States made a timely objection for that reason. JA. 2231-32. We later offered the decision into evidence as an attachment to a letter from defendant's legal counsel advising that, notwithstanding *Tucor*, arrangements other than a landed rate agreement were "more defensible."  Gov. Exh. 10.  We did so, however, *after* the district court had overruled our prior objection and admitted the *Tucor* decision into evidence.  Thus, contrary to defendants' contentions, we did not waive objection to *Tucor*'s admission.

settled that United States antitrust laws may properly be applied to anticompetitive conduct occurring abroad where the trade in question has significant contacts and nexus with the United States. *F. Hoffman-La Roche Ltd* v. *Empargan S.A.*, 542 U.S. 155, 165 (2004); *Pacific Seafarers, Inc.* v. *Pacific Far East Line, Inc.*, 404 F.2d 804, 817 (D.C. Cir. 1968). The Shipping Act's legislative history, moreover, shows that Congress generally intended the antitrust laws to continue to apply to activities within a foreign country if those activities meet the *Pacific Seafarer's* standard by having a direct, substantial, and reasonably foreseeable effect on the commerce of the United States. *See* H.R. Rep. No. 98-53, Pt. 2, 98th Cong., 1st Sess. 32-33 (1983) (citing *Pacific Seafarers, supra*), *reprinted in* 1984 U.S.C.C.A.N. 221, 252. The landed rate agreement easily satisfies this "nexus" test because it pertains to the foreign segment of "through transportation," transportation which, by definition, entails continuous transportation to or from the United States. *See* 46 U.S.C. app. § 1702(24). Antitrust regulation of the agreement thus does not involve a disfavored, extraterritorial application of the law.

Foreign inland segment agreements concluded by marine terminal operators or ocean common carriers are nonetheless exempted from antitrust laws, not because Congress was concerned that regulating them would

amount to disfavored, extraterritorial applications of the antitrust laws, but rather because such agreements would fall under the alternative regulatory oversight of the FMC.  Extending the exemption to agreements concluded by entities that, like defendants, are *not* subject to the FMC's oversight would create a regulatory lacuna in which neither the antitrust laws nor the Shipping Act would restrain blatantly anticompetitive conduct.

Nothing in the statutory text suggests a congressional intent to create a loophole in laws regulating anticompetitive conduct.  The statute instead provides that only agreements by common carriers or marine terminal operators – entities that fall under the FMC's regulatory oversight – are covered by this exemption.  46 U.S.C. app. § 1703(a)(1).

Defendants, citing 46 U.S.C. §§ 1709(a) and 1702(19), argue that other provisions of the Shipping Act apply to transactions by parties other than marine terminal operators or ocean common carriers.  That is true but irrelevant.  Section 1703(a) does not purport to define the coverage of the entire Shipping Act.  It defines only what *agreements* are covered by the Act.  And it makes plain that only agreements by or among ocean common carriers or marine terminal operators are exempted from the antitrust laws. The district court thus erred in holding that the Shipping Act renders defendants' landed rate agreement lawful.

58

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

STUART F. DELERY
  Principal Deputy Assistant Attorney General

NEIL H. MacBRIDE
  United States Attorney

MICHAEL S. RAAB
  (202) 514-4053
/s/ JEFFREY CLAIR
  (202) 514-4028
  jeffrey.clair@usdoj.gov
  Attorneys, Civil Division
  Room 7243, Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530

**RULE 32 CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with FRAP 32(a)(7)(B) because it is printed in a 14-point, proportionally spaced font and because, based on word processing software, the brief contains 13,845 words.

/s/ Jeffrey Clair, Attorney

**CERTIFICATE OF SERVICE**

I certify that on November 15, 2012, I electronically filed the foregoing Response/Reply Brief for the United States by using the Court's Case Management/Electronic Case Filing system, that counsel for the other parties are registered CM/ECF users, and that service will therefore be accomplished through the Court's CM/ECF system.

/s/ Jeffrey Clair, Attorney

60