Nos. 12-1369 (L), 12-1417, & 12-1494

_____

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

UNITED STATES ex rel. BUNK, et al.,

Plaintiffs-Appellants/Cross-Appellees,

v.

BIRKART GLOBISTICS, GmbH & Co. et al.,

Defendants-Appellees/Cross-Appellants.

_____

On Appeal from the U.S. District Court for the Eastern District of Virginia
Hon. Anthony J. Trenga, District Judge

_____

**RELATORS-APPELLANTS'
RESPONSE TO CROSS-APPEAL AND REPLY BRIEF**

_____

Michael T. Anderson
Ann Lugbill
Mark Hanna
Michelle L. Woolley
Murphy Anderson PLLC
1701 K Street NW, Suite 210
Washington, DC 20006
(202) 223-2620
(202) 223-8651 (Fax)

Richard E. Greenberg
John E. Petite
Greensfelder, Hemker, & Gale, P.C.
10 South Broadway, Suite 2000
St. Louis, MO 63102
(314) 241-9090
(314) 345-4792 (Fax)

Attorneys for Relators-Appellants

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

SUMMARY OF REPLY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

I.    Gosselin's Cross-Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    A.    Article III Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    B.    Article II Challenge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

II.   Reply to Gosselin's Response Brief. . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

RESPONSE TO CROSS-APPEAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

I.    RELATORS HAVE ARTICLE III STANDING... . . . . . . . . . . . . . . . . . .  6

    A.    *Vermont Agency* Approves Relator Standing, Whether
        the Government's Injury Is "Proprietary" or "Sovereign.". . . . . . . . .  7

        1.    *Vermont Agency* did not adopt the
            proprietary/sovereign distinction Gosselin urges.. . . . . . . . . .  7

        2.    *Vermont Agency* approved the First Congress' *qui tam*
            laws enforcing "sovereign" rather than proprietary interests.. .  8

        3.    *Vermont Agency* reaffirms Fourth Circuit law.. . . . . . . . . . .  12

        4.    *Lujan* distinguished *qui tam* suits.. . . . . . . . . . . . . . . . . . .  14

i

      B.    The Government's Interest Here Is Proprietary.. . . . . . . . . . . . . . . 16

          1.    Government procurement is a proprietary interest.. . . . . . . . . 16

          2.    The Government has a proprietary interest in the
statutory penalty once the violator incurs it: *Oceanpro*.. . . . . 16

II.     THE FALSE CLAIMS ACT DOES NOT VIOLATE ARTICLE II.. . . . . . 18

      A.    Gosselin Failed to Preserve the Article II Challenge Below.. . . . . 18

      B.    Gosselin's Article II Argument Is Meritless In Any Case.. . . . . . . 19

          1.    The Circuits unanimously reject Gosselin's position.. . . . . . 19

          2.    The prevalent use of *qui tam* statutes by the
First Congress shows they did not violate Article II.. . . . . . 22

          3.    The FCA does not violate Article II's "Take Care" clause
because the Executive retains control over the litigation.. . . . 24

          4.    The FCA does not violate the Appointments Clause.. . . . . . 27

REPLY IN SUPPORT OF RELATORS' APPEAL. . . . . . . . . . . . . . . . . . . . . 28

III.    STATUTORY PENALTIES ARE NOT DAMAGES.. . . . . . . . . . . . . . . . 28

      A.    "Harm" Is Not Limited to Monetary Damages.. . . . . . . . . . . . . . 28

      B.    Concealed Bid-Rigging Is a Grave Offense,
Regardless of Proximate Monetary Damage.. . . . . . . . . . . . . . . . 30

          1.    Bid-rigging is inherently harmful.. . . . . . . . . . . . . . . . . . 31

          2.    The "reasonableness" of the
cartel's prices is legally irrelevant.. . . . . . . . . . . . . . . . . . 32

3.  *Per se* antitrust cases require specific proof for monetary *damages*, but not for fines and statutory penalties.. . . . . . . . .  33

4.  FCA bid-rigging cases are governed by the same principles as private bid-rigging cases... . . . . . . . . . . . .  34

C.  Harm Is Measured by the Volume of Commerce.. . . . . . . . . . . . . .  34

D.  The Volume of Commerce Is the Entire €8 Million Contract... . . . .  36

E.  The Record Shows Substantial Proximate Damage In Any Case.... .  36

1.  The size of the standard shipment does not affect the percentage increase... . . . . . . . . . . . . . . . .  37

2.  The dispute over oversize container use is *de minimis*.. . . . . .  38

3.  The alleged overcharges in the prior 1999 contract do not affect the price increase in the subsequent rigged contract.. .  38

4.  The categorization of costs among different line items did not change the overall 54% estimate... . . . . . . .  39

5.  Gosselin's own analysis admitted a 10% increase.. . . . . . . .  39

6.  Gosselin presented no evidence about the extent to which external costs increased in 2001... . . . . . . . . .  39

IV.  GOSSELIN'S CULPABILITY IS ESTABLISHED BY THE JURY VERDICT AND THE LAW.. . . . . . . . . . . . . . . . . . . . . . .  40

A.  Gosselin's Profit Is Irrelevant.. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

B.  Gosselin's Denial of *Scienter* Contradicts the Jury Verdict.. . . . . . .  41

C.  The "Unique" Circumstances Do Not Excuse Knowingly Concealed Bid-Rigging.. . . . . . . . . . . . . . . . . .  43

iii

D. The Government's Renewal of the Contract Before the Investigation Was Complete Does Not Excuse Gosselin.. . . . . . . . 44

E. Bunk's Prior Conduct Does Not Affect Gosselin's Culpability.. . . . 45

F. Gosselin's Wrongdoing Was Related to Other Offenses.. . . . . . . . 46

    1. The related European offenses are *res judicata*.. . . . . . . . . . 46

    2. In Eighth Amendment analysis, the Court may consider subsequent related offenses. . . . . . . . . . . . . . . 48

V. THE DISTRICT COURT'S ALTERNATIVE GROUNDS FOR DENYING PENALTIES ARE UNSOUND... . . . . . . . . 49

A. The Court's Award of Zero Penalties.. . . . . . . . . . . . . . . . . . . . . . 49

    1. Gosselin ignores the perverse incentive to multiply violations above the Eighth Amendment threshold.. . . . . . . 50

    2. The Government and the Relators did not waive a "Constitutionally reduced" penalty.. . . . . . . . . . . . . 51

B. Gosselin May Not Limit the Penalty to a Single $11,000 Penalty or an "Appropriate" $500,000 Sanction.. . . . . . . . . . . . . . . 54

C. Gosselin May Not Limit Its Liability to $1.5 Million. . . . . . . . . . . 55

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

RULE 32 CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . 58

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Adams v. Woods*, 2 Cranch 336, 6 U.S. 336 (1805). . . . . . . . . . . . . .  10, 11, 22, 23

*Andrews v. Daw*, 201 F.3d 521 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . .  47

*Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332 (1982). . . . . . . . . . . . .  31

*Auffmordt v. Hedden*, 137 U.S. 310 (1890).. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996).. . . . . . . . . . . . . . . . .  57

*Bly-Magee v. California*, 236 F.3d 1014 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . .  12

*Bowsher v. Synar*, 478 U.S. 714 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Doe v. Kidd*, 501 F.3d 348 (4th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

*Edmond v. United States*, 520 U.S. 651 (1987). . . . . . . . . . . . . . . . . . . . . . . . . .  28

*Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558 (1951). . . . . . . . . .  47

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
    561 U.S. ___, 130 S.Ct. 3138 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Friedman v. Rite Aid Corp.*, 152 F.Supp.2d 766 (E.D. Pa. 2001). . . . . . . . . . . . .  20

*Gregg v. Ham*, 678 F.3d 333 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

*Gublo v. NovaCare, Inc.*, 62 F.Supp.2d 347 (D. Mass. 1999). . . . . . . . . . . . . . .  20

*Hernandez, Kroone and Associates, Inc. v. United States*,
    95 Fed. Cl. 395 (Fed. Cl. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

*Herrera v. Collins*, 506 U.S. 390 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

*Hollander v. Ranbaxy Laboratories Inc.*,
      804 F.Supp.2d 344 (E.D. Pa. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Hudson v. United States*, 522 U.S. 93 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963).. . . . . . . . . . . . . . . . . . . . . . .  47

*Korangy v. FDA*, 498 F.3d 272 (4th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . .  43

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991). . . . . . . . . . . . . . . . .  48

*Luka v. Procter and Gamble Co.,* 785 F.Supp.2d 712 (N.D. Ill. 2011). . . . . . . . .  20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . .  14, 15

*Marvin v. Trout*, 199 U.S. 212 (1905).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 11

*Morrison v. Olson*, 487 U.S. 654 (1988).. . . . . . . . . . . . . . . . . . . . . . . .  3, 24, 26, 27

*Northern Pacific Ry. Co. v. United States*, 356 U.S. 1 (1958). . . . . . . . . . . . . . . .  32

*Pequignot v. Solo Cup Co.*, 640 F.Supp.2d 714 (E.D.Va. 2009). . . . .  2, 7, 8, 20, 23

*Rex Trailer Inc. v. United States*, 350 U.S. 148 (1956). . . . . . . . . . . . . . . . .  16, 29

*Ridenour v. Kaiser-Hill Co., LLC*, 397 F.3d 925 (10th Cir. 2005). . . . . . . . . . . .  26

*Riley v. St. Luke's Episcopal Hosp.*,
      252 F.3d 749 (5th Cir. 2001) (*en banc*). . . . . . . . . . . . . . . . . . .  19, 21, 22, 27

*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429 (1992). . . . . . . . . . . . . . . . .  19

*Seminole Tribe v. Florida*, 517 U.S. 44 (1996).. . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519 (10th Cir. 2000). . . . . 44

*Sierra Club v. Wagner*, 555 F.3d 21 (1st Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . 19

*State Farm Mut. Automobile Ins. Co. v. Campbell*,
    538 U.S. 408 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 55, 56, 57

*Stauffer v. Brooks Brothers, Inc.*,
    619 F.3d 1321 (Fed. Cir. 2010).. . . . . . . . . . . . . . . . . . 2, 7, 8, 12, 14, 15, 18

*Swift v. U.S.*, 318 F.3d 250 (D.C. Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Toepleman v. United States*, 263 F.2d 697 (4th Cir. 1959). . . . . . . . . . . . . . . . . 16

*United States v. 47 mm Cannon*, 95 F.Supp.2d 545 (E.D.Va. 2000). . . . . . . . . . 47

*United States v. Ahmad*,
    213 F.3d 805 (4th Cir. 2000). . . . . . . . . . . . . . . . . . . 4, 29, 35, 36, 43, 48, 56

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000).. . . . . . . . . . . . . . . . . . . 35

*United States v. Bolden*, 325 F.3d 471 (4th Cir. 2003).. . . . . . . . . . . . . . . . . . . . 49

*United States v. Bollin*, 264 F.3d 391(4th Cir.2001). . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Bornstein*, 423 U.S. 303 (1976). . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Curry*, 461 F.3d 452 (4th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . 42

*United States v. Cushman & Wakefield, Inc.*,
    275 F.Supp.2d 763 (N.D. Tex. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Danielczyk*, 683 F.3d 611 (4th Cir. 2012). . . . . . . . . . . . . . . . . . 9

vii

*United States v. Fischbach and Moore, Inc.*, 750 F.2d 1183 (3d Cir. 1984). . . . .  33

