Nos. 12-1369 (L), 12-1417, & 12-1494
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**
_____

UNITED STATES EX REL. BUNK, ET AL.,

Plaintiffs-Appellants,

v.

GOSSELIN WORLD WIDE MOVING, ET AL.,

Defendants-Appellees.
_____

**REPLY BRIEF FOR
DEFENDANTS-APPELLEES/CROSS-APPELLANTS**
_____

Kerri Ruttenberg
Shay Dvoretzky
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3939

Counsel for Defendants-
Appellees/Cross-Appellants

Dated: December 28, 2012

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ....................................................................................1

ARGUMENT ........................................................................................2

I.    Bunk Lacks Article III Standing................................................2

    A.    Granting a Qui Tam Relator Standing to Seek Civil
        Penalties Under the FCA Violates Core Standing
        Principles  and Vermont Agency ......................................3

        1.    Vermont Agency's Holding Was Limited to
            Assignments of Proprietary Claims ...........................3

        2.    Vermont Agency Did Not Eviscerate Years of
            Article III Standing Jurisprudence...............................7

    B.    The History Regarding Qui Tam Actions Is Not Dispositive............11

    C.    Gosselin's Position Would Cause No "Sea Change" in
        Settled Law.............................................................13

    D.    FCA Civil Penalties Are Not Proprietary............................17

II.    Allowing Bunk to Prosecute Sovereign Claims Would Violate
    Article II.............................................................................19

    A.    The Article II Issues Are Properly Before this Court ........19

    B.    Assignments of Purely Sovereign Claims Would Violate
        The Appointments Clause ...............................................21

    C.    Assignments of Purely Sovereign Claims Would Violate
        the Take Care Clause......................................................25

CONCLUSION ....................................................................................29

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
   458 U.S. 592 (1982)................................................................19

*Auffmordt v. Hedden*,
   137 U.S. 310 (1890)................................................................23

*Brooks v. Dunlop Mfg., Inc.*,
   No. 2012-1164, 2012 WL 6200227 (Fed. Cir. Dec. 13, 2012) ..........................28

*Buckley v. Valeo*,
   424 U.S. 1 (1976)................................................................passim

*Corti v. Storage Tech. Corp.*,
   304 F.3d 336 (4th Cir. 2002) ..........................................20

*Eriline Co. S.A. v. Johnson*,
   440 F.3d 648 (4th Cir. 2006) ..........................................20

*Forest Group, Inc. v. Bon Tool Co.*,
   590 F.3d 1295 (Fed. Cir. 2009) ..........................................27

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000)..........................................................9, 10

*In re Boston Reg'l Med. Ctr., Inc.*,
   291 F.3d 111 (1st Cir. 2002)..........................................20

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..........................................1, 5, 9, 16

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)..........................................................7

*Morrison v. Olson*,
   487 U.S. 654 (1988)..........................................23, 24, 26, 29

*Nader v. Saxbe*,
   497 F.2d 676 (D.C. Cir. 1974)..........................................25

ii

*Pequignot v. Solo Cup Co.*,
    608 F.3d 1356 (Fed. Cir. 2010) ...................................................25, 28

*Raines v. Byrd*,
    521 U.S. 811 (1997)...................................................................... 8

*Ridenour v. Kaiser-Hill Co., L.L.C.*,
    397 F.3d 925 (10th Cir. 2005) ........................................................28

*Rogers v. Conair Corp.*,
    Civil Action No. 10-1497, 2012 WL 1443905 (E.D.Pa. Apr. 25, 2012) .....27, 28

*Rogers v. Tristar Prods., Inc.*,
    102 U.S.P.Q.2d 1722 (Fed. Cir. 2012) ..............................................27

*Schottel v. Young*,
    687 F.3d 370 (8th Cir. 2012) ..........................................................20

*Smith v. Meese*,
    821 F.2d 1484 (11th Cir. 1987) ......................................................25

*Spiller v. Atchison, Topeka & Santa Fe Ry.*,
    253 U.S. 117 (1920)...................................................................... 6

*Stauffer v. Brooks Brothers, Inc.*,
    619 F.3d 1321 (Fed. Cir. 2010) ...........................................16, 17, 26

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)..............................................................passim

*United States ex rel. Berge v. Bd. of Trustees of the Univ. of Alabama*,
    104 F.3d 1453 (4th Cir. 1997) .................................................14, 15

*United States ex rel. FLFMC v. TFH Publ'ns, Inc.*,
    855 F. Supp.2d 300 (D.N.J. 2012) ....................................................28

*United States ex rel. Milam v. Univ. of Texas M.D. Anderson Cancer Ctr.*,
    961 F.2d 46 (4th Cir. 1992) ...........................................................14

*United States v. Germaine*,
    99 U. S. 508 (1879)......................................................................23

*United States v. Jicarilla Apache Nation*,
    131 S.Ct. 2313 (2011) ...................................................................19

*United States v. Maurice*,
    26 F. Cas. 1211 (C.C.D. Va. 1823).................................................22

*United States v. Morris*,
    23 U.S. (10 Wheat) 256 (1825) ......................................................12

*United States v. Oceanpro Indus., Ltd.*,
    674 F.3d 323 (4th Cir. 2012) ....................................................17, 18

*United States v. Smith*,
    395 F.3d 516 (4th Cir. 2005) ..........................................................20

*Vermont Agency of Natural Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000).................................................................passim

*Warth v. Seldin*,
    422 U.S. 490 (1975)..........................................................................4

*Weiss v. United States*,
    510 U.S. 163 (1994)........................................................................22

*Yale v. Nat'l Indem. Co.*,
    602 F.2d 642 (4th Cir. 1979) ....................................................20, 21

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)........................................................................29

## CONSTITUTION AND STATUTES

U.S. Const. art. II .................................................................passim

U.S. Const. art. III ...............................................................passim