*United States v. Germaine*, 99 U.S. 508 (1878). . . . . . . . . . . . . . . . . . . . . . . . . .  27

*United States v. Gosselin World Wide Moving, N.V.*,
 411 F.3d 502 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 40

*United States v. Gravely*, 840 F.2d 1156 (4th Cir. 1988). . . . . . . . . . . . . . . . . . . .  32

*United States v. Hayter Oil Co.*, 51 F.3d 1265 (6th Cir. 1995). . . . . . . . . . . . .  4, 35

*United States v. Jalaram, Inc.*, 599 F.3d 347 (4th Cir. 2010). . . . . . .  4, 29, 36, 41, 55

*United States v. Lester*, 376 F.Supp.2d 679 (W.D. Va. 2005). . . . . . . . . . . . . . .  35

*United States v. National Financial Services, Inc.*,
 98 F.3d 131 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29, 50

*United States v. Oceanpro Industries, Ltd.*,
 674 F.3d 323 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 3, 17, 18

*United States v. Portsmouth Paving Corp.*,
 694 F.2d 312 (4th Cir. 1982). . . . . . . . . . . . . . . . . . . . . .  4, 31, 32, 33, 34, 44

*United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83 (2d Cir. 1999). . . . . . .  35

*United States v. Stout*, 415 F. 2d 1190 (4th Cir. 1969). . . . . . . . . . . . . . . . . . . . .  54

*United States v. W.F. Brinkley & Son Const. Co., Inc.*,
 783 F.2d 1157 (4th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*United States v. Walker*, 112 F.3d 163 (4th Cir. 1997). . . . . . . . . . . . . . . . . . . . .  49

*United States v. Williams*, 29 F.3d 172 (4th Cir. 1994). . . . . . . . . . . . . . . . . . . . .  48

*U.S. ex rel. Amin v. George Washington Univ.*,
    26 F.Supp.2d 162 (D.D.C. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*U.S. ex rel. Berge v. Board of Trustees of the Univ. of Alabama*,
    104 F.3d 1453 (4th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 13, 15

*U.S. ex rel. Fallon v. Accudyne Corp.*,
    921 F.Supp. 611 (W.D. Wis. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*U.S. ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208 (7th Cir.1995). . . . . . . . . . .  13

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.* (*Harrison I*),
    176 F.3d 776 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . .  29, 30, 50, 54

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.* (*Harrison II*),
    352 F.3d 908 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . .  29, 30, 43, 44, 50, 54

*U.S. ex rel. K & R Ltd. Partnership v. Massachusetts Housing Finance Agency*,
    154 F.Supp.2d 19 (D.D.C. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993). . . . . . . . . . .  20, 24, 26

*U.S. ex rel. Kreindler v. United Technologies*,
    985 F.2d 1148 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 21

*U.S. ex rel. Madden v. General Dynamics Corp.*, 4 F.3d 827 (9th Cir. 1993). . . .  45

*U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943). . . . . . . . . . . . . . . . . . . . .  11, 34

*U.S. ex rel. Milam v. Univ. of Texas M.D. Anderson Cancer Center*,
    961 F.2d 46 (4th Cir. 1992). . . . . . . . . . . .  2, 3, 12, 13, 15, 17, 21, 26, 27, 28

*U.S. ex rel. Phillips v. Pediatric Services of America, Inc.*,
    123 F.Supp.2d 990 (W.D.N.C. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*U.S. ex rel. Siller v. Becton Dickinson & Co.*,
    21 F.3d 1339 (4th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*U.S. ex rel. Smith v. Gilbert Realty*, 840 F.Supp. 71 (E.D. Mich. 1993). . . . . . . . 53

*U.S. ex rel. Stone v. Rockwell Int'l. Corp.*,
    282 F.3d 787 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 20

*U.S. ex rel. Taxpayers Against Fraud v. General Electric Corp.*,
    41 F.3d 1032 (6th Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 24, 25, 26

*Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*,
    529 U.S. 765 (2000). . . . . . . . . . 1, 2, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 18, 22

*Yale v. National Indem. Co.*, 602 F.2d 642 (4th Cir. 1979). . . . . . . . . . . . . . . . . . 19

*Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987). . . . . . . . . . . . 27, 28

## Constitution

U.S. Const. Art. II. . . . . . . . . . . . . . . . . 3, 6, 7, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28

U.S. Const. Art. III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 6, 9, 10, 18, 22, 23

U.S. Const.  Amend VIII. . . . . . . . . . . . . . . . . 4, 5, 6, 26, 28, 29, 35, 37, 40, 41, 42,
                                                          43, 44, 48, 50, 51, 52, 54, 55, 56

U.S. Const.  Amend XI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

## Statutes

31 U.S.C. §§ 3729-33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 24, 25

Act of Mar. 1, 1790, ch. 2, § 6, 1 Stat. 103. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 102. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Act of Apr. 30, 1790, ch. 9, §§ 16, 17, 1 Stat. 116. . . . . . . . . . . . . . . . . . . . . . . .  10

Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133. . . . . . . . . . . . . . . . . . . . .  9

Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137–138. . . . . . . . . . . . . . . . . . . . . . .  9

Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 209. . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

**Regulations**

48 C.F.R. § 52.203–2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 30

**Other Authorities**

Fed. R. Evid. 803(22). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46, 47

U.S.S.G. § 2R1.1(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 35, 48, 56

**Miscellaneous**

Myriam E. Gilles, *Representational Standing: U.S. ex rel. Stevens and the Future of Public Law Litigation*, 89 Cal. L. Rev. 315, (2001). . . . . . . . . . . . . . .  8, 18

This brief responds to Defendant Gosselin Worldwide Moving N.V.'s ("Gosselin's") cross-appeal, and replies to its response to Relators' Opening Blue Brief. We accept Gosselin's Jurisdictional Statement and Statement of Issue as to its Cross-Appeal, subject to our Argument in response.

In our Reply, we adhere to our Opening Blue Brief, including its Statement of Facts at 2-21. We agree with and incorporate the Response/Reply Brief of the United States. This Response and Reply amplifies the United States' argument, and addresses specific points of error in Gosselin's brief.

## SUMMARY OF REPLY

**I.     Gosselin's Cross-Appeal**

Gosselin raises two constitutional challenges to the False Claims Act (FCA), 31 U.S.C. §§3729-33, that were not raised in the District Court.

### A.    Article III Standing

Gosselin argues that the FCA has violated Article III continuously since 1863, by allowing private relators to sue for regulatory penalties without a "case and controversy" of their own. Gosselin Red Brief at 21-27. The Supreme Court rejected this Article III challenge in *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 771-78 (2000).

1

Gosselin tries to avoid *Vermont Agency* by distinguishing "sovereign" claims for penalties from "proprietary" claims for damages. This argument is futile in light of *Vermont Agency*'s reliance on the First Congress' *qui tam* statutes of 1790. 529 U.S. at 776-77 & nn. 5-6. These statutes allowed private relators to recover fines for violations of non-proprietary sovereign regulations. *Id*. The Federal Circuit and Judge Brinkema recently rejected Gosselin's "proprietary/sovereign" argument for this very reason. *See Stauffer v. Brooks Brothers, Inc.*, 619 F.3d 1321, 1326-27 (Fed. Cir. 2010); *Pequignot v. Solo Cup Co.*, 640 F.Supp.2d 714, 724 & n.15 (E.D.Va. 2009). Even before *Vermont Agency*, this Circuit held that FCA relators enjoyed the Government's assigned interest in enforcing its non-monetary procurement conditions. *See U.S. ex rel. Milam v. Univ. of Texas M.D. Anderson Cancer Center*, 961 F.2d 46, 49 (4th Cir. 1992).

In any case, there is no coherent distinction between sovereign penalties and proprietary damages. Even where a forfeiture is incurred by violation of a sovereign regulation, the Government has a proprietary interest in the penalty once it is incurred. *United States v. Oceanpro Indus., Ltd.*, 674 F.3d 323, 330-32 (4th Cir. 2012). Penalties for concealing bid-rigging on Government contracts protect the Treasury, whether or not a given violation causes provable monetary damage.

2

Under *Oceanpro*, the Government owns those penalties – a proprietary right that is assignable even under Gosselin's theory.

### B.    Article II Challenge

Gosselin also argues that the FCA encroaches on the Executive Branch's law enforcement duty under Article II. Gosselin Red Brief at 27-30.

This argument has been rejected by each of the five Circuits that has considered it. The First Congress' enactment of *qui tam* statutes is a compelling answer to the Article II challenge, just as it is for Article III. The FCA does not divest the Executive Branch of control over law enforcement. The FCA requires extensive control of relator litigation by the Department of Justice, even when it does not intervene. The Department of Justice supervises all FCA suits, and has the power to take over, dismiss, or settle them, even absent formal intervention. *See Milam*, 962 F.2d at 48-49. This is sufficient Executive control to pass muster under *Morrison v. Olson*, 487 U.S. 654, 690-95 (1988).

## II.    Reply to Gosselin's Response Brief

In our Reply, we focus on three principal errors in Gosselin's defense of the District Court's refusal to award penalties.

First, Gosselin consistently confuses monetary damages, of the kind that private plaintiffs must prove in a suit alleging a private injury, with the broader

3

social harm that will support a statutory penalty. This Court has repeatedly held the Eighth Amendment's Excessive Fines Clause does not require the Government to show monetary damage to enforce substantial forfeitures. *See United States v. Ahmad*, 213 F.3d 805, 817 (4th Cir. 2000); *United States v. Jalaram, Inc.*, 599 F.3d 347, 356 (4th Cir. 2010).

Gosselin's claim that bid-rigging is not significantly harmful is contrary to settled law. Bid-rigging is a direct threat to the integrity of government contracting, regardless of whether it results in a "reasonable" price in a particular instance. *See United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 317-18 (4th Cir. 1982). Even in cases where a private plaintiff would not be able to prove damages, the Government is entitled to substantial fines for such conduct. *Id*. In criminal sentencing, the harm of bid-rigging is defined by the total volume of commerce affected, not by the provable increase in prices. U.S.S.G. § 2R1.1(d); *United States v. Hayter Oil Co.*, 51 F.3d 1265, 1274 (6th Cir. 1995). Proof of proximate damages is simply not a constitutional prerequisite for enforcing a statutory penalty.

We also explain, in any case, why the record does reflect substantial short-term monetary effects of the bid-rigging.

Second, we show that Gosselin may not minimize the culpability of its bid-rigging. The extent of its profit is irrelevant. Its claim that it did not deliberately

4

intend to deceive the government (*i.e.*, did not have *scienter*) is contrary both to the jury verdict and to FCA law. The District Court had no authority to excuse bid-rigging based on "unique circumstances" – this is tantamount to judicial nullification of the Federal Acquisition Regulations. Nor may Gosselin minimize liability because the Army renewed its contract after Bunk first raised his allegations. The Department of Justice had not yet fully investigated the charges. Now that it has, it seeks $24 million in penalties. Gosselin's *ad hominem* attacks on Bunk are both factually groundless and legally irrelevant. Gosselin may not ask the Court to ignore its parallel bid-rigging schemes for the ITGBL elsewhere in Europe – this related conduct shows that Gosselin's offense here was not isolated.