U.S. Const. art. IV ....................................................................18

U.S. Const. amend XI ..............................................................5, 14

35 U.S.C. § 292(a) ....................................................................25

**OTHER AUTHORITIES**

Statement of Sen. Kyl, 157 Cong. Rec. S1360 (Mar. 8, 2011) .............................27

Statement of Sen. Kyl, 157 Cong. Rec. S5319 (Sept. 6, 2011) .............................27

**MISCELLANEOUS**

David Freeman Engstrom, *Harnessing the Private Attorney General: Evidence From Qui Tam Litigation*, 112 Colum. L. Rev. 1244, 1293 (2012) ...................................................................................................................2

Myriam E. Gilles, *Representational Standing: U.S. ex rel. Stevens and the Future of Public Law Litigation*, 89 Cal. L. Rev. 315, 353 (2001)....................12

Marcus Smith, *The Law of Assignment: The Creation and Transfer of Choses in Action* (2007)......................................................................................18

## INTRODUCTION

Appellants and their Amicus spend many pages of their responses answering straw questions not raised in this cross-appeal. Gosselin does not challenge whether private parties may sue to remedy particularized harms. Neither does it challenge whether the Government may properly assign to private parties its own claims for proprietary injury, conferring standing on private parties to sue in federal courts. Nor does Gosselin argue the Government cannot sue to remedy violations of law, without a showing of any economic injury.

The narrow question here is whether the Government may assign to private parties a claim *solely for civil penalties*, conferring on them standing to sue purely to vindicate the Government's injury to its sovereign interest in having its laws obeyed. The answer is clear: the "public interest in proper administration of the laws" cannot "be converted into an individual right by a statute that denominates it as such, and that permits all citizens . . . to sue." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 575-77 (1992).

## ARGUMENT

**I.    Bunk Lacks Article III Standing.**

Appellants and their Amicus[1] overstate Gosselin's and its Amicus's *Vermont Agency* argument.  We do not contend *Vermont Agency* **forecloses** Bunk's standing to seek civil penalties.   Rather, we contend that neither the holding nor the rationale of *Vermont Agency* **supports** Bunk's standing, because *Vermont Agency* did not consider standing to seek civil penalties, particularly without a conjoined claim for proprietary injury.   Long-established standing principles, including the Supreme Court's decision in *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998), make clear that a private party has no standing to seek penalties to vindicate public rights, *i.e.*, the undifferentiated public interest that the sovereign's laws be obeyed.   *Vermont Agency* did not overrule those principles.

---

[1] Amicus Taxpayers Against Fraud Education Fund ("TAFEF") expresses its "profound interest" in seeing the False Claims Act "appropriately" interpreted. TAFEF Br.2.  TAFEF's economic interest in this appeal also is profound.  *Qui tam* relators' counsel comprise the vast majority of TAFEF's membership and leadership.  Since Congress amended the FCA in 1986, TAFEF's 501(c)(4) arm, Taxpayers Against Fraud, is one of the most frequent and financially-rewarded relators in FCA *qui tam* actions.  *See* David Freeman Engstrom, *Harnessing the Private Attorney General: Evidence From Qui Tam Litigation*, 112 Colum. L. Rev. 1244, 1293 (2012).

**A.      Granting a *Qui Tam* Relator Standing to Seek Civil Penalties Under the FCA Violates Core Standing Principles and *Vermont Agency*.**

**1.      *Vermont Agency*'s Holding Was Limited to Assignments of Proprietary Claims.**

The Supreme Court in *Vermont Agency* held that a *qui tam* relator had standing under the FCA because "[t]he FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim." *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). The Government complains that Gosselin's reliance on this statement turns on "a negative inference drawn from a single word in a single sentence" rather than the "entirety of the Court's reasoning." U.S.Opp.10.  The Government ignores that the Court's language regarding assignment of a "damages claim" appears precisely when the Court shifts from rejecting alternative grounds for standing to stating its *basis* for finding standing.  This language is the most specific statement of the Court's holding and reasoning.[2]

Despite the Court's unambiguous and unequivocal statement, the Government, Bunk and TAFEF all wrongly contend that *Vermont Agency* held the assignment of a purely sovereign claim can confer standing on a private relator.

---

[2] Indeed, it is telling that Amicus TAFEF repeatedly paraphrases this statement in the Court's decision, yet consciously omits the language "the Government's damages claim."  TAFEF Br.3,6,12.

Rel.Opp.8-12; U.S.Opp.7-9; TAFFEF Br.6-9. The "entirety of the Court's reasoning" demonstrates this assertion is plainly flawed.

The Court reasoned that, despite the conventional rule that standing "exists only to redress or otherwise to protect against injury *to the complaining party*," *id.* at 771 (quoting *Warth v. Seldin*, 422 U. S. 490, 499 (1975)) (emphasis in *Vermont Agency*), the FCA could assign the Government's damages claim in light of the historical, common law doctrine permitting assignments of claims for *proprietary injury*. *Id.* at 771. The Court explained:

> We believe, however that adequate basis for the relator's suit for his bounty is to be found in the doctrine that the assignee of a claim has standing to assert the *injury in fact* suffered by the assignor. The FCA can reasonably be regarded as effecting a *partial assignment of the Government's damages claim*. Although we have never expressly recognized 'representational standing' on the part of assignees, we have routinely entertained their suits[.] We conclude, therefore, that *the United States' injury in fact suffices to confer standing* on [the relator.]

*Vermont Agency*, 529 U.S. at 773-74 (emphasis added) (internal citations omitted). The Government's injury in fact referred to in the preceding passage was its "proprietary injury resulting from the alleged fraud," *id*. at 771 – not "the injury to its sovereignty arising from violation of its laws." *Id*.