Third, we show that the District Court's alternative formulas for limiting penalties to zero, $11,000, $500,000 or $1.5 million are not tenable. Gosselin claims the Relators and the Government invited error, by telling the District Court it had no power to reduce the $50 million statutory minimum. This misrepresents the record. Relators and the Government repeatedly argued that, while the statute precluded a reduction, the Court had the Eighth Amendment power to reduce the penalty. Gosselin's argument to the contrary is simply an effort to use the magnitude of its fraud to avoid liability altogether.

5

The $24 million sought by the Government and the Relators is well within Eighth Amendment standards. The volume of commerce affected was approximately $8 million,[1] well within the single-digit forfeiture-to-fine ratio approved by the law.

## ARGUMENT

## RESPONSE TO CROSS-APPEAL

## I.    RELATORS HAVE ARTICLE III STANDING.

For the first time in this litigation,[2] Gosselin argues that Relator Kurt Bunk[3] lacks Article III standing to proceed on the DPM claim. This argument is foreclosed by *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 771-78 (2000).

---

[1]The precise total the Government expended during the three years of the 2001 DPM Contract is €8,359,844.63, the total of the three columns on JA 1405. As we explained in Relators' Opening Brief at 34 n.4, the euro was roughly equivalent in value to the dollar during these years.

[2]Insofar as Gosselin is challenging Article III standing, its challenge is jurisdictional. It may therefore be raised now even though it was not preserved below. As we discuss in Part II.A, however, Gosselin does not have the same right to raise the non-jurisdictional attack under Article II.

[3]Because the Government intervened on the ITGBL claim, Gosselin does not appear to challenge the Government's Article III standing as to that claim. However, to the extent that Gosselin's Constitutional challenge can be read to apply to the intervened ITGBL claim, our Response is equally applicable.

6

To avoid *Vermont Agency*, Gosselin proposes a distinction between "proprietary" and "sovereign" claims. Gosselin Red Brief at 21-24. It argues that only "proprietary" claims (in its definition, claims for monetary damages) may be assigned to a *qui tam* relator. *Id*. at 24-27. Gosselin claims that this case involves penalties for violations of the Government's "sovereign" interest, which it argues are not assignable under Article II. *Id*. at 27-30. Gosselin is wrong on both counts.

A.    ***Vermont Agency* Approves Relator Standing, Whether the Government's Injury Is "Proprietary" or "Sovereign."**

1.    ***Vermont Agency* did not adopt the proprietary/sovereign distinction Gosselin urges.**

The Federal Circuit and Judge Brinkema recently rejected Gosselin's "proprietary/sovereign" argument, because *Vermont Agency* does not support it. *See Stauffer v. Brooks Brothers, Inc.*, 619 F.3d 1321, 1326-27 (Fed. Cir. 2010); *Pequignot v. Solo Cup Co.*, 640 F.Supp.2d 714, 724 & n.15 (E.D.Va. 2009).

*Vermont Agency* identified sovereign interest and proprietary interest as two sources of the Government's "injury in fact." 529 U.S. at 771. But the Court held that both interests support relator standing, without making a distinction. The Federal Circuit explained: "The Supreme Court considered both types of injuries and found them collectively to be sufficient to confer standing on the government and therefore on the relator. *See* [*Vermont Agency*, 529 U.S.] at 774. . .,

7

(concluding, without stating which specific injury, 'that the United States' injury in fact suffices to confer standing on respondent Stevens'). The Court made no distinction between the two, and we similarly do not do so here." *Stauffer*, 619 F.3d at 1326. Judge Brinkema concluded that the law review article Gosselin cites does not represent *Vermont Agency*: "Although some scholars have argued that the government can assign only proprietary, and not purely sovereign, interests, *see* Myriam E. Gilles, *Representational Standing: U.S. ex rel. Stevens and the Future of Public Law Litigation*, 89 Cal. L. Rev. 315, 342-44 (2001), the Supreme Court made no such distinction in its discussion of assignment in *Vermont Agency*, and this Court declines to adopt this distinction." *Pequignot*, 640 F.Supp.2d at 724 n.15.

> ## 2.    *Vermont Agency* approved the First Congress' *qui tam* laws enforcing "sovereign" rather than proprietary interests.

Gosselin finds support for this proprietary/sovereign distinction in its own italicization of a sentence from *Vermont Agency*: "the FCA can reasonably be regarded as effecting a partial assignment of the Government *damages claim*." Gosselin Red Brief at 23-24 (italics supplied by Gosselin), *citing Vermont Agency*,

529 U.S. at 773. Gosselin points to its own emphasis as proof that Justice Scalia

intended *sub silentio* to exclude claims for civil penalties.[4]

Gosselin's argument is demolished by the subsequent passages in *Vermont*

*Agency.* The Court's primary basis for rejecting the Article III challenge was the

First Congress' enactment of *qui tam* statutes in 1790. All of these statutes allowed

private relators to enforce <u>sovereign</u> interests. *Vermont Agency*, 529 U.S. at 776-77

& nn. 5-6 (*citing* Act of Mar. 1, 1790, ch. 2, § 6, 1 Stat. 103 (allowing census taker

to sue for and receive half of penalty for failure to cooperate in census)); *id.* at 777

n.6 (*citing* Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 102 (allowing informer to sue for,

and receive half of fine for, failure to file census return)); Act of July 20, 1790, ch.

29, §§ 1, 4, 1 Stat. 131, 133 (allowing private individual to sue for, and receive half

of fine for, carriage of seamen without contract or illegal harboring of runaway

seamen); Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137–138 (allowing private

individual to sue for, and receive half of goods forfeited for, unlicensed trading

with Indian tribes); Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 209 (allowing person

---

[4]Gosselin also points to a sentence in a Government brief in *Vermont Agency*, suggesting that the Court must have adopted it without saying so. Gosselin Red Brief at 23-25. The holding in *Vermont Agency* is determined by the Court's opinion, not by arguments reconstructed from the briefs that the Court did not adopt. *See United States v. Danielczyk*, 683 F.3d 611, 616 (4th Cir. 2012), *quoting Seminole Tribe v. Florida*, 517 U.S. 44, 67 (1996).

who discovers violation of spirits duties, or officer who seizes contraband spirits, to sue for and receive half of penalty and forfeiture, along with costs, in action of debt); Act of Apr. 30, 1790, ch. 9, §§ 16, 17, 1 Stat. 116 (allowing informer to conduct prosecution, and receive half of <u>fine</u>, for criminal larceny or receipt of stolen goods).

Even though these early *qui tam* statutes enforced non-proprietary, sovereign regulations, Justice Scalia took them as compelling evidence that the Framers understood relator litigation to be legitimate under Article III: "We think this history well nigh conclusive with respect to the question before us here: whether *qui tam* actions were 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'" *Vermont Agency*, 529 U.S. at 777-78.

The early Supreme Court likewise affirmed the validity of *qui tam* statutes, even where they allowed relators to recover penalties for violations of sovereign interests. Chief Justice John Marshall explained this in *Adams v. Woods*, 2 Cranch 336, 341, 6 U.S. 336, 341 (1805) (in private informer's action to recover penalty for illegal slave trading, "[a]lmost every fine or forfeiture under a penal statute, may be recovered by an action of debt as well as by information"). This rule has remained the same through successive eras. *See Marvin v. Trout*, 199 U.S. 212, 225-26 (1905) ("The right to recover the penalty or forfeiture granted by statute is

10

frequently given to the first common informer who brings the action, although he has no interest in the matter whatever except as such informer. . . . There can be no doubt of the right of the government to give the whole instead of a moiety of the forfeiture to the informer."); *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 542 (1943) ("Congress has power to choose this method to protect the government from burdens fraudulently imposed upon it; to nullify the criminal statute because of dislike of the independent informer sections would be to exercise a veto power which is not ours"). Gosselin's argument is futile against this historical background. If Gosselin were correct, every *qui tam* statute cited in *Vermont Agency*, 529 U.S. at 776-77 & nn. 5-6, and all of the *qui tam* statutes enforced in *Adams v. Woods*, *Marvin v. Trout*, and *Marcus v. Hess* were unconstitutional.

The Federal Circuit recently rejected the same "proprietary/sovereign" standing argument, precisely because of *Vermont Agency*'s reliance on 1790 *qui tam* statutes: "Those fines [in the 1790 statutes described in *Vermont Agency*, 529 U.S. at 776-77 & nn. 5-6] were not based on harms to the United States' proprietary interest, as the federal treasury was not directly diminished because of the violations. The fines were instead based only on harms to the sovereign interest of the United States, *viz.*, the interest in seeing the harms, as defined in the statutes, redressed. . . . Thus, under *Vermont Agency*, the United States' sovereign injury is

11

sufficient to confer standing upon it and therefore upon Stauffer, its implicit partial assignee." *Stauffer*, 619 F.3d at 1326-27.

The Federal Circuit's analysis in *Stauffer* is correct. After *Vermont Agency*, FCA relators have standing even when they enforce sovereign interests. *See also U.S. ex rel. Stone v. Rockwell Int't Corp.*, 282 F.3d 787, 804 (10th Cir. 2002) (where FCA relators alleged that contractor knowingly concealed environmental and safety regulations, relators had standing under *Vermont Agency*); *Bly-Magee v. California*, 236 F.3d 1014, 1017 (9th Cir. 2001) (rejecting attack on relator's standing: "a *qui tam* plaintiff need not prove that the federal government will suffer monetary harm to state a claim under the FCA").

### 3.    *Vermont Agency* reaffirms Fourth Circuit law.

Even before *Vermont Agency*, this Circuit held that FCA relators have standing because the United States is the real party in interest, even where the Government does not formally intervene. *U.S. ex rel. Berge v. Board of Trustees of the Univ. of Alabama*, 104 F.3d 1453, 1457 (4th Cir. 1997); *U.S. ex rel. Milam v. Univ. of Texas M.D. Anderson Cancer Center*, 961 F.2d 46, 49 (4th Cir. 1992). "We have previously held that the 'United States is the real party in interest in any False Claims Act suit, even where it permits a *qui tam* relator to pursue the action on its behalf.' [*citing Milam*, 961 F.2d at 50] . . . [W]e see *Milam* as resolving the

12

general issue of standing in this circuit. The Seventh Circuit has concluded that

'[o]nce we accept the premise that the United States is the real plaintiff in a *qui tam*

action, it stands to reason that challenges to the standing of the government's

representative are beside the point.'" *Berge*, 104 F.3d at 1457, *quoting U.S. ex rel.*

*Hall v. Tribal Dev. Corp.*, 49 F.3d 1208, 1213 (7th Cir. 1995). *Vermont Agency*

reaffirms this rule: "We conclude, therefore, that the United States' injury in fact

suffices to confer standing on [the relator]." 529 U.S. at 774.

　　　　Gosselin and its *amici* do not acknowledge this Circuit precedent. Their

argument (that the assignable "injury in fact" can only be direct monetary damage

to the Treasury) is contradicted by the claims at issue in *Milam*, 961 F.2d at 50

(federal grant recipient falsified data in breach of contract condition) and *Berge*,

104 F.3d at 1457 (grant recipient plagiarized work and overstated its competence).

In both *Milam* and *Berge*, the relator's claim was not that the defendant had

directly stolen Treasury funds, but rather that it falsely certified compliance with a

"regulatory" condition on the receipt of funds. This case is no different: Gosselin

falsely certified that it had not engaged in bid collusion, a condition for receipt of

the contract. If the relators in *Milam* and *Berge* had standing to sue as the

Government's assignees, the relator Kurt Bunk has standing here.