The *Vermont Agency* Court had no reason to address whether standing could be based on the assignment of a civil penalties claim because there the relator alleged proprietary harm to the Government—namely, "the Government['s]

4

disburse[ment of] more grant money than [the agency] was entitled to receive." *Id*. at 770. Standing to sue for *that* injury was at issue, and assignment of that injury was consistent with *Lujan* and *Steel Co*. Although the relator also sought civil penalties, the original question presented did not require the Court to determine whether the relator had standing to seek civil penalties; and, as discussed below, the government and the relator conspicuously elided the subject of standing to seek civil penalties after the Court asked the parties to address standing.

The initial question in *Vermont Agency* was "[w]hether the Eleventh Amendment precludes a private relator from commencing and prosecuting a False Claims Act suit against an unconsenting State." Petition for Writ of Certiorari, *Vermont Agency*, 529 U.S. 765 (No. 98-1828), 1999 WL 33609312, at *i. After merits briefing on that question, the Court ordered *sua sponte* that the parties file supplemental briefs addressing whether "a private person ha[s] standing under Article III to litigate claims of fraud upon the government." Supplemental Brief for Respondents, *Vermont Agency*, 529 U.S. 765 (No. 98-1828), 1999 WL 1276923, at *1. Notably, the Court's choice of phrasing−"claims of fraud"−foreshadowed *Vermont Agency's* injury in fact distinction between "*proprietary* injury resulting from the alleged *fraud*" and "the injury to the government's *sovereignty* arising from the *violation of its laws*." *Id*. 529 U.S. at 771 (emphasis added).

5

In response to the Court's supplemental briefing instruction, *none of the parties* addressed standing to seek civil penalties. The parties consciously limited their substantive discussions to standing for proprietary damages claims. *See* Supp. Brief for Respondent, *Vermont Agency*, 529 U.S. 765 (No. 98-1828), 1999 WL 1276923, at *10 (emphasizing that FCA *qui tam* suits do not "seek[] to vindicate the public's nonconcrete interest in the proper administration of the laws" but rather are brought "*to compensate the government for specific acts of fraud committed against it*") (emphasis added); Supp. Brief for United States at 9-10, *Vermont Agency*, 529 U.S. 765 (No. 98-1828), 1999 WL 1086464 (arguing that the relator had standing because "'a claim *not for a penalty but for compensation*, is a property right assignable in its nature.'") (quoting *Spiller v. Atchison, Topeka & Santa Fe Ry.*, 253 U.S. 117, 135 (1920)) (emphasis added).

Perhaps recognizing the noticeable absence of discussion by any party or the Court regarding civil penalties, the Government here also argues that *Vermont Agency*'s failure to address civil penalties is "telling" because "standing is not dispensed in gross." U.S.Opp.9. DOJ contends that since the relator sought civil penalties, the Court must have found standing for civil penalty claims because it found standing for the relator's damages claims. But it is precisely *because*

6

standing is not dispensed in gross that the Government is wrong to assume the Court found standing for civil penalties despite not discussing the issue.[3]

Contrary to Appellants' assertions, *Vermont Agency* cannot be read to find Article III standing for a private party's claim solely for civil penalties.[4]  The Court meant what it said—the relator had standing based on a "partial assignment of the Government's damages claim." *Vermont Agency*, 529 U.S. at 773.

## 2. *Vermont Agency* Did Not Eviscerate Years of Article III Standing Jurisprudence.

Private plaintiffs may invoke the jurisdiction of federal courts based only upon a particularized injury, not upon a generalized interest in enforcing the law. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 516-17 (2007).  It is likewise "settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have

---

[3] And, even if the Court had assumed the relator had standing to sue for civil penalties, the Court has repeatedly made clear that "drive-by jurisdictional rulings," in which jurisdiction is "assumed without discussion by the Court" have "no precedential effect." *Steel Co.*, 523 U.S. at 91.

[4] Gosselin's Amicus, the U.S. Chamber of Commerce, takes the position that absent government intervention, relators always lack standing to seek civil penalties, regardless of whether such claims are conjoined with damages claims. Chamber Br.18,n.6.  The Chamber explains that because standing is not dispensed in gross, standing to seek damages does not establish standing to seek civil penalties.  Here, however, Bunk pursued *only* a claim for civil penalties.  Therefore, to decide Gosselin's cross-appeal, the Court need not address whether a relator has standing to bring a civil penalties claim if he *also* pursues a claim for economic damages.

standing." *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997). When *Vermont Agency* held that a *qui tam* relator had standing to pursue a "damages claim" for the Government, it did not intend to reject these fundamental rules of standing. Accordingly, the Court did not hold that the FCA confers standing on private individuals to sue without any showing of particularized, private injury and merely to enforce the law. Were the creation of such a claim sufficient to confer standing on private individuals, Congress could give private plaintiffs the right to sue for *any* generalized grievance, contrary to the numerous cases forbidding such a result.

In *Steel Co.*, 523 U.S. 83, the Court held that a private plaintiff lacked standing to sue for civil penalties under the Emergency Planning and Community Right-To-Know Act (EPCRA), which requires companies to file notices of toxic chemical exposures. The Court reasoned that, in suing for civil penalties, a plaintiff "seeks not remediation of its own injury . . . but vindication of the rule of law—the 'undifferentiated public interest' in faithful execution of [the statute]. This does not suffice [for standing]." *Id.* at 106. As in the instant case, it was clear in *Steel Co.* that the Government itself could have sued for civil penalties. *Steel Co.*, 523 U.S. at 87. And the EPCRA created a private cause of action with similar contours to the FCA, which could just as easily be deemed an assignment of the Government's claim. *Id.* However, as the Court summarized *in the same Term* it decided *Vermont Agency*, "*Steel Co.* held that private plaintiffs, unlike the Federal

8

Government, may not sue to assess [civil] penalties for wholly past violations [that did not cause actual injury]." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 188 (2000).