13

### 4.    *Lujan* distinguished *qui tam* suits.

Gosselin argues that *qui tam* plaintiffs lack standing because they are not

personally aggrieved, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572-73

(1992). Gosselin Red Brief at 25-27.

The *Vermont Agency* Court was well aware of *Lujan*: Justice Scalia (who

authored both opinions) cited *Lujan* throughout *Vermont Agency*, 529 U.S. at 771-

73, for the proposition that "[t]he interest must consist of obtaining compensation

for, or preventing, the violation of a legally protected right." Nevertheless, Justice

Scalia wrote in *Vermont Agency* that relators had such an assigned interest: "We

believe, however, that adequate basis for the relator's suit for his bounty is to be

found in the doctrine that the assignee of a claim has standing to assert the injury in

fact suffered by the assignor." 529 U.S. at 773. As *Vermont Agency*'s historical

study showed, this includes injuries to the sovereign's interest as well as injuries to

the government's purse. 529 U.S. at 776-77 & nn. 5-6.

Gosselin protests that *Lujan* forbids this result.[5] As the Federal Circuit

explained in rejecting this argument in *Stauffer*, 619 F.3d at 1325-26, *Lujan* does

---

[5]By invoking *Lujan*, Gosselin abandons its rationale for distinguishing
proprietary from sovereign interests. If *Lujan* requires relators to demonstrate their
own injury from the false claim, there is no principled distinction that would save
"proprietary" assignments from "sovereign" assignments.

not condemn *qui tam* suits. In *Lujan*, Justice Scalia took pains to distinguish a valid *qui tam* suit from a free-standing "citizen suit": "Nor is [this case] the unusual case in which Congress has created a concrete private interest in the outcome of a suit against a private party for the government's benefit, by providing a cash bounty for the victorious plaintiff." *Lujan*, 504 U.S. at 572-73; *see Stauffer*, 619 F.3d at 1325-26 (holding *Lujan* does not bar *qui tam* suits.) The statute in *Lujan* allowed plaintiffs to sue the Government, without any injury either direct or assigned. But the abstract "public" interest held insufficient in *Lujan* is not the same as the Government's undisputed injury in fact in *Vermont Agency*. 529 U.S. at 773. In this case, as in *Milam*, 961 F.2d at 49, and *Berge*, 107 F.3d at 1457, the Government is "injured in fact" by false statements to win Government contracts from which the bidder would have been disqualified had it told the truth. As in *Vermont Agency*, the harm is that the false statement "induc[ed] the Government to disburse more grant money than [defendant] was entitled to receive." 529 U.S. at 770. The Government may therefore partially assign its right of recovery to private relators through the False Claims Act.

15

**B.    The Government's Interest Here Is Proprietary.**

**1.    Government procurement is a proprietary interest.**

Gosselin argues that the Government's interest in preventing bid collusion on its contracts is purely "sovereign," rather than proprietary.

Even if such a distinction were valid, the Government's interest is proprietary. The Federal Acquisition Regulation, 48 C.F.R. § 52.203–2, is not a general regulation of private-sector economic behavior. It is a specific measure to protect the Government as a market actor from predatory bid collusion. This is a measure to protect the Government purse. *See Rex Trailer Inc. v. United States*, 350 U.S. 148, 152-54 (1956) ("The Government's recovery here is comparable to the recovery under liquidated-damage provisions which fix compensation for anticipated loss."); *Toepleman v. United States*, 263 F.2d 697, 699 (4th Cir. 1959) ("to the Government a false claim, successful or not, is always costly. Just as surely, against this loss the Government may protect itself, though the damage be not explicitly or nicely ascertainable").

**2.    The Government has a proprietary interest in the statutory penalty once the violator incurs it: *Oceanpro*.**

The Government has a clear proprietary interest in the civil penalties themselves. While FCA penalties are subject to the Excessive Fines Clause,

16

*Hudson v. United States*, 522 U.S. 93, 103 (1997), they are still discrete sums of

money which belong to the Government upon violation.[6]

Even where FCA penalties are due for violation of a regulatory requirement,

the Government has a <u>proprietary</u> interest in the penalty once it is incurred. This

Court explained this point in *United States v. Oceanpro Indus., Ltd.*, 674 F.3d 323,

330-32 (4th Cir. 2012). In *Oceanpro*, defendants who had illegally harvested

salmon were ordered to pay restitution to the States of Maryland and Virginia. The

defendants argued monetary restitution was improper, because the States had no

proprietary interest in the salmon before they were harvested. 674 F.3d at 330. This

Court held that even though the States did not own the salmon initially, the statute

gave the States a <u>proprietary</u> interest in the penalty once they were illegally

harvested. 674 F.3d at 332. That proprietary interest was therefore a proper basis

for the monetary restitution order.

The monetary forfeiture in *Oceanpro* would have been assignable, even

under Gosselin's theory. The law review commentator that Gosselin cites agrees

that delinquencies and forfeitures constitute assignable sums of money that the

---

[6]The FCA does not allow relators to sue for injunctions or bring criminal
prosecutions to imprison the violators. The only relief an FCA relator may win is a
monetary award, the lion's share of which goes to the Government. *See Milam*,
961 F.2d at 49.

government may authorize private relators to recover on its behalf. *See* Gilles, *Representational Standing*, 89 Cal. L. Rev. at 357-58. This case is no different. Even if FCA penalties were incurred by violation of a regulatory interest, the Government had a proprietary interest in the penalties upon violation. *See Oceanpro*, 674 F.3d at 330-31. Such a proprietary interest is assignable. As a result, Gosselin is wrong to assume that Relator Bunk was not enforcing a proprietary interest of the United States.

## II.   THE FALSE CLAIMS ACT DOES NOT VIOLATE ARTICLE II.

Gosselin argues that any assignment of the Government's right to FCA penalties would violate Article II of the Constitution. Gosselin Red Brief at 27-30. It claims that, for 150 years, the False Claims Act has unconstitutionally encroached on the Executive's Article II power to "Take Care" to enforce the laws under § 3 and to appoint officers under § 2.

### A.   Gosselin Failed to Preserve the Article II Challenge Below.

Gosselin never raised its Article II challenge in the District Court. Unlike its Article III standing challenge, the Article II challenge to the FCA is not a jurisdictional argument. *See Vermont Agency*, 529 U.S. at 778 n.8; *Stauffer*, 619 F.3d at 1327. It is therefore not preserved for review. *See id.*

18

Gosselin argues that the Court may consider this claim as an alternative ground for affirming the denial of penalties. Gosselin Red Brief at 78. This Court has the power to consider non-jurisdictional arguments waived below, but this is a matter of <u>discretion</u> rather than the appellee's right. *See Yale v. National Indem. Co.*, 602 F.2d 642, 650 n.18 (4th Cir. 1979). By failing to raise any Article II challenge in the District Court, Gosselin can only ask the Court to exercise its discretion to consider this new argument. *See id.*; *Sierra Club v. Wagner*, 555 F.3d 21, 26 (1st Cir. 2009) ("We may ourselves choose to consider newly minted arguments from the parties, or devise them ourselves, but this is not an entitlement of the parties")*.* The Court may properly decline Gosselin's invitation to reach a Constitutional challenge it failed to preserve below. *See Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 441 (1992) (declining to reach constitutional issue not preserved by either party below).

### B.    Gosselin's Article II Argument Is Meritless In Any Case.

### 1.    The Circuits unanimously reject Gosselin's position.

Every Circuit that has considered Gosselin's argument has rejected it. The *qui tam* provisions of the False Claims Act do not violate the Take Care or the Appointments Clause of Article II. *See U.S. ex rel. Kreindler v. United Technologies*, 985 F.2d 1148, 1155 (2d Cir. 1993); *Riley v. St. Luke's Episcopal*

19

*Hosp.*, 252 F.3d 749, 757-58 (5th Cir. 2001) (*en banc*); *U.S. ex rel. Taxpayers Against Fraud v. General Electric Corp.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993); *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 805 (10th Cir. 2002).

In this Circuit, Judges Brinkema and Potter have each rejected the claim that *qui tam* statutes violate Article II. *See Pequignot v. Solo Cup Co.*, 640 F.Supp.2d 714, 725-27 (E.D.Va. 2009) (Brinkema, J.); *U.S. ex rel. Phillips v. Pediatric Services of America, Inc.*, 123 F.Supp.2d 990, 993-94 (W.D.N.C. 2000) (Potter, J.). So have the consensus of district courts in other circuits. *See e.g., Hollander v. Ranbaxy Laboratories Inc.*, 804 F.Supp.2d 344, 354-55 (E.D. Pa. 2011); *Luka v. Procter and Gamble Co.* 785 F.Supp.2d 712, 720-22 (N.D. Ill. 2011); *U.S. ex rel. K & R Ltd. Partnership v. Massachusetts Housing Finance Agency*, 154 F.Supp.2d 19, 25-27 (D.D.C. 2001); *Friedman v. Rite Aid Corp.*, 152 F.Supp.2d 766, 770-72 (E.D. Pa. 2001); *Gublo v. NovaCare, Inc.*, 62 F.Supp.2d 347, 351-53 (D. Mass. 1999); *U.S. ex rel. Amin v. George Washington Univ.*, 26 F.Supp.2d 162, 168-70 (D.D.C. 1998); *U.S. ex rel. Fallon v. Accudyne Corp.*, 921 F.Supp. 611, 622-23 (W.D. Wis. 1995).

The central holding of these cases – that the Executive Branch retains control over FCA relators even when it does not intervene – is the law of this Circuit. *See*

20

*Milam*, 961 F.2d at 49. The Circuits upholding the FCA against Article II challenges frequently cite the Fourth Circuit's *Milam* decision as supporting authority. *See Riley*, 252 F.3d at 756 n.10, 758 n.13 (*en banc* Fifth Circuit cites *Milam* as authority that the Department of Justice supervises FCA relator litigation sufficiently that the FCA does not violate "Take Care" nor the Appointments Clause); *Taxpayers Against Fraud*, 41 F.3d at 1042 (Sixth Circuit cites *Milam* to uphold the constitutionality of the FCA's *qui tam* provisions); *Kreindler*, 985 F.2d at 1154-55 (Second Circuit cites *Milam* for the proposition that the Government is always the real party in interest, holding "the FCA *qui tam* provisions do not usurp the Executive Branch's litigating function because the statute gives the executive branch substantial control over the litigation").

Gosselin does not acknowledge this overwhelming contrary authority. Its *amicus* Chamber of Commerce does so briefly, but argues that all of these courts are wrong without mentioning *Milam*. Chamber Amicus Brief at 23-24.

To explain why this consensus is correct, we begin with the historical acceptance of *qui tam* statutes.

21

## 2. The prevalent use of *qui tam* statutes by the First Congress shows they do not violate Article II.

The *Vermont Agency* Court relied on the First Congress' *qui tam* statutes as compelling interpretive guidance that the Framers considered such laws constitutional. While *Vermont Agency* considered Article III without reaching the Article II challenge, the First Congress' *qui tam* statutes have the same interpretive value for Article II. The *en banc* Fifth Circuit explained: "it is logically inescapable that the same history that was conclusive on the Article III question in [*Vermont Agency*] with respect to *qui tam* lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning this statute." *Riley*, 252 F.3d at 752.