Likewise, in *Lujan*, the Court refused to allow uninjured private parties to sue to enforce the Endangered Species Act ("ESA") because such claims would raise a "generally available grievance" that asserted "only harm to [the plaintiff's] and every citizen's interest in proper application of the Constitution and laws." 504 U.S. at 573-74. Again, however, the ESA purported to confer a right to sue on private plaintiffs. If a statute creating a private cause of action could "assign" private plaintiffs a right to enforce the law, then the private plaintiffs in *Lujan* should have had standing, as well. The Court held they did not.

Appellants emphasize the Court's statement in *Lujan* that the ESA was not a statute by which "Congress has created a concrete private interest in the outcome of a suit against a private party for the Government's benefit, by providing a cash bounty for the victorious plaintiff." Rel.Opp.15; U.S.Opp.12 (quoting *Lujan*, 504 U.S. at 572-73). From the Court's statement of what *Lujan* was *not* about, Appellants conclude Bunk has standing because he sued a private party and would recover cash if he won. Appellants' strained interpretation of *Lujan* is demonstrably incorrect in light of later Supreme Court cases addressing these very issues and concluding that these distinctions do not matter.

9

The plaintiff in *Steel Co.* sued a private party; yet the Court still "held that private plaintiffs, unlike the Federal Government, may not sue to assess [civil] penalties for wholly past violations [that had not caused actual injury]." *Friends of the Earth, Inc.*, 528 U.S. at 188. That the plaintiff sued a private party instead of the Government was irrelevant.[5] And, *Vermont Agency* explained that although a relator has a "concrete private interest" in "the bounty [a relator] will receive if the suit is successful," this does not suffice for standing because "an interest that is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes." *Vermont Agency*, 529 U.S. at 772-73. *Steel Co.* and *Vermont Agency* establish that a private plaintiff has no standing to bring a generalized grievance regardless of whether he sues a private party, and regardless of whether he may collect a portion of the recovery as a cash bounty if the suit succeeds.

The Government claims Congress has the authority to assign causes of action to private parties as it desires, contending that a "common law rule cannot

---

[5] The Government also misleadingly asserts that *Steel Co.* did not involve an "injury to the United States." U.S.Opp.13; U.S.Opp.12 ("None of the 'citizen suit' cases cited by defendants involves a *qui tam* suit or suits similarly based on injuries to the government."). Although *Steel Co.* did not involve a *proprietary* injury to the Government, it obviously involved a cognizable *sovereign* injury—an injury in law—to the Government, which had the authority to seek criminal, civil, or administrative penalties against the defendant. *Steel Co.*, 523 U.S. at 87. The Court found no standing despite this sovereign injury to the Government.

trump Congress's authority to enact a federal statute." U.S.Opp.16-19. In the context of standing, however, traditional common law can have constitutional significance. The fact that claims for generalized sovereign injuries are fundamentally distinct from the type of claims traditionally assignable at common law is directly relevant to whether they would have been viewed as amenable to the judicial process when brought by private parties. *Vermont Agency*, 529 U.S. 774. *Vermont Agency* recognized the constitutional significance of traditional common law in this context. If common law limitations on assignments were irrelevant to standing, the Court in *Vermont Agency* would have relied on Congress's statutory fiat to uphold standing. The Court, however, did no such thing.

## B. The History Regarding *Qui Tam* Actions Is Not Dispositive.

Appellants argue that private parties have standing to bring purely sovereign claims because a handful of founding era statutes appear to have authorized *qui tam* suits for sovereign claims. Rel.Opp.9-10; U.S.Opp.14-15. Just as relevant, however, is the common law rule that claims for *proprietary* injuries, not sovereign injuries, could be freely assigned.

Although *Vermont Agency* discussed the history of *qui tam* statutes, it is apparent from the Court's opinion that the statutory history merely confirmed its ultimate decision, which was *based on* the common law rule. The Court first

11

analyzed various alternative theories for standing and concluded standing was proper because claims for an "injury in fact" could be assigned to the relator. Then, the Court discussed the history of *qui tam* statutes to "confirm[] [its] conclusion" on "the question before us here: whether *qui tam* actions were 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process" such that "a *qui tam* relator under the FCA has Article III standing." *Id*. at 777-78. But at this point in its opinion, the Court was no longer addressing the distinction between standing for proprietary versus sovereign injury−it had already done so, expressly finding representational standing proper for an "injury in fact," *i.e.*, the Government's "damages claim." The Court stated that "[w]hen combined with the theoretical justification for relator standing *discussed earlier*, it leaves no room for doubt that a *qui tam* relator under the FCA has Article III standing"−a conclusion Gosselin does not challenge in its appeal. 529 U.S. at 774 (emphasis added).

Moreover, the early *qui tam* statutes can be understood as employing relators as *agents* of the government, which *Vermont Agency* suggested would satisfy Article III. *See United States v. Morris*, 23 U.S. (10 Wheat) 256, 289-90 (1825) (customs officer, the informer, was "the agent of the government" and only had a "conditional" interest in the litigation); *Vermont Agency*, 529 U.S. at 772; *see also* Myriam E. Gilles, *Representational Standing: U.S. ex rel. Stevens and the Future*

*of Public Law Litigation*, 89 Cal. L. Rev. 315, 353 (2001) ("Unlike assignment, which by its nature may provide a basis for representational standing only where the government's proprietary interests are at stake, agency principles may be employed to authorize private actors to pursue either the government's proprietary *or* sovereign interests.") (emphasis in original).    But as *Vermont Agency* recognized, viewing the FCA relator as "simply the statutorily designated agent of the United States . . . is precluded" because the FCA "gives the relator himself an interest *in the lawsuit*, and not merely right to retain a fee out of the recovery." 529 U.S. at 772 (emphasis in original).  In light of this distinction, holding that the FCA cannot constitutionally assign civil penalty claims under Article III would not imply that the early *qui tam* statutes allowing enforcement of sovereign interests similarly violated Article III.