The First Congress in 1790 (and Chief Justice Marshall in 1805 in *Adams v. Woods*) considered *qui tam* statutes to be valid exercises of Congressional power. Judge Brinkema explains:

the Court finds the long history of *qui tam* statutes, including many passed by the First Congress soon after the signing of the Constitution, *see*, *e.g.*, 1 Stat. 131, 133, highly persuasive as to their constitutionality. *Qui tam* statutes were part of a long-accepted practice dating back centuries. It is unlikely that the Framers would

22

have written a Constitution that outlawed this practice, and then

immediately passed several *qui tam* laws that unconstitutionally

encroached on Executive Branch power before the ink on the

Constitution was even dry.

*Pequignot*, 640 F.Supp.2d at 726.

The Supreme Court looks to the First Congress' legislation to interpret

Article II as much as it does Article III. *See Free Enterprise Fund v. Public Co.*

*Accounting Oversight Bd.*, 561 U.S. ___, 130 S.Ct. 3138, 3151-52 (2010); *Bowsher*

*v. Synar*, 478 U.S. 714, 723-24 (1986). In *Free Enterprise Fund,* the Court relied

on the acts of the First Congress to interpret the President's Article II removal

power, because those early enactments "provide[] contemporaneous and weighty

evidence of the Constitution's meaning since many of the Members of the First

Congress had taken part in framing that instrument." *Id*., *quoting Bowsher*, 478

U.S. at 723-24.

Applied to this case, the First Congress' repeated use of *qui tam* statutes, and

their approval in 1805 by Chief Justice Marshall in *Adams*, is compelling evidence

that the Framers did not consider such statutes to violate Article II.

23

### 3.     The FCA does not violate Article II's "Take Care" clause because the Executive retains control over the litigation.

Gosselin argues that the FCA violates Article II by vesting "executive power" to prosecute violations in private relators. Gosselin Red Brief at 27-29.

Gosselin's argument fails in light of *Morrison v. Olson*, 487 U.S. 654, 671-72, 690-95 (1988). In *Morrison*, the Court held that congressional authorization of an Independent Counsel did <u>not</u> encroach on the Executive Branch's Article II authority, even though the Independent Counsel could initiate and conduct investigations in the name of the United States, separate from the Department of Justice. 487 U.S. at 662-63. *Morrison* held that the Attorney General retained sufficient control over the Independent Counsel that Congress did not violate the "Take Care" clause of Article II by creating the office. *Id*. *Morrison* relied on the Attorney General's initial control over the appointment of an Independent Counsel, even though the Attorney General may not thereafter remove an Independent Counsel except for "good cause" subject to judicial review. 487 U.S. at 662-63.

The FCA passes muster under *Morrison*, because the Department of Justice retains sufficient control over FCA relators even when it does not intervene. *See Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 751-57. Although a relator is initially self-appointed, the Act requires the relator to file its action under

24

seal to permit the Government at least 60 days to review the allegations and

evidence before it is served on the defendant. 31 U.S.C. § 3730(b)(2)-(3). Filing

under seal protects the Government's prosecutorial interest, since it avoids

"alert[ing] the defendants [to] trigger an evasive mechanism." *Taxpayers Against*

*Fraud*, 41 F.3d at 1041. Even if the Department of Justice does not directly

intervene, it is entitled to the pleadings, evidence and transcripts of discovery. 31

U.S.C. § 3730(b)(2) and (c)(3). The Executive may also limit the participation of a

relator's ability to conduct discovery, or to call witnesses, or to participate in any

way inimical to the Government's interest. 31 U.S.C. § 3730(c)(2)(C)-(D) and

(c)(4). The Department of Justice has an absolute right to oust the relator as

principal party by intervening, without being bound by any act of the relator. 31

U.S.C. § 3730(b)(2) and (c)(1). It may do so at any time within 60 days, and may

do so at any time thereafter upon showing of "good cause."[7] 31 U.S.C. § 3730(b)(3)

and (c)(3).

   The Executive has the power, at any time, to terminate the litigation by

dismissing the case or settling it. 31 U.S.C. § 3730(c)(2). The Executive is not

---

[7]The standard for intervention after 60 days is extremely liberal. *See U.S. ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1346 (4th Cir. 1994) (even where government negligently fails to intervene within 60-day period, strong public policy dictates liberal allowance of intervention).

25

required to intervene in order to dismiss the case. *See Ridenour v. Kaiser-Hill Co., LLC*, 397 F.3d 925, 932-35 (10th Cir. 2005) (noting this rule bolsters the FCA's constitutionality against Article II challenges); *Swift v. U.S.*, 318 F.3d 250, 251-52 (D.C. Cir. 2003). Nor may the relator dismiss or settle a non-intervened action without the Attorney General's consent. 31 U.S.C. § 3730(b)(1).

These provisions ensure that the Department of Justice supervises, and has the power to direct, settle or terminate any False Claims Act lawsuit pursued by a private relator. As Judge Boggs wrote for the Sixth Circuit: "Thus, the Executive Branch retains 'sufficient control' over the relator's conduct to 'ensure that the President is able to perform his constitutionally assigned dut[y],' to 'take Care that the Laws be faithfully executed.'" *Taxpayers Against Fraud*, 41 F.3d at 1041 *(quoting Morrison*, 487 U.S. at 696 )(citation omitted). As Judge Hall wrote for the Ninth Circuit: "once prosecution has been initiated, the government has greater authority [in an FCA case] to limit the conduct of the prosecutor and ultimately *end* the litigation in a qui tam action than it does in an independent counsel's action [in *Morrison*]." *Kelly*, 9 F.3d at 754.

The Fourth Circuit agrees with these courts' view of the FCA. In *Milam*, this Court held that the Executive Branch retains such "extensive power . . . to control the litigation" that States lack Eleventh Amendment immunity against a non-

26

intervened FCA suit. 961 F.2d at 49. *Milam* cannot be reconciled with Gosselin's argument. If Executive control over a relator's FCA suit renders it a Federal Government suit for Eleventh Amendment purposes, the same control is sufficient to answer any Article II objection.

### 4.    The FCA does not violate the Appointments Clause.

Gosselin and its *amicus* Chamber of Commerce are also wrong that the False Claims Act violates the Appointments Clause. Gosselin Red Brief at 27-28; Chamber Amicus at 21-27.

In the first place, FCA relators are not themselves "officers," since they do not draw regular pay and have no role aside from the specific case they litigate. *See*, *e.g.*, *Riley*, 252 F.3d at 757-58, *citing Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890); *United States v. Germaine*, 99 U.S. 508, 511-12 (1878).

While Gosselin and the *amicus* Chamber assert that all prosecution must be vested in an Article II officer, their argument overlooks *Morrison*. A litigator like the Independent Counsel in *Morrison* need not be an Article II officer, so long as the Attorney General has sufficient control over his or her actions. 487 U.S. at 671-72. *Morrison* recognized that private attorneys may legitimately be appointed to act as *ad hoc* prosecutors, even though they are not themselves Article II "officers." *Morrison*, 487 U.S. at 676, *citing Young v. U.S. ex rel. Vuitton et Fils*

27

*S.A.*, 481 U.S. 787, 793-94 (1987). For "inferior" officers, what matters is that their "work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1987). In FCA cases, the Attorney General through the Department of Justice is that supervising officer. *See Milam*, 961 F.2d at 49. Gosselin's Article II challenge is therefore without merit.

## REPLY IN SUPPORT OF RELATORS' APPEAL

## III.  STATUTORY PENALTIES ARE NOT DAMAGES.

Gosselin's defense of the District Court's zero penalty award is based on a subtle but persistent substitution of "actual damages" for "harm."

### A.    "Harm" Is Not Limited to Monetary Damages.

In Relators' Opening Brief at 27-30, we showed that the Eighth Amendment analysis of "harm" to justify a statutory penalty is not confined to proof of monetary damages. Gosselin largely ignores this point. While it initially acknowledges that intangible harm may support penalties, Gosselin Red Brief at 32-33, it later makes that concession meaningless by claiming there can be no intangible harm absent provable "monetary damage." Gosselin Red Brief at 58-59.

This argument is untenable. The vast majority of offenses for which Congress legislates fines, penalties and forfeitures do not cause <u>direct</u> damage to

28

the Treasury. For example, money-laundering harms the Government's interest in the integrity of financial reporting, but it does not cause proximate monetary damage to the Treasury. *See United States v. Ahmad*, 213 F.3d 805, 817 (4th Cir. 2000) (money-laundering and customs fraud); *United States v. Jalaram, Inc.*, 599 F.3d 347, 356 (4th Cir. 2010) (prostitution and money-laundering). Gosselin's argument would condemn the substantial forfeitures in *Ahmad* and *Jalaram* as "Excessive Fines." This Court rejects that argument: the Eighth Amendment does not bar a large forfeiture just because the offense does not directly cost the Government revenue. *Ahmad*, 213 F.3d at 816 n.5; *Jalaram*, 599 F.3d at 356. *See also United States v. National Financial Services, Inc.*, 98 F.3d 131, 140-41 (4th Cir. 1996) (affirming a $500,000 civil penalty against a firm who sent millions of unlawful debt collection notices, even though the Government was not required to prove actual harm: "Without a real sting, the defendants would be unlikely to be deterred from violating the Act").

Gosselin also ignores our showing that the FCA does not require proof of damages to support penalties. Relators' Blue Brief at 27-29, citing *Rex Trailer Inc. v. United States*, 350 U.S. 148, 152-54 (1956); *U.S. ex rel. Harrison v. Westinghouse Savannah River Co. (Harrison I)*, 176 F.3d 776, 785 n.7 (4th Cir. 1999); *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.* (*Harrison II*),

29

352 F.3d 908, 920 n.13 (4th Cir. 2003) (statutory penalties awarded for each false claim, even where no provable damages). Gosselin cites *Harrison II*'s discussion of damages, Gosselin Red Brief at 40, ignoring that both *Harrison I* and *II* hold the Government may still recover statutory penalties even where the proof of damages fails. *Harrison I*, 176 F.3d at 785 n.7; *Harrison II*, 352 F.3d at 920 n.13.

### B.    Concealed Bid-Rigging Is a Grave Offense, Regardless of Proximate Monetary Damage.

The jury found Gosselin deliberately and falsely certified its Independent Price Determination mandated by the Federal Acquisition Regulation, 48 C.F.R. §52.203–2, when in fact Gosselin had organized a hidden cartel among the major industry players to fix prices, allocate territories, and rig the bidding on the DPM contract. JA 1199; 1224-25; 1586-88. Gosselin does not appeal from the jury's verdict.

Instead, Gosselin argues (1) that this verdict does not "prove" intangible harm, Gosselin Red Brief at 41, (2) that the collusively fixed prices were reasonable, *id*. at 48-49, (3) that there must be proof of damages even in a *per se* antitrust case, *id*. at 41-42, and (4) this is not an antitrust case to begin with. *Id*.