### C.    Gosselin's Position Would Cause No "Sea Change" in Settled Law.

Appellants attempt to portray their position as settled law by invoking inapposite authorities.  The Government posits that several circuits recognize "*qui tam* suits may go forward without regard to whether the United States has suffered economic damages as a result of the false or fraudulent claim," and that *Vermont Agency* could not have "impliedly overruled" these "precedents."  U.S.Opp.8.  But every case the Government cites assessed whether, as a *statutory matter*, the FCA allows suits regardless of economic injury; none considered or addressed whether a

plaintiff could have *constitutional standing* to seek civil penalties without seeking or proving any economic injury.

Bunk similarly relies on inapposite cases in contending his position was adopted by this Court. Rel.Opp.12-13 (citing *United States ex rel. Milam v. Univ. of Texas M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir. 1992); *United States ex rel. Berge v. Bd. of Trustees of the Univ. of Alabama*, 104 F.3d 1453, 1457 (4th Cir. 1997)). In *Milam*, a *qui tam* relator sued a state agency. The issue was whether the *qui tam* action was a suit by the United States, such that the state was not protected by Eleventh Amendment sovereign immunity. This Court held that, to assess state sovereign immunity, a relator's suit should be considered a suit by the United States, the real party in interest. 961 F.2d at 50. *Milam* did not address whether a sovereign claim for civil penalties could be assigned to and confer standing on a private party.

In *Berge*, as Bunk notes, this Court stated "once we accept the premise [of *Milam*] that the United States is the real plaintiff in a *qui tam* action, it stands to reason that challenges to the standing of the government's representative are beside the point." *Berge*, 104 F.3d at 1457 (internal quotation marks and citation omitted) (emphasis added). But this position was expressly rejected by the Supreme Court in *Vermont Agency*. As the Court explained there, the relator's standing for a damages claim could not be based on the rationale that "the relator here is simply

14

the statutorily designated agent of the United States, *in whose name* . . . the suit is brought—and that the relator's bounty is simply the fee he receives *out of the United States' recovery*." *Id.* at 772 (emphasis in original). As discussed previously, that rationale was precluded because the FCA gives the relator "an interest *in the lawsuit*, and not merely the right to retain a fee out of the recovery." *Id.* Moreover, the relator in *Berge* had alleged and proven actual damages, so the issue here−whether a relator may sue for a sovereign claim in isolation−was not before the Court. 104 F.3d at 1457. *Berge* offers no support for Appellants' position, which may be why neither the Government nor TAFEF cites it.

The Government further asserts that "the upshot of defendants' argument is that *Vermont Agency* impliedly overrules all these precedents [cited by the Government] by limiting relator standing to instances in which the government has suffered economic damages or some other injury to its proprietary interests." U.S.Opp.8. The Government then contends that if *Vermont Agency* "intended to effect that sea change in FCA law, it surely would have referenced this long string of contrary precedent and expressly held that these cases are no longer good law." *Id*. To begin, only one of the Government's cases even predates *Vermont Agency*, rendering this contention nonsensical. More importantly, however, the Government misconstrues *Vermont Agency*. The Court did not consider whether a private party has Article III standing to seek civil penalties, and neither the Court's holding nor

15

its rationale extend so far as to support such standing. *Vermont Agency* could not have been overruling other (later-decided) cases on an issue it did not consider.

As the Government expressly recognizes, only one court has addressed the question posed here—whether a private plaintiff has Article III standing to enforce civil penalties in isolation. U.S.Opp.3,5 (citing *Stauffer v. Brooks Brothers, Inc.*, 619 F.3d 1321 (Fed. Cir. 2010)) (addressing standing under false patent marking statute). Although the Federal Circuit answered the question affirmatively, that court's holding was based on erroneous reasoning – namely, that "[t]he Supreme Court [in *Vermont Agency*] considered both types of injuries [sovereign and proprietary] and found them collectively to be sufficient to confer standing on the government and therefore on the relator." *Id.* at 1326-27. As explained above, *Vermont Agency* does not address whether a *qui tam* relator may constitutionally sue for civil penalties to redress a public injury; and it certainly does not address whether a relator may bring such a claim in isolation. Further, *Stauffer* relied on *Lujan*'s statement that it was not addressing whether standing existed where "Congress has created a concrete private interest in the outcome of a suit against a private party . . . by providing a cash bounty." *Id.* at 1326 (quoting *Lujan*, 504 U.S. at 572-73). However, *Steel Co.* and *Vermont Agency* teach that a defendant's status as a private party and the plaintiff's potential receipt of a cash bounty are

irrelevant to the standing analysis. *Supra* at 10. The Federal Circuit's analysis in *Stauffer* is flawed.

### D.    FCA Civil Penalties Are Not Proprietary.

Bunk erroneously argues that a suit purely for civil penalties is proprietary rather than sovereign because (a) it is "a specific measure to protect the Government as a market actor from predatory bid collusion" (Rel.Opp.16), and (b) "the Government has a proprietary interest in the penalty once it is incurred[.]" *Id.* at 17.

Bunk's first assertion ignores the purpose of the proprietary/sovereign distinction. The mere fact that a civil penalty ultimately may protect a market actor from harmful conduct cannot convert an underlying sovereign injury into a proprietary one. Most laws, including criminal laws, protect against harmful conduct through deterrence and punishment; but this does not render the Government's enforcement of such laws proprietary such that their enforcement could constitutionally be assigned to a private party.

Bunk's second point is even more unfounded. Relying on *United States v. Oceanpro Indus., Ltd.*, 674 F.3d 323 (4th Cir. 2012), Bunk argues that "the Government has a proprietary interest in the [civil] penalty," which can then be

17

assigned to Bunk.  Rel.Opp.17.[6]  As discussed, however, *Vermont Agency* squarely held that an interest in the civil penalty itself cannot be the basis for relator standing.  529 U.S. at 772-73.