### 1.    Bid-rigging is inherently harmful.

It is hard to fathom how Gosselin can argue, even now, that its bid-rigging scheme was a harmless act. As this Circuit held against Gosselin itself, bid-rigging is a fundamental threat to fair competition. "[Gosselin's] scheme, which prevented second round bids from converging to the prime and even erased FF1's first round prime bid, amounted to naked bid rigging. And 'bid rigging agreement is price-fixing agreement of the simplest kind.'" *U.S. v. Gosselin World Wide Moving, N.V.*, 411 F.3d 502, 508 (4th Cir. 2005) (*citing United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 318 (4th Cir.1982)); *see also United States v. W.F. Brinkley & Son Const. Co., Inc.*, 783 F.2d 1157, 1160 (4th Cir.1986). This is a grave offense, whether or not it causes a provable short-term increase in prices. Price-fixing and bid-rigging "are all banned because of their actual or potential threat to the central nervous system of the economy." *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 351 n.23 (1982).

If the District Court's decision is affirmed, the risk/benefit calculus will change for all bidders contemplating collusion on Government contracts worldwide. Even if violators are caught, the District Court's approach ensures that they will not have to pay FCA penalties unless the Government can prove specific damages. Such proof is inherently difficult where, as here, all of the major market

31

players are party to the price-fixing conspiracy. *See Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). The District Court's approach nullifies any deterrent effect of the FCA.

### 2. The "reasonableness" of the cartel's prices is legally irrelevant.

Gosselin argues that there is no proof that the cartel actually charged "unreasonable" prices. As we show in Part I.E. below, this is not true even as a factual matter.

Gosselin ignores the more basic point – that the reasonableness of the resulting prices is not a defense in a bid-rigging case. Because "the collusive bid rigging dimension of the conspiracy charged makes the arrangement little less than a cartel, which is never legally nor economically justifiable . . . we do not hesitate to conclude that the Government was not required to establish the unreasonableness of the conspiracy charged." *See United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 317-18 (4th Cir. 1982) (internal quotations omitted); *United States v. Gravely*, 840 F.2d 1156, 1161 (4th Cir. 1988) (rejecting defendant's proffer of expert testimony that fixed prices were not unreasonable).

32

### 3.    *Per se* antitrust cases require specific proof for monetary *damages*, but not for fines and statutory penalties.

Gosselin argues that even where the defendant has committed a *per se* antitrust violation, the plaintiff must still prove the amount of damages. Gosselin Red Brief at 41.

This is true  – where a private plaintiff is claiming <u>damages</u> for itself in a private suit alleging a private injury. But in an FCA case, the Government (through its assignee relator) is claiming <u>penalties</u> for a public offense, a statutory sanction governed by the Excessive Fines Clause. Fines and penalties are not subject to the same proof as monetary damages. For example, this Court affirmed a $400,000 fine for a bid-rigging scheme (much smaller than the Europe-wide conspiracy here) in *Portsmouth Paving*, 694 F.2d at 317-18, regardless of whether the cartel's prices were reasonable. Yet if Gosselin is correct, the $400,000 fine in *Portsmouth Paving* was unconstitutional because the Government failed to prove any actual damages. This is not the law. The Government is entitled to substantial penalties against bid-rigging schemes, regardless of proof of monetary damage, because of the grave danger that such conduct poses if left unpunished. *See also United States v. Fischbach and Moore, Inc.*, 750 F.2d 1183, 1192-93 (3d Cir. 1984) ($1 million fine

not disproportionate for bid-rigging; government not required to prove adverse effect on commerce).

### 4. FCA bid-rigging cases are governed by the same principles as private bid-rigging cases.

Gosselin suggests that antitrust case law is not valuable precedent here, because this is an FCA case. Gosselin Red Brief at 41.

This argument has no merit. Whatever the cause of action, this is a bid-rigging case. The fact that the bid-rigging was concealed by a deliberate falsehood to the Government makes the offense <u>more</u> culpable, not less. Bid-rigging is an equally grave offense whether it is prosecuted under the Sherman Act or the False Claims Act. Antitrust cases commonly rely on FCA cases where the false claim concealed bid-rigging. *See*, *e.g.*, *Portsmouth Paving*, 694 F.2d at 317 (quoting the seminal FCA case *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 539 (1943) for the proposition that "[t]he undisputed effect [of bid-rigging] is to force the contracting government entities to pay more for the goods and services sought than they would 'had there been free competition in the open market'").

### C. Harm is Measured by the Volume of Commerce.

In Relators' Opening Brief at 58-59, we showed that the "harm" in price-fixing cases, for purposes of sentencing, is the volume of commerce affected by the

conduct. This is so because the monetary loss may be hard to quantify. *See* U.S.S.G. § 2R1.1(d); *United States v. Hayter Oil Co.*, 51 F.3d 1265, 1274 (6th Cir. 1995); *United States v. Giordano*, 261 F.3d 1134, 1145 (11th Cir. 2001); *United States v. Andreas*, 216 F.3d 645, 678 (7th Cir. 2000); *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 89-93 (2d Cir. 1999); *United States v. Lester*, 376 F.Supp.2d 679, 684  (W.D. Va. 2005).

Gosselin offers little response, except to confuse harm and damages. Gosselin Red Brief at 58-59. Gosselin argues that the volume of commerce is not an appropriate measure for <u>damages</u>, but this ignores that volume of commerce measures the amount of a <u>fine</u>. The statutory fine is the baseline against which the Eighth Amendment measures penalties. *See Ahmad*, 213 F.3d at 817–18. In *Ahmad*, this Court approved a forfeiture seventeen times greater than the maximum fine. *Id*. Using that ratio, the $24 million penalty the Government seeks here is well within the Eighth Amendment multiplier of the baseline criminal fine for Gosselin's bid-rigging.

Gosselin suggests that the Sentencing Guidelines may run afoul of the Eighth Amendment, since it claims the fine requires "an assessment of the actual financial harm" rather than volume of commerce. Gosselin Red Brief at 59. Insofar as Gosselin is arguing that the Eighth Amendment requires the Government to

35

show proximate damages from inherently harmful conduct, its argument was

rejected in *Ahmad* and *Jalaram*.

> **D.    The Volume of Commerce Is the Entire €8 Million Contract.**

Gosselin appears to argue that the volume of commerce was limited to the

line item 1AA. Gosselin Red Brief at 57-59; 76-77.

This ignores our showing in our Opening Blue Brief that the illegal

agreement to fix prices extended to at least seven line items. *See* Relators' Blue

Brief at 46, citing JA 2823-24 (listing items 1AA, 3AC, 12AA, 14AA, 8AA,  7+15

and BAC). At trial, Relators focused on the most significant line item, 1AA, only

as the clearest illustration of Gosselin's culpability.  JA 2339-42.

Furthermore, the cartel involved territorial allocation among all the bid-

riggers as to the entire contract. JA 1843-44; 1911-13; 1954; 2846. While Relator

and the Government Voucher Examiner Riedl focused on line 1AA to estimate

actual damage, the "volume of commerce" affected by the bid-rigging was the

entire €8 million contract.

> **E.    The Record Shows Substantial Proximate Damage In Any Case.**

Gosselin continues to complain that the Government's Chief Voucher

Examiner Guenter Riedl based his estimate of an 87% increase on simplistic

methodology.[8] Gosselin Red Brief at 43. But Riedl's declaration offered an

<u>approximation</u> of actual harm only for purposes of Eighth Amendment analysis.

Gosselin points out alleged flaws in Mr. Riedl's analysis that make no

difference to his estimate.

### 1.    The size of the standard shipment does not affect the percentage increase.

Gosselin claims that actual pricing and shipment data show that a standard

shipment was below half of Riedl's assumed 10,000 pounds. Gosselin Red Brief at

45-46. But this quibble over the correct unit size applies to both the 1999 and 2001

contracts. Relators' calculation using the actual move data showed a 54% increase.

*See* Relators' Blue Brief at 36; JA 1564-67; 1569. It does not matter if a shipment

---

[8]To provide evidence of actual, tangible harm, Relators introduced the Affidavit of Guenter Riedl, the Chief Voucher Examiner who had been working with DPM shipments since 1996. JA 1295-1303. Riedl compared a "standard" shipment of 10,000 pounds under the 2001 DPM Contract to the costs under the 1999 DPM Contracts. JA 1298-99. He estimated that the United States' costs increased by 87%. JA 1299.

Gosselin responded by introducing the actual cost data for all the moves, and compared the actual costs under the 1999 DPM Contract to certain move costs under the 2001 DPM Contract, but omitted the costs of the crates and the surcharge of €3 per cubic foot. JA 1539-40. This resulted in a 10% increase according to Gosselin's figures. JA 1564-67; 1569. But when the actual costs for the equivalent moves (including costs of crates and the €3 surcharge) were included, Gosselin's data reflected a 54% price and cost increase. JA 1569.

unit is taken to be 4,000 or 10,000 pounds – the percentage of the overcharge would be the same.

### 2. The dispute over oversize container use is *de minimis*.

Gosselin claims that Mr. Riedl's 10% estimate of overflow or oversize containers is too great. Gosselin Red Brief at 45-46. Gosselin's chief executive Marc Smet testified that 12% of Gosselin shipments contain overflow or oversize containers. JA 2643. Using the actual data, Relators calculated that 13% was the accurate number. JA 1460 (based on spreadsheets on CD attached to JA.) Whether the figure is 10% or 13% does not significantly change Riedl's analysis. The United States paid more after the price conspiracy.

### 3. The alleged overcharges in the prior 1999 contract do not affect the price increase in the subsequent rigged contract.

Gosselin complains that Mr. Riedl's averaging of 1999 prices was improper because Birkart's profit relied on charges from non-standard boxes. Gosselin Red Brief at 46-47. Gosselin argues that some contractors, like Birkart and Viktoria, overbilled the government in the 1999 DPM contracts. *Id.*; JA 2494. But this only makes the 2001 rigged contract's estimated 54% increase over the 1999 DPM contracts all the more egregious if the 1999 baseline includes overcharges.

### 4. The categorization of costs among different line items did not change the overall 54% estimate.

Gosselin complains that the costs of packing were dispersed over several line items in the 1999 contracts, but were part of line item 1AA in the 2001 contract. Gosselin Red Brief at 47. But as we showed in Relators' Blue Brief at 35-36, a comparison of equivalent moves incorporating all the appropriate line items, and using actual move data, reflects a price increase of 54%. JA 1564-67; 1569.

### 5. Gosselin's own analysis admitted a 10% increase.

Gosselin does not deny that prices increased from the 1999 to the 2001 contracts. Gosselin's own calculations admit a 10% increase in price. JA 1540.

### 6. Gosselin presented no evidence about the extent to which external costs increased in 2001.

To explain the cost increase, Gosselin relies on its officer Marc Smet's testimony that fuel and labor costs increased. JA 2586. Gosselin also argues that the contract specifications were different between 1999 and 2001, without attempting to quantify how much these differences may have accounted for the cost increases. Gosselin's Red Brief at 48-49.

Gosselin's expert's entire analysis of fuel and labor costs consists of the following:

> Relators fail to adjust the 1999 pricing for changed external circumstances occurring from 1999 to 2001. Those changing

39

circumstances include increases in fuel costs, cost of labor increases and other cost increases (including general inflation). Without this adjustment, 1999 pricing cannot serve as a proxy for what 2001 pricing would have been in the absence of the alleged unlawful subcontracting agreement.