Similarly, DOJ asserts that the right to sue for civil penalties is not a sovereign interest, but rather a monetary claim arising from injury to the government.  U.S.Opp.17.  This circular reasoning fails.  The injury civil penalties are designed to address is the government's sovereign injury from violations of its laws.  All parties have recognized throughout this litigation that civil penalties are punitive.  *See, e.g.*, Rel.Open.Br.50,59-60.  Yet, the Government concludes that "the right to bring suit on such monetary, civil claims is a 'chose in action' that is freely assignable to a third party" under the Property Clause of Article IV.  U.S.Opp.17.

This conclusion is wrong.  "Choses in action have three essential characteristics."  Marcus Smith, *The Law of Assignment:  The Creation and Transfer of Choses in Action* 12 (2007).  First, they are rights in "intangible" property.  *Id*.  Second, they are recognized as "constituting property."  *Id*.  Third and most importantly for present purposes, they are "private (as opposed to public) law rights."  *Id*.  As the Government admits, FCA civil penalties vindicate public

---

[6] *Oceanpro* did not address Article III standing at all; it held that Maryland and Virginia had a statutory interest in restitution for wrongfully harvested fish under various statutes.  674 F.3d at 332.

18

rights.    U.S.Opp.14.    An FCA damages claim−a bona fide "chose in action"−vindicates the government's private property rights and for that reason is assignable at common law.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982) (a sovereign can sue to protect its proprietary interests, like any other proprietor); *see also United States v. Jicarilla Apache Nation*, 131 S.Ct. 2313, 2323 (2011) (distinguishing between public and private rights).  As the Chamber's brief observed (and as Appellants do not contest), no Supreme Court authority holds that public rights are assignable.  *See* Chamber Br.16.

## II.    Allowing Bunk to Prosecute Sovereign Claims Would Violate Article II.

### A.    The Article II Issues Are Properly Before this Court.

Appellants' contention that the Article II issues are not properly before the Court because they were not argued below is incorrect. Rel.Opp.18-19; U.S.Opp.20.  To begin, Appellants concede Bunk could only have standing here if there was a valid assignment of the Government's civil penalty claim.  Rel.Opp.8; U.S.Opp.7.  A necessary element of Bunk's standing, therefore, is showing Article II does not forbid such an assignment.  Because standing is a jurisdictional question that cannot be waived, deciding the Article II issue is also necessary.

The Government claims the Article II issues are waived because "when a party to a civil action fails to raise a point at trial, that party waives review of the issue unless there are exceptional and extraordinary circumstances justifying

19

review."[7] U.S.Opp.20 (quoting *Corti v. Storage Tech. Corp.*, 304 F.3d 336, 343 (4th Cir. 2002)).  But that standard refers only to arguments *for reversal.  Corti,* 304 F.3d at 341 (considering issue as potential ground for reversal).  As Bunk recognizes, a different rule applies to arguments *for affirmance*:  where the appellee raises an alternative ground for affirming the district court, the Court "[is] not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record."  Rel.Opp.19 (quoting *United States v. Smith,* 395 F.3d 516, 519 (4th Cir. 2005)); *see also Yale v. Nat'l Indem. Co.*, 602 F.2d 642, 650 n.18 (4th Cir. 1979) (the Court has the "power (and duty)" to address alternative grounds not raised below if the record is sufficiently developed); *In re Boston Reg'l Med. Ctr., Inc.*,  291 F.3d 111, 125 n.16 (1st Cir. 2002) ("Although with few exceptions we will not reverse a judgment on grounds raised for the first time on appeal, we may affirm on any ground supported by the record."); *Schottel v. Young*, 687 F.3d 370, 374 (8th Cir. 2012) (same). Here, the fact that Bunk's suit would violate Article II presents an independent

---

[7] The Government also argues Gosselin waived the Article II issues by discussing them at insufficient length in its opening brief.  U.S.Opp.22.  The sole case on which the Government relies refused to consider an argument asserted in "a single sentence" because "[t]his conclusory remark [wa]s insufficient to raise [the issue] on appeal."  *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 n.7 (4th Cir. 2006).  Here, Gosselin addressed Article II in multiple pages, clearly and sufficiently apprising the Court and Appellants of its arguments, and Appellants have exercised their opportunity to respond.  Goss.Br.27-29.

ground for affirming the district court's judgment of no civil penalties on the DPM

claim, and the Article II issues are therefore properly before the Court.[8]

## B. Assignments of Purely Sovereign Claims Would Violate The Appointments Clause.

As Gosselin explained in its opening brief, the Supreme Court held in

*Buckley v. Valeo*, 424 U.S. 1, 140 (1976), that "responsibility for conducting civil

litigation in the courts of the United States for vindicating public rights" is a core

Executive function that may be exercised "*only* by persons who are 'Officers of the

United States.'" (Emphasis added). *Buckley* further adopted the position that the

Appointments Clause "provides the only authorization for appointment of those to

whom substantial executive or administrative authority is given by statute." *Id.* at

124-25. The Clause does not "merely deal[] with etiquette or protocol in

describing 'Officers of the United States,'" but, rather, has "substantive meaning."

*Id.* at 125-26. Accordingly, any person or entity "exercising significant authority

pursuant to the laws of the United States is an 'Officer of the United States,' and

must, therefore, be appointed in the manner prescribed by [Art. II] § 2, cl. 2." *Id.*

---

[8] Bunk concedes the Court has the authority to decide the Article II issues, but maintains, relying on *Yale*, that the Court has "discretion" to decline to do so. Rel.Opp.19. But *Yale* recognized courts have the "power (and duty)" to address alternative grounds for affirmance not raised below; it declined to perform that duty only because the record was insufficiently developed. 602 F.2d at 650 n.18. Here, no gap in the record hinders this Court's ability to decide the legal question whether Article II prevents a *qui tam* relator from pursuing purely sovereign claims.