JA 1361. Yet the conclusory statement that "costs increased" does not meet any burden of proof, since it does not establish how much these unspecified cost increases accounted for the admittedly increased prices. If the amount of actual price increase were even relevant to the Eighth Amendment defense, Gosselin bore the burden of proving the lack of any increase after costs. In the ITGBL criminal case, Gosselin stipulated in its plea agreement that "[t]he net financial effect of the conspiracy was to cause the DOD to pay substantially more than if FF1' s original prime rate had prevailed." *Gosselin*, 411 F.3d at 507. Gosselin does not explain why its bid-rigging on the DPM contract had a more innocuous effect than the related bid-rigging in the ITGBL case.

## IV. GOSSELIN'S CULPABILITY IS ESTABLISHED BY THE JURY VERDICT AND THE LAW.

Gosselin defends the zero-penalty decision by arguing that it was not really culpable. Each of these arguments is either contrary to the jury's verdict or contrary to binding law.

### A.    Gosselin's Profit Is Irrelevant.

Gosselin claims it did not make a significant profit on the bid-rigging. Gosselin Red Brief at 34. It ignores that the amount of the defendant's profit on its illegal conduct is irrelevant for Eighth Amendment purposes. *See United States v. Jalaram, Inc.*, 599 F.3d 347, 356-57 (4th Cir. 2010).

### B.    Gosselin's Denial of *Scienter* Contradicts the Jury Verdict.

Gosselin argues that its *scienter* was "minimal," claiming that it did not have *scienter* for each of its 9,136 invoices. Gosselin Red Brief at 34-35. It also argues that it did not take any steps to conceal anything "[b]eyond the filing of the CIPD itself." Gosselin Red Brief at 54.

This is contrary to the law and the jury verdict. The jury found that Gosselin knowingly and falsely certified its independent pricing to win the DPM contract. Gosselin knew winning this contract would generate thousands of future invoices, even if it did not know the precise number in advance. On appeal, the evidence supporting the jury's findings must be reviewed in the light most favorable to the verdict. *Gregg v. Ham*, 678 F.3d 333, 341 (4th Cir. 2012).

The District Court had no power to contradict the jury's finding of *scienter* in assessing a penalty. In particular, a court may not show leniency based on the court's belief (contrary to the jury verdict) that the defendant did not really intend

41

to violate the law. *See U.S. v. Curry*, 461 F.3d 452, 460-61 (4th Cir. 2006) (citing cases). Insofar as the District Court absolved Gosselin of penalties because it believed Gosselin did not really intend to deceive the Government, its decision violates this rule.

The Eighth Amendment does not create an exception to this rule. In *United States v. Bollin*, 264 F.3d 391, 418-19 (4th Cir. 2001), the Court reviewed a jury verdict finding the defendant had committed mail and wire fraud, in the light most favorable to the government. It then analyzed the defendant's Excessive Fines challenge based on that verdict under the same standard. *Bollin*, 264 F.3d at 418-19. If Gosselin were correct, the Court would have had to disregard the jury verdict, and make its own independent conclusions of guilt or innocence, to evaluate the sentence as "disproportionate" under the Eighth Amendment. That is not the law. Even in death penalty cases, courts may not use Eighth Amendment review to entertain claims of "actual innocence" contrary to the jury's verdict. *Herrera v. Collins*, 506 U.S. 390, 401 (1993).

Gosselin's argument that its *scienter* should not extend to each invoice is simply contrary to FCA law. Gosselin knew when it rigged the bids that it would be submitting an invoice for each of thousands of future moves for U.S. service personnel across Europe. Gosselin knew that it would have been disqualified from

42

collecting on each of these thousands of invoices if it had truthfully disclosed its cartel.

Gosselin argues that its individual invoices did not repeat the CIPD. This is simply a protest against settled FCA law. Liability attaches to each invoice submitted based on a false certification, even if there is only one underlying falsehood. *See United States v. Bornstein*, 423 U.S. 303, 311 (1976); *Harrison II*, 352 F.3d at 920 n.13. The Eighth Amendment does not condemn multiplied penalties for multiple acts, even when they are based on a single underlying falsehood. *See Ahmad*, 213 F.3d at 818; *Korangy v. FDA*, 498 F.3d 272, 278 (4th Cir. 2007).

### C. The "Unique" Circumstances Do Not Excuse Knowingly Concealed Bid-Rigging.

Next, Gosselin defends the District Court's suggestion that Gosselin's bid-rigging was not really culpable under the "unique" circumstances. Gosselin Red Brief at 34-35, 37-38. It argues that the Regulation prohibiting bid collusion may not have been reasonable as applied to the DPM contract. It also argues that Gosselin did many things to benefit the Government during the contract period.

These arguments are pointless. Gosselin argued to the jury that it was not culpable at all based on that background. JA 2373-78; 2413-14. The jury rejected Gosselin's defense. Now that the jury has found that Gosselin rigged the bid and

43

lied about it, the District Court may not refuse a penalty because it believes Gosselin's conduct was reasonable. The law categorically condemns bid-rigging as a grave threat to the integrity of contracting. The Eighth Amendment does not give the District Court a special fact-finding power to reject that law. *See Portsmouth Paving*, 694 F.2d at 317-18.

### D. The Government's Renewal of the Contract Before the Investigation Was Complete Does Not Excuse Gosselin.

Gosselin next argues that it was not culpable because the Army renewed its contract even after Bunk began raising his accusations. Gosselin Red Brief at 36-37. This ignores our argument in Relators' Blue Brief at 43-46.

At the time the Army renewed the contract, Gosselin had not confessed to the cartel. While Bunk had raised accusations, the Department of Justice had not investigated them fully as of the Army's renewal. Now that the Department of Justice <u>has</u> fully investigated, it is demanding that Gosselin pay $24 million in penalties for its conduct. To absolve Gosselin now because the Army did not instantly credit Bunk's accusations would cripple the FCA. *See Harrison II*, 352 F.3d at 920 & n.14; *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000). Gosselin's argument that the Army should have believed Bunk is particularly ironic now, after Gosselin has spent eight years calling Bunk a liar and denying that it violated the FCA at all.

44

### E.    Bunk's Prior Conduct Does Not Affect Gosselin's Culpability.

Gosselin argues that its culpability should be minimized "in context," because Bunk himself allegedly engaged in "abusive" practices in the prior contract. Gosselin Red Brief at 39.

First, this argument is completely irrelevant to Gosselin's FCA liability. An FCA defendant may not avoid penalties by attacking the relator for having unclean hands. *U.S. ex rel. Madden v. General Dynamics Corp.*, 4 F.3d 827, 830 (9th Cir. 1993). *See also Hernandez, Kroone and Associates, Inc. v. United States*, 95 Fed.Cl. 395, 399 (Fed. Cl. 2010) (citing cases); *United States v. Cushman & Wakefield, Inc.*, 275 F.Supp.2d 763, 773–74 (N.D. Tex. 2002).

In any case, Gosselin's attacks on Bunk are not supported by the record. At trial, Gosselin sought to avoid liability by accusing Relator Bunk of being a tax cheat and an unscrupulous businessman. JA 1849-54;1906; 2382-86; 2390. The jury rejected this argument. Its verdict must be read in the light most favorable to the Government. Gosselin is not entitled to avoid liability by renewing *ad hominem* attacks on Bunk.

The jury had good reason to reject Gosselin's defense. Gosselin accused Bunk of overcharging on the prior 1999 contract. But this conduct was the responsibility of the prime contractors Viktoria and Birkart. Bunk's firm UTD was

45

merely a subcontractor to Birkart. JA 1827-28. Gosselin's witness Stephen

Marshall, the former Director of Operations of the Consolidated Property Shipping

Office in Grafenwoehr, testified that Birkart and Viktoria had been "overcharging

us time and time again for oversized crates and overflow boxes." JA 2493. Never in

his testimony did Mr. Marshall mention Relator Bunk or UTD as the party

responsible. Viktoria (for whom Bunk was not a subcontractor) and Birkart were

the entities Mr. Marshall accused of overcharging. Birkart and Viktoria went on to

become Gosselin's co-conspirators in bid-rigging the successor contract, unlike

Bunk and UTD.

Gosselin has no basis to accuse Bunk of violating the law. Nor does Gosselin

claim that Bunk caused it to form a concealed cartel. As the jury found, Gosselin's

attacks on Bunk do not affect its culpability.

## F.    Gosselin's Wrongdoing Was Related to Other Offenses.

Gosselin tries to avoid the connection between its DPM bid-rigging and its

similar bid-rigging on the ITGBL and other European contracts.  Relators' Blue

Brief at 46-47.

### 1.    The related European offenses are *res judicata*.

Gosselin argues that the criminal and administrative sanctions for ITGBL

and the other European contracts are excludable as hearsay, citing the District

46

Court's ruling *in limine* in the liability trial under Fed. R. Evid. 803(22). Gosselin Red Brief at 55-56. This misses the point.

There is a difference between excluding these judgments as evidence of liability to the jury under Fed. R. Evid. 803(22) (because they did not require a year's imprisonment) and refusing to give them *res judicata* effect in the penalty phase. The European offenses are relevant to the Excessive Fine issue, not for the evidentiary value of particular underlying facts under Fed. R. Evid. 803(22), but simply as *res judicata* on the fact that they occurred. *See* Advisory Committee Note to Rule 802(33), first paragraph (explaining that Rule's restriction on the evidentiary use to "felony grade" convictions does not affect *res judicata* use of other convictions). *See also United States v. 47 mm Cannon*, 95 F.Supp.2d 545, 548 (E.D.Va. 2000). The criminal conviction in the ITGBL case works an estoppel in favor of the United States in subsequent civil proceedings as to those matters determined by the criminal judgment. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 157 (1963); *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568-69 (1951). "[A] court may take judicial notice of facts from a prior judicial proceeding when the *res judicata* defense raises no disputed issue of fact." *Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir.2000). In evaluating the *res judicata* effect of a prior action, "courts routinely take judicial notice of documents

47

filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991).

Even if the other European offenses were properly excluded as trial evidence going to liability, they are entirely relevant for purposes of Eighth Amendment review of related wrongdoing.

### 2.    In Eighth Amendment analysis, the Court may consider subsequent related offenses.

Gosselin argues that the Court may not consider any bid-rigging or price-fixing activity that occurred <u>after</u> the events in this case. Gosselin Red Brief at 55-56. Gosselin cites *United States v. Williams*, 29 F.3d 172, 174 (4th Cir. 1994), where the Court considered a Sentencing Guideline for "career" criminal status that was expressly limited to "prior" convictions. U.S.S.G. § 4B1.2(3)(A).

This is not a requirement of the Excessive Fines analysis. In *Ahmad*, 213 F.3d at 816-17, this Court considered the defendant's money laundering occurring <u>after</u> the customs transaction at issue to affirm the fine against an Eighth Amendment challenge. Nor do the Sentencing Guidelines uniformly forbid consideration of later, related offenses. If Gosselin were correct, courts could never "group" subsequent related offenses committed after the initial offense for sentencing purposes. Yet this is plainly the way sentencing works – subsequent

48

related offenses may become part of the basis for sentencing. *See, e.g., United States v. Bolden*, 325 F.3d 471, 487 (4th Cir. 2003); *United States v. Walker*, 112 F.3d 163, 167 (4th Cir. 1997).