21

As Gosselin's Amicus observed, the Appointments Clause test is a functional one:  Persons exercising significant authority under the laws of the United States, "*because of the authority and responsibilities they possess*, act as 'Officers of the United States.'"  *Weiss v. United States*, 510 U.S. 163, 169 (1994) (emphasis added); *see also United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J., sitting as Circuit Justice) (for Appointments Clause purposes, "he who performs the duties of the office, is an officer."). The Government counters that "even if amicus' functional test were applicable to the Appointments Clause," the FCA does not unconstitutionally "vest the relator with plenary authority to wield the government's prosecutorial power" because "[*q*]*ui tam* cases are civil in character and do not authorize the relator to bring criminal cases based on the fraud committed against the government." U.S.Opp.26.  As *Buckley* made clear, however, the distinction between civil and criminal litigation to vindicate public rights is of no moment.  424 U.S. at 140.

Applying *Buckley*'s straightforward reasoning, and as the Government readily concedes, Bunk clearly is "conducting civil litigation . . . for vindicating public rights."  U.S.Op.14. (conceding FCA civil penalty claims are public rights). Bunk's penalty claims would therefore only be constitutional if he were appointed an officer of the United States consistent with the Appointments Clause.  He was not; therefore Bunk's pursuing civil penalties violated Article II.

The Government argues *Buckley* cannot mean what it says because it then would have overruled *Auffmordt v. Hedden*, 137 U. S. 310, 327 (1890), and *United States v. Germaine*, 99 U. S. 508 (1879). US.Opp.25-26. That is incorrect. In fact, *Buckley* cites both cases for the proposition that Officers are distinguished from employees by their *function*. "Employees are *lesser functionaries* subordinate to officers of the United States[.]" *Buckley*, 424 U.S. at 126 n.162 (emphasis added) (citing *Auffmordt* and *Germaine*). In both cases, "lesser functionaries" were held not to be Officers becase of the insubstantial nature of their duties. *See Auffmordt,* 137 U. S. at 327 (an appraiser of imported goods had "no general functions" and was a mere "expert assistant to aid in ascertaining the value of the goods"); *Germaine*, 99 U.S. at 512 (a surgeon that examined pension applicants was "but an agent of the commissioner . . . to procure information needed to aid in the performance of [the commissioner's] duties"). Underscoring that *Buckley* turns on function, *Morrison* cited this very footnote from *Buckley* to establish that the independent counsel "is an 'officer' of the United States, not an 'employee,'" because the independent counsel is not, in *Buckley's* words, a "lesser functionary." *See Morrison*, 487 U.S. 654, 671 n.12 (1988).[9]

---

[9] Neither Appellants nor TAFEF challenged the Chamber's argument that an FCA relator shares all of the relevant attributes of the independent counsel that *Morrison* deemed an "officer." *See* Chamber Br.26-27.

Bunk also argues that his suit raises no Appointments Clause problem because "*Morrison* [*v. Olson*, 487 U.S. 654 (1988),] recognized that private attorneys may legitimately be appointed to act as *ad hoc* prosecutors, even though they are not themselves Article II 'officers.'" Rel.Opp.27. This misstates the holding in *Morrison*, which held that a special independent prosecutor was an *inferior* rather than a *principal* officer. *Id.* at 671 ("[I]n our view appellant clearly falls on the 'inferior officer' side of th[e] line"). For that reason, the prosecutor could, consistent with the Appointments Clause, be appointed by a "Court[] of Law" without the advice and consent of the Senate. *Id.* at 676-77. *Morrison* did *not* hold that the independent prosecutor, like Bunk here, could have been given authority to enforce the law by statute, with no appointment.

The Government also alleges that "unlike the statute at issue in *Buckley*, the FCA does not afford a specific, individual relator 'primary responsibility'" for prosecuting the claim. U.S.Opp.27. Yet that is exactly what the FCA does absent intervention by the Government.

Finally, the Government asserts that *qui tam* relators should not be subject to the Appointments Clause because they do not have primary responsibility for "prosecuting an entire category of claims." U.S.Opp.27. But that is a distinction without a difference. In each case in which the Government does not intervene, a relator exercises "primary responsibility for conducting civil litigation in the courts

24

of the United States for vindicating public rights." *Buckley*, 424 U.S. at 140. That this "primary responsibility" is case-specific does not make it any less a core Executive function. If Congress allowed relators to bring criminal charges in individual cases, surely the Government would not contend criminal prosecution would cease to be an Executive function.

## C. Assignments of Purely Sovereign Claims Would Violate the Take Care Clause.

For similar reasons, the assignment of a purely sovereign claim would violate the Take Care Clause. Where a private relator seeks only civil penalties, the suit amounts to punishment for a violation of law. The Government notes that "[*q*]*ui tam* suits . . . are civil in character and do not entail delegation of the government's core sovereign function of enforcing the criminal law," U.S.Opp.31, but that distinction is of no moment. The Clause obviously applies to the Executive's civil as well as criminal enforcement powers. *See Buckley*, 424 U.S. at 140 (invalidating statutory provisions giving FEC authority to bring *civil* actions for election law violations based on Take Care and Appointments Clauses); *see also Smith v. Meese*, 821 F.2d 1484, 1492, n.4 (11th Cir. 1987); *Nader v. Saxbe*, 497 F.2d 676, 679, n.19 (D.C. Cir. 1974).

Moreover, without its remedial damages provisions, the FCA operates as a criminal statute, much like the false patent marking statute. *See* 35 U.S.C. § 292(a); *Pequignot v. Solo Cup Co.*, 608 F.3d 1356, 1363 (Fed. Cir. 2010) ("[T]he false

25

marking statute is a criminal one, despite being punishable only with a civil fine."). A *qui tam* relator seeking *only penalties*−the purposes of which are punitive and deterrent, not compensatory−engages in criminal law enforcement, not financial loss-recovery. This presents grave control problems under *Morrison* that were not present in any of the cases where courts rejected Take Care Clause challenges to the FCA.