In any case, as we showed in Relators' Blue Brief, p. 47 n.5, the Sonthofen price-fixing scheme addressed in the ITGBL conviction preceded the DPM bid-rigging agreement. See JA 1123; 2690 (Sonthofen/ITGBL agreement reached November 14, 2000); JA 1586-87 (DPM bid-rigging agreement entered into February 15, 2001).

Gosselin cannot seriously maintain that its DPM bid-rigging was an isolated mistake, in light of the ITGBL and other European bid-rigging cases.

## V.    THE DISTRICT COURT'S ALTERNATIVE GROUNDS FOR DENYING PENALTIES ARE UNSOUND.

### A.    The Court's Award of Zero Penalties

Gosselin's primary argument uses the sheer size of the $50 million statutory minimum (9,136 invoices times the FCA minimum $5,500 per claim) as an excuse to avoid any penalties at all. Gosselin argues that if the mandatory $50 million penalty would be excessive, the Court must let Gosselin off scot free. Gosselin Red Brief at 53-65.

**1.    Gosselin ignores the perverse incentive to multiply violations above the Eighth Amendment threshold.**

Like its *amicus* Pharmaceutical Research and Manufacturers, Gosselin recognizes that Fourth Circuit law assigns liability for FCA penalties for each claim, not merely for each underlying falsehood. Gosselin Red Brief at 75 n.13; Pharmaceutical Amicus at 5-6, *citing Harrison I*, 176 F.3d at 785. Gosselin indicates it may seek *en banc* or *certiorari* review of *Harrison I*, which it concedes is against its position. Gosselin Red Brief at 75 n.13. Gosselin and its *amicus* complain that this can result in "unfair astronomical" penalties for violations.

The short answer is that government contractors should avoid making repeated false claims to the government. The deterrent to such criminal conduct should be especially great where they submit a large number of claims. *See, e.g.*, *United States v. National Financial Services, Inc.*, 98 F.3d 131, 140 (4th Cir. 1996) (affirming $1,500,000 penalty under Fair Debt Collection Practices Act where defendant mailed millions of unlawful debt-collection letters, despite lack of direct proof that any consumer was harmed.) The rule in *Harrison* (that a separate penalty attaches for each claim) is simply a policy decision Congress has made. The alternative – allowing defendants an unlimited number of false claims for a one-time penalty of $11,000 – trivializes the FCA. This would turn an FCA penalty into

50

a single-price admission ticket for fraud, a $11,000 license for unlimited claims based on the same falsehood.

In any event, this complaint about "astronomical" penalties under the FCA is disingenuous, both from Gosselin and the Pharmaceutical Manufacturers. One would expect this argument to be a plea for reasonable modification of penalties through Eighth Amendment review. Neither Gosselin nor its *amicus* Pharmaceutical Manufacturers seek that. To the contrary, they argue that courts have no power, even under the Eighth Amendment, to reduce these astronomical penalties. Gosselin Red Brief at 59-66; Pharmaceutical Amicus at 25-28. Instead, they seek to use the sheer size of the penalty generated by their own repetition of false claims as the basis to wipe out <u>all</u> liability. This is not a persuasive argument.

### 2.    The Government and the Relators did not waive a "Constitutionally reduced" penalty.

Gosselin now argues that the Relators waived any "Constitutionally reduced" penalty if the Court found $50 million (the statutory minimum) or $24 million (the amount sought by Relators and the Government) to be too much. Gosselin claims that the Relators and the Government invited error, by somehow telling the District Court it could not award any penalties at all if $24 million were found to be too much. Gosselin Red Brief at 59-66.

51

This misrepresents the record. The Relators and the Government argued that the minimum penalty is mandatory as a <u>statutory</u> matter. This argument was directed at Gosselin's initial claim that the FCA required the penalties be reduced, either because the violation should be deemed a single violation or because the Court should depart downward due to inability to pay. In discussing <u>Constitutional</u> review under the Excessive Fines Clause, however, Relators and the Government repeatedly acknowledged that the District Court had power to review and reduce the penalty if it exceeded Eighth Amendment limits, and cited cases that did just that.

In the United States and Relators' Memorandum of Law in Opposition to Defendants' Motion Regarding Civil Penalties, SA 58, the Government (joined by the Relators) acknowledged that the Eighth Amendment counseled an award of less than half the statutory minimum: "[T]o ensure that the judgment will be safely within constitutional limits and to avoid the need for an evidentiary hearing, the United States will not demand the maximum number of civil penalties." SA 59. The Government and Relators acknowledged that the Eighth Amendment overrode the statute: "The only constitutional limit on the amount of an FCA judgment is the Excessive Fines Clause of the Eighth Amendment, which applies to statutory penalties that are sought by and payable to the government." SA 60. The Relators

and the Government then argued that $24 million was permissible, not because the statute forbade courts from a Constitutional reduction, but because $24 million was within the Constitutional "grossly disproportionate" test: "the United States is not seeking an amount of penalties that is out of line with the ratios between the remedial and punitive component of an FCA judgment that courts have approved." SA 63 (citing cases.) Among the cases the Relators and the Government jointly cited was *U.S. ex rel. Smith v. Gilbert Realty Co.*, 840 F. Supp. 71, 74-75 (E.D. Mich. 1993), which held that a court may reduce the amount of an FCA penalty under the Excessive Fines Clause. Relators and the Government argued from *Gilbert* that the $24 million was within the permissible ratio found in that case – not that the FCA barred a Constitutional reduction in all cases. SA 63.

The Relators and the Government never argued the absurd proposition that Gosselin now attributes to us – that the statute prevents the Court from making a Constitutionally mandated reduction where necessary. Relators and the Government argued jointly: "Instead, the imposition of FCA civil penalties is subject to constitutional review only under the Excessive Fines Clause. However, to the extent that the Court looks to the *State Farm* due process analysis to provide guidance . . . the forfeiture sought by the United States here falls squarely within those limits." SA 72 (emphasis added).

53

Gosselin's effort to seize on the Government's and the Relators' argument as an all-or-nothing demand is unavailing. It is similar to the unfair claim of waiver rejected in *Doe v. Kidd*, 501 F.3d 348, 354-55 (4th Cir. 2007). In *Kidd*, this Court refused to find waiver from language in briefs taken out of context: "[F]ederal law is well-settled that waiver is the voluntary and intentional relinquishment of a known right, and courts have been disinclined lightly to presume that valuable rights have been conceded in the absence of clear evidence to the contrary." *Doe v. Kidd*, 501 F.3d 348, 354-55 (4th Cir. 2007) *quoting United States v. Stout*, 415 F. 2d 1190, 1192-93 (4th Cir. 1969). The same principle applies here. Relators and the Government did not invite the District Court to award zero penalties if $24 million were held to be over the Eighth Amendment threshold.

### B.    Gosselin May Not Limit the Penalty to a Single $11,000 Penalty or an "Appropriate" $500,000 Sanction.

Gosselin continues to defend the District Court's alternative penalty of $11,000, taking 9,136 false claims as only representing a single wrongful act. Gosselin Red Brief at 74-78. Yet Gosselin acknowledges that this Circuit's law in *Harrison* is against them. Gosselin Red Brief at 75 n.13. Congress judged that multiple false claims based on the same falsehood should be treated as separate offenses for purposes of FCA liability. To override this law is to allow violators an unlimited freedom to make false claims for a one-time fee of $11,000.

54

Similarly, Gosselin argues that the District Court had the power to legislate its own judgment that $500,000 would be "appropriate" based on the court's own sense of fairness. Gosselin Red Brief at 77. This is not persuasive. The Eighth Amendment cannot become a vehicle for district courts to reject statutory penalties just because the court deems a more lenient penalty to be appropriate. If that is what the Eighth Amendment allows, all statutory sentencing provisions are merely advisory, since trial courts would enjoy unlimited power under the Eighth Amendment to define their own penalties.

### C.    Gosselin May Not Limit Its Liability to $1.5 Million.

Gosselin returns to its defense of the District Court's highest alternative figure – its declaration that ten times Gosselin's alleged $150,000 profit on the 1AA line item[9] would be the highest penalty the Eighth Amendment would allow. Gosselin Red Brief at 75-77, applying the ten-times multiplier in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424-425 (2003). But Gosselin does not acknowledge Fourth Circuit law that the defendant's profit is irrelevant to the Excessive Fine analysis. *See United States v. Jalaram, Inc.*, 599 F.3d 347, 356-57

---

[9]As we showed in Relators' Blue Brief at 57 n.6, Gosselin understates even this profit amount. The $150,000 figure only represents Gosselin's profit on the first year of the three-year 2001 Contract, when its profit over the entire 2001 Contract was at least €400,000.  JA 2655.

(4th Cir. 2010). Instead, the law looks to the fine that might have been imposed. *Ahmad*, 213 F.3d at 817. In *Ahmad*, this Court approved a punitive forfeiture of seventeen times the fine that might have been imposed ($85,000 forfeiture for money laundering that might have been fined up to $5,000).

In bid-rigging cases, the volume of commerce affected is the baseline for a fine. "The offense levels are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish. The volume of commerce is an acceptable and more readily measurable substitute." U.S.S.G. § 2R1.1 commentary (background). Applying the €8 million volume of the DPM contract to calculate a fine under the Guidelines yields a baseline fine that is well within the ratio contemplated by Eighth Amendment law to support a $24 million penalty. Whether or not the Court could apply the seventeen-to-one ratio in *Ahmad*, 213 F.3d at 817-18, the ten-to-one ratio in *State Farm* is appropriate at a minimum. *State Farm* acknowledged that even greater-than-single-digit punitive damages may be appropriate where "a particularly egregious act has resulted in only a small amount of economic damages . . . a higher ratio might be necessary where 'the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *State Farm*,

538 U.S. at 425, *quoting BMW of North America, Inc. v. Gore*, 517 U.S. 559, 582

(1996). This case falls in that category.

## CONCLUSION

The District Court's judgment denying relief should be reversed. The penalty

sought of $24 million on the DPM claim should be reinstated.

November 27, 2012                    Respectfully submitted,

                                     /s/ Michael T. Anderson

Michael T. Anderson              Richard E. Greenberg
Ann Lugbill                      John E. Petite
Mark Hanna                       Greensfelder, Hemker, & Gale, P.C.
Michelle L. Woolley              10 South Broadway, Suite 2000
Murphy Anderson PLLC             St. Louis, MO 63102
1701 K Street NW, Suite 210      (314) 241-9090
Washington, DC 20006             (314) 345-4792 (Fax)
(202) 223-2620
(202) 223-8651 (Fax)

                                 Attorneys for Relators-Appellants

57

## RULE 32 CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(3)(C)(i), I, Michael T. Anderson, hereby certify the attached Brief for the Relators Kurt Bunk and Ray Ammons as Appellants in Case No. 12-1369 is in 14 point, proportionally spaced, Times New Roman type face and contains less than 13,300 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), on the basis of a word count made by WordPerfect version XP word processing software that counts words in both text and footnotes.

/s/ Michael T. Anderson

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Brief for the Relators Kurt Bunk and Ray Ammons as Appellants was filed this 27th day of November, 2012, using the CM/ECF system, which will automatically send electronic notification of filing to all counsel of record.

/s/ Michelle L. Woolley