Indeed, in a typical FCA case involving substantial damages, the interests of the Government and the relator are roughly aligned. The relator seeks to recover the Government's economic loss due to overpayment for false claims, and the relator's motive to maximize recovery serves the Government's interest in remedying its proprietary injury.

Where an FCA relator seeks only penalties, however, the relator's and Government's interests diverge sharply. When the Government seeks penalties for violations of law, it is (or should be) guided primarily by interests of justice, not revenue-maximization. The proper penalty for an FCA violation depends on various law-enforcement considerations, including the defendant's culpability and the egregiousness of the FCA-violative conduct. *See* Goss.Br.30-31. But the private relator is motivated to pursue maximum penalties irrespective of justice.

As discussed, only the *Stauffer* case has analyzed whether a private plaintiff has Article III standing to sue solely for civil penalties. To date, there do not

appear to be *any* Court of Appeals decisions analyzing whether private parties may sue solely for penalties without violating Article II's Take Care or Appointments Clauses. If this Court sanctions such a practice, it will invite the very abuse engendered by the false marking statute that led to its recent amendment−namely, a surge in actions brought by *qui tam* relators motivated not by justice or personalized injury but by the prospect of large financial windfalls.

As the Federal Circuit explained in *Rogers v. Conair Corp.*, Civil Action No. 10-1497, 2012 WL 1443905, at *2-3 (E.D.Pa. Apr. 25, 2012), few people brought false patent marking claims between 1842 (when Congress created that *qui tam* action) and 2009, when the Federal Circuit held in *Forest Group, Inc. v. Bon Tool Co.*, 590 F.3d 1295 (Fed. Cir. 2009), that the $500 statutory fine could be imposed on every item imprinted with the false marking. "Subsequently, courts were flooded with *qui tam* false marking lawsuits, which could now provide a true windfall to *qui tam* plaintiff's [sic] who had suffered no personal or competitive injury. It is evident from the Congressional Record that Congress amended [that statute] in an effort to address the surge of false marking litigation that developed in the wake of *Forest Group*." *Id.*; *see also Rogers v. Tristar Prods., Inc.*, 102 U.S.P.Q.2d 1722, 1724 (Fed. Cir. 2012) (reconsideration denied) (citing 157 Cong. Rec. S1360, S1372 (Mar. 8, 2011) (Statement of Sen. Kyl) (noting that *Forest Group* "created a surge in false marking *qui tam* litigation"); 157 Cong. Rec.

S5319, S5320 (Sept. 6, 2011) (Statement of Sen. Kyl) ("The American Invents Act reins in abuses that are reflected in a recent surge in false marking litigation. It allows such suits to be brought only by those parties who have actually suffered a competitive injury as a result of false marking.")); *United States ex rel. FLFMC v. TFH Publ'ns, Inc.*, 855 F. Supp.2d 300, 305-06 (D.N.J. 2012) (same); *Brooks v. Dunlop Mfg., Inc.*, No. 2012-1164, 2012 WL 6200227 (Fed. Cir. Dec. 13, 2012) ("Commentators expressed similar concern that the *qui tam* action, combined with the statutory penalty, had created a surge of vexatious litigation and posed a risk of grossly disproportionate penalties for false marking."); *Pequignot*, 608 F.3d at 1360 (observing district court's recognition under *prior* patent false marking statute that "public policy concerns" suggested an "uninjured plaintiff should be prevented from pursuing such a lucrative recovery").[10]

As the Tenth Circuit recognized, the FCA tests the limits of constitutionality under the Take Care Clause. *Ridenour v. Kaiser-Hill Co., L.L.C.*, 397 F.3d 925, 934 (10th Cir. 2005). There, to avoid "constitutionally unsteady ground" and considering its obligation to "interpret statutes in a manner that renders them constitutionally valid," the *Ridenour* court interpreted the FCA to permit the

---

[10] The court in *Rogers v. Conair Corp.*, Civil Action No. 10-1497, 2012 WL 1443905, at *5, n.24 (E.D.Pa. Apr. 25, 2012), noted the Government's own representation that "over 900 false patent marking cases [were] filed in district courts" between April 2010 and June 28, 2011.

Government to move to dismiss an action even when it had not intervened. *Id.* at 934-35 (citing *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)). Here it is likewise necessary for this Court to interpret the FCA in a manner that preserves its constitutionality. It must be interpreted not to grant standing to a relator who seeks only penalties. Otherwise, the FCA would run afoul of *Morrison* because far more Executive Branch control is constitutionally necessary than the FCA provides over a private individual engaging in the equivalent of criminal law enforcement.

## <u>CONCLUSION</u>

The jury's DPM verdict should be set aside and Appellants' appeal on the DPM claim should not be reached. If this Court reaches the merits of Appellants' appeal, the district court's judgment of no civil penalties on the DPM claim should be affirmed.

Respectfully submitted,

    /s/   Kerri Ruttenberg

Kerri Ruttenberg
Shay Dvoretzky
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939

Counsel for Defendants-
Appellees/Cross-Appellants

Dated:  December 28, 2012

29

RULE 32 CERTIFICATE OF COMPLIANCE

I certify that this brief complies with FRAP 32(a)(7)(B).  The brief is printed in a 14-point, proportionally spaced font and, based on word processing software, contains 6,909 words.


_____/s/   Kerri Ruttenberg, Attorney___

CERTIFICATE OF SERVICE

I certify that on December 28, 2012, I electronically filed the foregoing Brief for Defendants-Appellees/Cross-Appellants with the Clerk of Court using the Court's Case Management/Electronic Case Filing system, which will serve a copy on counsel of record for the other parties.

_____/s/   Kerri Ruttenberg, Attorney_____